**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | |
|---|---|
| ATLAS GLOBAL TECHNOLOGIES LLC, | |
| Plaintiff, | Civil Action No. 2:21-cv-00430-JRG-RSP |
| v. | JURY TRIAL DEMANDED |
| TP-LINK TECHNOLOGIES CO., LTD., TP-LINK CORPORATION LTD, and TP-LINK INTERNATIONAL LTD., | |
| Defendants. | |

**PLAINTIFF'S OPENING CLAIM CONSTRUCTION BRIEF**

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................... 1

II.     LEGAL PRINCIPLES OF CLAIM CONSTRUCTION ...................................... 1

III.    OVERVIEW OF PATENTED TECHNOLOGY ................................................. 1

IV.     PRIOR LITIGATION ............................................................................................ 2

V.      TERMS FOR CONSTRUCTION ......................................................................... 3

        A.      U.S. Patent No. 9,531,520 .......................................................................... 3

                1.      "the downlink multi-user frame including a plurality of resource units
                        (RUS)" (claim 1) ............................................................................. 3

                2.      "including a respective set of MAC Protocol Data Units (MPDUs) in each
                        RU of the plurality of RUs" (claim 1) / "wherein the first MPDU is located
                        in a first resource unit of the downlink multi-user frame allocated to the
                        first station, wherein the downlink multi-user frame includes a second
                        resource unit that contains a second MPDU that includes
                        acknowledgement information for the second multi-user
                        acknowledgement frame" (claim 9) ................................................ 4

                3.      "network device" (claims 1, 6) ...................................................... 6

        B.      U.S. Patent No. 9,763,259 .......................................................................... 7

                1.      "wherein the NDPA frame indicates information corresponding to the
                        predetermined length" (claim 6) .................................................... 7

        C.      U.S. Patent No. 9,825,738 .......................................................................... 9

                1.      "wherein the second information is a function of a total number of space
                        time streams to be used to transmit the multiple uplink frames" (claim 1) /
                        "wherein the second information is a function of a total number of space
                        time streams to be used to perform the simultaneous transmission of the
                        uplink frame and the one or more uplink frames from the one or more
                        other stations" (claim 9) ................................................................ 9

                2.      "uplink setup information" (claims 1, 7, 9, 15) ......................... 11

                3.      "wherein the acknowledgement frame includes acknowledgement
                        information for one or more of the plurality of stations" (claims 6, 14) .. 13

        D.      U.S. Patent No. 9,912,513 ........................................................................ 14

                1.      "wherein at least a portion of the payload of the uplink frame is associated
                        with the first guard interval length" (claim 1) /"wherein at least a portion
                        of the payload of the uplink frame is associated with the first CP length"
                        (claim 9) / "wherein some or all of the legacy header uses a second CP
                        length" (claim 10) / "wherein at least a portion of the respective non-
                        legacy header is associated with the first guard interval" (claim 16) ....... 14

i

2.        "based on the resources for the UL MU transmission" (claim 15)........... 19

E.      U.S. Patent No. 9,917,679................................................................................... 22

        1.        "single-user (SU) format" / "SU format" / "multiple-user (MU) format" / "MU format" (claims 1, 6)......................................................................... 22

F.      U.S. Patent No. 10,020,919................................................................................. 24

        1.        "in response to determining that the number of the one or more station information fields in the NDPA is one" (claims 1) / "when a number of the one or more station information fields in the NDPA is one" (claim 11) / "when the number of the one or more station information fields in the NDPA is greater than one" (claims 2, 8, 12, 19) ...................................... 24

        2.        "cardinality" (claims 1-9, 11-19) ................................................................ 27

        3.        "wherein the number of the one or more station information fields in the NDPA is the cardinality of the one or more station information fields in the NDPA" (claims 1, 11)......................................................................... 27

G.      U.S. Patent No. 10,756,851................................................................................. 28

        1.        "scheduling extension" (claims 1, 2, 7, 8) ................................................. 28

VI.     CONCLUSION.......................................................................................................... 30

## TABLE OF AUTHORITIES

**Cases**

*Alexsam, Inc. v. Cigna Corp.*,
2021 WL 1561606 (E.D. Tex. Apr. 20, 2021).......................................................................... 3

*Cias, Inc. v. All. Gaming Corp.*,
504 F.3d 1356 (Fed. Cir. 2007) ............................................................................................ 26

*ClearOne, Inc. v. Shure Acquisition Holdings, Inc.*,
35 F.4th 1345 (Fed. Cir. 2022) ............................................................................................ 19

*Cox Commc'ns, Inc. v. Sprint Commc'n Co. LP*,
838 F.3d 1224 (Fed. Cir. 2016) .............................................................................................. 7

*DeGeorge v. Bernier*,
768 F.2d 1318 (Fed. Cir. 1985) ............................................................................................ 21

*Finisar Corp. v. DirecTV Grp., Inc.*,
523 F.3d 1323 (Fed. Cir. 2008) .............................................................................................. 2

*Hytera Communs. Co. v. Motorola Sols., Inc.*,
841 F. App'x 210 (Fed. Cir. 2021)........................................................................................ 26

*Intel Corp. v. VIA Techs.*,
319 F.3d 1357 (Fed. Cir. 2003) .............................................................................................. 4

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
358 F.3d 898 (Fed. Cir. 2004) ......................................................................................... 6, 13

*Markman v. Westview Instruments, Inc.*,
517 U.S. 370 (1996).............................................................................................................. 2

*Nautilus, Inc. v. Biosig Instr., Inc.*,
572 U.S. 898 (2014)............................................................................................................... 1

*Niazi Licensing Corp. v. St. Jude Med. S.C., Inc.*,
30 F.4th 1339 (Fed. Cir. 2022) ............................................................................................ 18

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) ................................................................................ 1, 6, 13, 26

*Sandisk Corp. v. Memorex Prods.*,
415 F.3d 1278 (Fed. Cir. 2005) .............................................................................................. 4

*Thorner v. Sony Comput. Entm't Am. LLC*,
669 F.3d 1362 (Fed. Cir. 2012) ............................................................................................ 26

*TQP Dev., LLC v. Intuit Inc.*,
   2014 WL 2810016 (E.D. Tex. June 20, 2014)............................................................................. 2

*Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*,
   200 F.3d 795 (Fed. Cir. 1999) ...................................................................................................... 8

## I.     INTRODUCTION

Atlas's constructions are supported by both intrinsic and extrinsic evidence, and are consistent with the canons of claim construction. TP-Link's constructions, conversely, attempt to avoid liability by (1) reading limitations from the specifications into the claims or (2) relying on attorney argument and a conclusory expert declaration to inject confusion into facially clear claim language in a shot at indefiniteness. The Court should adopt Atlas's constructions and reject TP-Link's overly restrictive interpretations and indefiniteness arguments.

## II.     LEGAL PRINCIPLES OF CLAIM CONSTRUCTION

Claim terms are construed according to their plain and ordinary meaning—that is, the "meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention" after having read the intrinsic record. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (en banc). A claim term is indefinite only if, when "read in light of the specification" and "prosecution history," it "fail[s] to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014). The "inherent limitations of language" make some "modicum of uncertainty" the "price of ensuring the appropriate incentives for innovation." *Id.* at 909.

## III.     OVERVIEW OF PATENTED TECHNOLOGY

This lawsuit involves eight patents covering various aspects of Wi-Fi 6, the current and most advanced version of Wi-Fi based on the IEEE 802.11ax standard. TP-Link makes, uses, and sells infringing Wi-Fi 6 devices. To promote its devices, TP-Link advertises that Wi-Fi 6 "is designed to improve speed, increase efficiency and reduce congestion in heavy bandwidth usage scenarios." PX 8 (TP-Link WiFi 6) at ATLAS-TPL-00000010. In fact, TP-Link touts that Wi-Fi 6 gives its products "explosively fast WiFi" and "4x More Capacity for More Devices." *Id.*

1

The Asserted Patents enable numerous features of Wi-Fi 6, including OFDMA and MU-MIMO (*e.g.*, the '520, '679, and '851), multi-user triggering frames and/or acknowledgement frames (*e.g.*, the '738, '513, '919), and channel sounding, estimation, and feedback in multi-user communication (*e.g.,* the '259, '919), and interleaving in multi-user systems (*e.g.*, the '187). These features support key new functionality in Wi-Fi 6, such as simultaneous uplink transmission by multiple users, simultaneous multi-user acknowledgements in response to multi-user transmissions, the ability for adjacent Wi-Fi networks to operate when interference levels are sufficiently low, the ability to timely estimate channel conditions in multi-user environments, and the ability to optimize frequency diversity in multi-user settings. The Asserted Patents enable significantly higher network throughput, lower latency, lower power operation, and increase the efficiency of Wi-Fi networks—including in the most demanding high-density usage scenarios.

## IV.    **PRIOR LITIGATION**

Of the fourteen disputed terms in this *TP-Link* case, the Western District of Texas previously construed thirteen of them (in Atlas's favor) in *Atlas v. Sercomm.*, No. 6:21-CV-00818-ADA and *Atlas v. ASUS*, No. 6:21-CV-00820-ADA (the "*Sercomm* and *ASUS* Cases"). PX 9 (*Sercomm/ASUS* CC Order).

"[P]revious claim constructions in cases involving the same patent are entitled to substantial weight, and the Court has determined that it will not depart from those constructions absent a strong reason for doing so." *TQP Dev., LLC v. Intuit Inc.*, No. 2:12-cv-180, 2014 WL 2810016, at *6 (E.D. Tex. June 20, 2014); *see also Finisar Corp. v. DirecTV Grp., Inc.*, 523 F.3d 1323, 1329 (Fed. Cir. 2008) (noting "the importance of uniformity in the treatment of a given patent") (quoting *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 390 (1996)); *Alexsam, Inc. v. Cigna Corp.*, No. 2:20-cv-00081-JRG-RSP, 2021 WL 1561606, at *2 (E.D. Tex. Apr. 20,

2

2021) ("[C]onsideration of prior claim construction orders is customary and appropriate.").

## V.   **TERMS FOR CONSTRUCTION**

### A.   **U.S. Patent No. 9,531,520**

#### 1.   **"the downlink multi-user frame including a plurality of resource units (RUS)" (claim 1)**

| Atlas's Construction | TP-Link's Construction |
|---|---|
| Plain and ordinary meaning<br><br>Alternatively, "the downlink multi-user frame including a plurality of particular units of spatial streams and/or subchannels of a wireless channel" | **Indefinite** |

TP-Link's expert Dr. Roy does not dispute the term "resource units (RUs)" has a plain and ordinary meaning. PX 10 (Roy *TP-Link* Dec.) at ¶30. Instead, Dr. Roy's indefiniteness argument is premised on a strange and narrow interpretation of the word "including." Based on this narrow interpretation, he argues the downlink multi-user frame cannot ***include*** resource units because "the specification requires the RUs to be resources ***on which*** a DL MU frame is transmitted." *Id.* at ¶31 (emphasis added). As a result, Dr. Roy argues "the claims are contrary to the specification" and therefore indefinite. *Id.* The Western District of Texas rejected the same indefiniteness argument and gave a "plain and ordinary" construction. PX 9 (*Sercomm/ASUS* CC Order) at 2.

Dr. Roy's argument does not make sense and he has gone out of his way to misunderstand the '520 Patent. In ordinary English there is no contradiction between the words "include" and "upon." A house ***includes*** its foundation and is built ***upon*** its foundation. A book ***includes*** its pages and is printed ***upon*** its pages. Similarly, claim 1 of the '520 Patent recites a DL MU frame structure that ***includes*** the resource units it is transmitted ***upon***. PX 1 ('520) at 30:52-53.

The '520 specification uses the term "include" interchangeably with adjectives like "upon" to describe the relationship between the downlink frame and its resource units. *See* PX 1 ('520) at,

*e.g.*, 2:49-50 ("the downlink multi-user frame *includes* a second resource unit"), 14:12-14 ("The resource units may be particular spatial streams or sub-channels of a wireless channel *upon* which the DL MU frame will be transmitted.") (emphases added). Additionally, the '520 Patent specification confirms that "including" is intended to have its broad ordinary meaning, similar to the open transition phrase "comprising." *Id.* at 29:13-16 ("To the extent that the term *include*, have, or the like is used, such term is intended to be *inclusive in a manner similar to the term comprise* as comprise is interpreted when employed as a transitional word in a claim."). This meaning is also consistent with Federal Circuit law. *Sandisk Corp. v. Memorex Prods.*, 415 F.3d 1278, 1284 (Fed. Cir. 2005) ("As a patent law term of art, 'includes' means 'comprising.'").

Dr. Roy's opinions are incorrect because they are premised on interpreting the word "including" in an unduly narrow way that is inconsistent with the specification and the canons of claim construction. A POSITA understands the claimed downlink multi-user frame "includes" or "comprises" resource units. Shoemake Dec. at ¶¶31-44. The downlink multi-user frame can also be described as being transmitted "upon" resource units. *Id.* There is nothing contradictory or unclear about the words "include" and "upon" as used in this context. *Id.* Dr. Roy has certainly not shown otherwise by clear and convincing evidence. *See Intel Corp. v. VIA Techs.*, 319 F.3d 1357, 1366 (Fed. Cir. 2003) ("Any fact critical to a holding on indefiniteness [] must be proven by the challenger by clear and convincing evidence.")

    **2. "including a respective set of MAC Protocol Data Units (MPDUs) in each RU of the plurality of RUs" (claim 1) / "wherein the first MPDU is located in a first resource unit of the downlink multi-user frame allocated to the first station, wherein the downlink multi-user frame includes a second resource unit that contains a second MPDU that includes acknowledgement information for the second multi-user acknowledgement frame" (claim 9)**

| Atlas's Construction | TP-Link's Construction |
|---|---|
| Plain and ordinary meaning | **Indefinite** |

Dr. Roy says his indefiniteness argument for this term is "similar" to the preceding term. PX 10 (Roy *TP-Link* Dec.) at ¶33. His argument fails for the same reasons discussed above. Like the preceding term, the Western District of Texas rejected the same indefiniteness argument and gave this term its plain and ordinary meaning. PX 9 (*Sercomm/ASUS* CC Order) at 2.

Dr. Roy attempts to create confusion about the meaning of phrases such as "MAC Protocol Data Units (MPDUs) *in* each RU of the plurality of RUs." He argues this language is indefinite because MPDUs are "data units," but RUs are part of "a transmission medium" and therefore an MPDU cannot be "in" the RU it is transmitted upon. PX 10 (Roy *TP-Link* Dec.) at ¶37 ("MPDUs may be transmitted as part of a frame which *uses* RUs … but they may not be … 'located in' RUs as the claims require").

Again, Dr. Roy applies unusually narrow definitions of common English words like "in." There is no contradiction between the words "in" and "upon." A package can be simultaneously *in* a delivery truck and *upon* a delivery truck. A boat can be simultaneously *in* the water and *upon* the water. Similarly, the '520 specification uses words like "in" and "upon" interchangeably to describe the relationship between MPDUs and resource units (and the "upon" embodiment is described using optional language):

> Each MPDU may include data and/or control frames intended for each respective STA and may be placed *in* resource units *within* the DL MU frame assigned/allocated to each respective STA. The resource units *may be* particular spatial streams or sub-channels of a wireless channel *upon* which the DL MU frame will be transmitted.

PX 1 ('520) at 14:9-14 (emphasis added); *see also id.* at 18:1-8. A POSITA understands that an MPDU can be placed *in* the resource unit(s) it is transmitted *upon*. Shoemake Dec. at ¶¶45-52. Dr. Roy has not shown by clear and convincing evidence that these terms are indefinite.

### 3. "network device" (claims 1, 6)

| Atlas's Construction | TP-Link's Construction |
|---|---|
| Plain and ordinary meaning | "an **access point** that may communicate with STAs over a network" |

TP-Link seeks to narrowly limit a "network device" to an "access point," which is just one of many types of network device. In doing so, TP-Link effectively asks this Court to re-litigate the same construction issues that were rejected by the Western District of Texas. PX 9 (*Sercomm/ASUS* CC Order) at 3. This Court should decline and adopt the prior court's plain meaning construction for at least three reasons.

First, the specification illustrates and repeatedly states that a "wireless communication device," which a POSITA understands to be a type of "network device," includes ***non***-access point stations. *See*, *e.g.*, PX 1 ('520) at Fig. 2 (illustrating "wireless communication devices 212-215" as a phone, laptop, computer, and PDA), 6:24-32 ("wireless communication devices (e.g., devices 212-215) may be non-AP STAs"), 6:38-46 ("A non-AP STA … may be, for example, a device with wireless communication capability"). The specification further recognizes there is often functionality overlap between access points and non-access point stations. *Id.* at 6:45-46 ("In one or more aspects, a non-AP STA may act as an AP"), 6:54-56 ("two or more non-AP STAs 212-215, … can communicate directly with each other (without using the AP 211)"), 6:60-61 ("In one or more aspects, a STA may act as an AP."). TP-Link's construction therefore impermissibly limits the claims to a preferred embodiment. *Phillips*, 415 F.3d at 1320.

Second, the term "access point" never appears in Claims 1 or 6—even though it appears in other independent claims. *Compare* PX 1 ('520) at 30:46-31:12 (claim 1), 31:34-41 (claim 6) *with id.* at 32:53-33:7 (claim 18). Nor is there any disclaimer that limits the claims to an access point. Thus, it would be erroneous to restrict the claimed "network device" to an access point. *See Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 908 (Fed. Cir. 2004).

6

Third, plain and ordinary meaning will not impermissibly expand the claim scope. For method claims, "the point of novelty resides with the steps of these methods, not with the machine that performs them." *Cox Commc'ns, Inc. v. Sprint Commc'n Co. LP*, 838 F.3d 1224, 1229 (Fed. Cir. 2016). If "network device" was replaced with "computer" or "station," two specification examples of non-AP devices, "the same steps would have to be performed." *See id.* at 1230. This "plain language of the claims proves" that any scope concerns are unfounded. *See id.* at 1229.

### B. U.S. Patent No. 9,763,259

#### 1. "wherein the NDPA frame indicates information corresponding to the predetermined length" (claim 6)

| Atlas's Construction | TP-Link's Construction |
|---|---|
| Plain and ordinary meaning | **Indefinite** |

This phrase from '259 Claim 6 is understood by one of skill and needs no construction. It uses commonly-understood words like "indicates" and "corresponding" that are not indefinite.

The '259 claims show this phrase is not indefinite. Dependent claim 6 implicates two frames: (1) a Null Data Packet Announcement ("NDPA") frame and (2) a responsive feedback frame (a/k/a, the compressed beamforming or "CB" frame). PX 2 ('259) at 22:36-37, 40-45. And "the NDPA frame indicates information corresponding to the predetermined length" of the data to be transmitted by the "feedback frame." *Id.* at 23:5-7. Annotated Figure 20 illustrates this:



The '259 specification explains there are numerous ways to "indicate" the predetermined length of the CB feedback frame. PX 2 ('259) at 15:38-65. "For example, a data field of the NDPA frame … *may include information on the maximum CB length*." *Id.* at 15:44-47 (emphasis added). Thus, the specification provides that the NDPA frame need not explicitly state the precise length of the subsequent CB feedback frame, but rather may "include information on the maximum CB length." *Id.* This is entirely consistent with the disputed claim language: "wherein the NDPA frame *indicates* information corresponding to the predetermined length." From this disclosure, persons of skill understand the claim phrase with reasonable certainty. Shoemake Dec. at ¶¶53-64.

The extrinsic evidence also confirms Atlas's plain and ordinary meaning construction. Dictionaries define "indicate" as "imply," *e.g.*, PX 11 (Random House) at ATLAS-00033238, and "to show indirectly," *e.g.*, PX 12 (Merriam-Webster) at ATLAS-00033243; and "corresponding" as "similar in character, form, or function," *e.g.*, PX 13 (New Oxford American) at ATLAS-00033164. Indeed, the Federal Circuit has consistently applied a plain and ordinary meaning to these words (thereby implicitly rejecting indefiniteness). *See Respironics, Inc. v. Invacare Corp.*, 303 F. App'x 865, 880–81 (Fed. Cir. 2008) (construing "correspond to" under "plain and ordinary meaning"); *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 806 (Fed. Cir. 1999) (affirming an "ordinary meaning" construction of the term "correspond to").

Finally, in the *ASUS* and *Sercomm* cases, Dr. Roy asserted an indefiniteness argument that is identical to what he asserts here. *Compare* PX 14 (Roy *Sercomm/ASUS* Dec.) at ¶¶38-42 *with* PX 10 (Roy *TP-Link* Dec.) at ¶¶38-42. The Western District of Texas rejected Dr. Roy's position by finding the phrase sufficiently definite and gave it a "plain and ordinary meaning" construction. PX 9 (*Sercomm/ASUS* CC Order) at 3.

8

### C.    U.S. Patent No. 9,825,738

**1.    "wherein the second information is a function of a total number of space time streams to be used to transmit the multiple uplink frames" (claim 1) / "wherein the second information is a function of a total number of space time streams to be used to perform the simultaneous transmission of the uplink frame and the one or more uplink frames from the one or more other stations" (claim 9)**

| Atlas's Construction | TP-Link's Construction |
|---|---|
| Plain and ordinary meaning<br><br>Alternatively, "wherein the second information in the common information portion is a value that is related to the total number of space time streams to be used to transmit the multiple uplink frames (claim 1) / "wherein the second information in the common information portion is a value that depends on the total number of space time streams to be used to simultaneously transmit the multiple uplink frames" (claim 9) | **Indefinite** |

The '738 Claims provide reasonable certainty regarding their scope. A POSITA understands that "a function" simply indicates that one quantity is determined based on one or more other quantities. Shoemake Dec. at ¶¶66-72; PX 15 (IEEE Dict.) at ATLAS-00033199. The notation $u = f(x)$ commonly is used to indicate that variable $u$ is "a function of" variable $x$. The variable $x$ is an independent variable, and $u$ is the dependent variable determined "as a function of" $x$.[1] *Id.* For each value of the independent variable(s), there exists a corresponding value of the dependent variable. *See id.*; PX 16 (Modern Dict. of Electronics) at ATLAS-00033189. Relative to the '738 claims, the independent variable comprises the total number of space time streams, while the dependent variable represents the second information included as part of the common information portion of the uplink setup information. A POSITA can identify with reasonable certainty whether the common information portion includes information that varies depending on

---

[1] It also is possible for a value $u$ to be dependent on multiple variables, for example $u = f(x, y)$.

9

the total number of space time streams used in the multi-user uplink transmission. Shoemake Dec. at ¶¶73-78.

The '738 specification explains "the common information is information … commonly used for the UL MU-MIMO transmission by the station STA and STA2, and *includes the total number of data streams, i.e., space-time streams* to be transmitted by the stations STA1 and STA2." PX 3 ('738) at 22:39-43 (emphasis added). Thus, the "total number of space-time streams" refers to the combined total of space-time streams to be transmitted by the plurality of stations responding to the uplink setup information. Shoemake Dec. at ¶79-80. Further, the specification identifies an exemplary functional relationship, noting that the number of high efficiency long training fields (HEW-LTF) *may be determined in accordance with* (*i.e.*, is a function of) the number of space time streams:

> For the MIMO channel estimation, **the number of HEW long training fields** (HEW-LTFs) **may be determined in accordance** with the number of antennas to be used for transmission, i.e., **the number of space-time streams**. For example, **when the numbers of space-time streams are 1, 2, 3, 4, 5, 6, 7, and 8, the numbers of long training fields may be determined as 1, 2, 4, 4, 6, 6, 8, and 8, respectively**.

PX 3 ('738) at 22:22-29 (emphasis added). This correspondence may be written in tabular form:

| # Space Time Streams ($x$) | # Long Training Fields ($u$) |
|:---:|:---:|
| 1 | 1 |
| 2 | 2 |
| 3 | 4 |
| 4 | 4 |
| 5 | 6 |
| 6 | 6 |
| 7 | 8 |
| 8 | 8 |

Consistent with the meaning of "function," for each value of the independent variable $x$ (the # of space time streams), there is a corresponding value(s) representing the dependent variable $u$ (the # of HEW-LTF) used for MU-MIMO. Shoemake Dec. at ¶¶80-82.

The Provisional Application No. 61/975,622, incorporated into the '738 Patent, describes

10

a similar concept, noting the UL setup information common information portion "includes the total number of data streams transmitted by all STAs," which "allow[s] the STA to know the number of LTFs to be included in a UL data frame." PX 17 ('738 Provisional) at ATLAS-00013794; *see also id.* at ATLAS-00013796 (common information identifies "total number of data streams of all STAs joining in the UL"). For all the foregoing reasons, this limitation is not indefinite. The Western District of Texas agrees. PX 9 (*Sercomm/ASUS* CC Order) at 4.

### 2. "uplink setup information" (claims 1, 7, 9, 15)

| Atlas's Construction | TP-Link's Construction |
|---|---|
| Plain and ordinary meaning | "information on the **transmission characteristics** to be used for a **subsequent uplink transmission**" |

The '738 Patent claims provide sufficient detail regarding the uplink setup information and thus no further construction is necessary. *See* PX 9 (*Sercomm/ASUS* CC Order) at 4. The relevant portion of Claim 9 provides:

> 9. A method of operating a station in a wireless communication network, the method comprising:
>
> *****
>
> *uplink setup information including a first information to be used for uplink multi-user transmission by the station*, and
>
> *****
>
> transmitting an uplink frame to the access point, *the uplink frame being simultaneously transmitted with one or more uplink frames from one or more other stations of the plurality of stations, the uplink frame being generated based on the uplink setup information*; and
>
> *****
>
> wherein *the uplink setup information includes a common information portion and a dedicated information portion*, *the common information portion includes a second information* being common to all of the plurality of stations to receive the uplink setup frame, *the dedicated information portion includes respective third information* specific to each of the plurality stations to receive the uplink setup information ….

11

PX 3 ('738) at 25:35-26:19 (emphasis added). Claim 9 therefore requires that uplink setup information: (i) provides information to be used for uplink multi-user transmissions sent simultaneously by a plurality of stations; (ii) includes a common portion; and (iii) includes a dedicated portion, as highlighted above. *Id.* at 25:40-42, 25:44-26:2, 26:7-9 (Claim 9); *see also* 24:57-59, 24:63-64, 25:1-3 (Claim 1). The specification disclosure is consistent. *See id.* at 17:9-17, 20:48-52, 20:63-21:3, 22:31-44.

There are at least three fundamental issues raised by TP-Link's proposal. First, it focuses only on the claimed "first information" of the uplink setup information but ignores the "common information" and "dedicated information" portions also recited in the Claims. *See* PX 3 ('738) at 26:7-14; 25:1-8. By focusing exclusively on one claimed requirement while ignoring others, TP-Link invites jury confusion.

Second, TP-Link's construction repeats a requirement recited in the independent '738 claims, but with a material narrowing modification that may be require further interpretation. The claims require that the uplink setup information includes "information to be used for uplink multi-user transmission," but TP-Link limits that information to only "transmission characteristics" without any justification. The '738 specification indicates the uplink setup information also provides an important ***initiation*** function enabling the plurality of stations to ***simultaneously*** perform ***multi-user*** uplink transmissions. *See* PX 3 ('738) at 4:65-5:3 (AP "indicat[es] an initiation of uplink multi-user transmission"), 5:47-49 ("indicating an initiation of uplink multi-user transmission"), 20:48-52 (AP transmits initiation frame to stations to perform UL MU-MIMO). Because the preferred embodiment identifies uplink setup information as performing this initiation function to coordinate simultaneous multi-user uplink transmissions, it is improper to limit its interpretation to only "transmission characteristics."

Third, TP-Link's construction fails to correlate uplink setup information to the "multi-user" transmissions by the plural stations, as claimed. PX 3 ('738) at 24:57-59; 25:40-42. TP-Link broadens this requirement to simply a "subsequent uplink transmission," which is contrary to the claim language. TP-Link provides no justification for this critical modification.

### 3. "wherein the acknowledgement frame includes acknowledgement information for one or more of the plurality of stations" (claims 6, 14)

| Atlas's Construction | TP-Link's Construction |
|---|---|
| Plain and ordinary meaning | "wherein the acknowledgement frame includes **an information per TID subfield, a block ACK starting sequence control field, and a block ACK bitmap subfield** for one or more of the plurality of stations" |

TP-Link's construction replaces the words "acknowledgment information" with a lengthy and specific implementation from just one of many embodiments. In doing so, TP-Link commits two cardinal sins of patent law: (1) reading a limitation from one embodiment into the claims, while at the same time (2) excluding other preferred embodiments. *See Phillips*, 415 F.3d at 1320; *Liebel-Flarsheim*, 358 F.3d at 913.

TP-Link offers a limited construction. But the '738 specification teaches several embodiments. In one embodiment illustrated by FIG. 7, the acknowledgment information includes a "(per TID Info) subfield," a "block ACK starting sequence control field," and a "block ACK bitmap subfield"—just as per TP-Link's narrow construction. *See* PX 3 ('738) at 11:34-40. In other embodiments, the acknowledgement information includes different fields. When referencing FIG. 9, the specification states that the ACK frame includes "a multi-TID ACK frame and uses a normal ACK and not the block ACK." *See id.* at 12:40-45. The specification indicates the FIG. 9 embodiment may use a format "excluding block ACK starting sequence subfield and a block ACK bitmap subfield," contrary to TP-Link's construction that always requires those fields. *See id.* at 12:59-67. And when describing FIG. 17, the specification teaches that "a block ACK starting

13

sequence control subfield and a block ACK bitmap subfield" are "not included" as part of the "ACK information" which contradicts TP-Link's construction. *See id.* at 18:20-23.

Furthermore, the '738 specification includes embodiments that do not require a per TID subfield for a multi-user acknowledgement transmission from an AP. *See* PX 3 ('738) at 4:65-5:28, 5:42-53, 5:54-62, 21:4-8, Figures 22-27. When discussing an embodiment, the specification states that "[t]he ACK frame may include information for identifying each station and a block ACK bitmap," and "[t]he ACK frame may further include block ACK starting sequence control information for each station" without mention of a TID subfield at all. *Id.* at 4:65-5:28. The embodiment only requires "an ACK frame indicating whether the plurality of data frames have been successfully received" with no further constraint. *Id*. It then adds other information that "may" be included in the ACK frame, which means those features are optional. *Id.*

No POSITA would understand "acknowledgment information" as narrowly as TP-Link. *See* PX 9 (*Sercomm/ASUS* CC Order) at 5.  An "acknowledgment" can be defined as "a signal that is used to reply to a message or signal originator that its message or signal was received." PX 18 (IEEE Dict.) at ATLAS-00033117. And "information" is "the meaning assigned to data by known conventions." PX 19 (IEEE Dict.) at ATLAS-00033327.

### D.    U.S. Patent No. 9,912,513

1. **"wherein at least a portion of the payload of the uplink frame is associated with the first guard interval length" (claim 1) /"wherein at least a portion of the payload of the uplink frame is associated with the first CP length" (claim 9) / "wherein some or all of the legacy header uses a second CP length" (claim 10) / "wherein at least a portion of the respective non-legacy header is associated with the first guard interval" (claim 16)**

| Atlas's Construction | TP-Link's Construction |
|---|---|
| Plain and ordinary meaning.<br><br>Alternatively, "wherein some or all of the payload of the uplink frame uses the first guard interval length" (claim 1) / | **Indefinite** |

14

| | |
|---|---|
| "wherein some or all of the payload of the uplink frame uses the first CP length" (claim 9) /<br><br>"wherein some or all of the legacy header uses a second CP length" (claim 10) /<br><br>"wherein some or all of the respective non-legacy header uses the first guard interval" (claim 16) | |

These claim phrases use simple words—"at least a portion" and "associated with"—according to their well-understood meaning. Because the claims are not indefinite, the Court can resolve the Parties' dispute with just a "plain and ordinary meaning" construction. Indeed, the Western District of Texas did just that when construing these same terms. PX 9 (*Sercomm/ASUS CC Order*) at 7. But if the Court is inclined to formally construe these terms, Atlas's alternative constructions capture the plain and ordinary meaning.

a. *The intrinsic and extrinsic evidence confirms these terms are readily understood as per their plain and ordinary meanings.*

The '513 Patent has three independent claims that recite similar concepts, albeit from different perspectives; claims 1 and 9 cover a station, while claim 15 covers an access point. Independent claim 1 is representative:

1. An apparatus for facilitating wireless communication, the apparatus comprising:

one or more memories; and

one or more processors coupled to the one or more memories, the one or more processors configured to cause:

receiving, in a ***trigger frame*** transmitted by an access point, ***an indication of a first guard interval length***, wherein the trigger frame allocates one or more resources for an uplink (UL) multi-user (MU) transmission and solicits the UL MU transmission, wherein ***a value of the first guard interval length is <u>to be used</u> by each of a plurality of stations***, including the apparatus, associated with the UL MU transmission,

**DL Frame**

generating an ***uplink frame*** for the UL MU transmission solicited by the trigger frame, wherein ***the uplink frame comprises a payload and a physical layer (PHY) header***, and

transmitting the uplink frame using a resource allocated by the trigger frame to the apparatus,

**UL Frame**

15

> *wherein at least a portion of the payload of the uplink frame is associated with the first guard interval length*.

PX 4 ('513) at 21:21-44 (emphasis added); *cf. id.* at 22:10-27 (claim 9), 22:50-67 (claim 15).

The '513 independent claims generally recite two transmissions: (1) a downlink "trigger frame" sent by an access point to a plurality of stations that, among other things, indicates the guard interval length[2] "to be used" by those stations for a responsive uplink frame; and (2) an "uplink frame" with a header and a payload that is sent by those responding stations, which uses the guard interval length indicated by the downlink trigger frame—"at least [for] a portion of the payload of the uplink frame." *Id.* Thus, the '513 independent claims[3] require that "at least a portion of the payload of the uplink frame" (*i.e.*, some or all of uplink frame's payload) will "use[]" and therefore be "associated with the first guard interval length." *Id.*

The '513 specification—and Fig. 8 in particular—also confirms the plain and ordinary meaning of the claims. Like the claims, Fig. 8 shows two transmissions: (1) downlink frame 810; and (2) uplink frames 830/850, each of which includes a header 840/860 and a payload 842/862. PX 4 ('513) at Fig. 8 (annotations added), 16:65-67, 17:23-28, 17; *see also* 8:65-9:2. Importantly, "[t]he downlink frame 810 may also include information on a guard interval duration GI3 ***to be utilized*** by the participating stations." *Id.* at 17:17-20 (emphasis added). The stations "decode the downlink frame 810" and "identify the guard interval duration GI3 ***to be utilized*** in the [payloads]

---

[2] The '513 Patent also refers to a "guard interval length" as a "cyclic prefix length." PX 4 ('513) at 10:55-57 ("In one or more implementations, a guard interval is a cyclic prefix (CP), and a guard interval duration is a CP length."); *also compare* '513 claim 1 (using "guard interval") *with* '513 claim 9 (using "cyclic prefix").

[3] Dependent claims 10 and 16 recite similar concepts, but address the guard interval length used by a portion of the legacy or non-legacy "header" (rather than the "payload") of the uplink frame. PX 4 ('513) at 22:28-31 (claim 10), 23:1-5 (claim 16). Those dependent claims similarly show that some or all of the specified header uses a particular guard interval length, as per the plain and ordinary meaning and Atlas's constructions. *Id.*

16

842 and 862 of the respective uplink frames 830 and 850." *Id.* at 17:23-31 (emphasis added). Then, those stations "***use*** the guard interval duration GI3 indicated by the downlink frame 810 for UL OFDMA transmission for" a portion of payload 842/862—***namely, that portion marked "GI3" and highlighted yellow in the figure above****. Id.* at 17:34-37 (emphasis added).



So the '513 specification also shows that some or all of the uplink frame's payload 842/862 uses[4] the guard interval length "GI3" indicated by the downlink frame.

Lastly, the extrinsic evidence confirms that the claims use these words consistent with their plain and ordinary meanings. For example, standard dictionaries define a "portion" as a "part of share of something." PX 20 (Merriam Webster's) at ATLAS-00033263. And "associate" means "to bring together or into relationship in any of various intangible ways." PX 21 (Merriam Webster's) at ATLAS-00033122. So even laypersons recognize that when "at least a portion" of

---

[4] In addition to teaching that a portion of an uplink frame "*uses*" the guard interval indicated by a prior downlink frame, the specification also consistently teaches: (1) "a cyclic prefix for a portion of each respective uplink frame may have a cyclic prefix length *corresponding to* the information included in the downlink frame" PX 4 ('513) at Abstract (emphasis added); (2) "a guard interval duration associated with the second part of the second frame may be *based on* information (e.g., a value) contained in the first frame that is indicative of the guard interval duration" *id.* at 3:62-67 (emphasis added). To the extent the Court provides explicit constructions of these terms that do not include "use," Atlas invites the Court to consider these alternatives.

thing A "is associated with" thing B, that means some or all of thing A has a relationship with or connection to (*e.g.*, it uses) thing B.

b. *These terms are not indefinite.*

TP-Link's expert mistakenly argues these terms are indefinite because they "contain[] two ambiguous claim phrases—'at least a portion of' and 'associated with—'" and a POSITA does not know "what the relevant 'portion' of the uplink frame might be" or "how and to what extent any guard interval might be associated with the uplink frames." PX 22 (Roy *Sercomm/ASUS* Supp. Dec.) at ¶¶8, 11-12; Dkt. 85-2 (P.R. 4-3) at 14 (incorporating Dr. Roy's prior declaration). As shown above and as demonstrated by Atlas's expert, Dr. Shoemake, a person of skill understands these terms with reasonable certainty. Shoemake Dec. at ¶¶84-94. For example, Dr. Shoemake explains that "if *any* part (including every part) of the UL frame's payload *uses* the guard interval length indicated by the preceding DL trigger frame, then 'at least a portion of the payload of the uplink frame is associated with the first guard interval length,'" as per '513 claim 1. *Id.* at ¶93.

Presumably, TP-Link will argue that "portion" and "associated with" are terms of degree and the '513 Patent provides no standard for measuring their bounds. But these terms are nothing like the purely subjective terms of degree that the Federal Circuit has invalidated, and the '513 Patent provides a standard for measuring their bounds. *See*, *e.g.*, *Niazi Licensing Corp. v. St. Jude Med. S.C., Inc.*, 30 F.4th 1339, 1349-50 (Fed. Cir. 2022) (claims not indefinite because "[t]he intrinsic record provides objective boundaries by which a skilled artisan could determine the scope of the claims."). For example, the '513 claims do not recite just any "portion." Rather, '513 claims 1 and 9 specify "at least a portion *of the payload of the uplink frame*." PX 4 ('513) at 21:42-43, 22:26-27 (emphasis added). From this context, a POSITA knows the boundaries of the claimed "portions." Shoemake Dec. at ¶¶87-88. Similarly, the '513 claims do not specify just any "association" between the claimed portion transmitted by the stations and the guard interval length.

18

Instead, those claims explain the downlink frame's "guard interval length is **to be used** by each of a plurality of stations" when transmitting the portion of the uplink frame. PX 4 ('513) at 21:32-33 (emphasis added); *see also* 22:18-19, 22:52-53. So a POSITA understands an "association" occurs when a portion of the uplink frame uses a guard interval length. Shoemake Dec. at ¶¶87-88.

### 2. "based on the resources for the UL MU transmission" (claim 15)

| Atlas's Construction | |
|---|---|
| Plain and ordinary meaning. | **Indefinite** |

This phrase is not indefinite because a POSITA understands it with at least the requisite "reasonable certainty." Shoemake Dec. at ¶96; *Nautilus*, 572 U.S. at 909. The Western District concurs. PX 9 (*Sercomm/ASUS* CC Order) at 8.

This phrase appears in the context of a larger phrase: "processing an uplink frame comprising a plurality of frames from the set of stations **based on the resources for the UL MU transmission**." PX 4 ('513) at 22:62-64 (emphasis added). TP-Link's expert, Dr. Roy, states "the issue is whether the 'based on' language refers to [1] processing of the uplink frame, or [2] the uplink frame itself." PX 22 (Roy *Sercomm/ASUS* Supp. Dec.) at ¶15; Dkt. 85-2 (P.R. 4-3) at 15 (incorporating Dr. Roy's prior declaration). And according to Dr. Roy, because there are two possibilities, this renders the claim indefinite. *See id.*

But legally, even if two constructions are possible, the claim term is still not indefinite. *ClearOne, Inc. v. Shure Acquisition Holdings, Inc.*, 35 F.4th 1345, 1351 (Fed. Cir. 2022) ("Just because a term is susceptible to more than one meaning does not render it indefinite."). And factually, the intrinsic evidence and everyday grammar show a person of ordinary skill would understand the latter interpretation to be correct—the uplink frame is based on the resources allocated by the trigger frame for the UL MU transmission.

19

Independent Claim 15 recites:

> 15. A computer-implemented method of facilitating wireless communication, the method comprising:
>
> determining, by an access point, a first guard interval to be used by a set of stations participating in a multi-user (MU) uplink (UL) transmission;
>
> creating, by the access point, a trigger frame, wherein the trigger frame includes information indicating the first guard interval for the UL MU transmission, ***wherein the trigger frame allocates resources for the UL MU transmission*** and solicits the UL MU transmission;
>
> transmitting, by the access point, the ***trigger frame to the set of stations***; and
>
> ***processing an uplink frame comprising a plurality of frames from the set of stations <u>based on the resources for the UL MU transmission</u>***, wherein each of the plurality of frames comprises a respective payload, and wherein at least a portion of the respective payload is associated with the first guard interval.

PX 4 ('513) at 22:50-67 (emphasis added). As can be seen, the access point creates and then transmits a "trigger frame [that] allocates resources for the UL MU transmission." PX 4 ('513) at 22:55-59. Resources are explained in the specification as "for example, bandwidth, time/duration that the STAs expect to occupy a transmission medium, and/or possibly a number of spatial streams that the STAs may use." *Id.* at 2:58-61. Resource allocation may also include "a sub-band assigned to a respective one of the participating stations as well as scheduling information regarding when a respective one of the participating stations may transmit using its assigned sub-band." *Id.* at 11:56-60. Thus, by allocating resources, the trigger frame effectively instructs the stations how and when to send the UL MU transmission to the access point.

Although not explicit in this access point claim, the specification explains that when the stations receive the trigger frame, they responsively create and then send the UL MU transmission to the access point. *See* PX 4 ('513) at 2:67-3:5, 17:23-42, Fig. 8. That UL MU transmission includes the claimed "uplink frame comprising a plurality of frames from the set of stations." *Id.* And as explained above, that uplink frame is "based on the resources for the UL MU transmission" that were allocated in the trigger frame because it is transmitted using those resources. *Id.* Finally,

20

the access point receives and then "process[es that] uplink frame." *See id.* Thus, the intrinsic evidence shows the uplink frame itself is based on the resources allocated by the trigger frame. Shoemake Dec. at ¶¶99, 101-102.

Proper grammar also shows that the uplink frame is based on the resources for the UL MU transmission. The phrase "based on the resources for the UL MU transmission" is closer to the "uplink frame" term than to the "processing" term, so the proper reading of this phrase is that it grammatically modifies the "uplink frame." *See DeGeorge v. Bernier*, 768 F.2d 1318, 1323 (Fed. Cir. 1985) (noting that "[m]odifiers of a term are usually in proximity to such term").

The alternative suggested by Dr. Roy—that the access point's "processing" is based on the resources for the UL MU transmission—makes less sense. An access point processes the UL frames that it receives based on its programming (which adheres to the 802.11ax standard). *See* PX 4 ('513) at 7:1-20, 8:12-53, Figs. 2 & 3B; *see also* Shoemake Dec. at ¶103.

But even if there were ambiguity in this case as to which of the two constructions may be "more" correct, this Court may hold that the term is not indefinite and ascribe it **both** meanings, which is what happened in *ClearOne*. In that case, the patent challenger argued the claim term "self-similar configuration" was indefinite because it could mean "fractal-like configuration" or "constellation." 35 F.4th at 1349. The Federal Circuit noted that a skilled artisan would understand the term to have several meanings, including "concentric rings, ovals, or other shapes." *Id.* at 1350. The Federal Circuit held the term to not be indefinite, even though there were several possible meanings. *Id.* at 1351.

For all these reasons, TP-Link cannot meet its burden to prove indefiniteness of this term by clear and convincing evidence.

21

E.    U.S. Patent No. 9,917,679

1.  "single-user (SU) format" / "SU format" / "multiple-user (MU) format" / "MU format" (claims 1, 6)

| Atlas's Construction | TP-Link's Construction |
|---|---|
| Plain and ordinary meaning. | **Indefinite** |

These terms are readily understood as per their plain and ordinary meaning; there is no need for a formal construction. The Court can resolve the Parties' dispute simply by holding the terms are not indefinite.

The '679 claims provide objective boundaries for these terms. They explain an acknowledgment frame in "multi-user format" is transmitted "simultaneously with transmission of at least one acknowledgment frame from at least one other STA," and suggest an acknowledgment frame in "single-user format" is not. PX 5 ('679) at 41:53-42:2, 42:35-45.

The '679 specification also provides guidance on "multi-user" vs. "single-user" format. For example, Figures 21 and 22 both show an AP transmitting a multi-user downlink frame (colored blue) to each of STAs 1-4. Depending on the acknowledgment information located within the downlink frame's QoS Control Field (colored yellow), a STA will transmit an immediate uplink response in either "multi-user format" simultaneously with other STAs (colored red, Fig. 21) or "single-user format" by itself (colored green, Fig. 22). PX 5 ('679) at Figs. 21-22 (annotations and highlighting added), 38:27-47.

22



So the specification describes these terms as per their plain and ordinary meanings in the claims.

Lastly, the extrinsic evidence also shows these terms are understood according to their plain and ordinary meanings. PX 23 (New Oxford Dict.) ("single: only one"; "multiple: having or involving several parts, elements, or members"; "user: a person who uses or operates something"; "format: the way in which something is arranged or set out").

Despite having the burden to prove by clear and convincing evidence that these terms are not reasonably certain to a person of skill, TP-Link's expert did not opine as to how such a POSITA would understand these terms (and should not be permitted to do so in response and flout the rules).

23

PX 10 (Roy *TP-Link* Dec.). On the other hand, Dr. Shoemake devotes nearly 20 pages to explaining why the evidence amply shows these terms are not indefinite. Shoemake Dec. at ¶¶106-135.

> ### F.    U.S. Patent No. 10,020,919
>
> 1. **"in response to determining that the number of the one or more station information fields in the NDPA is one" (claims 1) / "when a number of the one or more station information fields in the NDPA is one" (claim 11) / "when the number of the one or more station information fields in the NDPA is greater than one" (claims 2, 8, 12, 19)**

| Atlas's Construction | TP-Link's Construction |
|---|---|
| Plain and ordinary meaning | Claims 1, 11: Plain meaning: "in response to determining that there is one station information in the NDPA" / "when there is one station information in the NDPA" |
| | Claims 2, 8, 12, 19: **Indefinite** |

Claims 1 and 11 of the '919 Patent recite methods of communicating channel state information between a station device ("STA") and an access point device (an "AP"). In Claim 1, the STA first receives an NDPA that "include[es] one or more station information fields." PX 6 ('919) at 32:66-67. Upon receiving the NDPA frame, the STA "determin[es] exactly a number of the one or more station information fields." *Id.* at 33:1-2. As explained later in the claim, "the number of the one or more station information fields in the NDPA is the cardinality of the one or more station information fields in the NDPA." *Id.* at 33:8-10. In other words, the STA counts the number of station information fields in the NDPA, and that number is exactly the number of elements in the set made up of all the station information fields. If the STA "determine[es] that the number of station information fields in the NDPA is one," the STA transmits a feedback frame after receiving a Null Data Packet. *Id.* at 33:4-7. Claim 11 claims this method from the perspective of the AP. PX 6 ('919) at 33:54-34:11. Claims 2 and 12 claim what happens when the number of station information fields is greater than one. *Id.* at 33:11-16, 34:12-17. In that case, the AP transmits (or the STA receives) a trigger frame before receiving a feedback frame. *Id.*

24

A NDPA is a type of frame used in 802.11 in the channel feedback procedure. PX 6 ('919) at 18:19-25. And it includes a set of station information fields—"STA Info 1" to "STA Info *n*":



Figure 8-29j—VHT NDP Announcement frame format

PX 24 (802.11ac-2013) at ATLAS-00031988 (highlighting added). In this image the NDPA includes *n* number of station information fields. The '919 Patent also explains that a NDPA may "include[] a list of per-station information field[s]…." PX 6 ('919) at 21:8-9.

The '919 Patent builds on this NDPA frame by describing embodiments, in particular Figures 8A and 8B, that use the number of station information fields to decide what feedback method to use. In those embodiments, an AP sends a NDPA followed by an NDP. Then, in Figure 8A, a STA responds by sending feedback after a standoff period. PX 6 ('919) at 18:63-19:10. Alternatively, in Figure 8B, the STA sends its feedback only after receiving a MU trigger. *Id.* at 19:11-32. "Which of the first sounding procedure and the second sounding procedure is used is ***indicated by a number of per-station information fields in the NDPA frame***." *Id.* at 18:50-55 (emphasis added). The STA uses the Figure 8A method when the NDPA "indicates only a single station (itself)," and the STA uses the Figure 8B method when the NDPA "indicates a plurality of stations including itself." *Id.* at 18:63-19:3, 19:16-32. In the case of claims 1, 11 and their dependent claims, this distinction is made by determining the number of station information fields in the NDPA, *i.e.* some number between 1 and *n*.

Despite the '919 Patent's description of this conditional method, TP-Link contends that that claims 1 and 11 require the NDPA to only have one station information field. This construction

25

eliminates the "one or more" language from the claims. But nothing in the intrinsic record suggests that the patentee acted as his own lexicographer or that a disclaimer justifies this construction. For these reasons alone, TP-Link's arguments should be rejected. *Thorner v. Sony Comput. Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012) ("Claims are given their ordinary meaning except 1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution.").

Without any specification for their proposed construction, TP-Link may contend (as Sercomm and ASUS did) that a conditional claim is improper. However, no case law suggests conditional claims are improper or necessarily invalid. *See Hytera Communs. Co. v. Motorola Sols., Inc.*, 841 F. App'x 210, 216-218 (Fed. Cir. 2021) (reviewing the construction of a claim that "requires that a specific action be taken in response to each of two alternative specified conditions"). Here, Claims 1 and 11 plainly claim determining whether there is one station information field in the NDPA or more than one, and if there is one, performing an action. If there is more than one, the independent claims do not require or prohibit any action. *See Cias, Inc. v. All. Gaming Corp.*, 504 F.3d 1356, 1360 (Fed. Cir. 2007) ("'Comprising' is well understood to mean 'including but not limited to.'").

Moreover, TP-Link's construction does not make sense in light of the dependent claims. Those claims, and in particular claims 2 and 12, add the second part of this contingent process— when there is more than one station information field a different action is taken. *See Phillips*, 415 F.3d at 1314 ("Other claims of the patent in question, both asserted and unasserted, can also be valuable sources of enlightenment as to the meaning of a claim term."); *see also Hytera*, 841 F. App'x 210 at 216-218. TP-Link contends that its construction renders these claims indefinite. But as explained here, the plain meaning does not.

26

Because TP-Link's proposed construction ignores the specification and the plain language of the claims, the Court should reject TP-Link's construction, give these claims their plain and ordinary meaning, and find that they are not indefinite. *See* PX 9 (*Sercomm/ASUS* CC Order) at 8.

### 2. "cardinality" (claims 1-9, 11-19)

| Atlas's Construction | TP-Link's Construction |
| --- | --- |
| "the number of elements in a set" | Needs no construction; plain and ordinary meaning |

As the Applicant explained, the plain and ordinary meaning of "cardinality" is "the number of elements in a set or group." PX 25 ('919 FH) at ATLAS-00019155, -162, -206; PX 26 (Webster's Dict.) at ATLAS-00033138; PX 27 (IEEE Dict.) at ATLAS-00033143; Shoemake Dec., ¶153-156. While the parties do not dispute that cardinality should be given its plain and ordinary meaning, TP-Link does not use this meaning in its construction of the next term.

### 3. "wherein the number of the one or more station information fields in the NDPA is the cardinality of the one or more station information fields in the NDPA" (claims 1, 11)

| Atlas's Construction | TP-Link's Construction |
| --- | --- |
| Plain and ordinary meaning. Alternatively, "wherein the number of the one or more station information fields in the NDPA is the number of elements in the set of station information fields." | Plain meaning: wherein the number of the one or more station information fields in the NDPA is the number of the one or more station information fields in the NDPA. This renders the claim **indefinite**. |

As the Applicant explained, This element was introduced during the prosecution of the '919 Patent to clarify the claims by explaining that the "number" is the cardinality of the station information fields, e.g., the total number of fields in the set of station information fields. PX 25 ('919 FH) at ATLAS-00019155, -162, -206; Shoemake Dec. at ¶¶153-156. Atlas's alternative construction simply inserts the definite of "cardinality" into the claim. TP-Link's construction eliminates "cardinality" from the claims and does not provide any alternative language that serves

27

the same clarifying function. This construction also introduces ambiguity because it is not clear if the "number" is the cardinality or the index of a station information field. As Dr. Shoemake explains, without "cardinality," "the number" could refer to either the value of a particular station information field directed, e.g., the index, or the total number of fields (as claimed). Shoemake Dec. at ¶¶154, 156. In sum, the claims are clear as written, while TP-Link's proposed construction is ambiguous and appears to simply be an attempt to invalidate the claims. PX 9 (*Sercomm/ASUS* CC Order) at 9.

### G.    U.S. Patent No. 10,756,851

#### 1.  "scheduling extension" (claims 1, 2, 7, 8)

| Atlas's Construction | TP-Link's Construction |
|---|---|
| Plain and ordinary meaning: "an extension to the control field that includes scheduling information." | "A **subfield included in the HT control field** that includes scheduling information **for the uplink multi-user response**" |

A POSITA reading the intrinsic record would understand that "scheduling extension" refers to "an extension to the control field that includes scheduling information." *See* PX 7 ('851) at Abstract ("Uplink response scheduling may be located in a payload of the downlink frame, in which the uplink response scheduling indicates one or more resource units assigned to the multiple stations for transmitting the uplink frames. In some examples, *the uplink response scheduling is in a control field* of the payload, in a trigger frame as part of the payload."); *id.* at 30:63-66 ("An AP may schedule which STAs to use which sub-bands; hence, an AP may provide uplink multi-user response scheduling information."). The Western District of Texas previously adopted Atlas's construction for this term. PX 9 (*Sercomm/ASUS* CC Order) at 9.

TP-Link's proposed construction is wrong because it is both narrower than the plain and ordinary meaning in some respects and broader than the plain and ordinary meaning in other respects. *First*, the construction is unduly narrow because it attempts to confine this term to the

"*HT* control field" example embodiment shown in Figure 13, rather than just a "control field" as recited in the claims. The specification repeatedly describes the HT control field embodiment as a non-limiting example. *See, e.g.* PX 7 ('851) at 30:11-12 ("FIG. 13 illustrates *an example* of an extended control field 1320 in a HT control field 1300 of a data frame."); *id.* at 16-18 ("In *some embodiments*, an AP *may* use the QoS control field in the MAC header of each MPDU and an extended HT control field). It is legally improper to limit the claims to these "example" embodiments. Moreover, the specification also describes broader embodiments in which the scheduling information is located in a "control field" without using the modifier "HT." *See, e.g.*, '851 at Abstract ("the uplink response scheduling is in a control field of the payload"); *id.* at 41:11-13 ("the control field indicates scheduling information for transmitting a second frame"); *see also* Shoemake Dec. at ¶160 (incorp. PX 28 (Shoemake *Sercomm/ASUS* Supp. Dec.) at ¶37-38, 42).

*Second*, TP-Link's construction improperly adds the term "subfield." TP-Link appears to be inserting the term "subfield" in another improper attempt to limit the claims to the embodiment of Figure 13, even though the patent describes this embodiment as an example. *See, e.g.*, PX 7 ('851) at 30:11-15 ("FIG. 13 illustrates an *example* of an extended control field 1320 in a HT control field 1300 of a data frame. For convenience, the extended control field 1320 is *sometimes* referred to as an HE Control extended *subfield*/field or an HE control *subfield*/field."); *id.* at 30:31-33 ("*In one or more implementations*, a STA *may* use both the QoS control field and the HT control field 1300 (having the HECE *subfield* 1320)…"). In the example embodiment of Figure 13, the scheduling extension is included in a separate subfield (labeled 1320) that is appended to the end of the existing control field (labeled 1310). But the '851 Patent is not limited to embodiments where a "subfield" is appended to the control field. Rather, the '851 Patent also describes embodiments where the scheduling extension is located "in" the control field rather than

29

being added as a separate subfield. *See, e.g.* '851 Patent at Abstract ("In some examples, the uplink response *scheduling* is *in a control field* of the payload"); *id.* at 30:16-20 ("In some embodiments, an AP may use the QoS control field in the MAC header of each MPDU and an *extended* HT control field (denoted as HE Control *Extension* (HECE) *in* the HT *control field*)…").

*Third*, TP-Link's construction is overbroad because it would encompass *any* scheduling subfield of the HT control field, even if such subfield is *always included*. This is inconsistent with the claims, the specification, and the ordinary meaning of "extension." The claim language itself confirms that the "scheduling extension" is not always included in the control field: "*determining whether the scheduling extension exists* based on a setting of the control extension indication." *See, e.g.*, PX 7 ('851) at Claim 7. The specification also confirms that the scheduling extension is not always included—sometimes the scheduling extension "does not exist." *Id.* at 30:40-42. The ordinary meaning of "extension" does not encompass something that is always included by default. *See, e.g.*, PX 29 (American Heritage Dict.) at ATLAS-00033179 ("extension: An addition that increases the area, influence, operation, or contents of something"). This term recites an "extension" that, when present, provides additional scheduling capabilities beyond the default.

*Fourth*, TP-Link's construction is incorrect because it adds the phrase "the uplink multi-user response." This phrase does not appear in any of the relevant claims, so the addition of this phrase to the claim construction creates ambiguity and potential antecedent basis problems. The claims recite generating "a multi-user uplink *transmission* … based on the scheduling information" *not* a "multi-user uplink *response*." PX 7 ('851) at Claim 1. The addition of this unclaimed phrase "uplink multi-user response" creates ambiguity and antecedent basis problems.

## VI. CONCLUSION

For all these reasons, the Court should adopt Atlas's constructions and reject TP-Link's.

30

Dated: December 2, 2022

Respectfully submitted,

/s/ *Eric Enger*
Max L. Tribble, Jr.
Texas State Bar No. 20213950
Joseph S. Grinstein
Texas State Bar No. 24002188
Alejandra C. Salinas
Texas State Bar No. 24102452
**SUSMAN GODFREY, LLP**
1000 Louisiana Street, Suite 5100
Houston, Texas 77002
Telephone: (713) 651-9366
Facsimile: (713) 654-6666
mtribble@susmangodfrey.com
jgrinstein@susmangodfrey.com
asalinas@susmangodfrey.com

Kalpana Srinivasan
California State Bar No. 237460
Oleg Elkhunovich
California State Bar No. 269238
**SUSMAN GODFREY, LLP**
1900 Avenue of the Stars, 14th Floor
Los Angeles, CA 90067
Telephone: (310) 789-3100
Facsimile: (310) 789-3150
ksrinivasan@susmangodfrey.com
oelkhunovich@susmangodfrey.com

Michael F. Heim
Texas State Bar No. 09380923
Eric J. Enger
Texas State Bar No. 24045833
Blaine A. Larson
Texas State Bar No. 24083360
Alden G. Harris
Texas State Bar No. 24083138
William B. Collier, Jr.
Texas State Bar No. 24097519
**HEIM, PAYNE & CHORUSH, LLP**
1111 Bagby, Suite 2100
Houston, Texas 77002
Telephone: (713) 221-2000
Facsimile: (713) 221-2021
mheim@hpcllp.com
eenger@hpcllp.com
blarson@hpcllp.com

31

aharris@hpcllp.com
wcollier@hpcllp.com

T. John Ward, Jr.
Texas Bar No. 00794818
Email: jw@wsfirm.com
Andrea L. Fair
Texas Bar No. 24078488
Email: andrea@wsfirm.com
**WARD, SMITH & HILL, PLLC**
1507 Bill Owens Parkway
Longview, Texas 75604

S. Calvin Capshaw
Texas State Bar No. 03783900
Elizabeth L. DeRieux
Texas State Bar No. 05770585
**CAPSHAW DeRIEUX, LLP**
114 E. Commerce Ave.
Gladewater, TX 75647
Telephone: (903) 845-5770
Email: ccapshaw@capshawlaw.com

*ATTORNEYS FOR ATLAS GLOBAL
TECHNOLOGIES LLC*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on December 2, 2022, all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document through the Court's CM/ECF system.

*/s/Eric Enger*
Eric Enger

32