# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### MARSHALL DIVISION

| | | |
|---|---|---|
| **ATLAS GLOBAL TECHNOLOGIES LLC** | § § § § | Civil Action No. 2:21-cv-00430-JRG-RSP |
| **Plaintiff,** | § § | **Jury Trial Requested** |
| v. | § § | |
| **TP-LINK TECHNOLOGIES CO., LTD., TP-LINK CORPORATION LTD, and TP-LINK INTERNATIONAL LTD.,** | § § § § | |
| **Defendants.** | | |

## DECLARATION OF DR. MATTHEW B. SHOEMAKE
## REGARDING INDEFINITENESS ISSUES

Signed: _____

Dr. Matthew B. Shoemake

November 11, 2022

## I.    Introduction

1.    I have been retained as an expert on behalf of Plaintiff Atlas Global Technologies LLC ("Atlas") in the above captioned cases to provide my professional opinions and conclusions relating to certain indefiniteness issues involving U.S. Patent No. 9,531,520 ("the '520 Patent"); U.S. Patent No. 9,763,259 ("the '259 Patent"); U.S. Patent No. 9,825,738 ("the '738 Patent"); U.S. Patent No. 9,912,513 ("the '513 Patent"); U.S. Patent No. 9,917,679 ("the '679 Patent"); and U.S. Patent No. 10,020,919 ("the '919 Patent") (collectively, "the Patents-at-Issue").[1]

## II.    Summary of Opinions

2.    None of the fourteen terms that TP-Link has alleged to be indefinite from amongst the Patents-at-Issue are, in fact, indefinite.  Persons of ordinary skill understand the scope of these fourteen terms with at least reasonable certainty.  TP-Link has not met its burden to prove otherwise by clear and convincing evidence.

## III.    Qualifications

3.    I have summarized in this section my educational background, career history, publications, and other relevant qualifications. My full *curriculum vita* is attached as Exhibit A to this declaration.

### A.    Educational Background

4.    I received Bachelor of Science degrees in electrical engineering and computer science with honors from Texas A&M University, College Station, Texas in 1994. I received a Master of Science degree in electrical engineering from Cornell University, Ithaca, New York in 1997. I received a Ph.D. in electrical engineering from Cornell University, Ithaca, New York in

---

[1] I understand there are other patents asserted in the litigation, but TP-Link has not raised indefiniteness issues for those patents.  *See* TP-Link P.R. 4-2 Preliminary Claim Construction Disclosure dated October 14, 2022.

1999. My doctoral studies focused on communication and information theory with specific focus on error correction codes. My M.S. thesis and Ph.D. dissertation at Cornell both related to advanced error correction coding including turbo codes.

**B.      Career**

5.      From 1991 to 1995, I worked as an intern in the Digital Signal Processing Group at Texas Instruments, Inc. in Stafford, Texas. I worked on both product engineering and applications engineering projects. Processors that I worked on at Texas Instruments were used in a variety of applications, including, *e.g.*, voice processing, image processing, fax machines, voiceband modems, wireless communications, digital radio receivers and anti-lock brakes on cars and aircraft. As a further example, these processors were used for OFDM-based communications systems such as the Harris RF-5000 military wireless communication systems developed in the late 1980s and early 1990s.

6.      From 1997 to 2000, I was a Manager at Alantro Communications, Inc. in Santa Rosa, California. I managed the baseband systems team where I developed 802.11b (now Wi-Fi 1) compliant physical layer technology. I also led the first development of 802.11a (now Wi-Fi 2) OFDM technology at Alantro. Amongst other things, I was responsible for building and designing error correction encoders and decoders at Alantro. Alantro Communications was later acquired by Texas Instruments. The 802.11 solutions that I built at Alantro and Texas Instruments shipped in numerous products including in Intel's Centrino brand of Wi-Fi products and in Dell, D-Link, Linksys, Nokia and many other products. The descendants of those products are still sold by Texas Instruments today.

7.      From 2000 to 2003, I was the Director of Advanced Technology at Texas Instruments in Dallas, Texas. I worked in the Wireless Networking Business Unit where I led the development of Bluetooth and Wi-Fi coexistence technology. My work on Bluetooth and Wi-Fi

2

coexistence included analyzing interference effects, testing interference versus range, testing the impact of transmit power on interference, and developing techniques to mitigate interference between overlapping wireless networks. I also led efforts at Texas Instruments to enhance the IEEE 802.11 standard with quality of service extensions and to develop a very low power Wi-Fi technology for mobile phones. During my time at Alantro and Texas Instruments, I also worked on error correction coding for 802.11 systems including but not limited to CCK, PBCC, BCC, concatenated Reed Solomon codes, turbo codes and LDPCs.

8.     Further, while at Texas Instruments and through my expert consulting, I worked on and managed development of MAC-layer Wi-Fi technologies such as quality-of-service and data unit aggregation technologies.

9.     Additionally, while at Alantro, Texas Instruments and through my expert consulting, I have worked on, studied, and managed activities related to MIMO, space-time-block codes and beamforming.

10.     From 2003 to 2008, I was the CEO and Founder of WiQuest Communications, Inc. in Allen, Texas. I developed the world's first 1 Gbps ultra-wideband chipset. I also developed the world's first wireless VGA/DVI system for notebook computers. This technology was incorporated into products developed by several major computer and electronics manufacturers such as Dell, Toshiba, Lenovo, Belkin, D-Link, and Kensington. I built the company from inception to 120 employees. I managed a diverse group of employees that were located in Texas, India, California, Taiwan, and Japan.

11.     In 2008, I founded and became the CEO of Biscotti, Inc. At Biscotti, I developed high-definition, Wi-Fi-based video calling systems for the home and office. During my time at Biscotti, I evaluated numerous Wi-Fi chip offerings for range, rate and robustness capabilities. Wi-

3

Fi products that I evaluated were made by manufacturers such as Broadcom, Atheros (now Qualcomm), Marvell and Texas Instruments. At Biscotti, we used Wi-Fi chips from Broadcom and Marvell based on our range, rate and performance testing. As with many applications, range, rate and robustness were important to Biscotti due to our need to operate reliably across the entire home, tolerate interference from other products operating in the unlicensed bands used by Wi-Fi and achieve speeds that were sufficient to move high-definition video. Biscotti's products incorporated MIMO capabilities.

12.    Also in about 2008, large companies began calling on me to serve as an expert and testifying witness in patent litigation cases. Thus, for 14 years, I have served in an expert capacity in trials where my expertise in communication systems and standards were needed by judges and juries. Clients that have used my services include Cisco, Intel, Broadcom, Apple, Texas Instruments, Samsung, Blackberry, NXP, FujiFilm, Sharp, Sprint, AT&T, Dell, Realtek, MediaTek, Qualcomm, HTC, Canon, Honda, Subaru, Verizon, Mercedes-Benz, Wistron, Mitsubishi, Google, Harmon, T-Mobile, 7-Eleven, Uber, Lyft, and Caltech. After working in this capacity as a sole proprietor for many years, I incorporated Peritum LLC in 2015. Today, I continue providing expert engineering, consulting and technical services via Peritum.

**C.    Patents and Publications**

13.    I am a named inventor on over thirty patents, including patents related to wireless communications systems and various aspects of data communications systems, including encoding, decoding, and transmission of information.

14.    I have authored, co-authored, and contributed to many academic papers and publications, most in the area of data communications.

15.    I have presented, authored, co-authored and/or co-sponsored many submissions to the IEEE.  I have also authored or co-authored numerous papers in IEEE publications, including

4

"High Performance Wireless Ethernet," IEEE Communications Magazine, November 2001, and various other articles in IEEE publications.

### D.    Other Relevant Qualifications

16.    I have been a member of the Institute of Electrical and Electronic Engineers ("IEEE") since 1991. In 1999, I was elected as the Chairperson of the IEEE 802.11g Study Group where I led a committee of twenty engineers to set project requirements for IEEE 802.11g. Subsequently, from 2000 to 2003, I was the Chairperson of the IEEE 802.11g Task Group (now Wi-Fi 3) where I led a committee of over 200 engineers to set standards for 54 Mbps data rates in the 2.4 GHz band in a way that was backward compatible with the IEEE 802.11b standard (now Wi-Fi 1). From 2003 to 2004, I was the Chairperson of the IEEE 802.11n Task Group (Wi-Fi 4) where I led a committee of over 300 engineers through the initial stages of standardization of data rate enhancements in excess of 100 Mbps.

17.    I have expertise in error correction coding, a form of coding of information and signals for the purpose of making them resilient to noise and interference. I have expertise in protocols that are designed to mitigate noise and interference such as spread spectrum technologies and ARQ. I am familiar with the theory of propagation of electromagnetic waves and antennas including concepts such as signal-to-noise ratio. I am familiar with concepts such as frequency-division and time-division used to allocate wireless resources for avoidance of interference. I am also familiar with concepts such as carrier-sense multiple access with collision avoidance (CSMA/CA) as used in Wi-Fi systems. I am also familiar with concepts of beacons used in networks such as Wi-Fi. I am familiar with channel access protocols such as IEEE 802.11's distributed coordination function (DCF). I am familiar with techniques for mitigating interference between wireless devices such as the 802.11 virtual carrier sense mechanism (NAV). I am familiar with concepts related to cell site planning, coverage, and interference mitigation between cells. I

5

am familiar with concepts of carrier sense, listen-before-talk, collisions, and collision avoidance mechanisms. I am familiar with FCC regulations such as the regulations for use of so-called "unlicensed spectrum" in the ISM and U-NII bands. I am familiar with physical layer transmission and reception techniques including channel coding, modulation, upconversion, down-conversion, channel estimation, carrier offset, timing offset, MIMO and MU-MIMO, OFDM and MU OFDMA, clear channel assessment, adjacent channel rejection, signal detection, beamforming, and channel feedback techniques. I am familiar with Maxwell's laws and Friis transmission equation.

18.     I began programming computers myself at the age of 10 using a TI-99/4A computer.

19.     I served on the External Advisory Committee for the Texas A&M University Department of Electrical and Computer Engineering from 2006 to 2020.

## IV.     Compensation

20.     I am being compensated for my time at my current standard rate of $725 per hour for the services that I provide in connection with this case. That compensation is not contingent upon my performance, the outcome of the case, or any issues involved in or related to this case.

## V.     Legal Standards

21.     I am not an attorney. For the purposes of this report, I have been informed about certain aspects of the law that are relevant to my analysis and opinions.

22.     I have been informed that, as a general rule, a claim term should be construed according to its plain and ordinary meaning, which is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention.

23.     I have been informed that determining the plain and ordinary meaning of a claim term involves considering the usage of the term in the context of the intrinsic evidence, including the claim language, patent specification and prosecution history.

24.     I have been informed that extrinsic evidence such as technical dictionaries, treatises, and expert testimony may be considered to understand the underlying technology and the manner in which one skilled in the art might use the claim terms within that context, but extrinsic evidence may not be used for the purpose of altering the terms of the claim from their plain meaning nor to create contradictions in the terms of the claims.

25.     I have been informed that the burden is on the accused infringer to prove indefiniteness by clear and convincing evidence. I understand that, to be valid, a patent's claims, viewed in light of the specification and prosecution history, must inform those skilled in the art about the scope of the invention with reasonable certainty. I further understand that the courts do not require absolute precision and provide latitude to a patentee with regard to how claims are drafted.

## VI.     Materials Considered

26.     Among the materials I have reviewed in forming my opinions are the Patents-at-Issue, their prosecution file histories, the patent applications to which any Patent-at-Issue claims priority, the agreed constructions in these proceedings, as well as the patents, references, and other materials cited in this expert report.

27.     I have also reviewed TP-Link's Local Patent Rule 4-2 Preliminary Claim Construction Disclosure (dated October 14, 2022) and the portions of TP-Link's invalidity contentions (dated July 13, 2022) dealing with these indefiniteness issues.

28.     I understand from TP-Link's Local Patent Rule 4-2 Preliminary Claim Construction Disclosure that TP-Link will rely on the prior declarations of Dr. Sumit Roy submitted on September 15, 2022 ("Roy *Sercomm/ASUS* Dec.") and October 17, 2022 ("Roy Supp. *Sercomm/ASUS* Dec.") in the related cases against Sercomm and ASUSTeK, as well as a new declaration from Dr. Roy on indefiniteness issues for the '679 Patent.  I previously submitted indefiniteness and claim construction declarations on behalf of Atlas in those related cases against Sercomm and ASUSTeK on October 6, 2022 ("Shoemake *Sercomm/ASUS* Dec.") and October 28, 2022 ("Shoemake Supp. *Sercomm/ASUS* Dec").  Those prior declarations rebutted various opinions from Dr. Roy.  I adopt and incorporate by reference those prior declarations from the related Sercomm and ASUSTeK cases.

## VII.     Person of Ordinary Skill in the Art

29.     Based on the materials and information I have reviewed and on my experience in the technical areas relevant to the Patents-at-Issue, a person of ordinary skill in the art ("POSITA") at the time of the invention would (a) have had at least an undergraduate degree in electrical engineering, computer science, or computer engineering, or an equivalent field; (b) have knowledge of the IEEE 802.11 standard including its MAC and PHY protocols; and (c) have at least two years' experience in the development of wireless local area networks (WLANs).  This description is approximate, and a higher level of education or skill might make up for less experience, and vice-versa. I was a person of at least ordinary skill in the art at the time of the inventions of the Patents-at-Issue (*i.e.*, the mid-2010s).

## VIII.     Agreed Constructions

30.     I understand that the parties have agreed to constructions for the following terms. I have applied these constructions in my analysis.

8

| Claim Term | Agreed Construction |
|---|---|
| "A method, implemented by a network device in a wireless network, for coordinating an uplink multi-user response transmission to a downlink multiuser transmission" ('520 claim 1) | Plain and ordinary meaning. The preamble is limiting. |
| "A method, implemented by a first station in a wireless network, for transmitting an uplink acknowledgment" ('520 claim 8) | Plain and ordinary meaning. The preamble is limiting. |
| "A method, implemented by a first station in a wireless network, for transmitting an uplink acknowledgment" ('520 claim 18) | Plain and ordinary meaning. The preamble is limiting. |

## IX.   U.S. Patent No. 9,531,520

### A.   "the downlink multi-user frame including a plurality of resource units (RUs)" (claim 1)

| TP-Link's Construction | Atlas's Construction |
|---|---|
| Indefinite | Plain and ordinary meaning<br><br>Alternatively, "the downlink multi-user frame including a plurality of particular units of spatial streams and/or subchannels of a wireless channel" |

31.     TP-Link states in its P.R. 4-2 Disclosures that this term is indefinite and incorporates the declarations of Dr. Sumit Roy submitted in the related cases against Sercomm and ASUSTeK.   I previously submitted declarations in those related cases against Sercomm and ASUSTeK, and incorporate here the portions related to this term.   *See*, *e.g.*, Shoemake *Sercomm/ASUS* Dec. at ¶¶30-41.   This term is not indefinite.

32.     In the related Sercomm and ASUSTeK cases, Defendants' expert, Dr. Roy, opined that this "limitation is wholly nonsensical and requires an impossibility" and that a "POSITA would not be able to understand the limitation." Roy *Sercomm/ASUS* Dec. at ¶29. I disagree. This claim term is not nonsensical or impossible, and a POSITA would understand the meaning of this

claim term with at least reasonable certainty, particularly when read in the context of the intrinsic evidence.

33. A POSITA would understand "Resource Units" ("RUs") to connote particular units of wireless channel resources, specifically, particular units of spatial streams and/or subchannels of the wireless channel. For example, resource units can be formed by dividing the wireless channel into predefined frequency subchannels. Each predefined frequency subchannel may thus be viewed as a unit of resources that can be used for transmitting information.

34. An example of a POSITA's usage of the term "resource unit" can be found in an IEEE submission dated March 9, 2015 titled "OFDMA Numerology and Structure" which uses the term "resource unit" several dozen times. IEEE 802.11-15/0330r1. In OFDM, the wireless channel is divided into a plurality of sub-carriers or "tones." Historically, all the tones in a transmission would be allocated to the same receiving device. For example, a 20 MHz Wi-Fi transmission would historically consist of 242 tones (234 data tones and 8 pilot tones) used for transmission, and each tone would be destined for the same receiver, *e.g.* a Wi-Fi access point may transmit a packet of information to a particular Wi-Fi device (STA 1) using all 242 data tones. However, it is also possible to divide the 242 tones into smaller, predefined groups of tones. The IEEE presentation cited above proposes subdividing the 242 tones of the 20 MHz channel into defined "resource units" as small as 26 tones each, *i.e.*, the 20 MHz channel would be subdivided into as many as nine separate resource units as shown in the diagram on slide 24 of the IEEE submission:

10



*Id.* at 24; *see also id.* at 13 ("The proposed **resource units** have the following sizes 26-tone with 2 pilots, 52-tone with 4 pilots, 102 data tone plus 4 to 6 pilots, 242-tone with 8 pilots").

35.    These predefined groups of tones were referred to as "resource units" or "RUs." The primary purpose of sub-dividing the channel into resource units is to enable information to be sent to multiple recipients, rather than allocating all the tones to a single recipient. For example, a 20MHz packet containing nine 26-tone resource units could be addressed to as many as nine recipients, *e.g.*, a Wi-Fi access point may send information to a first Wi-Fi device (STA 1) by placing information on RU1 while simultaneously transmitting information to a second Wi-Fi device (STA 2) using RU2, while simultaneously transmitting to a third Wi-Fi device (STA 3) using RU3, and so forth. *See, e.g.*, *id.* at 28 ("RUs are building blocks for the scheduler to assign them to different users"). As such, a POSITA at the time of the '520 Patent's priority date would have understood that a frame can include a plurality of resource units.

36.    A person of ordinary skill would understand that RUs may be groups of subcarriers (*e.g.,* when using OFDMA) and/or spatial streams (*e.g.*, when using MU-MIMO) allocated for communication of data to specific stations (or groups of stations), and when said frame is transmitted the RUs within the frame utilize specific resources of the wireless communication

11

channel corresponding to those RUs within the frame. Given this correspondence between RUs in the context of the frame itself and the actual resource of the wireless communication channel, a person of ordinary skill in the art would have no issue with interpreting the meaning of an RU in the context of the frame itself nor in the context of the corresponding physical resources of the wireless communication channel over which the frame is transmitted. Said differently, there is no contradiction between RUs being part of a frame and an RU of a frame being transmitted upon an associated resource of a wireless channel. Rather than mutual, the specification teaches a relationship between the RUs of a frame and the resources of the wireless channel.

37.     The teachings of the '520 Patent confirm this ordinary meaning, as understood by a POSITA. The Abstract teaches that a downlink multi-user frame may comprise resource units when it teaches "The acknowledgment information may be ***present in each resource unit of the downlink multi-user frame*** to indicate to each corresponding station properties/characteristics of a subsequent acknowledgment transmission." '520 Patent at Abstract. Further, the specification teaches that a single downlink frame from an access point may assign particular resource units to different receiving stations. Each of those RUs may include data for a single station. *Id.* at 1:31-36 ("In particular, an access point may transmit a …. frame that assigns particular resource units (RUs) to separate station…. Each RU may include data … that is intended for a single station ….").

38.     Further, the specification states that resource units may be included in a frame:

> In one embodiment, the ***first MPDU is located in a first resource unit of the downlink multi-user frame allocated to the first station***, wherein ***the downlink multi-user frame includes a second resource unit that contains a second MPDU*** with acknowledgement information for a second station to transmit a second multi-user acknowledgement frame. In one embodiment, the first multi-user acknowledgement frame and the second multi-user acknowledgement frame together form a multi-user acknowledgement frame for acknowledging the downlink multi-user frame.

12

*Id.* at 2:23-53 (emphasis added).

39.     The figures of the specification also make clear that a frame may include resource units. For example, Figure 11 shows a frame in which RUs are illustrated containing data for STA1 and STA2, respectively (green and blue). The y-axis shows frequency (orange), which indicates the RUs in the frame for STA1 and STA2 are created by sub-dividing available spectrum into units of frequency. Additionally, the RU for STA2 shows four rectangles on top of each other which illustrates that the particular RU for STA2 has another aspect, *i.e.* it uses four spatial streams in the RU. *Id.* at 26:10-15 ("[] STA1 and STA2 are allocated for a MU transmission, wherein STA1 occupies the upper half of the channel bandwidth and STA2 occupies the lower half of the channel bandwidth. Further, the NSTS (e.g. the number of spatial streams) for STA1 is one and the NSTS for STA2 is four.")



FIG. 11

*Id.* at Fig. 11 (annotation added); *see also id.* at Figures 6B, 7B, 8B, 9, 12.

40.     The specification teaches that resource units "may be particular spatial streams or sub-channels upon which the DL MU frame will be transmitted":

> At sub-operation **501**A the AP may generate one or more MAC Protocol Data Units (MPDUs) or aggregated-MPDUs (A-MPDUs) for each non-legacy STA. In the example, one or more MPDUs/A-MPDUs may be generated for STA1 and one or more MPDUs/A-MPDUs may be generated for STA2. Each MPDU may include data and/or control frames intended for each respective STA and may be placed

in resource units within the DL MU frame assigned/allocated to each respective STA. ***The resource units <u>may be</u> particular spatial streams or sub-channels of a wireless channel <u>upon which the DL MU frame will be transmitted.</u>***

*Id.* at 14:12-14 (emphasis added).

41.    These disclosures show that a frame may comprise resource units, such as particular spatial streams or sub-channels in the frequency domain. The frame is then transmitted such that respective data units are placed on their assigned resource unit. Thus, it is proper to talk about RUs within a frame, and it is also proper to speak of RUs in the context of how the wireless channel has been apportioned for transmission of data.

42.    In this particular case, we are concerned with the phrase "the downlink multi-user frame including a plurality of resource units (RUs)." The claim language itself makes clear that the "resource units (RUs)" being referenced are those that are "include[ed]" in the "frame." In this case, the claim makes clear that the RUs being discussed are within the frame, and as the specification teaches, a POSITA would know that such a frame may correspond to resource units formed from "spatial streams or sub-channels of a wireless channel" upon which the frame will be transmitted.

43.    As shown in the evidence presented above, a POSITA reading the '520 Patent would understand that the claimed downlink multi-user frame "includes" or "comprises" resource units. The downlink multi-user frame can also be described as being transmitted "upon" resource units. There is nothing contradictory or unclear about the words "include" and "upon" as used in this context. The structure of the downlink multi-user frame is subdivided into RUs, and therefore includes RUs. The downlink multi-user frame is then subsequently transmitted upon corresponding resources of the wireless communication channel to reach its intended recipients.

14

44.     I also note that the Court in the *Sercomm/ASUS* cases recently held this term is not indefinite and that the plain and ordinary meaning applies.   *Sercomm/ASUS* 11/3/22 Claim Construction Order at 2 (term #1).

**B.     "including a respective set of MAC Protocol Data Units (MPDUs) in each RU of the plurality of RUs" (claim 1) / "wherein the first MPDU is located in a first resource unit of the downlink multi-user frame allocated to the first station, wherein the downlink multi-user frame includes a second resource unit that contains a second MPDU that includes acknowledgement information for the second multi-user acknowledgement frame" (claim 9)**

| TP-Link's Construction | Atlas's Construction |
|---|---|
| Indefinite | Plain and ordinary meaning |

45.     TP-Link states in its P.R. 4-2 Disclosures that these terms are indefinite and incorporates the declarations of Dr. Sumit Roy submitted in the related cases against Sercomm and ASUSTeK.   I previously submitted declarations in those related cases against Sercomm and ASUSTeK, and incorporate here the portions related to these terms.   *See*, *e.g.*, Shoemake *Sercomm/ASUS* Dec. at ¶¶42-47.   These terms are not indefinite.

46.     In the related Sercomm and ASUSTeK cases, Defendants' expert, Dr. Roy, stated that his analysis regarding these terms is "similar" to his analysis regarding the preceding term. Roy *Sercomm/ASUS* Dec. at ¶ 33. I disagree with his conclusions for similar reasons to the ones I articulated above, and I incorporate my analysis for the preceding term here. A POSITA would understand the meaning of these terms with at least reasonable certainty.

47.     Dr. Roy stated "an MPDU is not included in a resource unit." Roy *Sercomm/ASUS* Dec. at ¶36. I disagree. A POSITA would have understood that an MPDU can be included in a resource unit, and the '520 Patent's intrinsic teachings confirm this understanding.

48.     As I described above, the '520 specification teaches that RUs may be particular units of spatial streams and/or subchannels of a wireless channel. *See, e.g.*, '520 at 14:12-14. A

POSITA would understand that the '520 specification repeatedly teaches that frames may include resource units, those frames may be transmitted, and the resource units are formed via particular units of spatial streams (*e.g.* MU-MIMO) and/or frequency sub-channels (*e.g.* OFDMA). Thus, a POSITA would understand the meaning of transmitting using RUs, as well as the meaning of a plurality of RUs being "included" in a frame.

49.    The specification also teaches that data units (*e.g.* MAC protocol data units ("MPDUs")) may be transmitted using frames, and those MPDUs may be "located in" or "contain[ed]" within resource units of the frame:

> In one embodiment, ***the first MPDU is located in a first resource unit of the downlink multi-user frame*** allocated to the first station, wherein ***the downlink multi-user frame includes a second resource unit that contains a second MPDU*** with acknowledgement information for a second station to transmit a second multi-user acknowledgement frame.

*Id.* at 2:47-53.

50.    The specification's figures further illustrate that data units (such as MPDUs) can be included in or contained in a resource unit. For example, Figures 11 and 12 specifically show "STA1 DATA" and "STA2 DATA" being located in separate RUs within the frame (illustrated by their separate positions on the vertical "frequency" axis). Further, STA 2 Payload/DATA is transmitted using 4 and 2 spatial streams, in Figures 11 and 12, respectively. This different allocation of spatial streams to the MPDUs further illustrates that the MPDUs are located in separate RUs of the frame.

51.    As shown in the evidence presented above, a POSITA reading the '520 Patent would understand that the claimed MPDUs are included within respective resource units of the downlink multi-user frame. The MPDUs can also be described as being transmitted "upon" those resource units. There is nothing contradictory or unclear about the words "in" and "upon" as used

16

in this context. The MPDUs are each included in their respective RUs of the downlink multi-user frame and are then subsequently transmitted upon the corresponding resources of the wireless channel in order to reach their intended recipients.

52.     I also note that the Court in the *Sercomm/ASUS* cases recently held these terms are not indefinite and that the plain and ordinary meaning applies.  *Sercomm/ASUS* 11/3/22 Claim Construction Order at 2 (term #2).

## X.    U.S. Patent No. 9,763,259

### A.    "wherein the NDPA frame indicates information corresponding to the predetermined length" (claim 6)

| TP-Link's Construction | Atlas's Construction |
| --- | --- |
| Indefinite | Plain and ordinary meaning |

53.     TP-Link states in its P.R. 4-2 Disclosures that this term is indefinite and incorporates the declarations of Dr. Sumit Roy submitted in the related cases against Sercomm and ASUSTeK.  I previously submitted declarations in those related cases against Sercomm and ASUSTeK, and incorporate here the portions related to this term.  *See*, *e.g.*, Shoemake *Sercomm/ASUS* Dec. at ¶¶48-57.  This term is not indefinite.

54.     Defendants in the related Sercomm and ASUSTeK cases (and TP-Link) argue the phrase "wherein the NDPA frame indicates information corresponding to the predetermined length" is indefinite. Defendants first take issue with the phrase "indicates information," saying: "Instead, the patentee selected a wording that indicates that it is something less than providing the actual information without explaining what it covers." *Sercomm/ASUS* Opening Br. at p. 12.  But the plain meaning of "indicate" is applicable here. The claim requires that there be indication of certain information. Plain meanings of indicate include "show," "point out" including to "be a sign or symptom of." *See Oxford New American Dictionary Third Edition,* 2010 at p. 884.

17

55.      In the context of communication systems, information is commonly indicated by electrical voltages. Without the use of the word "indicate," an infringer might argue that the voltage of an electric field is not the actual information. But a POSITA would readily understand that frames containing information indicates certain information. This type of indication happens commonly in communication systems. For example, the bits 0 and 1 may be communicated using -5 volts and +5 volts, respectively. If one were to communicate the letter "A", the ASCII representation of 0100 0001 might be used. This would correspond to the sequence of voltages -5, +5, -5, -5, -5, -5, -5, +5.

56.      A POSITA would readily understand that both the ASCII representation 0100 0001 and the sequences of voltages indicate the letter A, which is information. A POSITA would also understand that the sequence of voltages indicates the binary sequence of information 0100 0001. In fact, one may even consider Morse code in which a sequence of dashes, dots, and spaces was used to indicate certain information such as a telegraph message.  Thus, a POSITA would readily understand that the claim requires the NDPA frame to indicate certain information but need not explicitly express that information in a particular format.

57.      Second, the phrase requires the "information" to "correspond to a predetermined length." A correspondence also would be readily understood by a POSITA. For example, in its simplest form, consider that there may be some information, *e.g.*, 0 or 1. This information must correspond to a predetermined length. For example, if the information is 1, then there may be a predetermined maximum length of a subsequent communication. As another example, a bit being a 0 or 1 may correspond to whether the workday is a full day (predetermine length of 8 hours) or a half-day (predetermined length of 4 hours).

18

58.  My view is supported by the specification of the '259 patent. The specification has support for claim 6 in that it teaches: "The NDPA frame or the NDP frame may indicate information corresponding to the predetermined length." '259 patent at 2:35-36. This indicates that the inventors also thought that "indication information" and "information corresponding to the predetermined length" would be readily understood.

59.  I have examined other uses of the word "corresponding" in the specification, and I find that it takes on its plain meaning. For example:

- "information corresponding to the predetermined length", *Id.* at 23:6-7,

- "bits may indicate that a corresponding subchannel is selected", *Id.* at 2:55-56,

- "use of a plurality of interleavers and a plurality of mappers corresponding to a number of spatial streams", *Id.* at 5:55-57,

- "use a plurality of demappers and a plurality of deinterleavers corresponding to the number of spatial streams", *Id.* at 6:57-59,

- "each of the plurality of beamformee devices is allocated a corresponding subchannel", *Id.* at 10:28-29,

- "a value corresponding to a category of the CB frame", *Id.* at 11:41-42,

- "information of a corresponding beamformee device", *Id.* at 12:4, and

- "subchannel allocated to the corresponding beamformee device", *Id.* at 12:5-6.

60.  All of these uses show that "corresponding to" is used in the plain and ordinary sense, i.e., meaning that one thing has a correspondence to another, whether that be information corresponding to a length, bits corresponding to a subchannel, a plurality corresponding to a number, a value corresponding to a category, information corresponding to a specific device, or a subchannel corresponding to a particular devices. Thus, in my view a POSITA would readily

19

understand the information indicated in the NDPA frame must have a correspondence to the predetermined length.

61.    I also analyzed the usage of "indicates" in the specification. The specification teaches: "As such, when the beamformer device *indicates the maximum CB length using the NDPA frame or the NDP frame*, the beamformer device and the beamformee devices may change the maximum CB length each time performing a sounding procedure." '259 patent at 15:53-57 (emphasis added).

62.    Here the specification teaches that there may be an indication of a maximum length using a NDPA frame. This usage of "indicates" is also based on the plain and ordinary meaning to a POSITA, i.e., a frame, e.g. a "NDPA frame," may indicate some other information, e.g. a "maximum [] length" of a compressed beamforming ("CB") report.

63.    Thus, in my view the phrase "frame indicating information" would be readily understood by a POSITA. Indeed, a key function of frames in communication systems is to indicate information. Further, a POSITA would readily understand the meaning of "information corresponding to the predetermined length," i.e., there is some correspondence between the information indicated by the frame and the predetermined length, e.g., the indicated information has a correspondence to that predetermined value.

64.    I also note that the Court in the *Sercomm/ASUS* cases recently held this term is not indefinite and that the plain and ordinary meaning applies. *Sercomm/ASUS* 11/3/22 Claim Construction Order at 3 (term #4).

20

## XI.    U.S. Patent No. 9,825,738

**A.    "wherein the second information is a function of a total number of space time streams to be used to transmit the multiple uplink frames" (claim 1) / "wherein the second information is a function of a total number of space time streams to be used to perform the simultaneous transmission of the uplink frame and the one or more uplink frames from the one or more other stations" (claim 9)**

| TP-Link's Construction | Atlas's Construction |
|---|---|
| Indefinite | Plain and ordinary meaning<br><br>Alternatively, "wherein the second information in the common information portion is a value that depends on the total number of space time streams to be used to simultaneously transmit the multiple uplink frames. |

65.    TP-Link states in its P.R. 4-2 Disclosures that these terms are indefinite and incorporates the declarations of Dr. Sumit Roy submitted in the related cases against Sercomm and ASUSTeK.  I previously submitted declarations in those related cases against Sercomm and ASUSTeK, and incorporate here the portions related to these terms.  *See*, *e.g.*, Shoemake *Sercomm/ASUS* Dec. at ¶¶58-65; Shoemake Supp. *Sercomm/ASUS* Dec. at ¶¶13-26.  These terms are not indefinite.

66.    Claims 1 and 9 of the '738 Patent are method claims, directed to the operation of an access point and of a station, respectively, in a wireless communication network (such as an 802.11 wireless local area network). These particular limitations, from Claims 1 and 9 of the '738 Patent, relate to uplink setup information that is transmitted by (Claim 1) or received from (Claim 9) an access point. According to these claims, the uplink setup information transmission includes a common information portion that includes "second information being common to all of the plurality of stations to receive the uplink setup information." '738 Patent at 25:3-5 (Claim 1); 26:9-11 (Claim 9). The second information, in the common information portion, has a value that "is a

function of a total number of space time streams to be used to transmit the multiple uplink frames" from the plurality of stations.

67. There is nothing indefinite or ambiguous regarding this claim language and it provides reasonable certainty regarding the boundaries of the claims. According to the claims, an access point provides information as part of a common information field in an uplink setup information transmission. That information represents a value that is related (or which varies based on) the total number of space time streams that will be used by the stations transmitting a multi-user uplink frame in response to the uplink setup information.

68. The concept of a "function" is well understood by a POSITA. The term "function" refers to a value that depends on the value of one or more other quantities. *See Modern Dictionary of Electronics* (7th ed. 1999) ATLAS-00033189 (Definition 1, "[a] quantity of value that depends on the value of one or more other quantities.").

69. In his supplemental declaration submitted in the related cases against Sercomm and ASUSTeK, Dr. Roy states that "[w]ithout any explanation of what the 'function' is, the POSITA would be forced to speculate." *Sercomm/ASUSTeK* Supp. Decl. of Roy at ¶ 6. Effectively, Defendants in that case and Dr. Roy are advancing the notion that for a "function" to be definite, a specific function – such as a formula – must be defined specifically. I disagree with that position. A person of ordinary skill in the art is very familiar with the concept of a "function," which is basic mathematical terminology. The claim requirement that the second information "is a function of a total number of space time streams" identifies with reasonable precision the requirements of the second information so that a skilled artisan would know whether an accused system or method falls within or outside the scope of that requirement.

70. As a general matter, a person skilled in the art is able to ascertain if one variable is a function of another variable without requiring a specific mathematical formula to define the relationship between the variables. A POSITA would understand that this "function" language indicates that one quantity is determined based on one or more other quantities. For example, the notation $u = f(x)$ is commonly used to indicate that a variable $u$ is "a function of" a variable $x$. Numerous references can be found that define a function in this manner. For example, *The Authoritative Dictionary of IEEE Standards Terms* (7th Edition) provides the following principal definition of "function":

> **function (1) (general)** When a mathematical quantity $u$ depends on a variable quantity $x$ so that to each value of $x$ (within the interval of definition) there correspond one or more values of $u$, then $u$ is a function of $x$ written $u = f(x)$. The variable $x$ is known as the independent variable or the argument of the function. When a quantity $u$ depends on two or more variables $x_1, x_2, \ldots x_n$ so that for every set of values of $x_1, x_2, \ldots x_n$ (within given intervals for each of the variables) there correspond one or more values of $u$, then $u$ is a function of $x_1, x_2, \ldots x_n$ and is written $u = f(x_1, x_2, \ldots x_n)$. The variables $x_1, x_2, \ldots x_n$ are the independent variables or arguments of the function. (Std100) 270-1966w

PX AA at ATLAS-00033199. As this definition indicates, a function includes an independent variable and a dependent variable. In the common notation of $u = f(x)$, $x$ constitutes an independent variable, and $u$ represents a dependent variable. Whether the quantity $u$ is a function of $x$ can be readily answered by determining whether $u$ is determined based on a rule (or expression) that depends on $x$.

71. As the definition of "function" indicates, it is also possible for a value to be dependent on multiple variables. For example, there may be a function such that $y = f(x,z)$. Here a POSITA would understand that $y$ is a dependent variable that is determined as "a function of" the independent variables $x$ and $z$. So, in this example, $y$ is "a function of" both $x$ and $z$.

23

72.    Regardless of whether a dependent variable is a function of a single or multiple variables, for any unique combination of independent variables, there must be a corresponding value of the dependent quantity. Thus, determining whether the quantity or value of one variable is a function of one or more other variable(s) does not require *a priori* knowledge of a specific function or formula. Rather, it requires an understanding of the meaning of a function.

73.    Dr. Roy also stated in his prior declarations that absent identifying some precise formula or method, there could be an infinite number of functions that could fall within the scope of the claims. *Sercomm/ASUSTeK* Supp. Decl. of Roy at ¶ 6.  This is a non-sequitur.  As an example, consider a requirement that a number be an integer. Integers include all whole numbers that are not fractional. Limiting the number to an integer clearly places further limitation on the set of numbers, even though that set of numbers may still be very large. But that set of numbers would not include any fractional numbers such as 2/3.

74.    Similarly, while it is true that there may be a large number of possible functions that could be used that depend on the total number of space time streams, this does not support the conclusion that a function based on the total number of space time streams is not well defined. Dr. Roy's assertion is equivalent to asserting that just because there are an infinite number of integers (…, -3, -2, -1, 0, 1, 2, 3, …), a POSITA could not understand the meaning of an integer.  While it may be true that the number of functions that may be employed is relatively large, it is also true that there is a large (and possibly infinite) number of non-functions that could be represented. The quantity of possible functions and non-functions is irrelevant to the question of definiteness. The proper question is whether a POSITA understands the meaning of "a function of," and indeed a POSITA understands the meaning of this phrase well. As such, the boundaries of the claim are well defined, as a POSITA can readily examine any relationship between the claimed "second

24

information" and determine if it is "a function of a total number of space[-]time streams…" as claimed.

75.    Note that in my example, there are only two possibilities for the number: It is an integer or not an integer. So, all numbers are placed into one of two categories. That is the same with respect to the "a function of" language in the '738 claims. A POSITA would understand that the claim requires the "second information" to be "a function of" "a total number of space time streams," and if the second information is not dependent on the value of the total number of space time streams, then it falls outside the scope of the claims.

76.    As another example, consider the values of a variable $x$ and $y$ which represent the following parameters:

$$y: \text{time of day}$$
$$x: \text{person's name}$$

In this example, there is no relationship or dependence between the time of day, and a person's name.  As a result, the variable $y$ is not a function of $x$. Similarly, if the claimed "second information" value does not have any relationship or dependence on the total number of space time streams, then it would not qualify as a function of the total number of space time streams and would be outside the scope of the claims. As an example, if the second information represented only a modulation and coding scheme (MCS) for OFDM transmissions, then that second information would not be a function of the total number of space time streams.

77.    To the extent that TP-Link insists that a function must be written as a "formula," that would also be incorrect. A functional relationship can be expressed in forms other than a formula, including using tables or in expressions that pair together the values of the independent and dependent variables. For example, the following table expresses what is served for lunch as a function of the day of the week:

25

| Lunch | Day of Week |
|---|---|
| Seafood | Monday |
| Sandwiches | Tuesday |
| Tacos | Wednesday |
| Soups | Thursday |
| Pasta | Friday |

Functions can also be expressed in prose as is done in the '738 patent specification, as discussed further below.

78.     Defendants in the related Sercomm and ASUSTeK cases suggest that "any number can be written as a function of the number of space-time streams," without further explanation. *Sercomm/ASUSTeK* Reply Br. at 4. Although not entirely clear, those Defendants may be referring to a so-called constant function, *e.g.* $f(x) = c$ where $c$ is a constant value. For example, one might have $f(x) = 3$, where 3 is a constant. Thus, for any value of $x$ the function is equal to 3. While such a function exists in mathematics, this is a red herring. A POSITA would not interpret "as a function of" in the '738 claims as covering a situation involving such a constant value. The '738 patent is written in the context of wireless communication systems, as indicated in the preamble of the '738 independent claims. In wireless communication systems, if a value does not change, no information can be communicated. Thus, suggesting that the '738 patent covers "second information" that never changes is inconsistent with the purpose of communicating the second information to the plurality of station devices.

79.     In the '738 patent claims, the independent variable of the function comprises the total number of space-time streams, which is sometimes written as $N_{STS, total}$. Conversely, the dependent variable is the second information $y$ that forms part of the common information portion of the uplink setup information.  For a particular value of $N_{STS, total}$, there will be a corresponding value of the second information, as follows:

$$y = f(N_{STS, total})$$

This functional expression identifies with reasonable certainty the set of values comprising the variable $y$ (the values of the second information). Those values must depend upon the values of the total number of space time streams, so that as the number of space time streams vary, values for the second information will correspond to each value for the total number of space time streams.

80.     To the degree TP-Link and/or their expert, Dr. Roy, suggest there is no support in the specification for this functional relationship with the total number of space time streams, that is incorrect. The specification specifically teaches a relationship between the number of high efficiency long training fields (referred to the in the '738 patent as HEW-LTF) and the total number of space time streams:

> In yet another embodiment, when the ULI frame indicates to perform the channel sounding procedure, the number of long training fields used by the UL req frame may be the number of antennas of the corresponding station. That is, the long training field (LTF) is used for estimating a MIMO channel in a frame. For the MIMO channel estimation, the number of HEW long training fields (HEW-LTFs) may be determined in accordance with the number of antennas to be used for transmission, i.e., the number of space-time streams. For example, ***when the numbers of space-time streams are 1, 2, 3, 4, 5, 6, 7, and 8, the numbers of long training fields may be determined as 1, 2, 4, 4, 6, 6, 8, and 8, respectively***. Accordingly, the AP can estimate the channel in each transmitting antennas from the long training fields.

'738 Patent at 22:17-30 (emphasis added).

81.     This correspondence between the number of long training fields and the number of space time streams may be written in tabular form as:

| # Space Time Streams ($x$) | # Long Training Fields ($u$) |
|:---:|:---:|
| 1 | 1 |
| 2 | 2 |
| 3 | 4 |
| 4 | 4 |
| 5 | 6 |

27

|   |   |
|---|---|
| 6 | 6 |
| 7 | 8 |
| 8 | 8 |

As this table shows, and consistent with the meaning of "function," for each value of the independent variable $x$ (the # of space time streams), there is a corresponding value representing the dependent variable $y$ (the # of HEW-LTF symbols) used for MU-MIMO by the plurality of stations that receive the uplink setup information.

82.    Thus, there is language in the specification that aligns with the claim language, as "determined in accordance with" would be understood by a POSITA to align with the meaning of "a function of."

83.    I also note that the Court in the *Sercomm/ASUS* cases recently held these terms are not indefinite and that the plain and ordinary meaning applies.  *Sercomm/ASUS* 11/3/22 Claim Construction Order at 4 (term #5).

## XII.    U.S. Patent No. 9,912,513

**A.    "wherein at least a portion of the payload of the uplink frame is associated with the first guard interval length" (claim 1) / "wherein at least a portion of the payload of the uplink frame is associated with the first CP length" (claim 9) / "wherein at least a portion of the legacy header is associated with a second CP length" (claim 10) / "wherein at least a portion of the respective non-legacy header is associated with the first guard interval" (claim 16)**

| TP-Link's Construction | Atlas's Construction |
|---|---|
| Indefinite | Plain and ordinary meaning. |
| | Alternatively, "wherein some or all of the payload of the uplink frame uses the first guard interval length" (claim 1) / |
| | "wherein some or all of the payload of the uplink frame uses the first CP length" (claim 9) / |
| | "wherein some or all of the legacy header uses a second CP length" (claim 10) / |
| | "wherein some or all of the respective non-legacy header uses the first guard interval" (claim 16) |

84.     TP-Link states in its P.R. 4-2 Disclosures that these terms are indefinite and incorporates the declarations of Dr. Sumit Roy submitted in the related cases against Sercomm and ASUSTeK.  I previously submitted declarations in those related cases against Sercomm and ASUSTeK, and incorporate here the portions related to these terms.  *See*, *e.g.*, Shoemake *Sercomm/ASUS* Dec. at ¶¶91-99; Shoemake Supp. *Sercomm/ASUS* Dec. at ¶¶32-35.  These terms are not indefinite.

85.     None of these four terms are indefinite.  As explained below, persons of ordinary skill understand these terms according to their plain and ordinary meanings with at least reasonable certainty (and likely absolute certainty).  Further, Atlas's constructions are consistent with those plain and ordinary meanings.

86.     The '513 Patent has three independent claims that recite similar subject matter.  However, independent claims 1 and 9 (and their dependent claims) are drafted from the perspective of an 802.11ax (Wi-Fi 6) station, while independent claim 15 (and its dependent claims) is drafted from the perspective of an 802.11ax (Wi-Fi 6) access point.  I reproduce those independent claims and the dependent claims at issue below:

1. An apparatus for facilitating wireless communication, the apparatus comprising:

one or more memories; and

one or more processors coupled to the one or more memories, the one or more processors configured to cause:

receiving, in **a trigger frame** transmitted by an access point, **an indication of a first guard interval length**, wherein the trigger frame allocates one or more resources for an uplink (UL) multi-user (MU) transmission and solicits the UL MU transmission, wherein **a value of the first guard interval length is *to be used* by each of a plurality of stations**, including the apparatus, associated with the UL MU transmission,

generating an **uplink frame** for the UL MU transmission solicited by the trigger frame, wherein **the uplink frame comprises a payload and a physical layer (PHY) header**, and

29

> transmitting the uplink frame using a resource allocated by the trigger frame to the apparatus,
>
> ***wherein at least a portion of the payload of the uplink frame is associated with the first guard interval length***.

'513 at 21:21-44 (emphasis added).

9. A method for facilitating wireless communications between a wireless device and an access point, the method comprising:

> receiving, by the wireless device in a **downlink frame** from the access point, **an indication of a first cyclic prefix (CP) length**, wherein the downlink frame is for allocating resources for an uplink (UL) multi-user (MU) transmission and for soliciting the UL MU transmission, wherein **the first CP length is the same length *to be used* for all of a plurality of stations** addressed by the downlink frame in the UL MU transmission;
>
> generating, by the wireless device, an **uplink frame** for the UL MU transmission solicited by the downlink frame, wherein **the uplink frame comprises a payload**; and
>
> transmitting the uplink frame using a resource allocated by the downlink frame,
>
> ***wherein at least a portion of the payload of the uplink frame is associated with the first CP length***.

'513 at 22:9-27 (emphasis added).

10. The method of claim 9, wherein **the uplink frame further comprises a legacy header**, and ***wherein at least a portion of the legacy header is associated with a second CP length***.

'513 at 22:28-31 (emphasis added).

15. A computer-implemented method of facilitating wireless communication, the method comprising:

> determining, by an access point, **a first guard interval *to be used* by a set of stations participating in a multi-user (MU) uplink (UL) transmission**;
>
> creating, by the access point, a trigger frame, wherein **the trigger frame includes information indicating the first guard interval for the UL MU transmission**, wherein the trigger frame allocates resources for the UL MU transmission and solicits the UL MU transmission;
>
> transmitting, by the access point, the trigger frame to the set of stations; and
>
> processing an **uplink frame comprising a plurality of frames** from the set of stations based on the resources for the UL MU transmission, **wherein each of the plurality of frames comprises a respective payload**, and

30

> *wherein at least a portion of the respective payload is associated with the first guard interval*.

'513 at 22:50-67 (emphasis added).

> 16. The computer-implemented method of claim 15, wherein **each of the plurality of frames comprises a respective non-legacy header**, and *wherein at least a portion of the respective non-legacy header is associated with the first guard interval*.

'513 at 23:1-5 (emphasis added).

87.     Each of those independent claims generally describe two transmissions: (1) a downlink "trigger frame" sent by an access point to a plurality of stations that, among other things, indicates the guard interval/cyclic prefix length[2] "to be used" by those stations for a responsive uplink frame; and (2) an "uplink frame" with a payload that is sent by those stations, which actually uses the guard interval/cyclic prefix length indicated by the downlink frame—for "at least a portion" of its payload.  Thus, the '513 independent claims make clear to persons of ordinary skill that "at least a portion of the payload of the uplink frame" (i.e., some or all of uplink frame's payload) will "use[]" and therefore be "associated with the first guard interval length."

88.     Dependent claims 10 and 16 recite similar concepts but speak to the guard interval/cyclic prefix length used by a portion of the legacy or non-legacy "header" (rather than the "payload") of the uplink frame.  So, to a person of ordinary skill, those dependent claims similarly show that some or all of the specified header uses a particular guard interval/cyclic prefix length.

89.     The '513 specification—and Figure 8 in particular—also sheds light on these terms:

_____

[2] Claim 1 recites a "guard interval length," claim 9 recites a "cyclic prefix length," and claim 15 recites a "guard interval."  Persons of ordinary skill recognize those terms each *generally* refer to the same concept.  *See* '513 Patent at 10:55-57 ("In or more implementations, a guard interval is a cyclic prefix (CP), and a guard interval duration is a CP length.").  Any differences are immaterial with respect to the question of indefiniteness.



FIG. 8

'513 Patent at Fig. 8 (annotations and highlighting added). As can be seen, Figure 8 shows two transmissions: (1) downlink frame 810 sent by the AP access point to stations STA1 and STA2; and (2) uplink frames 830/850 sent in response to the downlink frame, each of which includes a header 840/860 and a payload 842/862. '513 Patent at Fig. 8, 16:65-67, 17:23-28, 17; *see also* '513 Patent at Fig. 4, 8:65-9:2 (showing more details of the frame format). Importantly, the specification teaches "[t]he downlink frame 810 may also include information on a guard interval duration GI3 ***to be utilized*** by the participating stations." '513 Patent at 17:17-20 (emphasis added). The stations "decode the downlink frame 810" and "identify the guard interval duration GI3 ***to be utilized*** in the [payloads] 842 and 862 of the respective uplink frames 830 and 850." '513 Patent at 17:23-31 (emphasis added). Then, those stations actually "***use*** the guard interval duration GI3 indicated by the downlink frame 810 for UL OFDMA transmission for" a portion of

32

payload 842/862—namely, that portion marked "GI3" and highlighted yellow in the figure below. '513 Patent at 17:34-37 (emphasis added). In short, a POSITA having read the '513 specification understands with respect to Figure 8: (1) the claimed "portion" includes the payload symbols that are preceded by the guard interval GI3 (highlighted yellow in the annotated figure); and (2) the claimed "association" comes from the fact that those symbols use the same guard interval GI3 indicated by the prior downlink frame.

90.     The specification also sheds light on '513 dependent claims 10 and 16. For example, it teaches both legacy headers and non-legacy headers (aka "HE headers"). '513 Patent at 9:2-6, 9:20-25, Fig. 4. And like the claims, those legacy and non-legacy headers may use different guard interval lengths. *See* '513 Patent at 10:57-61, 12:12-18, Fig. 8.

91.     In addition to teaching that a portion of an uplink frame "***uses***" the guard interval indicated by a prior downlink frame, the specification also consistently teaches that "a cyclic prefix for a portion of each respective uplink frame may have a cyclic prefix length ***corresponding to*** the information included in the downlink frame." '513 Patent at Abstract (emphasis added). The '513 specification also explains that "a guard interval duration associated with the second part of the second frame may be ***based on*** information (e.g., a value) contained in the first frame that is indicative of the guard interval duration." '513 Patent at 3:62-67 (emphasis added). Each of those terms—"uses," "corresponding to," and "based on"—are consistent with the plain and ordinary meaning of "associated with."

92.     The prosecution history is also informative as to indefiniteness issues associated with these claim terms. The initial claims submitted on July 16, 2016 as part of application 15/203,717 included the claim language at issue here. '513 FH at ATLAS-00014255-8. On July 28, 2017, the Examiner rejected those initial claims for "double patenting" in view of other Atlas

33

patent applications with claims that were supposedly not patentably distinct from the pending '513 claims. '513 FH at ATLAS-00014285-91. But the Examiner never rejected the claims for indefiniteness, nor indicated that their meaning was unclear. *Id.* On October 30, 2017, the Applicant responded with a terminal disclaimer that overcame the double patenting rejection. '513 FH at ATLAS-00014302-8. Finally, on November 22, 2017, the Examiner allowed the claims. '513 FH at ATLAS_00014317-24. The Examiner's stated reason for allowance was:

> However regarding claims 1 and 15 **none of the prior art of the record explicitly teaches or fairly suggests** all of the claimed limitation, especially the features of: wherein the trigger frame allocates one or more resources for an uplink (UL) multi-user (MU) transmission and solicits the UL MU transmission, wherein a value of the first guard interval length is to be used by each of a plurality of stations, including the apparatus, associated with the UL MU transmission, generating an uplink frame for the UL MU transmission solicited by the trigger frame, wherein the uplink frame comprises a payload and a physical layer (PHY) header, and transmitting the uplink frame using a resource allocated by the trigger frame to the apparatus, ***wherein at least a portion of the payload of the uplink frame is associated with the first guard interval length***.

> Further regarding claim 9 **none of the prior art of the record explicitly teaches or fairly suggests** all of the claimed limitation, especially the features of: wherein the first CP length is the same length to be used for all of a plurality of stations addressed by the downlink frame in the UL MU transmission; generating, by the wireless device, an uplink frame for the UL MU transmission solicited by the downlink frame, wherein the uplink frame comprises a payload; and transmitting the uplink frame using a resource allocated by the downlink frame, ***wherein at least a portion of the payload of the uplink frame is associated with the first CP length***.

'513 FH at ATLAS-00014322-3 (emphasis added). The fact that the Examiner specifically identified the claim language at issue in the reasons for allowance suggests to a person skilled in the art that the Examiner understood the import of this limitation. So, this evidence also suggests the claims are not indefinite.

93.    Based on the above evidence, I conclude that a person of skill understands the boundaries of these claims with at least reasonable certainty. For example, such a person of skill understands that, with respect to '513 claim 1, if ***any*** part (including every part) of the UL frame's

34

payload *__uses__* the guard interval length indicated by the preceding DL trigger frame, then "at least a portion of the payload of the uplink frame is associated with the first guard interval length." The '513 claims and specification provide an objective boundary as to what "portion" of the uplink frame is "associated with" the guard interval length.

94.    I also note that the Court in the *Sercomm/ASUS* cases recently held these terms are not indefinite and that the plain and ordinary meaning applies. *Sercomm/ASUS* 11/3/22 Claim Construction Order at 7 (term #11).

**B.    "based on the resources for the UL MU transmission" (claim 15)**

| TP-Link's Construction | Atlas's Construction |
| --- | --- |
| Indefinite | Plain and ordinary meaning. |

95.    TP-Link states in its P.R. 4-2 Disclosures that this term is indefinite and incorporates the declarations of Dr. Sumit Roy submitted in the related cases against Sercomm and ASUSTeK. I previously submitted declarations in those related cases against Sercomm and ASUSTeK, and I incorporate here the portions related to these terms. *See*, *e.g.*, Shoemake *Sercomm/ASUS* Dec. at ¶¶100-109. This term is not indefinite.

96.    This term is not indefinite. As explained below, a person of ordinary skill understands this term according to its plain and ordinary meaning with at least reasonable certainty.

97.    First, this term uses the common phrase "based on" that is well understood. New Oxford American Dictionary at ATLAS-00033133 ("base: (often be based) have as the foundation for (something); use as a point from which (something) can develop").

98.    Second, when read in the context of the whole clause in which it is recited, both the clause and the term are readily understandable.

99.    Claim 15 is independent. As stated above, it differs from independent claims 1 and 9 in that it is drafted from the perspective of an access point. The full claim recites:

15.    A computer-implemented method of facilitating wireless communication, the method comprising:

determining, by an access point, a first guard interval to be used by a set of stations participating in a multi-user (MU) uplink (UL) transmission;

determining, by an access point, a first guard interval to be used by a set of stations participating in a multi-user (MU) uplink (UL) transmission;

creating, by the access point, a trigger frame, wherein the trigger frame includes information indicating the first guard interval for the UL MU transmission, **wherein the trigger frame allocates resources for the UL MU transmission** and solicits the UL MU transmission;

transmitting, by the access point, the **trigger frame to the set of stations**; and

**processing an uplink frame comprising a plurality of frames from the set of stations _based on the resources for the UL MU transmission_**, wherein each of the plurality of frames comprises a respective payload, and wherein at least a portion of the respective payload is associated with the first guard interval.

'513 at 22:50-67 (emphasis added).

100.    Turning to the processing clause, the dispute asserted by the Sercomm and ASUSTeK Defendants (and presumably by TP-Link, too) is "whether [1] the processing of the uplink frame, or [2] the uplink frame itself, are required to be 'based on the resources for the UL MU transmission.'" _Sercomm/ASUSTeK_ Opening CC Brief at 25.

101.    The claim recites that the access point creates and then transmits a "trigger frame [that] allocates resources for the UL MU transmission." '513 Patent at 22:55-59. The specification explains that resources are, "for example, bandwidth, time/duration that the STAs expect to occupy a transmission medium, and/or possibly a number of spatial streams that the STAs may use." _Id._ at 2:58-61.  The specification also explains that resource allocation may include "a sub-band assigned to a respective one of the participating stations as well as scheduling information regarding when a respective one of the participating stations may transmit using its assigned sub-band." _Id._ at 11:56-60.  By allocating resources, the trigger frame effectively instructs the stations how and when to send the UL MU transmission to the access point.

102.    The specification also explains that when the stations receive the trigger frame, they responsively create and then send the UL MU transmission to the access point. '513 Patent at 2:67-3:5, 17:23-42, Fig. 8. That UL MU transmission includes the claimed "uplink frame comprising a plurality of frames from the set of stations." *Id.* And as stated above, that uplink frame is "based on the resources for the UL MU transmission" that were allocated in the trigger frame because the uplink frame is transmitted using those resources. *Id.* After that, the access point receives and then "process[es that] uplink frame." *See id.* This intrinsic evidence shows the uplink frame itself is based on the resources allocated by the trigger frame.

103.    I have considered the Sercomm and ASUSTeK Defendants' alternative interpretation (and presumably TP-Link's, too), i.e. that it is the access point's "processing" that is "based on the resources for the UL MU transmission." While it may be the case that such processing at the access point is based on the UL MU transmission, I find the following facts would guide a POSITA's interpretation. First, the claim makes clear that the trigger frame that is created and transmitted by the access point "allocates resources for UL MU transmission." Those allocations are to the respective stations that will transmit on the uplink. Then the claim requires processing of the uplink frame that comprises a plurality of frames that were sent on the uplink by the stations. The claim recites the plurality of frames sent on the uplink to be "based on the resources for the UL MU transmission," something that was not previously recited in the claim. Further, if the inventor had wanted to draft the claim to require the processing to be based on the resources for UL MU transmission, the inventor could have done that by writing the limitation as "processing, based on the resources for the UL MU transmission, an uplink frame comprising a plurality of frames from the set of stations." Here, however, what precedes the phrase "based on the resources for the UL MU transmission" is "frames from the set of stations." In my view this

makes clear to a POSITA that (a) the claim requires the plurality of frames to come from the set of stations that are participating in the UL MU transmission; and (b) not only must those stations receive the resources allocated for UL MU transmission, but the frames themselves must be based on those allocations. Finally, it is my understanding that the claims are entitled to a presumption of validity and should be read in light of the specification. Based on my review of the specification, I find numerous teachings of the UL MU frames being based on the allocated resources. This further confirms my view that a POSITA would understand the phrase "based on the resources for the UL MU transmission" to pertain to the frames being transmitted on the uplink by the set of stations.

104. Based on the above evidence, I conclude that a person of ordinary skill understands the boundary of this claim term and the processing clause with at least reasonable certainty. That is, "processing an uplink frame comprising a plurality of frames from the set of stations based on the resources for the UL MU transmission" means that the uplink frames themselves are based on the resources allocated to respective stations in the set of stations by the trigger frame. It does not require (nor prohibit) the processing itself to be based on the resources for the UL MU transmission.

105. I also note that the Court in the *Sercomm/ASUS* cases recently held this term is not indefinite and that the plain and ordinary meaning applies. *Sercomm/ASUS* 11/3/22 Claim Construction Order at 8 (term #12).

## XIII.    U.S. Patent No. 9,917,679

### A.    "single-user (SU) format" / "SU format" / "multiple-user (MU) format" / "MU format" (claims 1, 6)

| TP-Link's Construction | Atlas's Construction |
|---|---|
| Indefinite | Plain and ordinary meaning. |

106.    TP-Link states in its P.R. 4-2 Disclosures that these terms are indefinite and references the forthcoming declaration of Dr. Sumit Roy.  Specifically, TP-Link suggests Dr. Roy may opine that "a POSITA would have been unable to ascertain the bounds of this claim term, which renders it indefinite."  TP-Link P.R. 4-2 at 5.  From this bare-bones disclosure, it is unknown why Dr. Roy believes these terms are indefinite.  Notwithstanding, I have analyzed the use of these phrases in the claims and in light of the teachings of the specification, the prosecution history, and the knowledge of a POSITA. Based on that analysis which is described in detail below, I find a POSITA would have understood these terms with reasonable certainty. Thus, I disagree with Dr. Roy's conclusion and reserve any right I may have to respond to any new theories or analysis he may proffer.

107.    As a preliminary matter, I note that Sercomm and ASUSTeK initially asserted that these terms were indefinite, too.  *See Sercomm/ASUS* Invalidity Contentions (dated July 21, 2022) at 105-106.  Yet they abandoned that indefiniteness position when it came time to construe the claims.  *See Sercomm/ASUS* Preliminary Proposed Claim Constructions (dated August 18, 2022) at 6.

108.    The '679 Patent has two independent claims, Claims 1 and 6.  The claims cover similar subject matter, except Claim 1 is drafted from the perspective of a station communicating with an access point, while Claim 6 is drafted from the perspective of a access point communicating with a station.  I reproduce those claims below:

> 1. A method for transmitting an acknowledgement frame for notifying successful data reception by a station (STA) to an access point (AP) in a wireless local area network, the method comprising:
>
> receiving, from the AP, a downlink frame including a quality of service (QoS) control field including acknowledgement information representing whether the STA is requested to transmit the acknowledgement frame in a ***single-user (SU) format*** or in a ***multiple-user (MU) format*** at a Short Inter-Frame Space (SIFS) time after the downlink frame; and

39

transmitting, to the AP, the acknowledgement frame based on the acknowledgement information at the SIFS time after the downlink frame,

wherein transmitting the acknowledgment frame comprises:

when the acknowledgment information represents that the STA is requested to transmit the acknowledgement frame in the ***MU format*** and the STA is allocated a resource, transmitting the acknowledgement frame in the ***MU format*** on the allocated resource ***simultaneously with transmission of at least one acknowledgement frame from at least one other STA***, and

when the acknowledgment information represents that the STA is requested to transmit the acknowledgement frame in the ***SU format***, transmitting the acknowledgement frame in ***SU format***.

'679 at 41:37-42:2 (emphasis added).

6. A method for receiving an acknowledgement frame for notifying successful data reception by an access point (AP) from a station (STA) in a wireless local area network, the method comprising:

transmitting, to the STA, a downlink frame including a quality of service (QoS) control field including acknowledgement information representing whether the STA is requested to transmit the acknowledgement frame in a ***single-user (SU) format*** or in a ***multiple-user (MU) format*** at a Short Inter-Frame Space (SIFS) time after the downlink frame; and

receiving, from the STA, the acknowledgement frame based on the acknowledgement information at the SIFS time after the downlink frame,

wherein receiving the acknowledgment frame comprises:

when the acknowledgment information represents that the STA is requested to transmit the acknowledgement frame in the ***MU format***, receiving the acknowledgement frame in the ***MU format*** on an allocated resource ***simultaneously with transmission of at least one acknowledgement frame from at least one other STA***, and

when the acknowledgment information represents that the STA is requested to transmit the acknowledgement frame in the ***SU format***, receiving the acknowledgement frame in ***SU format***.

'679 at 42:20-45 (emphasis added).

109.    Those claims clearly distinguish between an acknowledgment frame in a "single-user (SU) format" on the one hand, and an acknowledgment frame in a "multi-user (MU) format" on the other hand.  *Id.*  And they specify that an acknowledgment frame in MU format will be transmitted "simultaneously" with an acknowledgment frame from at least one other station.  *Id.*

110.    The '679 specification also informs one of skill as to the meaning of these claim terms.  For example, the Abstract states:

> The method may include receiving, from the AP, a downlink frame including information related to a *type of the uplink frame, the type of the uplink frame including a single-user (SU) type and a multiple-user (MU) type*; and transmitting, to the AP, the uplink frame having a type determined based on the information related to the type of the uplink frame, wherein, when the type of the uplink frame corresponds to the *MU type*, the uplink frame is *simultaneously transmitted by a plurality of STAs including the STA and at least one other STA*.

'679 at Abstract (emphasis added).

111.    The Background of the Invention section teaches that there is a need in the development of 802.11ax for (a) protecting a transmitted frame; and (b) determining the type of a response frame. *Id.* at 1:65-67.  The specification describes methods to address both of these needs. Claims 1 and 6 and the SU/MU format terms correspond to the latter of these two needs, i.e. the need to determine a type of response frame.

112.    The Summary of the Invention section then teaches that "the present invention … provide[s] a method for determining the type of a response frame in a High Efficiency WLAN (HEW)." *Id*. at 2:3-6. The Summary of the Invention goes on to teach:

> In an aspect of the present invention, a method for transmitting an uplink frame by a station (STA) to an access point (AP) in a WLAN may be provided. The method may include receiving, from the AP, a downlink frame including information related to a *type of the uplink frame, the type of the uplink frame including a single-user (SU) type and a multiple-user (MU) type*; and transmitting, to the AP, the uplink frame having a type determined based on the information related to the type of the uplink frame, wherein, when the type of the uplink frame corresponds to the *MU type*, the uplink frame is *simultaneously transmitted by a plurality of STAs including the STA and at least one other STA*.

'679 at 2:11-23 (emphasis added).  Again, those '679 specification passages identify two "types" of uplink frames: (1) a "single-user (SU) type" of uplink frame; and (2) a "multi-user (MU) type" of uplink frame.  *Id.*  And the MU type of uplink frame is "simultaneously transmitted by a plurality of STAs including the STA and at least one other STA."  *Id.*

41

113.    The Summary of Invention uses the phrase "uplink frame" 40 times. This is telling as 802.11ac-2013 already implemented DL MU MIMO. In downlink MU MIMO the AP transmits a frame comprising data for multiple receiving stations. But 802.11ac did not implement uplink multi-user transmissions. A POSITA would understand a key aspect of the invention to be determination of the type of frame to be sent on the uplink in a system that supports not only single-user transmission on the uplink to the access point, but also multi-user transmission, i.e. simultaneous transmission by a plurality of stations on the uplink to the access point. *Cf. id.* at 23:21-29 transitioning from discussion of downlink to uplink communication.

114.    A POSITA would already be aware that frame formats exist for single-user and multi-user transmission. For example, the specification refers to 802.11a, 802.11g, and 802.11n, all of which used frame formats for single-user transmission. Whether on the uplink or downlink, those transmissions were intended to carry data for a single user. *Id.* at 1:44-56.

115.    A POSITA would also be aware that IEEE 802.11ac (ratified in 2013) added downlink multi-user MIMO transmission. In this case, the access point could transmit a type of packet with a format that contained data for multiple users. This type of packet was referred to as "multi-user" because data for multiple users was being sent simultaneously. *Id*. at 1:46-53. However, 802.11ac did not include a means for UL MU transmission.

116.    The specification teaches the use of frame formats for downlink multi-user transmissions. For example, Figure 11 provides an example of a frame formatted for downlink multi-user transmission. *Id.* at 19:64-20:1 ("…two spatial streams are transmitted to each STA in DL MU-MIMO or OFDMA mode…").

42

**FIG. 11**

| L-STF | L-LTF | L-SIG | HE-SIG-A | HE-STF | HE-LTF | HE-LTF | HE-LTF | HE-LTF | HE-SIG-B | PSDU(AP to STA6) |
| | | | | HE-STF | HE-LTF | HE-LTF | HE-LTF | HE-LTF | HE-SIG-B | PSDU(AP to STA5) |
| | | | | HE-STF | HE-LTF | HE-LTF | HE-LTF | HE-LTF | HE-SIG-B | PSDU(AP to STA3,STA4) |
| | | | | HE-STF | HE-LTF | HE-LTF | HE-LTF | HE-LTF | HE-SIG-B | PSDU(AP to STA1,STA2) |

*Id.* at Figure 11 (annotation added).

117.    The specification also teaches that frames may be formatted for uplink multi-user transmission. For example, relative to Figure 13 the specification teaches formatting by which four stations simultaneously transmit on the uplink to the access point.

**FIG. 13**

| L-STF | L-LTF | L-SIG | HE-SIG-A | HE-STF | HE-LTF | HE-SIG-B | HE-LTF | HE-LTF | HE-LTF | HE-LTF | HE-SIG-C | PSDU(STA4 to AP) |
| | | | | HE-STF | HE-LTF | HE-SIG-B | HE-LTF | HE-LTF | HE-LTF | HE-LTF | HE-SIG-C | PSDU(STA3 to AP) |
| | | | | HE-STF | HE-LTF | HE-SIG-B | HE-LTF | HE-LTF | HE-LTF | HE-LTF | HE-SIG-C | PSDU(STA2 to AP) |
| | | | | HE-STF | HE-LTF | HE-SIG-B | HE-LTF | HE-LTF | HE-LTF | HE-LTF | HE-SIG-C | PSDU(STA1 to AP) |

*Id*. at Figure 13 (annotation added).

118.    At column 27, the specification transitions to teaching method for performing uplink transmissions:

> *Now*, a description will be given of a method for performing *UL SU PPDU transmission or UL MU PPDU transmission according to the type of a response to DL MU transmission* and a method for protecting a DL/UL HE PPDU in a WLAN system supporting DL/UL MU transmission.

*Id.* at 27:44-49.

119.    The specification describes the "method for protecting … transmissions" from column 27 into column 34, saying: "The method for *protecting a DL/UL HE PPDU* will *first* be described below." *Id*. at 27:50-51 (emphasis added). These embodiments utilize Figures 15-18 and

43

do not directly correspond to claims 1 and 6. Rather they correspond to the teaching of "protecting a transmitted frame." *Id.* at 2:4.

120.   At column 34, the specification begins teaching the embodiments corresponding to claims 1 and 6, stating:

> ***Now***, a description will be given of a method for performing ***UL SU PPDU transmission or UL MU PPDU transmission according to the type of a response to DL MU transmission***. For example, while UL SU transmission of a response to DL MU transmission is basically supported, if responses to DL MU transmission can be transmitted in UL MU transmission, system performance such as DL throughput may be significantly increased.

*Id.* at 34:22-30 (emphasis added). The teaching corresponding to claims 1 and 6 utilizes Figures 19-23.

121.   Figure 19 illustrates transmissions of UL SU PPDUs. The Access Point transmits a DL MU DATA PPDU (red), and STA1 immediately responds with a single user transmission (blue) containing a block acknowledgement based on the information in the control field of the downlink transmission (green). The downlink multi-user transmission (red) would be understood to be a multi-user transmission because it is carrying data for multiple users. The next PPDU (blue) would be understood to be a single-user transmission, as it is transmitting data from a single user to the access point with no other user transmitting data simultaneously. The subsequent transmissions in Figure 19 (not highlighted) are all single user transmissions occurring between the access point and a single device at a time.

44



122.    Figure 20 shows a situation in which the DL MU DATA PPDU (red) is followed by a simultaneous uplink transmission (blue) from stations 1-4. Here, two multi-user transmissions are employed. The first PPDU (red) is formatted to carry data from the AP to multiple stations, thus making it a multi-user formatted PPDU. The second is an uplink multi-user transmission, i.e. a plurality of devices each format their respective PPDUs to be simultaneously transmitted to the AP at the same time.



123.    Figures 21 and 22 are also helpful to understand these claim terms.  With respect

to those figures, the '679 specification begins by explaining:

> ***FIGS. 21 and 22 depict various types of UL responses to DL MU transmission***.
>
> All destination STAs of a DL MU DATA PPDU may not be assumed to support UL MU transmission. Therefore, ***the destination STAs of the DL MU DATA PPDU may be classified into UL MU transmission supported STAs and UL MU transmission non-supported STAs***, and a UL transmission scheme may be determined for the DL MU DATA PPDU accordingly.
>
> ***The AP may request a UL MU transmission supported STA to transmit a UL MU block ACK PPDU*** (i.e., the AP may provide a response request (or trigger) indicating the UL MU transmission-based response type). Meanwhile, ***the AP may request a UL MU transmission non-supported STA to transmit a UL SU block ACK PPDU (e.g., a legacy block ACK PPDU) (i.e., the AP may provide a response request (or trigger) indicating the UL SU transmission-based response type)***.
>
> Such different types of UL responses may not be transmitted simultaneously. Therefore, a UL response request (or trigger) may be provided such that different types of UL responses to a DL MU DATA PPDU may be transmitted at different time points. For example, to receive block ACK PPDUs from a plurality of STAs including UL MU transmission supported STAs and a UL MU transmission non-supported STA(s), the AP may include an implicit block ACK request in the DL MU PPDU or an explicit block request in a separate block ACK request PPDU, and transmit the DL MU PPDU sequentially to the UL MU transmission supported STAs and the UL MU transmission non-supported STA(s).
>
> In the examples of FIGS. 21 and 22, it is assumed that STA1, STA2, and STA3 are UL MU transmission supported STAs and STA4 is a UL MU transmission non-

46

supported STA. If the destination STAs of a DL MU DATA PPDU include both a UL MU transmission supported STA and a UL MU transmission non-supported STA, the ACK Policy may be set to Implicit Block ACK Request for one or more STAs supporting one (a first type) of different UL immediate response types and to Block ACK for one or more STAs supporting the other type (a second type). *Herein, the first type may be the UL MU transmission-based response type and the second type may be the UL SU transmission-based response type. Or the first type may be the UL SU transmission-based response type and the second type may be the UL MU transmission-based response type.*"

'679 at 36:55-37:2 (emphasis added).  Thus, the '679 specification explains there may be two types of station devices, those that support UL MU transmissions (*e.g.*, Wi-Fi 6 devices) and those that do not (*e.g.*, Wi-Fi 5 devices).  *Id.*  The station devices that support UL MU transmissions may send "UL MU block ACK PPDUs," while the station devices that do not support UL MU transmissions may send "UL SU block ACK PPDUs" (also referred to as "legacy block ACK PPDUs."  *Id.*  The specification refers to the UL MU block ACK PPDUs as of the "UL MU transmission-based response type," while it refers to the UL SU block ACK PPDUs as of the "UL SU transmission-based response type."  *Id.*

124.    Then the '679 goes into detail regarding Figure 21, which I've annotated below:

*In the example of FIG. 21*, the ACK Policy is set to Implicit Block ACK Request for *STA1, STA2, and STA3 supporting UL MU transmission (i.e., supporting the UL MU transmission-based response type)* in a DL MU DATA PPDU. In this case, *STA1, STA2, and STA3 may transmit a UL MU Block ACK PPDU* to the AP a predetermined IFS (e.g., an SIFS) after receiving the DL MU DATA PPDU. That is, *the UL MU transmission supported STAs (i.e., STAs supporting the UL MU transmission-based response type), STA1, STA2, and STA3 may simultaneously transmit block ACK frames in UL MU transmission*. Since different channel estimation sequences (e.g., HE-STF and HE-LTF sequences) are used for the plurality of STAs participating in the UL MU transmission, the AP may receive the block ACK frames from the plurality of STAs without collision.

Since *a UL MU transmission non-supported STA (i.e., an STA supporting only the UL SU transmission-based response type) is not allowed to transmit a block ACK frame simultaneously with other STAs*, the ACK Policy may not be set to Implicit Block ACK Request for the UL MU transmission non-supported STA except for the case where the ACK Policy is set to Implicit Block ACK Request for only one STA in a DL MU DATA PPDU.

In the example of FIG. 21, since the ACK Policy is set to Implicit Block ACK Request for STA1, STA2, and STA3, the ACK Policy may be set to not Implicit Block ACK Request but Block ACK for ***STA4 that does not support UL MU transmission (i.e., supporting only the UL SU transmission-based response type)***. In this case, ***STA4 may transmit a legacy block ACK PPDU (or a UL SU block ACK PPDU)*** a predetermined IFS (e.g., an SIFS) after receiving a block ACK request PPDU from the AP.



'679 at 37:3-35 (emphasis added); Fig. 21 (annotations added).  Thus, we see that in the example

of Figure 21, STA1, STA2, and STA3 (which are station devices that support UL MU

transmissions) simultaneously transmit "block ACK frames in UL MU transmission," which I've

highlighted in the figure above. *Id.*  Similarly, Figure 21 shows that STA 4 (which does not support

UL MU transmissions) transmits a "UL SU block Ack PPDU," also referred to as a "legacy block

ACK PPDU," which I've also highlighted in the figure above. *Id.*

48

125.    Next, the '679 describes Figure 22 in detail, which I've annotated below:

Meanwhile, ***in the example of FIG. 22***, the ACK Policy is set to Block ACK for ***STA1, STA2, and STA3 supporting UL MU transmission (i.e., supporting the UL MU transmission-based response type)*** and to Implicit Block ACK Request for ***STA4 that does not support UL MU transmission (i.e., supporting only the UL SU transmission-based response type)*** in a DL MU DATA PPDU. In this case, ***STA4 may transmit a block ACK PPDU (e.g., a legacy block ACK PPDU or a UL SU block ACK PPDU)*** a predetermined IFS (e.g., an SIFS) after receiving the DL MU DATA PPDU from the AP. ***STA1, STA2, and STA3 may transmit a UL MU block ACK PPDU*** to the AP a predetermined IFS (e.g., an SIFS) after receiving a block ACK request PPDU from the AP. That is, ***the UL MU transmission supported STAs (i.e., STAs supporting the UL MU transmission-based response type), STA1, STA2, and STA3 may simultaneously transmit block ACK frames in UL MU transmission***. Since different channel estimation sequences (e.g., different scrambling codes used in generation of HE-STFs and HE-LTFs) are used for the plurality of STAs participating in the UL MU transmission, the AP may receive the block ACK frames from the plurality of STAs without collision.



FIG. 22

49

'679 at 37:36-57 (emphasis added); Fig. 21 (annotations added).  Figure 22 is similar to Figure 21

in that STA 4 does not support UL MU transmission and transmits a "block ACK PPDU (e.g., a

legacy block ACK PPDU or a UL SU block ACK PPDU," which I've highlighted in the figure

above.  *Id.*  But STAs 1-3 that do support UL MU transmission simultaneously transmit a "UL

MU block ACK PPDU," which I've also highlighted in the figure above.  *Id.*  Here, in contrast to

Figure 21, the AP includes information that causes STA4 to respond with a single-user

transmission immediately after the downlink MU DATA PPDU has been transmitted to STA1-4.

Subsequently the AP sends a "Block ACK Request PPDU" to STA1-3, thereby causing them to

respond with a multi-user transmission ("UL MU Block ACK PPDU") as highlighted at right

above. Thus, Figures 21 and 22 work in combination to show the inventions' capability to provide

information in the downlink transmission from the AP that indicates whether a station should

immediately respond with transmission formatted for single-user communication (Figure 22) or if

a plurality of stations should immediately respond with transmissions formatted for multi-user

transmission (Figure 21).

126.    The '679 Patent concludes its discussion of Figures 21 and 22 as follows:

> As described above with reference to the examples of ***FIGS. 21 and 22***, the PPDU
> type of an immediate response to a DL MU PPDU (i.e., a UL response transmitted
> a predetermined IFS (e.g., an SIFS) after reception of a DL MU PPDU) may be of
> the ***UL SU transmission type (e.g. a legacy PPDU type) or the UL MU
> transmission type (e.g., a UL MU PPDU type)***, and the type of the immediate
> response to the DL MU PPDU may be determined based on information (e.g.,
> information triggering UL transmission) included in the DL MU PPDU.

'679 at 37:58-67 (emphasis added).  Again, it distinguishes between a "UL SU transmission type

(*e.g.*, a legacy PPDU type)" and a "UL MU transmission type (*e.g.*, a UL MU PPDU type)"  *Id.*

A POSITA understands that the UL SU transmission types are transmitted using PPDUs in SU

format, while UL MU transmissions are transmitted using PPDUs in MU format.

50

127.    Lastly, the '679 specification's treatment of Figure 23 is also instructive.  It describes how a station determines whether it should transmit a MU type acknowledgment or a SU type acknowledgment:

> *FIG. 23 depicts an exemplary method* according to the present invention.
>
> In step S2310, an AP may transmit a DL frame to an STA group including one or more STAs. The DL frame may correspond to a DL MU DATA PPDU or a block ACK request PPDU described in the foregoing examples. The DL frame may include information about the type of a UL frame transmitted as an immediate response (i.e., transmitted a predetermined IFS (e.g., an SIFS) after reception of the DL frame). *The UL frame may correspond to a block ACK PPDU described in the foregoing examples. The type of the UL frame may be an SU type or an MU type*. If the information about the type of a UL frame, included in the DL frame is the MU type, the DL frame may further include resource allocation information, transmission time information, and MCS information for a plurality of STAs, for transmission of UL frames (i.e., a UL MU frame).
>
> *In step S2320, each STA of the STA group may determine the type of the UL frame* elicited by the DL frame based on the information (e.g., the information about the type of a UL frame) included in the received DL frame. *If the type of the UL frame is the MU type*, the STA may determine UL MU transmission parameters (e.g., a resource index for the STA, for transmission of the UL MU frame, a transmission time of the UL MU frame, and an MCS to be applied to the UL MU frame) based on the information included in the DL frame (e.g., the resource allocation information, the transmission time information, and the MCS information). Therefore, *a plurality of STAs may simultaneously transmit a UL MU frame to the AP in step S2340*.
>
> *If the type of the UL frame is determined to be the SU type in step S2320, one STA may transmit a UL SU frame to the AP in step S2350*.

51



FIG. 23

'679 at 40:45-41:10 (emphasis added); Figure 23 (annotations added).    From the above specification a POSITA understands these terms "single-user (SU) format" and "multi-user (MU) format" with at least reasonable certainty. A POSITA understands that, when the type of transmission is a single-user transmission, a frame format for sending data from a single device to another is utilized (*e.g.* a legacy 802.11a/g/n/ac format).  Also, when the type of transmission is multi-user on the uplink, a frame format is used corresponding to multiple devices transmitting on the uplink to the access point at the same time.

52

128.    The '679 prosecution history also evidences that these terms are not indefinite. The originally filed independent claims were as follows:

> 1.    A method for transmitting an uplink frame by a station (STA) to an access point (AP) in a wireless local area network, the method comprising:
>
> receiving, from the AP, a downlink frame including information related to a type of the uplink frame, the type of the uplink frame including a single-user (SU) type and a multiple-user (MU) type; and
>
> transmitting, to the AP, the uplink frame having a type determined based on the information related to the type of the uplink frame,
>
> wherein, when the type of the uplink frame corresponds to the MU type, the uplink frame is simultaneously transmitted by a plurality of STAs including the STA and at least one other STA.

> 11.    A method for receiving an uplink frame by an access point (AP) from at least one station (STA) in a wireless local area network, the method comprising:
>
> transmitting, to the at least one STA, a downlink frame including information related to a type of the uplink frame, the type of the uplink frame including a single-user (SU) type and a multiple-user (MU) type; and
>
> receiving, from the at least one STA, the uplink frame having a type determined based on the information related to the type of the uplink frame,
>
> wherein, when the type of the uplink frame corresponds to the MU type, the uplink frame is simultaneously transmitted by a plurality of STAs including the at least one STA.

'679 FH at ATLAS-00014833-4.

129.    The Examiner rejected those claims as obvious in view of the combination of (1) another Newracom US published patent application 2013/0188627 to Cheong et al. ("Cheong") and (2) a LG US published patent application 2015/0085836 to Kang et al. ("Kang"). '679 FH at ATLAS-00014833-5. Specifically, the Examiner asserted:

> For claim 1, Cheong et al. discloses a method for transmitting an uplink frame by a station (STA) to an access point (AP) in a wireless local area network, the method comprising:

receiving, from the AP, a downlink frame including information related to a type of the uplink frame, the type of the uplink frame including a single-user (SU) type and a multiple-user (MU) type (paragraph [0069], lines 1-4, Cheong et al. teaches in S810 of figure 8, the STA receives the frame including the group information of the STAs capable of transmitting/receiving data using the MU-MIMO scheme from the AP). Cheong et al. teaches further in the foregoing frame, in case of a single user (SU), not multi users, the membership status 214 and the STA position 216 corresponding to a single user group ID field become 1. That is, the frame includes the group information of the STAs capable of transmitting/receiving data using the MU-MIMO scheme); and

transmitting, to the AP, the uplink frame having a type determined based on the information related to the type of the uplink frame (paragraph [0070], lines 3-7, Cheong et al. teaches in S830 of figure 8, the data are transmitted to the AP using the MU-MIMO scheme based on the group information of the STAs).

However, Cheong et al. does not expressly disclose wherein, when the type of the uplink frame corresponds to the MU type, the uplink frame is simultaneously transmitted by a plurality of STAs including the STA and at least one other STA. In an analogous art, Kang et al. discloses wherein, when the type of the uplink frame corresponds to the MU type, the uplink frame is simultaneously transmitted by a plurality of STAs including the STA and at least one other STA (paragraph [0067], lines 13-18, Kang et al. teaches for UL MU-MIMO transmission, packets transmitted by a plurality of devices should be simultaneously received by the AP and at the same frequency).

One skilled in the art would have recognized the wherein, when the type of the uplink frame corresponds to the MU type, the uplink frame is simultaneously transmitted by a plurality of STAs including the STA and at least one other STA, and would have applied Kang et al.'s UL MU-MIMO in Cheong et al.'s MU-MIMO. Therefore, it would have been obvious before the effective filing date of the claimed invention to a person having ordinary skill in the art to which the claimed invention pertains, to use Kang et al.'s uplink signal transmission method and station device, and uplink signal receiving method and access point device in Cheong et al.'s apparatus and method for transmitting/receiving data in communication system with the motivation being to provide for UL MU-MIMO transmission, packets transmitted by a plurality of devices should be simultaneously received by the AP and at the same frequency (paragraph [0067], lines 13-18).

*Id.*; *see also id.* at ATLAS-00014888-90 (re claim 11).

130.    In response, the Applicant amended the claims as follows:

1.    (Currently Amended) A method for transmitting an ~~uplink~~ acknowledgement frame for notifying successful data reception by a station (STA) to an access point (AP) in a wireless local area network, the method comprising:

receiving, from the AP, a downlink frame including a quality of service (QoS) control field including acknowledgement information representing whether the STA is requested to transmit the acknowledgement frame ~~related to a type of the uplink frame, the type of the uplink frame including~~ in a single-user (SU) ~~type~~ format or [[and]] in a multiple-user (MU) [[type]] format at a Short Inter-Frame Space (SIFS) time after the downlink frame; and

transmitting, to the AP, the acknowledgement ~~uplink~~ frame ~~having a type determined~~ based on the acknowledgement information at the SIFS time after the downlink frame ~~related to the type of the uplink frame~~,

wherein transmitting the acknowledgment frame comprises:[[,]]

when ~~the type of the uplink frame corresponds to the MU type~~ the acknowledgment information represents that the STA is requested to transmit the acknowledgement frame in the MU format and the STA is allocated a resource, transmitting the ~~uplink~~ acknowledgement frame in the MU format [[is]]on the allocated resource simultaneously with transmission of at least one acknowledgement frame from ~~transmitted by a plurality of STAs including the STA and~~ at least one other STA, and

when the acknowledgment information represents that the STA is requested to transmit the acknowledgement frame in the SU format, transmitting the acknowledgement frame in SU format.

55

11.    (Currently Amended) A method for receiving an acknowledgement uplink frame for notifying successful data reception by an access point (AP) from at least one a station (STA) in a wireless local area network, the method comprising:

transmitting, to the at least one STA, a downlink frame including a quality of service (QoS) control field including acknowledgement information related to a type of the uplink frame, the type of the uplink frame including representing whether the STA is requested to transmit the acknowledgement frame in a single-user (SU) type and format or in a multiple-user (MU) [[type]] format at a Short Inter-Frame Space (SIFS) time after the downlink frame; and

receiving, from the at least one STA, the acknowledgement uplink frame having a type determined based on the acknowledgement information related to the type of the uplink frame at the SIFS time after the downlink frame,

wherein receiving the acknowledgment frame comprises:

when the acknowledgment information represents that the STA is requested to transmit the type of the acknowledgement uplink frame corresponds to in the MU [[type]] format, receiving the acknowledgement uplink frame in the MU format on an allocated resource [[is]] simultaneously with transmission of at least one acknowledgement frame from transmitted by a plurality of STAs including the at least one other STA, and

when the acknowledgment information represents that the STA is requested to transmit the acknowledgement frame in the SU format, receiving the acknowledgement frame in SU format.

*Id.* at ALAS-00018762-4.

131.    In connection with these amendments, the Applicant argued:

The cited portions and proposed combination of the applied references are not understood to disclose or suggest all of the features of independent claim 1, particularly with respect to at least the features of "receiving, from the AP, a downlink frame including a quality of service (QoS) control field including acknowledgement information representing whether the STA is requested to transmit the acknowledgement frame in a single-user (SU) format or in a multiple user (MU) format a Short Inter-Frame Space (SIFS) time after the downlink frame" and "when the acknowledgment information represents that the STA is requested to transmit the acknowledgement frame in the MU format and the STA is allocated a resource, transmitting the acknowledgement frame in the MU format on the allocated resource simultaneously with transmission of at least one acknowledgement frame from at least one other STA."

56

The Office Action contends that *Cheong* teaches the previously-recited features of "receiving, from the AP, a downlink frame including information related to a type of the uplink frame, the type of the uplink frame including a single-user (SU) type and a multiple-user (MU) type." Office Action at pp. 2, 3.

*Cheong* discloses that "the STA receives the frame including the group information of the STAs capable of transmitting/receiving data using the MU-MIMO scheme from the AP." *Cheong* at para. [0069]. *Cheong* also discloses that "the frame includes the information indicating the group ID assignment when the type of the action is the first type and also includes the group ID, group number information indicating a group number of the STAs corresponding to each group ID table, positional information indicating a spatial stream position of the STAs, and the like." *Cheong* at para. [0049].

The "group information" of *Cheong,* however, does not disclose or suggest "a downlink frame including a quality of service (QoS) control field including acknowledgement information representing whether the STA is requested to transmit the acknowledgement frame in a single user (SU) format or in a multiple-user (MU) format a Short Inter-Frame Space (SIFS) time after the downlink frame," as recited in independent claim 1. Nowhere in the cited portions of *Cheong* is seen to disclose or suggest that the "group ID assignment" and/or "group number information" of Cheong disclose "acknowledgement information representing whether the STA is requested to transmit the acknowledgement frame in a single-user (SU) format or in a multiple-user (MU) format," as recited in independent claim 1.

Moreover, the cited portions of *Cheong* are not seen to disclose or suggest that the "transmitting unit" of *Cheong* ( e.g., Fig. 7, element 730) disclose "transmitting the acknowledgement frame in the MU format on the allocated resource simultaneously with transmission of at least one acknowledgement frame from at least one other STA" when "the acknowledgment information represents that the STA is requested to transmit the acknowledgement frame in the MU format and the STA is allocated a resource," as recited in independent claim 1.

'679 FH at ATLAS-00018758-9; *see also id.* at ATLAS-00018759-60 (re claim 11).

132.   The Examiner allowed the claims shortly thereafter. '679 FH at ATLAS-00018770. This indicates that the Examiner understood these terms. The Examiner never rejected them for indefiniteness.

133.   The extrinsic evidence also shows that these terms are not indefinite. For example, numerous dictionaries define the words in these terms as follows:

57

- "single: consisting of one part, aspect, or section; consisting of one in number." American Heritage Dictionary (ATLAS-00033329)

- "single: only one, not of several." New Oxford American Dictionary (ATLAS-00033334)

- "multiple: having, relating to, or consisting of more than one individual, element, part or other component." American Heritage Dictionary (ATLAS-00033369)

- "multiple: having or involving several parts, elements, or members." New Oxford American Dictionary (ATLAS-00033374)

- "user: one who uses the services of a computer system." IEEE Dictionary (ATLAS-00033339)

- "user: one that uses." American Heritage Dictionary (ATLAS-00033344)

- "user: a person who uses or operates something, esp. a computer or other machine." New Oxford American Dictionary (ATLAS-00033349)

- "format: the arrangement, order, or layout of data in or on a data medium." IEEE Dictionary (ATLAS-00033354)

- "format: the arrangement of data for storage or display." American Heritage Dictionary (ATLAS-00033359)

- "format: the way in which something is arranged or set out; a defined structure for the processing, storage, or display of data." New Oxford American Dictionary (ATLAS-00033364)

134.    These definitions are consistent with the '679 Patent and confirm that a POSITA would understand the terms at issue.

135.    Based on the above evidence, I conclude that a person of skill understands the boundaries of these claims with at least reasonable certainty. None of the terms "single-user (SU) format," "SU format," "multiple-user (MU) format," or "MU format" is indefinite.

58

## XIV.   U.S. Patent No. 10,020,919

> A.   **"in response to determining that the number of the one or more station information fields in the NDPA is one" (claim 1) / "when a number of the one or more station information fields in the NDPA is one" (claim 11) / "when the number of the one or more station information fields in the NDPA is greater than one" (claims 2, 8, 12, 19)**

| TP-Link's Construction | Atlas's Construction |
|---|---|
| Claims 1, 11: plain meaning: in response to determining that there is one station information in the NDPA (claim 1) / "when there is one station information in the NDPA (claim 11)<br><br>Claims 2, 8, 12, and 19 are indefinite. | Plain and ordinary meaning. |

136.   TP-Link states in its P.R. 4-2 Disclosures that these terms are indefinite and incorporates the declarations of Dr. Sumit Roy submitted in the related cases against Sercomm and ASUSTeK.   I previously submitted declarations in those related cases against Sercomm and ASUSTeK, and incorporate here the portions related to these terms.   *See*, *e.g.*, Shoemake *Sercomm/ASUS* Dec. at ¶¶110-120.   These terms are not indefinite.

137.   These terms require no construction, and none of these terms are indefinite. As explained below, persons of ordinary skill understand these terms according to their plain and ordinary meanings with at least a reasonable certainty.

138.   The '919 Patent has two independent claims that recite similar subject matter. Both Claims 1 and 11 claim methods performed by a wireless device. Claim 1 and its dependent claims are drafted from the perspective of a station, while independent claim 11 and its dependent claims are drafted from the perspective of an access point. I reproduce those independent claims and the dependent claims at issue below:

1. A method performed by a wireless device, the method comprising:

receiving a Null Data Packet Announcement (NDPA), the NDPA including one or

more station information fields;

determining exactly a number of the one or more station information fields in the NDPA;

receiving a Null Data Packet (NDP); and

**in response to determining that the number of the one or more station information fields in the NDPA is one**, transmitting first Channel State Information (CSI) feedback in response to receiving the NDP,

**wherein the number of the one or more station information fields in the NDPA is the cardinality of the one or more station information fields in the NDPA.**

'919 Patent at 32:64-33:10 (emphasis added).

2. The method of claim 1, further comprising:

**when the number of the one or more station information fields in the NDPA is greater than one:**

receiving a first trigger frame; and

transmitting the first CSI feedback in response to receiving the first trigger frame.

'919 Patent at 33:11-16 (emphasis added).

8. The method of claim 2, further comprising:

**when the number of one or more station information fields in the NDPA is greater than one:**

receiving a second trigger frame; and

transmitting second CSI feedback in response to receiving the second trigger frame.

'919 Patent at 33:39-44 (emphasis added).

11. A method performed by a wireless device, the method comprising:

transmitting a Null Data Packet Announcement (NDPA), the NDPA including one or more station information fields;

transmitting a Null Data Packet (NDP); and

**when a number of the one or more station information fields in the NDPA is one**, receiving first Channel State Information (CSI) feedback transmitted in response to the NDP having only one station information field,

60

**wherein the number of the one or more station information fields in the NDPA is exactly the cardinality of the one or more station information fields in the NDPA.**

'919 Patent at 33:54-34:11 (emphasis added).

12. The method of claim 11, further comprising:

**when the number of the one or more station information fields in the NDPA is greater than one:**

transmitting a first trigger frame; and

receiving the first CSI feedback in response to transmitting the first trigger frame.

'919 Patent at 34:12-17 (emphasis added).

19. The method of claim 12, further comprising:

**when the number of one or more station information fields in the NDPA is greater than one:**

transmitting a second trigger frame; and

receiving second CSI feedback in response to transmitting the second trigger frame.

'919 Patent at 34:45-50 (emphasis added).

139.   Both independent claims generally describe a feedback method that may or may not include a "trigger frame" depending on the number of stations participating in the feedback. In both cases, the method begins with transmitting or receiving a Null Data Packet Announcement (an "NDPA") followed by a Null Data Packet ("NDP"). When the NDPA is directed to only one station, the station will transmit (or the AP will receive) feedback in response to the NDP, as claimed in Claims 1 and 11. Claims 1 and 11 do not limit what actions are taken if there are more than one station information fields in the NDPA. Claims 2 and 12 (and their dependent claims) add the circumstance where the NDPA is directed to multiple stations. There, the feedback is only transmitted or received in response to a trigger frame.

61

140.    Whether the NDPA is directed to one or more stations is signaled to the station by the Station Information fields within the NDPA. In Claim 1, the station counts the number of station information fields, and if there is only one, will send feedback following the NDP. In Claims 2 and 8, if the station determines that there is more than one, the station will only send feedback after receiving a trigger frame. Claim 11 describes this process from the perspective of the device transmitting the request for feedback. There, and in Claim 11's dependent claims, when the NDPA includes one station information field, feedback is received in response to the NDP. Claims 12 and 19 add that when there is more than one station information field in the NDPA, a trigger frame is transmitted, and the feedback is received in response to transmitting the trigger frame. In both independent claims, there is no limit on the station or transmitting device's actions when there are two or more station information fields in the NDPA.

141.    Thus, the '919 claims make clear to a person of ordinary skill that when there is one station information field in the NDPA, feedback is sent in response to the NDP, and in the dependent claims, feedback is transmitted after a trigger frame when there is more than one station information field.

142.    The '919 specification, and Figures 8A and 8B in particular, explains this process:

62



'919 at Figs. 8A, 8B (highlighting added).

143.    As seen above, Figure 8A shows feedback from a single station. In this embodiment, an AP transmits an NDPA designating only a single station, STA1. '919 Patent at 18:57-62. After a Short Inter-Frame Space ("SIFS"), The AP then transmits an NDP. *Id.* at 18:62. The station receives the NDPA and determines that it indicates only a single station. *Id.* at 18:63-

65. This determination is made by determining that the NDPA does not indicate a plurality of stations, *e.g.*, by determining that there is only one station information field. *Id.* at 18:65-67. By determining that the NDPA indicates only one station, the station is able to understand which sounding procedure is in use. *Id.* at 18:67-19:1. Accordingly, the station receives the NDP, uses it to compute CSI feedback, and sends the feedback without awaiting a trigger frame. *Id.* at 19:1-9.

144.    In the alternative, Figure 8B illustrates a multi-user feedback technique. In this embodiment, an AP transmits an NDPA designating multiple stations, STA1, STA2, and STA3. *Id.* at 19:10-15. The stations receive the NDPA and determine that it indicates a plurality of stations, *e.g.*, by determining the NDPA includes multiple station information fields. *Id.* at 19:16-20. By determining that the NDPA indicates more than one station, the stations determine that they are operating under this second sounding procedure. *Id.* at 19:20-22. Accordingly, the stations receive a NDP, use it to compute CSI feedback, and wait for an MU Trigger frame. *Id.* at 19:23-27. After the NDP and SIFS, the AP sends a trigger frame that indicates to the station which resources the stations will use to provide the CSI feedback. *Id.* at 26-31. In response to this trigger frame, the stations simultaneously transmit their CSI feedback after a short inter-frame space, an SIFS. *Id.* at 32-47.

145.    Finally, a person of ordinary skill in the art would have understood that an NDPA includes one or more station information fields. An NDPA frame was defined in prior versions of 802.11, including versions that predate the '919 Patent. For example, 802.11ac-2013 defines the VHT variant of the NDPA frame. Its format is described in Figure 8-29j:

64



**8.3.1.20 VHT NDP Announcement frame format**

The frame format of the VHT NDP Announcement frame is shown in Figure 8-29j.

| | Frame Control | Duration | RA | TA | Sounding Dialog Token | STA Info 1 | ... | STA Info *n* | FCS |
|---|---|---|---|---|---|---|---|---|---|
| Octets: | 2 | 2 | 6 | 6 | 1 | 2 | | 2 | 4 |

**Figure 8-29j—VHT NDP Announcement frame format**

802.11ac-2013 § 8.3.1.20, Fig 8-29j VHT NDP Announcement Frame Format (annotated).

146.    As illustrated in Figure 8-29j, the NDPA frame includes at least one station information field, and may include more, illustrated here as STA Info 1 through STA Info *n*:

> The VHT NDP Announcement frame contains at least one STA Info field. If the VHT NDP Announcement frame contains only one STA Info field, then the RA field value is the address of the STA identified by the AID in the STA Info field. If the VHT NDP Announcement frame contains more than one STA Info field, then the RA field value is the broadcast address.

802.11ac-2013 § 8.3.1.20.

147.    Based on the above evidence, I conclude that a POSITA understands the boundaries of these claims with at least reasonable certainty. For example, a person of skill understands that with respect to Claims 1 and 11, the NDPA frame may include one or more station information fields. When only one is present, the method claims specify sending feedback without first receiving a trigger frame. The independent claims do not limit what the actions are taken if there are more than one station information fields in the NDPA. With respect to Claims 2, 8, 12, and 19, the methods also claim sending feedback after sending a trigger frame when the NDPA includes more than one station information field.

148.    I also note that the Court in the *Sercomm/ASUS* cases recently held that independent claims 1 and 11 had their plain and ordinary meaning, while dependent claims 2, 8, 12 and 19 were

65

not indefinite and that the plain and ordinary meaning applies. *Sercomm/ASUS* 11/3/22 Claim Construction Order at 8 (term #13).

**B.    "wherein the number of the one or more station information fields in the NDPA is the cardinality of the one or more station information fields in the NDPA" (claims 1, 11)**

| TP-Link's Construction | Atlas's Construction |
|---|---|
| Plain meaning: wherein the number of the one or more station information fields in the NDPA is the number of the one or more station information fields in the NDPA<br><br>This renders the claim indefinite. | Plain and ordinary meaning<br><br>Alternatively, "wherein the number of the one or more station information fields in the NDPA is the number of elements in the set of station information fields" |

149.    TP-Link states in its P.R. 4-2 Disclosures that these terms are indefinite and incorporates the declarations of Dr. Sumit Roy submitted in the related cases against Sercomm and ASUSTeK.  I previously submitted declarations in those related cases against Sercomm and ASUSTeK and incorporate here the portions related to these terms. *See, e.g.,* Shoemake *Sercomm/ASUS* Dec. at ¶¶121-129.  This term is not indefinite.

150.    This term requires no construction. This term is closely related to the other terms of the '919 Patent discussed above. I incorporate that discussion by reference.

151.    As I discuss above, the '919 claims make clear to a person of ordinary skill that when there is one station information field in the NDPA, no trigger frame is transmitted before feedback is sent, and in the dependent claims, when there is more than one station information field, feedback is transmitted after a trigger frame.

152.    This element of Claims 1 and 11 clarifies the "number of the one or more station information fields in the NDPA" found earlier in the claims by explaining that this number is the number of station information fields in the NDPA, rather than, for example, the number of a particular station information field.

153.    Figure 8-29j from 802.11ac, described above, illustrates this concept. As I explained above, the NDPA frame includes at least one station information field, and may include more, illustrated here as STA Info 1 through STA Info *n*:



802.11ac-2013 § 8.3.1.20, Fig 8-29j VHT NDP Announcement Frame Format (annotated). In this example, where *n* is a number, the cardinality of the one or more station information fields in the NDPA would be *n*. In the example of Figure 8B of the '919 Patent, discussed above, the cardinality of the one or more station information fields in the NDPA would be 3, one for each station.

154.    If not for the limitation that the number of information fields means the cardinality of the information fields, there is the potential for confusion. For example, in Figure 8-29j above, there is the potential that someone might think the "number" is the number that indexes (or enumerates) a particular "STA Info" field, *e.g.*, there is the potential for confusion (or least a question) as to whether "number" might mean the index of a particular field. The drafters of the claim made clear that this is not the case by explicitly stating the "number" is the cardinality of the set of fields, rather than the index of a particular field in the set. Thus, contrary to the apparent view of TP-Link, the inclusion of the requirement that "the number of the one or more station information fields in the NDPA is the cardinality of the one or more station information fields in the NDPA" clarifies the meaning of the claim to a POSITA.

67

155. The prosecution history further describes this element. This element was first proposed in the September 13, 2017 Applicant-Initiated Interview Summary. As the Examiner explained, "[t]he applicant proposed amending the claim to further define the process of determining a number and further defining the number as a cardinality wherein the cardinality is a number of elements in a set or group." '919 File History at 115. This element was added to the claims in the October 11, 2017 response to the first office action. *Id.* at 106 (Response to office action).In its remarks, the applicant noted that in the examiner interview, the applicant discussed "the different between the claimed 'number of station fields in the [NDPA]' and the disclosure by the references of behaviors dependent on the contents of the first stations fields." *Id.* at 110.

156. Nothing suggests that TP-Link's construction is correct. In fact, TP-Link's construction introduces ambiguity into the claims by suggesting that the number could be either the number of station information fields or the number (or index) of the station information field directed to a station. In other words, TP-Link's construction could mean that in the Figure 8B embodiment, station 1 determines that the number is 1, the number (index) of the STA Info 1 field directed to station 1, instead of 3, the total number of STA Info fields (cardinality), as required by the claims.

157. Based on the above evidence, I conclude that a person of skill understands the boundaries of these claims with at least reasonable certainty. As I explain above, a person of skill understands that with respect to claims 1 and 11, the NDPA frame may include one or more station information fields. In Claim 1, the station determines what the number of station information fields is. When only one is present, the method claims sending feedback without first receiving a trigger frame. With respect to Claims 2, 8, 12, and 19, the method also claims sending feedback after sending a trigger frame when the NDPA includes more than one station information fields.

68

158.    I also note that the Court in the *Sercomm/ASUS* cases recently held this term is not indefinite and that the plain and ordinary meaning applies.  *Sercomm/ASUS* 11/3/22 Claim Construction Order at 8 (term #14).

## XV.    U.S. Patent No. 10,756,851

### A.    "scheduling extension" (claims 1, 2, 7, 8)

| TP-Link's Construction | Atlas's Construction |
|---|---|
| "A subfield included in the HT control field that includes scheduling information for the uplink multi-user response" | Plain and ordinary meaning<br><br>Alternatively, "an extension to the control field that includes scheduling information" |

159.    TP-Link's P.R. 4-2 Disclosures do not disclose any expert testimony regarding this claim term.

160.    I note that Dr. Sumit Roy submitted a supplemental declaration regarding this claim term in the related cases against Sercomm and ASUSTeK.  I previously submitted a supplemental declaration regarding this claim term in those related cases against Sercomm and ASUSTeK. To the extent TP-Link tries to cite or rely on Dr. Roy's prior opinions regarding this claim term, I reserve the right to rebut those opinions, and I incorporate here the portions of my prior opinions related to this term.  *See*, *e.g.*, Supplemental Shoemake *Sercomm/ASUS* Dec. at ¶¶36-44.

161.    I also note that the Court in the *Sercomm/ASUS* cases recently held that this claim term has its plain and ordinary meaning, wherein the plain-and-ordinary meaning is "an extension to the control field that includes scheduling information."  *Sercomm/ASUS* 11/3/22 Claim Construction Order at 9 (term #15).

162.    I declare under penalty of perjury that the foregoing is true and correct.