# Exhibit 10

DocuSign Envelope ID: B36450A3-5B1A-44GD-9D69-B6DD4A86F292

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

|  |  |
|---|---|
| ATLAS GLOBAL TECHNOLOGIES LLC, | |
| Plaintiff, | |
| v. | Civil Action No. 2:21-cv-00430-JRG-RSP |
| TP-LINK TECHNOLOGIES CO., LTD., TP-LINK CORPORATION LIMITED, and TP LINK INTERNATIONAL LTD., | **JURY TRIAL DEMANDED** |
| Defendants. | |

## DECLARATION OF DR. SUMIT ROY IN SUPPORT OF DEFENDANTS' OPENING CLAIM CONSTRUCTION BRIEF

I, Sumit Roy, hereby declare:

1.      My name is Sumit Roy, Professor of Electrical Engineering, U. Washington, Seattle. I am over eighteen years of age and I could competently testify as to the matters set forth herein if I am called upon to do so.

2.      I am a technical expert in the subject matter areas relevant to the patents-in-suit including the area of wireless communication systems and methods. I am qualified to reach the opinions and conclusions stated in this Declaration.

3.      My opinions expressed herein are based on my review of the patents-in-suit, their prosecution histories, extrinsic evidence relating to the technology of the patents-in-suit, and other evidence cited in this declaration. My opinions are also based on my technical experience, knowledge, and expertise in the area of wireless communications systems and methods.

4.      I am being compensated for my work on this case at my standard hourly rate of $600.00 per hour. No part of my compensation is dependent upon the outcome of this case or any issue in it.

## I.      EDUCATION AND EXPERIENCE

5.      I am an expert in the field of wireless networks. I have studied, taught, practiced, and researched this field for over thirty years. I have summarized in this section my educational background, work experience, and other relevant qualifications.

6.      I earned my Bachelor of Technology degree in Electrical Engineering from Indian Institute of Technology in Kanpur in 1983. In 1985, I earned my Master of Science degree in Electrical Engineering from University of California in Santa Barbara. I earned a Doctor of Philosophy in Electrical Engineering and Master of Arts in Statistics & Applied Probability from University of California in Santa Barbara in 1988, with my dissertation being on "Estimation Strategies for a Network of Distributed Sensors."

1

DocuSign Envelope ID: B36450A3-5B1A-44GD-9D60-B6DD4A86F292

7.      While a graduate student, from 1983 through 1988, I worked on various projects related to networked wireless communication and radar systems using a mix of analytical modeling and computer simulation.

8.      In July of 1988, I joined the faculty of the University of Pennsylvania as an Assistant Professor in the Department of Electrical Engineering, where I taught upper level undergraduate course called "Communication Systems" and graduate level courses, "Advanced Digital Signal Processing" and "Digital Communications."

9.      In January of 1995, I became a tenured Associate Professor in the Division of Engineering at the University of Texas at San Antonio, in San Antonio, Texas. In April of 1998, I transferred to a tenured Associate Professor in the Department of Electrical Engineering in the University of Washington ("UW") in Seattle, Washington and was promoted to Professor in September of 2002. As a faculty member at UW, I have taught courses and directed research in networking and telecommunications, including 802.11 WLAN and cellular technologies. From September 2014 to September of 2019, I received Integrated Systems Term Professorship at the UW in recognition of my leadership and national stature in this area.

10.      I took full-time leave from UW to serve as a Senior Staff Researcher at Intel Labs, Hillsboro, OR from September 2001 to December 2003, where I served as Wireless Systems Architect researching IEEE 802.15.3a Ultra-Wideband PHY layer for Wireless Personal Area Networks and nascent pre-802.11n (MIMO WiFi) technology, with responsibility for representing Intel at IEEE Standards meetings and coordination with other industry partners. My research resulted in several patents relating to the above, including design implementation of MIMO WiFi transceivers.

DocuSign Envelope ID: B36450A3-5B1A-44GD-9D60-B6DD4A86F292

11. As a result of my academic teaching, research, and industry experience, I have significant knowledge of wireless networking technologies. Since 1988, I have received over ten million dollars in funding from various national and international organizations to support my work on wireless networking.

12. In addition to advising and mentoring students at UW, I have served as external dissertation reviewer for several reputed international universities, such as McGill Univ., Montreal, National University of Singapore, University of Victoria, and Australia National University. At UW and U. Penn., I have advised and supervised over 20 Ph.D. students and visitingscholars.

13. In addition to my academic work, I have remained active in the communication industry through my academic consulting activities. I have professionally interacted with Mathworks, a leading vendor of WLAN toolbox products for design as well as Intel Corpn, on current 802.11 designs including MIMO systems. I am also a named co-inventor on 10 U.S. Patents, including Nos. 7,782,970 and 8,289,836 titled "An Apparatus and Associated Methods to Introduce Diversity in a Multi Carrier Channel," which are listed in my curriculum vitae.

14. I have authored and co-authored over 200 journal publications, conference proceedings, technical papers, book chapters, and technical presentations in a broad array of communications-related technologies, including networking and wireless communication. I have also developed and taught over 10 courses related to communications and computer systems, including several courses on signals and systems, wireless communication, communications systems. These courses included introductory courses on communication systems, as well as more advanced courses on wireless communications. A complete list of my publications and the courses I have developed and/or taught is also contained in my curriculum vitae.

15.     My professional affiliations include serving in various professional organizations and as a reviewer for a number of technical publications, journals, and conferences. I have also received multiple awards and recognitions, most notably, elevation to IEEE Fellow in 2007 for "contributions to multi-user communications theory and cross-layer design of wireless networking standards." By IEEE bylaws, only 0.1% of IEEE membership is elevated to Fellow annually. *See* https://www/ieee.org/membership/fellows/steps.html. In addition, I was selected as IEEE Communications Society's Distinguished Lecturer (2014-15, 2017-18), and appointed by Shanghai JiaoTung University as High-end Foreign Expert award (1 month/year, 2014-16), which are listed in my curriculum vitae.

17.     I am not now and have never been an employee of Defendants.

## II.     LEGAL STANDARDS

18.     I am not a legal expert and offer no opinions on the law. However, I have been informed by counsel of the legal standards that apply with respect to claim construction, and I have applied them in arriving at my conclusions.

19.     I understand that claim terms in a patent should be interpreted from the vantage point of a person of ordinary skill in the art ("POSITA") at the time of the invention.

20.     I am familiar with patents and with the legal framework by which claim terms in patents are to be interpreted. I understand that a claim term must be given the meaning it would have had to one of skill in the art at the time of the invention after reviewing the intrinsic record.

21.     With respect to construing the patent claims, I understand that one must first consider the intrinsic evidence, which includes the claim language, the specification, and the prosecution history of the asserted patent. I further understand that one may also consider extrinsic evidence to ensure that a claim construction is not inconsistent with clearly expressed and widely held understandings in the pertinent technical field, particularly for technical terms. Such extrinsic

4

DocuSign Envelope ID: B36450A3-5B1A-44GD-9D60-B6DD4A86F292

evidence may take the form of expert testimony, dictionaries, textbooks, technical treatises, and articles. I further understand that one may not rely on extrinsic evidence to contradict or vary the clear meaning of claims provided by the intrinsic evidence of record.

22. I understand that a claim is indefinite if one skilled in the art would not understand what is claimed even after the claim is read in light of the specification. Specifically, a claim is indefinite if a person of ordinary skill in the art would not understand the scope of the claim with reasonable certainty. I understand that a claim is indefinite if its full scope is not reasonably certain to a POSITA, even if a POSITA would be able to discern particular embodiments that are within the scope of the claim.

23. I further understand that if a claim attempts to cover both an apparatus and a method of use of that apparatus, the claim is indefinite. Similarly, I understand that if a claim does not inform with reasonable certainty one skilled in the art of when, as a matter of timing, the claim would be infringed, then the claim is indefinite.

## III. THE PATENTS-IN-SUIT

### A. The Effective Filing Date of the Patents-in-Suit

24. For purposes of this declaration, I have been instructed to use the following dates as the effectives filing date of each of the patents-in-suit:

| Patent | Priority Date of Asserted Claims |
|---|---|
| 9,531,520 | March 20, 2015 |
| 9,763,259 | September 15, 2014 |
| 9,825,738 | April 4, 2015 |

25.     My opinions in this declaration were formed from the perspective of a person of ordinary skill in the art as of the dates listed above.

## IV.     CLAIM TERMS

26.     I understand that the parties dispute the meaning of certain claim terms of the following U.S. Patent Nos. 9,763,259 ("259 Patent"); 9,825,738 ("738 Patent"); 9,912,513 ("513 Patent"); 9,917,679 ("679 Patent"); 10,020,919 ("919 Patent"); 10,756,851 ("851 Patent"); and 9,531,520 ("520 Patent")[1].  The disputed claim terms I have been asked to address are:

a.     "the downlink multi-user frame including a plurality of resource units (RUS)" (520 patent, claim 1)

b.     "including a respective set of MAC Protocol Data Units (MPDUs) in each RU of the plurality of RUs" (520 patent, claim 1)

c.     "wherein the first MPDU is located in a first resource unit of the downlink multi-user frame allocated to the first station, wherein the downlink multi-user frame includes a second resource unit that contains a second MPDU that includes acknowledgement information for the second multi-user acknowledgement frame" (520 patent, claim 9)

d.     "wherein the NDPA frame indicates information corresponding to the predetermined length" (259 patent, claim 6)

e.     "wherein the second information is a function of a total number of space time streams to be used to transmit the multiple uplink frames" (738 patent, claim 1)

f.     "wherein the second information is a function of a total number of space time streams to be used to perform the simultaneous transmission of the uplink frame and the one or more uplink frames from the one or more other stations" (738 patent, claim 9)

---

[1] Certain of the patents-in-suit are attached as Ex. 1 ("520 patent"), Ex. 2 ("259 patent"), and Ex. 3 ("738patent").

27.     I have been asked to address each of these claim terms from the perspective of a person of ordinary skill in the art at the time of the invention.

## V.     ANALYSIS

### A.     U.S. Patent No. 9,531,520

#### 1.     "the downlink multi-user frame including a plurality of resource units (RUS)" (claim 1)

| Sercomm's Proposed Construction | Atlas' Proposed Construction |
|---|---|
| Indefinite | Plain and ordinary meaning |

28.     The above limitation is present in claim 1 of the 520 patent. I have been asked to provide the perspective of a person of ordinary skill in the art regarding the meaning of the above limitation in the context of the 520 patent.

29.     A POSITA would have understood that this limitation is nonsensical and, therefore, indefinite. More specifically, this limitation requires resource units ("RUs") (*i.e.*, those resources that have been allocated to stations ("STAs") for uplink transmissions to be transmitted on) to be part of a frame (*i.e.*, the data that is transmitted on the resources). As I explain below, such a limitation is wholly nonsensical and requires an impossibility, rendering it indefinite because a POSITA would not be able to understand the limitation.

30.     The specification and claims support this limitation being indefinite. As an initial matter, this limitation requires resource units ("RUs") (*i.e.*, those resources that have been allocated to stations ("STAs") for uplink transmissions to be transmitted on) to be part of a frame (*i.e.*, the data that is transmitted on the resources). '520 patent, 30:52-53. Thus, RUs, in the context of the '520 patent claim and the understanding of a POSITA, were those resources that were allocated to the STAs to be used for the subsequent transmission of the uplink frames. *Id.*

7

31.    On top of requiring the RUs to be part of the frame, claim 1 also recites the "transmitting the downlink multi-user frame . . . over a wireless channel." '520 patent, 30:66-67. And the specification confirms this understanding that the frame is what is transmitted over the RUs. *Id.*, 5:49-50 ("even though DL data frames are sent in parallel in the spatial domain"), 10:57-11:2 (referring to the transmission of a HE frame). More specifically, the '520 patent's specification notes that "[t]he resource units may be particular spatial streams or sub-channels of a wireless channel upon which the DL MU frame will be transmitted." *Id.*, 14:12-14, 18:5-8, 20:48-50. Thus, RUs, in the context of the '520 patent and the understanding of a POSITA, were those resources that were allocated to the STAs for the subsequent transmission of the uplink frames. *Id*. Combining the disclosures, the specification requires the RUs to be resources on which DL MU a frame is transmitted, yet claim 1 requires the DL MU frame to "includ[e] a plurality of resource units (RUs)." *Id.*, 1:52-53. I note that, since the claims are contrary to the specification, a POSITA would have been unable to ascertain the bounds of this claim which, I understand, renders it indefinite.

**2.    "including a respective set of MAC Protocol Data Units (MPDUs) in each RU of the plurality of RUs" (claim 1)**

**3.    "wherein the first MPDU is located in a first resource unit of the downlink multi-user frame allocated to the first station, wherein the downlink multi-user frame includes a second resource unit that contains a second MPDU that includes acknowledgement information for the second multi-user acknowledgement frame" (claim 9)**

| Sercomm's Proposed Construction | Atlas' Proposed Construction |
|---|---|
| Indefinite | Plain and ordinary meaning |

32.     The above limitations are included in claims 1 and 9 of the '520 patent. I have been asked to provide the perspective of a person of ordinary skill in the art regarding the meaning of the above limitation in the context of the '520 patent.

33.     My analysis with respect to these limitations is similar to my analysis above. *Supra*, Section V.A.1. This limitation is similarly nonsensical and, for similar reasons, fails to inform, with reasonable certainty, the scope of the invention.

34.     These limitations require a set of MPDUs to be "in" (*i.e.*, claim 1) or "located in" (*i.e.*, claim 9) at least one RU. As I discuss above, a POSITA would have understood that RUs, in the context of the '520 patent, are those resources on which a frame is transmitted (*e.g.*, subcarriers, spatial streams). *Supra*, Section V.A.1; *see also* '520 patent, 14:12-14, 18:5-8, 20:48-50. Like claim 1, claim 9 contains similar language about the RUs being part of the downlink frame. *Id.*, 32:2-5 ("a first resource unit of the downlink multi-user frame allocated to the first station, wherein the downlink multi-user frame includes a second resource unit that contains a second MPDU").

35.     First, as I discussed above, RUs cannot be both *in* the downlink frame and, simultaneously, part of the streams or sub-channels *which* the downlink frame uses for transmissions as taught by the specification.  *Supra*, Section V.A.1.

36.     For similar reasons, an MPDU is not included in a resource unit. First, the claims note that the MPDUs include data in the form of acknowledgement information corresponding to the STA "to which the RU is assigned." '520 patent, 30:59-53. And the specification confirms that the MPDU "include[s] data and/or control frames intended for each respective STA." *Id.*, 14:9-10, 17:64-18:22 ("The data MPDU may include any type of data (e.g., voice, video, best effort, background, or control data) that is specifically intended for the particular STA.").  This

9

accords with a POSITA's understanding, wherein a MPDU is a data unit that is exchanged between MAC entities in a communication system.

37.    MPDUs may be transmitted as part of a frame which *uses* RUs (*e.g.*, frequency subcarriers or streams) in both DL and UL transmissions, but they may not be "included…in" or "located in" RUs as the claims require. RUs cannot both be data units to be transmitted while simultaneously being the transmission medium that frames containing those data units use for transmissions.  Therefore, a POSITA would find that the claim limitation, particularly when read in light of the specification, fails to inform, with reasonable certainty, the scope of the invention.

### B.    U.S. Patent No. 9,763,259

#### 1.    "wherein the NDPA frame indicates information corresponding to the predetermined length" (claim 6)

| Sercomm's Proposed Construction | Atlas' Proposed Construction |
| --- | --- |
| Indefinite | Plain and ordinary meaning |

38.    The above limitation is included in claim 6 of the '259 patent.  I have been asked to provide the perspective of a person of ordinary skill in the art regarding the meaning of the above limitation in the context of the '259 patent.

39.    In particular, I find that a POSITA would not have been informed, with reasonable certainty, of the scope of the phrase "indicates information corresponding to."

40.    The specification provides no guidance as to the bounds of the phrase "indicates information corresponding to" besides noting that "[t]he NDPA frame or the NDP frame may indicate information corresponding to the predetermined length. '259 patent, 2:35-37. The specification contains no disclosure on how a frame is to "indicate[] information" or how that indicated information is to "correspond[] to the predetermined length." I note that this phrase is

10

different than if patentee had chosen the phrase "contains information" or "identifies." If patentee had chosen those phrases, a POSITA would have recognized that this limitation would require that the NDPA frame *contains* or *identifies* information corresponding to the predetermined length. Instead, patentee's choice of vague words are further complicated by the requirement that the indicated information must be "corresponding to" the predetermined length.

41.    The "predetermined length" in the context of this claim is the length against which the data is compared to determine whether pad bits are to be added to the frame. '259 patent, 2:28-31. If the data is shorter than the "predetermined length," pad bits are added to the frame. *Id*. If it is longer than the "predetermined length," the data is partitioned into a plurality of fragments and "any one of the fragments" is inserted into the data field of the feedback frame. *Id*. at 2:31-34.

42.    A POSITA would have been unable to ascertain the bounds of which the indicated information is to "correspond to" the predetermined length nor what that "information" entails and to what level suffices for it to be indicated.

### C.    U.S. Patent No. 9,825,738

1.    **"wherein the second information is a function of a total number of space time streams to be used to transmit the multiple uplink frames" (claim 1)**

2.    **"wherein the second information is a function of a total number of space time streams to be used to perform the simultaneous transmission of the uplink frame and the one or more uplink frames from the one or more other stations" (claim 9)**

| Sercomm's Proposed Construction | Atlas' Proposed Construction |
|---|---|
| Indefinite | Plain and ordinary meaning |

11

43.     The above limitations are included in claims 1 and 9 of the '738 patent.  I have been asked to provide the perspective of a person of ordinary skill in the art regarding the meaning of the above limitations in the context of the '738 patent.

44.     I opine that these claim limitations are indefinite because a POSITA would not be reasonably apprised of the claims' bounds with respect to the limits of "the second information" that is claimed.

45.     First, the claims themselves provide no help in ascertaining any objective meaning of these terms and the phrase "a function of a total number of space time streams" or "a total number of space time streams" does not appear in the specification. Rather, the Specification states "[w]hen the MIMO or the MU-MIMO is used, the transmitting signal processing unit 100 may use a plurality of interleavers 120 and a plurality of mappers corresponding to the number of $N_{SS}$ of spatial streams." '738 patent, 8:11-14. At most, a POSITA would understand the abbreviation "$N_{SS}$" to refer to a number of spatial streams, not "a total number of space time streams" which is a wholly different concept. While a POSITA may recognize that $N_{STS}$ refers to a number of space-time streams, this disclosure does not discuss anything related to a "function" of the space time streams being used to transmit the uplink frame. *Id.*, 8:18-25. What's more, "interleavers" and "mappers" are not "functions," they are devices. *Id.*, 8:4-10, Fig. 8. Thus, this disclosure is in no way teaching anything related to a "function" of space time streams. It merely discloses the actions performed by various devices such as mapping and interleaving of signals as part of the transmitting signal processing unit.

46.     "Function" is a broad term. It is defined as "[w]hen a mathematical quality u depends on a variable quantity x so that to each value of x (within the interval of definition) there correspond one or more values of u, then u is a function of x written u." Ex. 9, 468 (IEEE

12

DocuSign Envelope ID: B36450A3-5B1A-44CD-9D69-B6DD4A86F292

dictionary – function). As required by the claims, the "second information" is an information that is "common to all of the plurality of stations to receive the uplink setup information." '738 patent, 25:3-8, 26:9-14. Thus, these claims entail a "second information" that is mathematically dependent on a total number of number of space time streams to be a "function" of it.  But, as there are only two pieces of data included in the mathematical relation (and they are supposed to share a relation between each other), these claims are unbounded. A POSITA would have understood that these claim limitations have no objective boundaries because every "second information" will be a "function" of the total number of space time streams as there will always be some sort of mathematical relation between the two data.

47.     As such, a POSITA would have understood that this claim limitation is indefinite because a POSITA would not have been able to understand any objective boundaries.

Executed on the 11th day of November, 2022, in Bothell, WA.

I declare under penalty of perjury that the foregoing is true and correct.



Dr. Sumit Roy

76732809V.1