# Exhibit 28

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## WACO DIVISION

| | | |
|---|---|---|
| **ATLAS GLOBAL TECHNOLOGIES LLC** | § § § § | Civil Action No. 6:21-cv-818-ADA |
| **Plaintiff,** | § § | **Jury Trial Requested** |
| v. | § § § | |
| **SERCOMM CORPORATION,** | § § § | |
| **Defendant.** | § § | |
| **ATLAS GLOBAL TECHNOLOGIES LLC** | § § § | Civil Action No. 6:21-cv-820-ADA |
| **Plaintiff,** | § § | **Jury Trial Requested** |
| v. | § § § | |
| **ASUSTEK COMPUTER, INC.,** | § § § | |
| **Defendant.** | § § | |

## SUPPLEMENTAL DECLARATION OF DR. MATTHEW B. SHOEMAKE
## REGARDING CLAIM CONSTRUCTION ISSUES

Signed _____

Dr. Matthew B. Shoemake

October 28, 2022

## I. Introduction

1. I have been retained as an expert on behalf of Plaintiff Atlas Global Technologies LLC ("Atlas") in the above captioned cases to provide my professional opinions and conclusions relating to certain claim construction issues.

2. I previously submitted a declaration on October 6, 2022 regarding certain indefiniteness issues. That declaration rebutted indefiniteness positions taken by Defendants in their opening claim construction brief and oftentimes also taken by their claim construction expert, Dr. Sumit Roy, in his initial September 15, 2022 Declaration. After my initial October 6, 2022 Declaration, Dr. Roy submitted a Supplemental Declaration on October 17, 2022 speaking to the indefiniteness issues, but also other broader claim construction issues. This supplemental declaration responds to Dr. Roy's Supplemental Declaration.

## II. Qualifications

3. I described my qualifications in Section III of my October 6, 2022 declaration, which I incorporate by reference here.

## III. Compensation

4. I am being compensated for my time at my current standard rate of $725 per hour for the services that I provide in connection with this case. That compensation is not contingent upon my performance, the outcome of the case, or any issues involved in or related to this case.

## IV. Legal Standards

5. I am not an attorney. For the purposes of this report, I have been informed about certain aspects of the law that are relevant to my analysis and opinions.

1

6. I have been informed that, as a general rule, a claim term should be construed according to its plain and ordinary meaning, which is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention.

7. I have been informed that determining the plain and ordinary meaning of a claim term involves considering the usage of the term in the context of the intrinsic evidence, including the claim language, patent specification and prosecution history.

8. I have been informed that extrinsic evidence such as technical dictionaries, treatises, and expert testimony may be considered to understand the underlying technology and the manner in which one skilled in the art might use the claim terms within that context, but extrinsic evidence may not be used for the purpose of altering the terms of the claim from their plain meaning nor to create contradictions in the terms of the claims.

9. I have been informed that the burden is on the accused infringer to prove indefiniteness by clear and convincing evidence. I understand that, to be valid, a patent's claims, viewed in light of the specification and prosecution history, must inform those skilled in the art about the scope of the invention with reasonable certainty. I further understand that the courts do not require absolute precision and provide latitude to a patentee with regard to how claims are drafted.

## V. Materials Considered

10. Among the materials I have reviewed in forming my opinions are the Patents-at-Issue, their prosecution file histories, the patent applications to which any Patent-at-Issue claims priority, the agreed constructions in these proceedings, as well as the patents, references, and other materials cited in this expert report.

11.     I have also reviewed Defendants' Opening Claim Construction Brief, the accompanying September 15, 2022 Declaration of Dr. Sumit Roy In Support of Defendants' Opening Claim Construction Brief, Defendants' Reply Claim Construction Brief, and the accompanying October 17, 2022 Supplemental Declaration of Dr. Sumit Roy.

## VI.    Person of Ordinary Skill in the Art

12.     Based on the materials and information I have reviewed and on my experience in the technical areas relevant to the Patents-at-Issue, a person of ordinary skill in the art ("POSITA") at the time of the invention would (a) have had at least an undergraduate degree in electrical engineering, computer science, or computer engineering, or an equivalent field; (b) have knowledge of the IEEE 802.11 standard including its MAC and PHY protocols; and (c) have at least two years' experience in the development of wireless local area networks (WLANs). This description is approximate, and a higher level of education or skill might make up for less experience, and vice-versa. I was a person of at least ordinary skill in the art at the time of the inventions of the Patents-at-Issue (*i.e.*, the mid-2010s).

## VII.    U.S. Patent No. 9,825,738

A.     **"wherein the second information is a function of a total number of space time streams to be used to transmit the multiple uplink frames" (claim 1) / "wherein the second information is a function of a total number of space time streams to be used to perform the simultaneous transmission of the uplink frame and the one or more uplink frames from the one or more other stations" (claim 9)**

| Defendants' Construction | Atlas's Construction |
|---|---|
| Indefinite | Plain and ordinary meaning<br><br>Alternatively, "wherein the second information in the common information portion is a value that is related to the total number of space time streams to be used to simultaneously transmit the multiple uplink frames. |

3

13. In his supplemental declaration, Dr. Roy states that "[w]ithout any explanation of what the 'function' is, the POSITA would be forced to speculate." Supp. Decl. of Roy at ¶ 6. Effectively, Defendants and Dr. Roy are advancing the notion that for a "function" to be definite, a specific function – such as a formula – must be defined specifically. I disagree with that position. A person of ordinary skill in the art is very familiar with the concept of a "function," which is basic mathematical terminology. The claim requirement that the second information "is a function of a total number of space time streams" identifies with reasonable precision the requirements of the second information so that a skilled artisan would know whether an accused system or method falls within or outside the scope of that requirement.

14. As a general matter, a person skilled in the art is able to ascertain if one variable is a function of another variable without requiring a specific mathematical formula to define the relationship between the variables. A POSITA would understand that this "function" language indicates that one quantity is determined based on one or more other quantities. For example, the notation $u = f(x)$ is commonly used to indicate that a variable $u$ is "a function of" a variable $x$. Numerous references can be found that define a function in this manner. For example, *The Authoritative Dictionary of IEEE Standards Terms* (7th Edition) provides the following principal definition of "function":

> **function (1) (general)** When a mathematical quantity $u$ depends on a variable quantity $x$ so that to each value of $x$ (within the interval of definition) there correspond one or more values of $u$, then $u$ is a function of $x$ written $u = f(x)$. The variable $x$ is known as the independent variable or the argument of the function. When a quantity $u$ depends on two or more variables $x_1, x_2, \ldots x_n$ so that for every set of values of $x_1, x_2, \ldots x_n$ (within given intervals for each of the variables) there correspond one or more values of $u$, then $u$ is a function of $x_1, x_2, \ldots x_n$ and is written $u = f(x_1, x_2, \ldots x_n)$. The variables $x_1, x_2, \ldots x_n$ are the independent variables or arguments of the function. (Std100) 270-1966w

4

PX AA at ATLAS-00033199; *see also* PX BB at ATLAS-00033189 ("A quantity of value that depends on the value of one or more other quantities"). As this definition indicates, a function includes an independent variable and a dependent variable. In the common notation of $u = f(x)$, $x$ constitutes an independent variable, and $u$ represents a dependent variable. Whether the quantity $u$ is a function of $x$ can be readily answered by determining whether $u$ is determined based on a rule (or expression) that depends on $x$.

15.     As the definition of "function" indicates, it is also possible for a value to be dependent on multiple variables. For example, there may be a function such that $y = f(x,z)$. Here a POSITA would understand that $y$ is a dependent variable that is determined as "a function of" the independent variables $x$ and $z$. So, in this example, $y$ is "a function of" both $x$ and $z$.

16.     Regardless of whether a dependent variable is a function of a single or multiple variables, for any unique combination of independent variables, there must be one or more corresponding values of the dependent quantity. Thus, determining whether the quantity or value of one variable is a function of one or more other variable(s) does not require *a priori* knowledge of a specific function or formula, as Defendants appear to demand. Rather, it requires an understanding of the meaning of a function.

17.     Dr. Roy also states that absent identifying some precise formula or method, there could be an infinite number of functions that could fall within the scope of the claims. Supp. Decl. of Roy at ¶ 6. This is a non-sequitur. As an example, consider a requirement that a number be an integer. Integers include all whole numbers that are not fractional. Limiting the number to an integer clearly places further limitation on the set of numbers, even though that set of numbers may still be very large. But that set of numbers would not include any fractional numbers such as 2/3.

5

18.     Similarly, while it is true that there may be a large number of possible functions that could be used that depend on the total number of space time streams, this does not support the conclusion that a function based on the total number of space time streams is not well defined. Defendants' and Dr. Roy's assertion is equivalent to asserting that just because there are an infinite number of integers (…, -3, -2, -1, 0, 1, 2, 3, …), a POSITA could not understand the meaning of an integer.  While it may be true that the number of functions that may be employed is relatively large, it is also true that there is a large (and possibly infinite) number of non-functions that could be represented. The quantity of possible functions and non-functions is irrelevant to the question of definiteness. The proper question is whether a POSITA understands the meaning of "a function of," and indeed a POSITA understands the meaning of this phrase well. As such, the boundaries of the claim are well defined, as a POSITA can readily examine any relationship between the claimed "second information" and determine if it is "a function of a total number of space[-]time streams…" as claimed.

19.     Note that in my example, there are only two possibilities for the number: It is an integer or not an integer. So, all numbers are placed into one of two categories. That is the same with respect to the "a function of" language in the '738 claims. A POSITA would understand that the claim requires the "second information" to be "a function of" "a total number of space time streams," and if the second information is not dependent on the value of the total number of space time streams, then it falls outside the scope of the claims.

20.     As another example, consider the values of a variable $x$ and $y$ which represent the following parameters:

$$y\text{: time of day}$$
$$x\text{: person's height}$$

6

In this example, there is no relationship or dependence between the time of day, and a person's height. As a result, the variable $y$ is not a function of $x$. Similarly, if the claimed "second information" value does not have any relationship or dependence on the total number of space time streams, then it would not qualify as a function of the total number of space time streams and would be outside the scope of the claims. As an example, if the second information represented only a modulation and coding scheme (MCS) for OFDM transmissions, then that second information would not be a function of the total number of space time streams.

21.     To the extent that Defendants insist that a function must be written as a "formula," that would also be incorrect. A functional relationship can be expressed in forms other than a formula, including using tables or in expressions that pair together the values of the independent and dependent variables. For example, the following table expresses what is served for lunch as a function of the day of the week:

| Lunch | Day of Week |
|---|---|
| Seafood | Monday |
| Sandwiches | Tuesday |
| Tacos | Wednesday |
| Soups | Thursday |
| Pasta | Friday |

Functions can also be expressed in prose as is done in the '738 patent specification, as discussed further below.

22.     Defendants suggest that "any number can be written as a function of the number of space-time streams," without further explanation. Reply Br. at 4. Although not entirely clear, Defendants may be referring to a so-called constant function, *e.g.* $f(x) = c$ where $c$ is a constant value. For example, one might have $f(x) = 3$, where 3 is a constant. Thus, for any value of $x$ the function is equal to 3. While such a function exists in mathematics, this is a red herring. A POSITA

7

would not interpret "as a function of" in the '738 claims as covering a situation involving such a constant value. The '738 patent is written in the context of wireless communication systems, as indicated in the preamble of the '738 independent claims. In wireless communication systems, if a value does not change, no information can be communicated. Thus, suggesting that the '738 patent covers "second information" that never changes is inconsistent with the purpose of communicating the second information to the plurality of station devices.

23. In the '738 patent claims, the independent variable of the function comprises the total number of space-time streams, which is sometimes written as $N_{STS, total}$. Conversely, the dependent variable is the second information $y$ that forms part of the common information portion of the uplink setup information. For a particular value of $N_{STS, total}$, there will be a corresponding value of the second information, as follows:

$$y = f(N_{STS, total})$$

This functional expression identifies with reasonable certainty the set of values comprising the variable $y$ (the values of the second information). Those values must depend upon the values of the total number of space time streams, so that as the number of space time streams vary, one or more values for the second information will correspond to each value for the total number of space time streams.

24. To the degree Defendants and/or their expert, Dr. Roy, suggest there is no support in the specification for this functional relationship with the total number of space time streams, that is incorrect. The specification specifically teaches a relationship between the number of high efficiency long training fields (referred to the in the '738 patent as HEW-LTF) and the total number of space time streams:

> In yet another embodiment, when the ULI frame indicates to perform the channel sounding procedure, the number of long training fields used by the UL req frame

8

may be the number of antennas of the corresponding station. That is, the long training field (LTF) is used for estimating a MIMO channel in a frame. For the MIMO channel estimation, the number of HEW long training fields (HEW-LTFs) may be determined in accordance with the number of antennas to be used for transmission, i.e., the number of space-time streams. For example, ***when the numbers of space-time streams are 1, 2, 3, 4, 5, 6, 7, and 8, the numbers of long training fields may be determined as 1, 2, 4, 4, 6, 6, 8, and 8, respectively***. Accordingly, the AP can estimate the channel in each transmitting antennas from the long training fields.

'738 Patent at 22:17-30 (emphasis added).

25. This correspondence between the number of long training fields and the number of space time streams may be written in tabular form as:

| # Space Time Streams ($x$) | # Long Training Fields ($u$) |
|:---:|:---:|
| 1 | 1 |
| 2 | 2 |
| 3 | 4 |
| 4 | 4 |
| 5 | 6 |
| 6 | 6 |
| 7 | 8 |
| 8 | 8 |

As this table shows, and consistent with the meaning of "function," for each value of the independent variable $x$ (the # of space time streams), there is a corresponding value(s) representing the dependent variable $y$ (the # of HEW-LTF symbols) used for MU-MIMO by the plurality of stations that receive the uplink setup information.

26. Thus, there is language in the specification that aligns with the claim language, as "determined in accordance with" would be understood by a POSITA to align with the meaning of "a function of."

9

**B.** **"wherein the acknowledgement frame includes acknowledgement information for one or more of the plurality of stations" (claims 6, 14)**

| Defendants' Construction | Atlas's Construction |
|---|---|
| "wherein the acknowledgement frame includes **an information per TID subfield, a block ACK starting sequence control field, and a block ACK bitmap subfield** for one or more of the plurality of stations" | Plain and ordinary meaning |

27. Defendants' initial construction—which effectively replaces "acknowledgement information" with "an information per TID subfield, a block ACK starting sequence control field, and a block ACK bitmap subfield"—would both limit the claims to some embodiments and exclude other embodiments. This sort of construction would not follow the '738 specification, which includes embodiments that do not always require subfields like the TID subfield sought to be included by Defendants. *See, e.g.*, '738 Patent at 4:65-5:28.

28. Defendants' alternative construction also improperly narrows the claim. Defendants seek to require that the acknowledgement frame only be referenced in connection with a "message originator." *See* Reply Br. at 6. Injecting the "message originator" language into this term only creates confusion rather than provide clarity as to what Defendants mean by the "origin" of a message and which "origin" is applicable to this claim. For example, the origin requirement that Defendants attempt to implement may make this claim apply to messages sent by certain stations in certain locations and not others. Moreover, the "acknowledgment" definition includes a "signal originator" and "signal" that are withheld from Defendants' construction that only references a "message originator" and "message." *See* PX K (IEEE Dict.) at ATLAS-00033117.

29. As an example of how the injection of a "message originator" limitation reduces rather than improves clarity, consider a web server for www.wsj.com in New York. When your web browser in Texas connects to the Wall Street Journal's (WSJ) web server, it obtains what is

10

known as a TCP connection. TCP operates at the transport layer of a communication system. In TCP, every data packet is acknowledged. So, your browser sends a TCP acknowledgment message that goes back to the WSJ's server.

30.     But that TCP-level message was forwarded by many routers and servers from New York to Texas. Along the way, other acknowledgment packets were sent between individual routers to acknowledge at a lower layer (e.g. layer 2 of the communication system) that an individual packet was properly received over a given segment (aka "hop") of the network. This includes the connection between devices such as wireless access points and stations. Those acknowledgement messages sent to confirm successful transmission on any individual segment of the network including between Wi-Fi devices would also be understood to be "acknowledgement frames" comprising "acknowledgement information."

31.     However, the injection of "message *originator*" brings into question whether acknowledgment frames and information sent by any device other than the "originator" of the content of the data would qualify as an acknowledgement frame or acknowledgment information. If the "originator" is only the WSJ's web server in New York, then Defendants may argue (incorrectly) that none of the other acknowledgement frames and information utilized on the various segments of the network including on the Wi-Fi connection are acknowledgement frames or information under the court's construction, as only a message sent by the "originator" could possibly be an acknowledgment.

11

## VIII. U.S. Patent No. 9,912,513

**A. "wherein at least a portion of the payload of the uplink frame is associated with the first guard interval length" (claim 1) / "wherein at least a portion of the payload of the uplink frame is associated with the first CP length" (claim 9) / "wherein at least a portion of the legacy header is associated with a second CP length" (claim 10) / "wherein at least a portion of the respective non-legacy header is associated with the first guard interval" (claim 16)**

| Defendants' Construction | Atlas's Construction |
|---|---|
| Indefinite | Plain and ordinary meaning.<br><br>Alternatively, "wherein some or all of the payload of the uplink frame uses the first guard interval length" (claim 1) /<br><br>"wherein some or all of the payload of the uplink frame uses the first CP length" (claim 9) /<br><br>"wherein some or all of the legacy header uses a second CP length" (claim 10) /<br><br>"wherein some or all of the respective non-legacy header uses the first guard interval" (claim 16) |

32.     In my initial declaration, I opined (at ¶91) that, for a multitude of reasons, "persons of ordinary skill understand these terms according to their plain and ordinary meanings with at least reasonable (and likely absolute certainty)." Nothing in Dr. Roy's Supplemental Declaration changes my opinion.

33.     My initial declaration (at ¶95) included an annotated version of '513 Figure 8 to show how the specification sheds light on the disputed claim language:



34.      Dr. Roy's Supplemental Declaration (at ¶¶10-11) incorrectly suggests my Figure 8 annotations—particularly those at the top right showing the payload of the downlink frame includes "GI3" to indicate the guard interval length to be used by the subsequent uplink frames— are misleading and simply an attempt to "rehabilitate the specification." I disagree. The '513 specification aligns *exactly* with my annotations:

> **The downlink frame 810 may also include information on a guard interval duration GI3 (e.g., information or a value that can identify GI3) to be utilized by the participating stations**. In one aspect, the information on the guard interval duration GI3 may be provided in a payload in the second part 822 of the downlink frame 810.  When the participating stations receive the downlink frame 810 transmitted by the AP, the participating stations may decode the downlink frame 810 and identify that the participating stations are supposed to transmit their own respective uplink frame 830 and 850 after a T2 time period after receiving the downlink frame 810. **The participating stations may also identify the guard interval duration GI3 to be utilized in the second parts 842 and 862 of the respective uplink frames 830 and 850.**

13

'513 Patent at 17:17-31 (emphasis added).

35. In short, a POSITA having read the '513 specification understands with respect to Figure 8: (1) the claimed "portion" includes the payload symbols that are preceded by the guard interval GI3 (highlighted yellow in the annotated figure); and (2) the claimed "association" comes from the fact that those symbols use the same guard interval GI3 indicated by the prior downlink frame.

## IX. U.S. Patent No. 10,756,851

### A. "scheduling extension" (claims 1, 2, 7, 8)

| Defendants' Construction | Atlas's Construction |
|---|---|
| A subfield appended to the HT control field that includes scheduling information for the uplink multi-user response | Plain and ordinary meaning<br><br>Alternatively, "an extension to the control field that includes scheduling information" |

36. The term "scheduling extension" has a plain and ordinary meaning to a person of ordinary skill in the art when this term is read in the context of the claims, specification, and prosecution history. The plain and ordinary meaning of "scheduling extension" is "an extension to the control field that includes scheduling information." I disagree with Dr. Roy's opinion that this term lacks an ordinary meaning.

37. The '851 Patent makes many references to "scheduling" information that is located in a control field, for example:

a. "Uplink response *scheduling* may be located in a payload of the downlink frame, in which the uplink response *scheduling* indicates one or more resource units assigned to the multiple stations for transmitting the uplink frames. In some examples, the uplink response scheduling is in a control field of the payload, in a trigger frame as part of the payload." '851 at Abstract.

b. "An AP may *schedule* which STAs to use which sub-bands; hence, an AP may provide uplink multi-user response *scheduling information*." *Id.* at 30:63-66.

c. "the control field is located in a payload section of the first frame, wherein the control field indicates *scheduling* information for transmitting a second frame" *Id.* at 41:11-13.

d. "the downlink frame includes a control field located in a payload section of the downlink frame, wherein the control field indicates the *scheduling* information" *Id.* at 41:27-30.

A POSITA reading passages such as the above would understand the ordinary meaning of "scheduling" and that scheduling information can be located in a control field.

38.    A POSITA reading the '851 Patent would also understand the meaning of an "extension" in this context. The '851 Patent contains many references to an "extension" to the control field, for example:

a. "FIG. 13 illustrates an example of an *extended* control field 1320 in a HT control field 1300 of a data frame." '851 Patent at 30:11-12.

b. "In some embodiments, an AP may use the QoS control field in the MAC header of each MPDU and an *extended* HT control field (denoted as HE Control *Extension* (HECE) in the HT control field)…" *Id.* at 30:16-20.

c. "if the HECEI [HE control extension indication] field is set to one, then the HECE [HE control extension] subfield 1320 exists; otherwise the HECE does not exist" *Id.* at 30:40-42.

15

A POSITA reading passages such as the above would understand the ordinary meaning of "extension" and that a "scheduling extension" is an extension to the control field that includes scheduling information.

39. Defendants' proposed construction departs from the ordinary meaning of "scheduling extension" in several ways. *First*, the word "appended" is not part of the ordinary meaning of "scheduling extension" as understood by a POSITA in light of the intrinsic and extrinsic evidence. The word "appended" does not appear anywhere in the intrinsic record and is never used to describe the "scheduling extension." Rather than saying the "scheduling extension" must be "appended" to the control field, the specification instead says that the extension containing scheduling information may be located "*in*" the control field. *See, e.g.*, '851 at Abstract, 30:16-20. The term "in" is broader than the term "appended." The term "appended" would improperly require the scheduling extension to be located ***at the end*** of the control field, which is not a requirement imposed by the claims or the intrinsic evidence. Further, "appended" suggests that the scheduling extension may not be "in" the control field at all, thus reading an exemplary embodiment out of the scope of the claims.

40. To illustrate how an extension can be located "in" a field, but not "appended to" the field, consider the following example. Assume you have a field that is 4 bits, meaning it can represent 16 values. Say this is the "animals" field. A version of a standard says the meaning of the field is:

0000 – Zebras

0001 – Elephants

0010 – Giraffes

0011 – Monkeys

16

0100-1111 – Unused

Now let's say there is then a subsequent version of the standard, and it says this 4-bit field is going to be extended with scheduling information as to when the animals should be fed. Realizing the first two bits are not currently used, the new standard says the meaning of the two left-most bits can be extended to indicate a schedule:

00 – Feed morning only

01 – Feed morning and evening

10 – Feed morning, midday, and evening

11 – Feed morning, midday, late afternoon, and evening

Using this scheduling extension, the value of 0111 would mean the monkeys (11 at end) should be fed in the morning and evening (01 at the beginning). Thus, an extension of the field has been achieved for the purpose of scheduling without prepending bits to the field or appending bits to the field. Rather, the extension is located "in" the field. This is consistent with the teachings of the '851 Patent.

41. Similarly, dictionaries define "extension" as not limited to "appended." For example the American Heritage Dictionary defines "extended" as "An addition that increases the area, influence, operation, or contents of something." PX Z. This definition is not limited to "appended" and would include an extension "in" an existing field that increases the operation or contents of that field, such as my example from the previous paragraph.

42. *Second*, Defendants' construction departs from the ordinary meaning of "scheduling extension" by requiring the extension to be part of an "HT control field." It is improper to limit this term to an "HT control field" because the '851 Patent describes control fields generally. *See, e.g.* '851 at 41:11-13 ("the control field is located in a payload section of the first

17

frame, wherein the control field indicates scheduling information for transmitting a second frame"). The '852 Patent states that the "HT control field" is just "an example" that is present in "some embodiments." '851 at 30:11-12 ("FIG. 13 illustrates *an example* of an extended control field 1320 in a HT control field 1300 of a data frame."); *id.* at 16-18 ("In *some embodiments*, an AP *may* use the QoS control field in the MAC header of each MPDU and an extended HT control field).

43.    *Third*, Defendants' inclusion of the phrase "uplink multi-user response" does not comport with the ordinary meaning of "scheduling extension" as used in the claims. The asserted claims do not refer to a "uplink multi-user *response*." Rather, the claims say: "generating a second frame for a multi-user uplink *transmission* with the plurality of stations based on the scheduling information included in the scheduling extension." '851 at Claim 1. It is unclear whether the "uplink multi-user *response*" in Defendants' proposed construction is supposed to be the same thing as the "multi-user uplink transmission" or whether it is supposed to refer to something else. Adding Defendants' proposed language would make the claims less clear.

44.    *Fourth*, to the degree the language of Defendants' construction would require the scheduling information to always be present in the control field, that is incorrect. The claims themselves make clear that the scheduling information would only be obtained when it is determined that the scheduling extension exists in the first frame. The specification also teaches embodiments in which the "scheduling extension" is not always included by default, rather it is an "extension" that is not always present. *See, e.g.*, '851 at 30:40-42 ("if the HECEI [HE control extension indication] field is set to one, then the HECE [HE control extension] subfield 1320 exists; otherwise the HECE does not exist."). Defendants seem to acknowledge that the scheduling

18

extension is not always present. *See* Reply at 25 ("the scheduling extension may not always be present").

45.     I declare under penalty of perjury that the foregoing is true and correct.