**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | |
|---|---|
| ATLAS GLOBAL TECHNOLOGIES LLC, | |
| Plaintiff, | |
| v. | Civil Action No. 2:21-cv-430-JRG |
| TP-LINK TECHNOLOGIES CO., LTD., TP-LINK CORPORATION LTD, and TP LINK INTERNATIONAL LTD., | **JURY TRIAL DEMANDED** |
| Defendants. | |

**DEFENDANTS' RESPONSIVE CLAIM CONSTRUCTION BRIEF**

1

**TABLE OF CONTENTS**

I.    INTRODUCTION .............................................................................................................1

II.   LEGAL PRINCIPLES OF CLAIM CONSTRUCTION ...................................................1

III.  OVERVIEW OF THE PATENTS......................................................................................2

IV.   TERMS FOR CONSTRUCTION ......................................................................................2

      A.    U.S. Patent No. 9,531,520...........................................................................................2

            1.    "the downlink multi-user frame including a plurality of resource
                  units (RUs)" (claim 1)......................................................................................2

            2.    "including a respective set of MAC Protocol Data Units
                  (MPDUs) in each RU of plurality of RUs" (claim 1) / "wherein
                  the first MPDU is located in a first resource unit of the
                  downlink multi-user frame allocation to the first station,
                  wherein the downlink multi-user frame includes a second
                  resource unit that contains a second MPDU that includes
                  acknowledgement information for the second multi-user
                  acknowledgement frame" (claim 9).................................................................4

            3.    "network device" (claims 1, 6) .......................................................................5

      B.    U.S. Patent No. 9,763,259...........................................................................................8

            1.    "wherein the NDPA frame indicates information corresponding
                  to the predetermined length" (claim 6) ...........................................................8

      C.    U.S. Patent No. 9,825,738...........................................................................................9

            1.    "wherein the second information is a function of a total number
                  of space time streams to be used to transmit the multiple uplink
                  frames" (claim 1) / "wherein the second information is a
                  function of a total number of space time streams to be used to
                  perform the simultaneous transmission of the uplink frame and
                  the one or more uplink frames from the one or more other
                  station" (claim 9)...............................................................................................9

            2.    "uplink set-up information" (claim 9).........................................................11

            3.    "wherein the acknowledgement frame includes
                  acknowledgement information for one or more of the plurality
                  of stations" (claims 6, 14)..............................................................................12

D.      U.S. Patent No. 9,912,513.................................................................................14

     1.      "wherein at least a portion of the payload of the uplink frame is associated with the first guard interval length" (claim 1) / "wherein at least a portion of the payload of the uplink frame is associated with the first CP length" (claim 9) / "wherein some or all of the legacy header uses a second CP length" (claim 10) / "wherein at least a portion of the respective non-legacy header is associated with the first guard interval" (claim 16) ...........................14

     2.      "based on the resources for the UL MU transmission" (claim 15) ...................................................................................................16

E.      U.S. Patent No. 9,917,679.................................................................................17

     1.      "single-user (SU) format" / "SU format" / "multiple-user (MU) format" (claims 1, 6)...............................................................17

F.      U.S. Patent No. 10,020,919...............................................................................21

     1.      "in response to determining that the number of the one or more station information fields in the NDPA is one" (claim 1) / "when a number of the one or more station information files in the NDPA is one" (claim 11) / "when the number of the one or more station information fields in the NDPA is greater than one" (claims 2, 8, 12, 19)..........................................21

     2.      "cardinality" (claims 1-9, 11-19) ............................................25

     3.      "wherein the number of the one or more station information fields inthe NDPA is the cardinality of the one or more station information fields in the NDPA" (claims 1, 11)....................................25

G.      U.S. Patent No. 10,756,851...............................................................................25

     1.      "scheduling extension" (claims 1, 2, 7, 8) ..............................................26

V.      CONCLUSION..............................................................................................27

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*3M Innovative Props. v. Tredegar Corp.*,
   725 F.3d 1315, 1334 (Fed. Cir. 2013)..................................................................................4

*Advanced Aerospace Techs., Inc. v. U.S.*,
   124 Fed. Cl. 282 (2015) ....................................................................................................15

*Alcon Rsch., Ltd. v. Apotex Inc.*,
   687 F.3d 1362 (Fed. Cir. 2012)..........................................................................................23

*Berkheimer v. HP Inc.*,
   881 F.3d 1360 (Fed. Cir. 2018)..........................................................................................15

*Biosig Instruments, Inc. v. Nautilus, Inc.*,
   783 F.3d 1374 (Fed. Cir. 2015)..........................................................................................15

*Brookhill-Wilk 1, LLC. v. Intuitive Surgical, Inc.*,
   334 F.3d 1294 (Fed. Cir. 2003)..........................................................................................19

*Chef Am., Inc. v. Lamb-Weston, Inc.*,
   358 F.3d 1371 (Fed. Cir. 2004)..........................................................................................24

*Datamize, LLC v. Plumtree Software, Inc.*,
   417 F.3d 1342 (Fed. Cir. 2005)............................................................................................2

*Eon Corp. IP Holdings v. Silver Spring Networks*,
   815 F.3d 1314 (Fed. Cir. 2016)......................................................................................2, 20

*Intamin Ltd. v. Magnetar Techs., Corp.*,
   483 F.3d 1328 (Fed. Cir. 2007)..........................................................................................23

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
   572 U.S. 898, 134 S. Ct. 2120 (2014)....................................................................2, 3, 8, 24

*O2 Micro Int'l, Ltd. v. Beyond Innovation Tech. Co.*,
   521 F.3d 1351 (Fed. Cir. 2008)............................................................................................2

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005) (*en banc*) .........................................................................1

*Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*,
   844 F.3d 1370 (Fed. Cir. 2017)............................................................................................2

*SRI Int'l v. Matsushita Elec. Corp.*,
   775 F.2d 1107 (Fed. Cir. 1985) (en banc)..................................................................................1

*Sun Chemical Corp. v. U.S.*.
   698 F.2d 1203 (Fed. Cir. 1983)..................................................................................................23

*Synchronoss Techs., Inc. v. Dropbox, Inc.*,
   987 F.3d 1358 (Fed. Cir. 2021)............................................................................................23, 25

*Thorner v. Sony Computer Ent. Am. LLC*,
   669 F.3d 1362 (Fed. Cir. 2012)............................................................................................13, 14

*Trustees of Columbia Univ. in City of New York v. Symantec Corp.*,
   811 F.3d 1359 (Fed. Cir. 2016)..................................................................................................23

*TVnGO Ltd. (BVI) v. LG Elecs. Inc.*,
   *861 F. App'x* 453 (Fed. Cir. 2021)..........................................................................................19

**Statutes**

35 U.S.C...............................................................................................................................................2

35 U.S.C. § 112, ¶ 2......................................................................................................................2, 3

## I.    INTRODUCTION

Without waiving their objections to personal jurisdiction, service of process, and venue in this District, Defendants ("TP-Link") herein present their positions on those claim terms identified by the parties for construction by the Court, including their response to the arguments raised by Plaintiff ("Atlas") in its Opening Claim Construction Pl. Br. (Dkt. 88) ("Pl. Br.").[1]

## II.    LEGAL PRINCIPLES OF CLAIM CONSTRUCTION

The words of a claim are generally given the "meaning that the term would have to a person of ordinary skill in the art in question … as of the effective filing date of the patent application." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (*en banc*).  Courts look to "those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean."  *Id*. at 1314 (quotation omitted).  Those sources include "the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art."  *Id*. (quotation omitted).  Of these sources, the claim language is paramount, as it is the function of the claims, not the specification, to set forth the limits of the patentee's invention. Otherwise, there would be no need for claims.  *SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985) (en banc).  On the other end of the spectrum, extrinsic evidence is considered "less reliable than the patent and its prosecution history in determining how to read claim terms."  *Phillips*, 415 F.3d at 1318-19.

"A determination that a claim term 'needs no construction' or has the 'plain and ordinary meaning' may be inadequate when a term has more than one 'ordinary' meaning or when

---

[1] TP-Link's motions to dismiss for lack of personal jurisdiction and insufficient service of process, and their motion to transfer venue are pending.  Dkt. Nos. 28, 29, 30.

reliance on a term's 'ordinary' meaning does not resolve the parties' dispute." *Eon Corp. IP Holdings v. Silver Spring Networks*, 815 F.3d 1314, 1318 (Fed. Cir. 2016) (quoting *O2 Micro Int'l , Ltd. v. Beyond Innovation Tech. Co*., 521 F.3d 1351, 1361 (Fed. Cir. 2008)).

The Supreme Court of the United States has "read [35 U.S.C.] § 112, ¶ 2 to require that a patent's claims, viewed in light of the specification and prosecution history, inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus, Inc. v. Biosig Instruments, Inc*., 572 U.S. 898, 910, 134 S. Ct. 2120, 2129 (2014). "A determination of claim indefiniteness is a legal conclusion that is drawn from the court's performance of its duty as the construer of patent claims." *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1347 (Fed. Cir. 2005) (citations and internal quotation marks omitted), abrogated on other grounds by *Nautilus*, 134 S. Ct. 2120. "Indefiniteness must be proven by clear and convincing evidence." *Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*, 844 F.3d 1370, 1377 (Fed. Cir. 2017).

## III.    OVERVIEW OF THE PATENTS

With respect to the background of the Asserted Patents, TP-Link incorporates by reference the "Description of the Asserted Patents" set forth in the Western District of Texas ("WDTX") "Claim Construction Order and Memorandum in Support Thereof," Dkt. 75, Case No. 6:21-cv-00820-ADA, attached hereto as DX 1. *See* DX 1 at 1-9. Other aspects of the WDTX's order in the prior litigation ("*Sercomm*") are addressed herein.

## IV.    TERMS FOR CONSTRUCTION

### A.    U.S. Patent No. 9,531,520

#### 1.    "the downlink multi-user frame including a plurality of resource units (RUs)" (claim 1)

| Atlas's Construction | TP-Link's Construction |
|---|---|
| Plain and ordinary meaning. | **Indefinite** |

| Alternatively, "the downlink multi-user frame including a plurality of particular units of spatial streams and/or subchannels of a wireless channel" | |
|---|---|

The phrase fails to inform, with reasonable certainty, those skilled in the art about the scope of the invention, and is thus indefinite under 35 U.S.C. § 112, ¶ 2. *Nautilus,* 572 U.S. at 910 (2014).  The claim requires that "a plurality of resource units (RUs)" be "**include[ed]**" in "the downlink multi-user frame."  In other words, the plain language of the claim requires that the resource units **must be** a part of the downlink multi-user frame.  Claim 1 further recites "transmitting the downlink multi-user frame … over a wireless channel."  This claim language directly contradicts the specification, however, which teaches that "[t]he resource units may be particular spatial streams or sub-channels of a wireless channel **upon which** the DL MU frame will be transmitted." '520 patent, 14:12-14; 18:5-8; 20:48-50.

The claimed "resource units" cannot be part of the DL MU frame being transmitted *and* part of the wireless channel over which the DL MU frame is transmitted.  And because there is no intrinsic evidence that resolves this contradiction between intrinsic sources, a POSITA would find that the claim limitation, when read in light of the specification, fails to inform with reasonable certainty the scope of the invention.  DX 2 (Roy Decl.) ¶¶ 28-31.

Atlas labels this contradiction a "strange and narrow" interpretation of the word "including," and argues that because the WDTX in *Sercomm* found against other defendants, this Court should simply reject TP-Link's argument here.  Pl. Br. at 3.  But in that decision, the WDTX acknowledged that the specification and claims do not match. DX 1 at 15.  Yet the WDTX did not explain how a POSITA would resolve this ambiguity and reach "reasonable certainty" regarding the scope of the invention. *See id.*

In particular, the decision to use "including" in the claim, rather than "upon which" as seen in the specification, cannot be excused as mere "clunky" or sloppy drafting, but rather

3

leaves room for broader claim scope and causes the claim to be invalid for indefiniteness. *See 3M Innovative Props. v. Tredegar Corp.*, 725 F.3d 1315, 1334 (Fed. Cir. 2013) (Plager, J., concurring) ("[s]ometimes such ambiguity [in claim drafting] is the result of sloppy drafting, and sometimes it appears that claims are drafted with a degree of indefiniteness so as to leave room to later argue for a broad interpretation designed to capture later-developed competition."). Atlas's attempts to deflect the issue by alleging that two disparate terms—"including" and "upon which"—can be used "interchangeably" should be disregarded. Pl. Br. at 3. A claim must provide a clear statement of the scope of the invention; here, the manifest mismatch in language between the specification and claim renders "reasonable certainty" regarding the scope of the claim unachievable.

> **2.    "including a respective set of MAC Protocol Data Units (MPDUs) in each RU of plurality of RUs" (claim 1) / "wherein the first MPDU is located in a first resource unit of the downlink multi-user frame allocation to the first station, wherein the downlink multi-user frame includes a second resource unit that contains a second MPDU that includes acknowledgement information for the second multi-user acknowledgement frame" (claim 9)**

| Atlas's Construction | TP-Link's Construction |
|---|---|
| Plain and ordinary meaning. | **Indefinite** |

Like Term 1 of the '520 patent, these phrases fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention and are therefore indefinite.

The phrases recite "MAC Protocol Data Units (MPDUs) in each RU" and that "the first MPDU is located in a first resource unit." As with Term 1, *supra*, claim 9 recites "a first resource unit of the downlink multi-user frame" (also referred to as a "DL MU frame") and "the downlink multi- user frame **includes** a second resource unit." In contrast, the '520 specification repeatedly teaches that "[t]he resource units may be particular spatial streams or sub-channels of a wireless channel **upon which** the DL MU frame will be transmitted." '520 patent, 14:12-14;

4

18:5-8; 20:48-50.  Again, "resource units" cannot both be included in the DL MU frame (as specified in the claims) *and* part of the streams or sub-channels upon which the DL MU frame is transmitted (as taught by the specification).  DX 2 (Roy Decl.) ¶¶ 30, 35.  In addition, the MPDUs are data units exchanged between MAC entities in a communication system.  *Id.* ¶ 36.  Resource units cannot both be data units to be transmitted *and* a transmission medium (e.g., a spatial streams or subchannel) that is used for transmissions.  *Id.* ¶ 37.  A POSITA would not be able to resolve this discrepancy with reasonable certainty.

As with Term 1 for the '520 patent, Atlas again relies on the decision of the WDTX in *Sercomm*.  Pl. Br. at 5.  But that decision is not binding on this Court, and its conclusory labeling of the claim drafting as "clunky" does not resolve the uncertainty faced by a POSITA. Therefore, the claim is indefinite.

### 3.    "network device" (claims 1, 6)

| Atlas's Construction | TP-Link's Construction |
|---|---|
| Plain and ordinary meaning. | **"an access point that may communicate with STAs over a network"** |

Atlas ignores how "network device" is specifically used in claims 1 and 6, namely, to refer to actions performed by an access point ("AP") in communicating with stations.  This is critical as the steps performed by the claimed "network device" are performed by an AP and not by a station or generic device on the network.  Specifically, claim 1 requires that the "network device" generate a downlink multi-user frame addressed to a plurality of stations (that are separate and different from the "network device"); transmit the downlink multi-user frame to the plurality of non-AP stations; and receive the uplink multi-user response transmission from the non-AP stations.  Therefore, a POSITA would under that the "network device" must be an AP, not some generic device or non-AP device.

5

Any other interpretation would not work.  As Dr. Roy explained in *Sercomm*, a non-access point does ***not*** generate a downlink multi-user frame addressed to a plurality of stations; transmit the downlink multi-user frame to the plurality of stations; or receive the uplink multi-user response transmission from the stations, and that a non-access point would not even be capable of doing so.  DX 3 (*Sercomm/ASUS* Roy Supp. Decl.) ¶ 4.  Thus, the claim language itself refutes Atlas's proposal for "plain and ordinary meaning."

Moreover, claim 1 recites a "downlink" transmission.  In the prior art 802.11 specifications referred to in the patent (*e.g.*, IEEE 802.11ac a/k/a "Wi-Fi 5") and later-arising specifications that the claim supposedly covers (*e.g.*, Atlas argues that the claims are essential to the later-approved IEEE 802.11ax (a/k/a "Wi-Fi 6") specification), a downlink transmission is ***defined*** as a transmission ***from an AP*** to one or more stations ("STAs").  *See* Shoemake Decl. (Dkt. 88-1) at ¶ 37 ("[T]he specification teaches that a single downlink frame from an access point …"); *id*. at ¶ 88 (discussing downlink frame "sent by the AP access point to stations"); DX 4 (excerpts of the 802.11-2012 standard) at 10 (ATLAS-00016061) ("downlink: A unidirectional link from an access point (AP) to one or more non-AP stations (STAs)").[2]  In contrast, an "uplink" transmission is, ***by definition***, a transmission ***from a STA*** to an AP.  *Id.* at 24 (ATLAS-00016075) ("uplink: A unidirectional link from a non-access-point (non-AP) station (STA) to an access point (AP).").  Thus, unsurprisingly, the specification repeatedly confirms that a downlink transmission is sent only by an AP: "an ***access point*** may transmit a single ***downlink*** (DL) Orthogonal Frequency Division Multiple Access (OFDMA) frame that assigns particular resources units (Rus) to separate ***stations*** in

---

[2] *See* '520 patent, 13:25-31 ("… STA1 and STA2 may … operate according to the IEEE 802.1ax standard, which is currently in development[] and STA 3 may be … a device that operates according to the IEEE 802.11ac standard …").

the wireless system." '520 patent at 1:29-35 (emphasis added); *see also id*. at 5:9-13 ("as shown in FIG. 1A, an access point (AP) transmits a downlink … data unit … to a set of stations (STAs) …"); *id*. at 5:44-47 ("As shown in FIG. 1B, after sending the DL MU PPDU, the AP polls acknowledgement frames from each STA …"); *id*. at 10:63-67 ("… an AP may transmit a frame for downlink (DL) …").

The language of Claim 1 expressly distinguishes "a network device" from a station, *e.g.,* "generating, by the network device, a downlink multi-user frame addressed to a plurality of stations." In addition, the specification references "[w]ireless local network (WLAN) devices…generally characterized by the existence of access points and non-access point stations." '520 patent, 1:26-29. Because the claim distinguishes "network device" from "non-access point stations," the term "network device" plainly connotes "an access point."

The prior art IEEE 802.11 specifications referenced in the patent—and which were known to a POSITA—similarly distinguish "an access point (AP)" from "non-AP stations (STAs)." DX 4 at 10 (ATLAS-00016061). The specification provides that "a non-AP STA may act as an AP (e.g., a wireless hotspot)." '520 patent, 6:45-46. But a STA communicating in "ad hoc" mode (such as a wireless hotspot communicating via a direct link between two stations) does not rely on the downlink and uplink communications used in "infrastructure mode" as required by claim 1. *See id.* at 53-56 ("[W]hen a direct link is established between two or more non-AP STAs 212-215, *the connected STAs 212-215 can communicate directly with each other (without using the AP 211)*.") (emphasis added). Two connected STAs communicating directly with each other do not use downlink frames and uplink responses. Thus, the disclosure is irrelevant to claims 1 and 6. DX 3 (Roy Supp. Decl.) ¶ 5. And as discussed above, the 802.11 specifications and the specification show that "downlink" transmissions come only from an AP (and not from a STA or any other device). In view of the plain claim language and the

7

specification, the phrase should be properly constructed as "an access point."  This is not an improper "narrowing" as Atlas suggests (Pl. Br. at 6), but rather, is the only construction that makes sense in light of the intrinsic evidence, including the IEEE 802.11 specifications repeatedly referenced in the specification.

In *Sercomm*, the WDTX reflexively held that "network device" should be given its "plain-and-ordinary meaning."  DX 1 at 22-23.  That cursory conclusion cannot be reconciled with the claim language and the specification for the reasons set forth above.

**B.      U.S. Patent No. 9,763,259**

**1.      "wherein the NDPA frame indicates information corresponding to the predetermined length" (claim 6)**

| Atlas's Construction | TP-Link's Construction |
| --- | --- |
| Plain and ordinary meaning. | **Indefinite** |

This phrase fails to "inform, with reasonable certainty, those skilled in the art about the scope of the invention" and thereby is indefinite.  *Nautilus*, 572 U.S. at910.  In particular, a POSITA would not be able to ascertain what is—and what is not—within the scope of the phrase "indicates information corresponding to. . . ."

The specification provides no guidance as to the meaning of this term other than to state that "[t]he NDPA frame or the NDP frame may indicate information corresponding to the predetermined length." '259 patent, 2:35-37.  Nowhere does it explain how a frame is to "indicate information," or how that information "corresponds to the predetermined length."  Notably, the patentee elected not to use the phrase "contains information" or "identifies" in the specification, the discussion of which could have informed a POSITA, for example, that the NDPA frame actually provides that information.  But the specification does not do so.  Instead, the patentee selected a wording for the claim that fails to inform a POSITA as to the scope of

8

what the claim covers.  As a result,a POSITA would not be able to ascertain the scope of the claim with reasonable certainty, and the claim is thus indefinite.  DX 2 (Roy Decl.), ¶¶39-42.

Atlas's Brief fails to identify intrinsic evidence explaining how a frame is to "indicate information" or how the information "corresponds to the predetermined length." *See* Pl. Br. at 8. For example, Atlas cites to the specification that the frame "**may** include information on the maximum CB length," but that optional language does not provide certainty as to how this is done in the claim.  *Id*. (citing '259 patent, 15:44-47).  Further, the extrinsic evidence cited by Atlas are definitions of "indicate" that are provide no further information as to the "how."  Pl. Br. at 8.  The court in *Sercomm* did not help the issue, but merely repeated Atlas's argument presented above, which fails to articulate the scope (i.e., the "how") of this claim term.  DX 1 at 25-26.  Therefore, this claim term is indefinite.

### C.    U.S. Patent No. 9,825,738

1.    **"wherein the second information is a function of a total number of space time streams to be used to transmit the multiple uplink frames" (claim 1) / "wherein the second information is a function of a total number of space time streams to be used to perform the simultaneous transmission of the uplink frame and the one or more uplink frames from the one or more other station" (claim 9)**

| Atlas's Construction | TP-Link's Construction |
|---|---|
| Plain and ordinary meaning.<br><br>Alternatively, "wherein the second information in the common information portion is a value that is related to the total number of space time streams to be used to transmit the multiple uplink frames" (claim 1) / "wherein the second information portion is a value that depends on the total number of space time streams to be used to simultaneously transmit the multiple uplink frames" (claim 9) | **Indefinite** |

These terms also are indefinite because a POSITA would not be reasonably apprised of the claims' bounds with respect to the limits of "the second information" that is claimed. DX 2 (Roy Decl.) ¶¶ 44-46.

First, the claims themselves provide no help in ascertaining any objective meaning for these terms. The claims require "the second information is a function of a total number of space time streams to be used [to transmit the multiple uplink frames]/[to perform the simultaneous transmission of the uplink frame]," but do not provide any information on such "a function." The intrinsic record similarly fails to provide any clarity as to the phrase "a function of a total number of space time streams." And the phrase "a function of a total number of space time stream" or "a total number of space time streams" does not appear in the specification.

Instead, the specification states "[w]hen the MIMO or the MU-MIMO is used, the transmitting signal processing unit 100 may use a plurality of interleavers 120 and a plurality of mappers corresponding to the number of NSS of spatial streams." '738 patent, 8:11-14. At most, a POSITA would understand "NSS" to refer to a number of spatial streams, not "a total number of space time streams" as claimed. While a POSITA might understand the abbreviation "NSTS" to refer to a number of space-time streams, the specification only mentions NSTS once and the discussion is not in the context of transmitting or receiving "a total number of space time stream" or any function thereof: "The transmitting signal processing unit 100 may further include a space-time block code (STBC) encoder for spreading the constellation points from the NSS spatial streams into NSTS space-time streams and a spatial mapper for mapping the space-time streams to transmit chains." '738 patent, 8:18-23; DX 2 (Roy Decl.) ¶ 45. Moreover, a POSITA would not find "interleavers" or "mappers" to be "a function.". *Id.* ¶45.

10

As Dr. Roy notes, the concept of a "function" is broad, and in the context of this claim, overbroad such as to provide no discernable bound.  DX 2 (Roy Decl.) ¶ 46.  It simply connotes a mathematical dependence between quantities. *Id*.; Roy Decl. Ex. 9, 468 (definition of "function").  As there are only two pieces of data included in this mathematical relation (i.e., the "second information" and the "total number of space time streams"), a POSITA would have been unable to ascertain the bounds of this "function" which, as Dr. Roy testifies, is essentially unbounded.  DX 2 (Roy Decl.) ¶ 46.

This is further reflected in Atlas's brief.  Citing Dr. Shoemake and extrinsic evidence, Atlas appears to agree with Dr. Roy that "function" as used in the claim is unbounded, stating "function" is "one quantity determined based on or more other quantities."  Pl. Br. at 9.  With respect to intrinsic evidence, the only examples Atlas identifies use the total number of space time streams, rather than identifying any **particular formula** that employs a "function" of the total number of space time streams.  Pl. Br. at 10-11.  Conceivably, any number could be written as a function of the number of space time streams, so a POSITA has no basis to determine whether, for any particular number, the claim is infringed.  Atlas's "alternative" construction fares no better, as it merely replaces "function of" with the equally unknown and unbounded "related to" and "depends on."  The court in *Sercomm* reaches the same flawed conclusion as Atlas; namely, "'function' is, at most, a broad term, but a POSITA would understand that it *just* broadly written."  DX 1 at 30 (emphasis added).  That should not be enough here—the failure to define the function rather than just reference "function" should be determinative.

As a result, a POSITA would not be reasonably apprised the limits of "the second information" with reasonable certainty and the claim is thus indefinite.

### 2. "uplink set-up information" (claim 9)

| Atlas's Construction | TP-Link's Construction |
|---|---|
| Plain and ordinary meaning. | **"information on the transmission characteristics to be used for a subsequent uplink transmission"** |

The disputed phrase, the surrounding claim language, and the specification are abundantly clear: setup information is used for a subsequent uplink transmission. *See, e.g.*, '738 patent, 21:4-6.  The patent teaches that transmission characteristics make that happen. Otherwise, there is uncertainty in the claim.

The WDTX in *Sercomm* incorrectly rejected the same proposed construction now urged by TP-Link.  DX 1 at 33-34.  The plain text of the term is "uplink set-up information"—thus, the set-up information, defined in the claim by the listed transmission characteristics, is the "information" specifically called for and then defined in the claim.  In *Sercomm*, the court incorrectly stated that the proposed construction would "ignore" other types of information.  *Id.* This is incorrect, as the proposed construction specifically addresses the specific "uplink set-up information," which is separate from the "first information," and separate from the "common" and "dedicated" information otherwise addressed in Claim 9.  The construction is limited to the "uplink set-up information" and does not touch those other aspects of the claim.

In addition, TP-Link's proposed construction does not ignore an embodiment.  DX 1 at 34.  The cited "embodiment" only states an AP "indicat[es] an initiation of uplink multi-user transmission"; such an "indication" is not affected by a proposed construction that defines **only** "uplink set-up information."  '738 patent, 4:65-5:3.  For these reasons, the Court should adopt TP-Link's proposed construction.

      **3.**      **"wherein the acknowledgement frame includes acknowledgement information for one or more of the plurality of stations" (claims 6, 14)**

| Atlas's Construction | TP-Link's Construction |
|---|---|
|  |  |

12

| Plain and ordinary meaning. | **"wherein the acknowledgment frame includes an information per TID subfield, a block ACK starting sequence control field, and a block ACK bitmap subfield for one or more of the plurality of stations"** |
|---|---|

TP-Link's proposed construction should be adopted to avoid any attempt to depart from the specific and clear definition of "acknowledgement information for one or more of the plurality of stations" in the '738 patent.  More specifically, the '738 patent defines, starting in the Abstract, that "[a]n ACK information field for a data unit satisfying a first condition among the plurality of ACK information fields includes a Traffic Identifier (TID) and a block ACK bitmap indicating whether the data unit has been successfully received.  An ACK information field for a data unit satisfying a second condition and having been successfully received among the plurality of ACK information fields includes the first TID and does not include a block ACK bitmap" (emphasis added).  *See, e.g.,* '738 patent, 2:34-42, 12:4-8 FIG. 16.  Because the '738 patent provides particular teaching on how an ACK information field would provide sufficient acknowledgement or otherwise be 'satisfactory,' the Court should adopt TP-Link's proposed construction to reflect the patentee's specific definition of "acknowledgement information for one or more of the plurality of stations" in the '738 patent.

Atlas incorrectly alleges that TP-Link is seeking to read into the claim a *specific* embodiment.  Pl. Br. at 13-14.  This is not accurate—as discussed above, the patentee opens the '738 patent with a specific definition of the "acknowledgment frame," including in the Abstract wherein the patentee is otherwise not discussing any preferred embodiment, and then consistently applies that definition across the specification.  '738 patent, 2:34-42, 12:4-8 FIG. 16.  This is a clear example of the patentee acting as his own lexicographer.  *See Thorner v. Sony Computer Ent. Am. LLC,* 669 F.3d 1362, 1365 (Fed. Cir. 2012) (To act as his/her own lexicographer, the patentee must "clearly set forth a definition of the disputed claim term" and

"'clearly express an intent' to [define] the term."). The court's decision in *Sercomm* to adopt the "plain-and-ordinary meaning" is equally flawed. DX-1 at 33-34. The court incorrectly ruled that the proposed construction—the same proposed here by TP-Link—"excludes an embodiment," and there was no recognition of the patentee's own lexicography. *Id.* But, as shown above, the patentee defines the term as proposed by TP-Link throughout the specification and there is no evidence of an exclusion of an embodiment when the patentee's own definition is applied. Therefore, TP-Link's proposed construction should be adopted.

### D.    U.S. Patent No. 9,912,513

**1.    "wherein at least a portion of the payload of the uplink frame is associated with the first guard interval length" (claim 1) / "wherein at least a portion of the payload of the uplink frame is associated with the first CP length" (claim 9) / "wherein some or all of the legacy header uses a second CP length" (claim 10) / "wherein at least a portion of the respective non-legacy header is associated with the first guard interval" (claim 16)**

| Atlas's Construction | TP-Link's Construction |
|---|---|
| Plain and ordinary meaning.<br><br>Alternatively, "wherein some or all of the payload of the uplink fram uses the first guard inerval length" (claim 1) /<br><br>"wherein some or all of the payloard of the uplink frame uses the first CP length" (claim 9) /<br><br>"wherein some or all of the legacy header uses a second CP length" (claim 10) /<br><br>"wherein some or all of the respective non-legacy header uses the first guard interval" (claim 16) | **Indefinite** |

All of these claims require an undefined "portion" of something to be "associated with" something else. Claims 1, 9, 10, and 16's requirements that "at least a portion" of the uplink frame, legacy header, or respective non-legacy header be "associated" with a guard interval or CP length are indefinite because a person of ordinary skill in the art would not be reasonably apprised of the

14

claims' bounds with respect to the limits of the "portion" of the header and payload that is claimed and the level to which they must be "associated with" the guard interval or CP length.

These claim terms each include two separate "terms of degree" (*i.e.*, "portion" and "associated with") which, while not inherently indefinite, must "provide[] enough certainty to one of skill in the art when read in the context of the invention" to be considered definite. *Biosig Instruments, Inc. v. Nautilus, Inc.*, 783 F.3d 1374, 1378 (Fed. Cir. 2015); *see also Advanced Aerospace Techs., Inc. v. U.S.*, 124 Fed. Cl. 282, 293-94 (2015) (finding "outboard portion" indefinite because "the intrinsic evidence contains no guidance that would informs skilled artisan, with reasonable certainty, as to where the 'outboard portion' begins and ends."). Thus, to be considered definite, the '513 patent must provide "some standard for measuring" the bounds of "portion" and "associated with." *Id.*; *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1363 (Fed. Cir. 2018).

First, the claims themselves provide no help in ascertaining any objective meaning of these terms. According to the claims, an indication of the guard interval or cyclic prefix ("CP") is transmitted as part of the downlink transmission and "to be used by each of a plurality of stations…associated with the UL MU transmission." '513 patent, 21:27-35, 22:13-20. In turn, "at least a portion of" the uplink frame is "associated with" the guard interval or cyclic prefix. *Id.* at 21:42-44, 22:26-27. But the claims provide no objective boundary as to what "portion" of the uplink frame must be "associated with" the guard interval or cyclic prefix.

Nor does the specification provide or shed any light on an objective boundary for these limitations. The specification's only mention of the guard interval in the context of the uplink frame is that the guard interval may be "used" or "utilized" by stations in transmitting the uplink frames. '513 patent, 12:64-13:3 ("the participating stations *use* the predetermined guard interval duration…for the first *parts*…of their respective frames"), 13:48-65 (disclosing that the guard

intervals are "utilized by the first part…of the downlink frame), 14:47-63, 15:12-20, 16:22-30, 17:28-38.  And Figures 5-8 provide no further definition, depicting the guard interval as being prepended to the uplink frame, but failing to provide any objective guidance on the limits of the "portion" of the frame that is claimed and how it is "associated with" the guard interval.  *Id*., Figs.5-8.

Simply saying "plain and ordinary meaning" as proposed by Atlas provides no objective boundary.  And its alternative construction should be rejected because saying "some or all" provides no clarity.  Indeed, a "portion" of something, by any reasonable measure, cannot include "all" of it, and the word "some" is just as indefinite as the claim term "portion."  And while the *Sercomm* court found that the term should have "its plain-and-ordinary meaning," that decision is incorrect for the same reasons set forth above.  DX 1 at 38-39.

### 2.    "based on the resources for the UL MU transmission" (claim 15)

| Atlas's Construction | TP-Link's Construction |
|---|---|
| Plain and ordinary meaning. | **Indefinite** |

Claim 15 requires the "processing [of] an uplink frame comprising a plurality of frames from the set of stations based on the resources for the UL MU transmission."  '513 patent, 22:62-67.  This term is indefinite because a POSITA would not have been reasonably certain as to whether the processing of the uplink frame, or the uplink frame itself, are required to be "based on the resources for the UL MU transmission."  As Atlas seems to concede, this leads to two possible outcomes: "the issue is whether the 'based on' language refers to [1] processing of the uplink frame, or [2] the uplink frame itself."  Pl. Br. at 19, citing DX 3 (Roy Supp. Decl.) ¶ 15. This acknowledgment of two competing constructions raises the specter of indefiniteness.

The intrinsic record fails to provide any clarity.  First, the claims provide no guidance for interpreting this aspect of the claim. Claims 1 and 9 require that the transmission of the uplink

frame be done "using a resource allocated by the trigger frame to the apparatus." '513 patent, 21:36-39. But apart from claim 15, no other claim discloses "processing an uplink frame…based on the resources for the UL MU transmission." *Id*., 22:62-67 (emphasis added).

The specification similarly provides no useful information to discern the scope of the term.  The specification only teaches the inclusion of "resource allocation for each STA" as part of the trigger frame (i.e., "downlink frame") transmitted to the STA(s) and that "[e]ach of the participating STAs may send its respective UL frame in its assigned resource." *Id*., 2:54-56, 3:3-5.  Yet, neither the claims nor the specification refer to "processing an uplink frame" based on the resources for the UL MU transmission or to "a plurality of frames" based on "the resources for the UL MU transmission."  Nonetheless, the *Sercomm* court found that the term should be construed "according to its plain-and-ordinary meaning," but that decision is incorrect for the reasons set forth above.  DX 1 at 58-60.

E.      U.S. Patent No. 9,917,679

1.      "single-user (SU) format" / "SU format" / "multiple-user (MU) format" (claims 1, 6)

| Atlas's Construction | TP-Link's Construction |
|---|---|
| Plain and ordinary meaning. | **Indefinite** |

Atlas's position fails to address the core issue with these terms.  Namely, the common element that lacks definition is the specifically claimed "format."  A POSITA would not be reasonably appraised of the claims' bounds with respect to what the "single-user (SU) **format**" or "multi-user (MU) **format**."

The specification provides no guidance as to the meaning of "format" within the claimed "SU format" and "MU format."  For both terms, the specific phrase "SU format" / "MU format" appears only within the claims themselves and nowhere else in the specification.  *See* '679

17

patent, cl. 1, 6. By failing to describe the claimed "format," the specification inherently does not provide any definition or guidance as to what the required SU or MU "format" means or entails.

What is more, these claim terms did not even appear in the original claims. *See* DX 5 (11/3/2015 original claims) at 54 (ATLAS-00014833. Rather, they made their debut during prosecution in response to rejections over prior art. *See* DX 6 (6/21/2017) at 1 (ATLAS-00018762):

> 1.    (Currently Amended) A method for transmitting an ~~uplink~~ acknowledgement frame for notifying successful data reception by a station (STA) to an access point (AP) in a wireless local area network, the method comprising:
>
> receiving, from the AP, a downlink frame including a quality of service (QoS) control field including acknowledgement information representing whether the STA is requested to transmit the acknowledgement frame ~~related to a type of the uplink frame, the type of the uplink frame including~~ in a single-user (SU) ~~type~~ format or [[and]] in a multiple-user (MU) [[type]] format at a Short Inter-Frame Space (SIFS) time after the downlink frame; and
>
> transmitting, to the AP, the acknowledgement ~~uplink~~ frame ~~having a type determined~~ based on the acknowledgement information at the SIFS time after the downlink frame ~~related to the type of the uplink frame~~,
>
> wherein transmitting the acknowledgment frame comprises:[[,]]
>
> when ~~the type of the uplink frame corresponds to the MU type~~ the acknowledgment information represents that the STA is requested to transmit the acknowledgement frame in the MU format and the STA is allocated a resource, transmitting the ~~uplink~~ acknowledgement frame in the MU format [[is]]on the allocated resource simultaneously with transmission of at least one acknowledgement frame from ~~transmitted by a plurality of STAs including the STA and~~ at least one other STA, and
>
> when the acknowledgment information represents that the STA is requested to transmit the acknowledgement frame in the SU format, transmitting the acknowledgement frame in SU format.

Among other amendments, the applicant deleted the generic phrases "single-user (SU) type" and "multiple-user (MU) type" in favor of the more specific phrases "single-user (SU) format" and "multiple-user (MU) format," respectively. *See id.* In making these amendments,

18

the applicant attempted to distinguish the prior art (*i.e*., US 2013/0188627 to Cheong), which the examiner had found discloses "a downlink frame including information related to a *type* of the uplink frame, the *type* of the uplink frame including a single-user (SU) *type* and a multiple-user (MU) *type*."  DX 6 (6/21/207 Response) at 7 (ATLAS-00018758) (emphasis added).  The applicant argued that Cheong fails to disclose, *inter alia*, "a single-user (SU) format" or a "multiple-user (MU) format" as recited in the amended claims—but did not explain what these newly minted "format" terms mean.  *See id*. at 8.  "Neither phrase is mentioned, let alone defined, in the … specification, as both were added to the claims during prosecution."  *TVnGO Ltd. (BVI) v. LG Elecs. Inc., 861 F. App'x* 453, 458 (Fed. Cir. 2021) (affirming indefiniteness).  The prosecution history therefore cements the conclusion that these claims are indefinite.

And tellingly, the patentee demonstrated the ability to define a "format"—just not with respect to the claimed "SU format" and "MU format."  For example, in Fig. 7, the patentee defined an exemplary "HE PPDU **format**," providing detailed explanation across multiple columns of the patents of the "two parts" including all necessary information of the relevant "fields," "channel bandwidth," and "subcarrier spacing;" this explanation also includes a detailed table.  *Id.* at 10:33-13:26, Table 1.  No such definition or table is offered for the claimed "SU format" or "MU format."  Again, these terms first appeared during prosecution.

In its infringement theories, Atlas argues that the IEEE 802.11ax specification defines the claimed SU and MU formats.  However, as discussed previously (*see supra* at 6; 6 n. 2), the IEEE 802.11ax specification was approved long after the claimed priority dates of the asserted patents and is therefore irrelevant to claim construction.  *Brookhill-Wilk 1, LLC. v. Intuitive Surgical, Inc*., 334 F.3d 1294, 1299 (Fed. Cir. 2003) ("These references are dated well after the '003 patent ... They are not contemporaneous with the patent, do not reflect the meanings that

19

would have been attributed to the words in dispute by persons of ordinary skill in the art as of the grant of the '003 patent, and for those reasons are not considered in our de novo claim construction analysis."). For all these reasons, a POSITA is left to guess at the scope of these terms.

Atlas fails to identify any adequate definition of "format," and in failing to provide a proposed alternative construction of these terms does not offer any further guidance for the Court. Atlas instead focuses on irrelevant non-sequitur arguments that "single user" and "multi-user" are different (*i.e.*, "Depending on the acknowledging information located within the downlink frame' QoS Control Field. . . , a STA will transmit an immediate uplink response in either 'multi-user format' simultaneously with other STAs. . . or 'single user format' by itself . . . ." (Pl. Br. at 22)). Atlas does not identify a concrete definition of the claimed "format" of those described transmissions, supported by the patent or otherwise. And, in any event, TP-Link does not dispute that a "single-user" or "multi-user" transmission are different; instead, the lack of foundational definition of the claimed "format" is why the claim terms are indefinite. Because the claim terms "SU format" and "MU format" neither had an established meaning at the time of the invention nor are described in the intrinsic evidence, the Court should not find that these terms need no construction or should be given an unspecified "plain" meaning. *Eon Corp. IP Holdings*, 815 F.3d at 1318.

The lack of specificity for SU and MU "format" is further seen in Atlas's own cited extrinsic evidence. Pl. Br. at 23. The extrinsic evidence offered for "format" (as that word is used in isolation, divorced from the context of the patent) is vague and non-specific. *See* Pl. Br. at 23 ("format: the way in which something is arranged or set out."). Dr. Shoemake, in fact, cites an IEEE definition for "format" (again, as the word is used in isolation) that offers no assistance

20

to a POSTIA: "format: the arrangement, order, or layout of data in or on a data medium."

Shoemake Dec. at ¶ 133.  Even if a POSTIA were to apply the IEEE's generic definition of

"format" to these claims, neither the specification or claims explains the "arrangement, order, or

layout of data in or on a data medium" in reference to these specific claim terms.  What precisely

is the MU format as a whole rather than as separate words "multiple", "user" and "format"?

What is the SU format as a whole rather than as separate words "single", "user" and "format"?

The claims, specification, prosecution, Atlas's paid expert, and Atlas's other extrinsic dictionary

evidence do not answer these questions.

Finally, Atlas's argument that Dr. Roy offered no opinion on these terms is of no

consequence.  The lack of a definition for the claimed "format" is self-evident from the intrinsic

evidence (*see supra*) and no testimony from Dr. Roy is needed to establish that fact.  And Atlas's

expert Dr. Shoemake never identifies a definition of "format" across nearly 20 pages extrinsic

opinion.   Therefore, for all these reasons, a POSTIA would not be able to ascertain the scope of

the claim with reasonable certainty and the claim is thus indefinite.

    **F.**    **U.S. Patent No. 10,020,919**

        **1.**    **"in response to determining that the number of the one or more station information fields in the NDPA is one" (claim 1) / "when a number of the one or more station information files in the NDPA is one" (claim 11) / "when the number of the one or more station information fields in the NDPA is greater than one" (claims 2, 8, 12, 19)**

| Atlas's Construction | TP-Link's Construction |
| --- | --- |
| Plain and ordinary meaning. | Claims 1, 11: Plain meaning: "in response to determining that there is one station information in the NDPA" / "when there is one station information in the NDPA." <br><br> Claims 2, 8, 12, 19: **Indefinite** |

Independent claims 1 and 11 are method claims.  Both claims specifically require that the "number of the one or more station information fields in the NDPA is one." In claim 1, the first CSI feedback is transmitted "in response to" determining that there is only one station information filed in the NDPA.  Claim 11, which is from the perspective of the access point, similarly receives the first CSI feedback "in response to" the "NDP having only one station information field."

The dependent claims (claims 2, 8, 12, and 19), however, require the number of station information field to be two or more ("greater than one").  Accordingly, when each method step of the independent claims is practiced, necessarily it would be *impossible* to practice dependent claims 2, 8, 12, and 19 ("is one" vs. "greater than one").  As such, if these dependent claims were practiced, the independent claims would not be practiced.  This inherent mismatch between the number of station information fields as defined by the independent and dependent claims renders the dependent claims indefinite.

Specifically, the plain text of independent claims 1 and 11 require the number of station information fields in the NDPA be **exactly one**; otherwise, the first CSI feedback cannot be transmitted/received: "in response to determining that the number of the one or more station information fields in the *NDPA is one*" (claim 1) / "when a number of the one or more station information files in the NDPA *is one*" (claim 11).   If more than one, the claimed method could not be practiced.   To practice the full scope of the independent claim, claim 1 discloses that the NDPA must include **one** station information field, the "number" of the **one** station information field must be determined, and "in response to" determining that the number of station information fields is **one**, the first CSI feedback must be transmitted. '919 patent, 32:64-33:7.  If there is more than one station information field in the NDPA, as

22

required by the dependent claims, the independent claims are not practiced, which is not permissible. *See, e.g.*, *Alcon Rsch., Ltd. v. Apotex Inc.*, 687 F.3d 1362, 1367 (Fed. Cir. 2012) ("It is axiomatic that a dependent claim cannot be broader than the claim from which it depends."); *Intamin Ltd. v. Magnetar Techs., Corp.*, 483 F.3d 1328, 1335 (Fed. Cir. 2007) ("An independent claim impliedly embraces more subject matter than its narrower dependent claim.").

The dependent claims require exactly that. The dependent claims recite processes that must occur only when the number of the station information fields in the NDPA is "*greater than one.*" '919 patent, 33:12-13, 33:40-41, 34:13-14, 34:46-47 (emphasis added). Thus, one cannot simultaneously practice the dependent claims while also practicing the independent claims. In other words, there cannot be "one station information field" (as required by the independent claims) while the "number of the one or more station fields…is greater than one" (as required by the dependent claims). Where, as here, the dependent claims are "nonsensical and require an impossibility," the Court should find them indefinite. *Synchronoss Techs., Inc. v. Dropbox, Inc.*, 987 F.3d 1358, 1366(Fed. Cir. 2021) (finding asserted claims indefinite where they "are nonsensical and require an impossibility"); *Trustees of Columbia Univ. in City of New York v. Symantec Corp.*, 811 F.3d 1359,1367 (Fed. Cir. 2016) (claims that nonsensically "describe[d] the step of extracting machine codeinstructions from something that does not have machine code instructions" were indefinite for being "nonsensical").

Atlas attempts to save this claim by arguing that the claims are conditional. Pl. Br. at 25-26. While "[t]here is nothing wrong with a conditional claim *per se*," a conditional claim is "not . . . sufficient under law" if the "condition never occur[s]." *Sun Chemical Corp. v.*

23

*U.S.*. 698 F.2d 1203, 1208 n.8 (Fed. Cir. 1983).  Moreover, twisting the language of the claims such that they can be understood as being "conditional" contradicts the plain and ordinary meaning of the claim language.  Atlas argues that "Claim 1 and 11 plainly claim determining whether there is one station information filed in the NDPA [is one [sic]] or more than one, and if there is one, performing an action. . . .[i]f there is more than one, the independent claims do not require or prohibit an action."  Pl. Br. at 26.  But if the station information filed in the NDPA is **more than one**, the dependent claims are performed, while the independent claims would not "perform[ ] an action."  *Id.*  If Claims 1 and 11 do not perform an action, as argued by Atlas, then all the steps of method set forth in the dependent claims would not be performed.  Thus, under Atlas's proposal, no infringement could occur; for a method claim, all steps must be performed for infringement to occur. *Muniauction,* 532 F.3d at 1323-24; *see also Limelight*, 134 S. Ct. at 2120 (2014) ("A method patent claims a number of steps; under this Court's case law, the patent is not infringed unless all the steps are carried out."). And it is black letter law that a court should not re-write claims to save validity or preserve infringement when there can be none, which is what Atlas asks here by seeking to re-write the claims to be "conditional" under the guise of an unspecified "plain and ordinary" meaning.  *Chef Am., Inc. v. Lamb-Weston, Inc*., 358 F.3d 1371, 1375 (Fed. Cir. 2004) (rejecting patent owner's argument to re-write a claim because "otherwise the patented process could not perform the function the patentees intended").

To infringe these dependent claims, all the claimed steps (including all steps of the independent claim) must be carried out.  Atlas's contrived "plain and ordinary meaning" construction would violate that principle.  Therefore, adoption of Atlas' construction would lead to a scenario where the dependent claims would not actually depend from the independent claims at all. Specifically, Atlas's construction asks the Court to construe the dependent claims to be

24

*broader* than the independent claims, allowing for "greater than one" station information field in the dependent claims' NDPA as opposed to the single station information field required by the independent claims.

Accordingly, the Court should find that the dependent claims are indefinite for requiring an "impossibility." *See Synchronoss Techs., Inc.*, 987 F.3d at 1366.

### 2.    "cardinality" (claims 1-9, 11-19)

| Atlas's Construction | TP-Link's Construction |
|---|---|
| "the number of elements in a set" | Needs no construction; plain and ordinary meaning. |

TP-Link contends that "cardinality" does not require construction; however, even under Atlas's construction, the usage of "cardinality" in claims 1, 11 (*see* term 3, '919 patent) does not affect the conclusion that claims 1 and 11 are indefinite. *See infra* at Term 3, '919 patent.

### 3.    "wherein the number of the one or more station information fields in the NDPA is the cardinality of the one or more station information fields in the NDPA" (claims 1, 11)

| Atlas's Construction | TP-Link's Construction |
|---|---|
| Plain and ordinary meaning.<br><br>Alternatively, "wherein the number of the one or more station information fields in the NDPA is the number of elements in the station information fields." | Plain meaning: wherein the number of the one or more station information fields in the NDPA is the number of the one of the one or more station information fields in the NDPA |

As discussed above for the term 1 of the '919 patent, and incorporated herein, claims 1 and 11 plainly require that the numberof the "one or more station information fields" be "**one**" in order to practice claims 1 or 11.  Based on that plain requirement of the claims, this claim element is nonsensical. To the extent Atlas attempts to ascribe any other meaning to claims 1 and 11, and this claim phrase, other than "one equals one," the claims are indefinite.

### G.    U.S. Patent No. 10,756,851

25

### 1.   "scheduling extension" (claims 1, 2, 7, 8)

| Atlas's Construction | TP-Link's Construction |
|---|---|
| Plain and ordinary meaning: "an extension to the control field that includes scheduling information." | **"a subfield including in the HT control field that includes scheduling information for the uplink multi-user response."** |

The term "scheduling extension" does not carry any plain and ordinary meaning. The term never appears anywhere in the 46-page specification either, but only appears in the claims.  Accordingly, at a minimum, Atlas's proposed "plain and ordinary meaning" should be rejected.  The claims provide the starting context for determining the meaning of "scheduling extension."  First, the scheduling extension is associated with the control field ("the control field includes the scheduling extension").  Second, the scheduling extension includes "scheduling information" ("the scheduling information included in the scheduling extension").  Third, the claims specify that the "scheduling information" is what the multi-user uplink response is based upon ("multi-user uplink transmission . . . based on the scheduling information included in the scheduling extension").  Each of these three concepts is captured in TP-Link's construction.

While the specification does not specifically mention "scheduling extension," it does discuss with respect to Fig. 13 an HE Control Extension (HECE).  *See* '851 patent, 30:11-33:52, 40:11-44.  This HECE field may or may not exist based upon the control extension indication.  *Id.*,30:40-42 ("if the HECEI field is set to one, then the HECE subfield 1320 exists; otherwise the HECE does not exist").  The claims reflect this concept as well. If the HECE does exist, then it isan extension to the legacy HT Control Field.  *Id.*, 30:11-15, 40:28-32.  As the specification notes, "The structure of the HT Control (HTC) field and its possible extension is shown in FIG. 13:"

26



FIG. 13

*Id.*, Fig. 13 (annotated).  As shown above, the legacy HT Control Field is highlighted in green anddesignated by numeral 1310. To the right and highlighted in yellow is the HECE subfield. This subfield is appended to the end of the HT Control Field.

Atlas's own cited extrinsic evidence supports that the "scheduling extension" should be something that is appended to the HT control field.  For example, Atlas relies on a dictionary definition for "extension" as "[a]n addition that increases the area, influence, operation, or contents of something."  Pl. Br. at 30 (citing PX 29 at ATLAS-00033179 (emphasis added)).

Accordingly, the intrinsic and extrinsic evidence all agree that the scheduling extension issomething appended to the HT control field, and TP-Link's construction should be adopted.

## V.    CONCLUSION

For the reasons set forth above, the Court should adopt TP-Link's proposed constructions.

27

Dated:  December 16 2022

Respectfully submitted,

/s/ *Melissa R. Smith*
Steven D. Moore
(Eastern District of Texas Member)
KILPATRICK, TOWNSEND & STOCKTON LLP
Two Embarcadero Center, Suite 1900
San Francisco, CA 94111
Telephone: (415) 576-0200
Facsimile: (415) 576-0300
smoore@kilpatricktownsend.com

Kristopher L. Reed
(Eastern District of Texas Member)
KILPATRICK, TOWNSEND & STOCKTON LLP
2001 Ross Avenue, Suite 4400
Dallas, TX 75201
Telephone: (214) 922-7143
Facsimile: (214) 922-7101
kreed@kilpatricktownsend.com

Kevin M. Bell
(Eastern District of Texas Member)
Edward J. Mayle
(Eastern District of Texas Member)
KILPATRICK, TOWNSEND & STOCKTON LLP
1400 Wewatta Street Suite 600
Denver, CO 80202
Telephone: (303) 571-4000
Facsimile: (303) 571-4321
kbell@kilpatricktownsend.com
tmayle@kilpatricktownsend.com

Andrew N. Saul
(Eastern District of Texas Member)
KILPATRICK, TOWNSEND & STOCKTON LLP
1100 Peachtree Street NE, Suite 2800
Atlanta, GA 30309
Telephone: (404) 815-6500
Facsimile: (404) 815-6555
asaul@kilpatricktownsend.com

Melissa R. Smith
(Eastern District of Texas Member)
GILLIAM & SMITH LLP
303 South Washington Avenue

28

Marshall, TX 75670
Telephone: (903) 934-8450
Facsimile: (903) 934-9257
melissa@gillamsmithlaw.com

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing document was filed electronically in compliance with Local Rule CV-5(a) on December 16, 2022 and was served via CM/ECF on all counsel who are deemed to have consented to electronic service.

*/s/  Melissa R. Smith*

30