THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

* * * * *

| | | |
|---|---|---|
| ATLAS GLOBAL TECH, LLC. | * | NO. 2:21-CV-430 |
| | * | Marshall, Texas |
| VS. | * | |
| | * | 9:00 a.m. - 10:30 a.m. |
| TP-LINK TECH CO. LTD, ET AL | * | January 13, 2023 |

* * * * *

**MARKMAN HEARING**

BEFORE JUDGE ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE

* * * * *

Proceedings recorded by computer stenography
Produced by computer-aided transcription

*GLR TRANSCRIBERS*
9251 Lynne Circle
Orange, Texas 77630 * 409-330-1610

**APPEARANCES:**

For the Plaintiff:

MR. MICHAEL HEIM
MR. ERIC ENGER
MR. ALDEN HARRIS
**Heim Payne & Chorush, LLP**
1111 Bagby, Suite 2100
Houston, TX 77002

MS. ALEJANDRA C. SALINAS
MR. ARMSTEAD LEWIS
**Susman Godfrey, LLP**
1000 Louisiana
Suite 5100
Houston, TX 77002

MS. CLARE A. HENRY
**Ward Smith & Hill, PLLC**
1507 Bill Owens Parkway
Longview, TX 75604

MS. ELIZABETH DERIEUX
**Capshaw DeRieux, LLP**
114 E. Commerce Ave.
Gladewater, TX 75647

For the Defendant:

MR. KRISTOPHER L. REED
MR. KEVIN M. BELL *(Denver Office)*
**Kilpatrick Townsend & Stockton, LLP**
2001 Ross Ave., Suite 4400
Dallas, TX 75201

MR. J. TRAVIS UNDERWOOD
**Gillam & Smith, LLP**
102 N. College
Suite 800
Tyler, TX 75702

Courtroom Deputy:

BECKY ANDREWS

Court Reporter:

EDWARD L. REED

**P R O C E E D I N G S**

**9:00 A.M. – JANUARY 13, 2023**

THE COURT: For the record, we're here for the Claim Construction Hearing in Atlas Global Technologies vs. TP-Link Technologies, Case No. 2:21-430 on our docket.

Would counsel state their appearances for the record?

MR. HEIM: Yes, Your Honor, good morning. Michael Heim with Heim Payne & Chorush for the Plaintiff, Atlas. With me today is Eric Enger, Alden Harris, Alejandra Salinas, Armstead Lewis, Claire Henry, and Betty DeRieux. And we also have the client, Craig Yudell, with us today.

Thank you, Your Honor.

THE COURT: All right, thank you, Mr. Heim.

MR. REED: Good morning, Your Honor. Kristopher Reed of the law firm of Kilpatrick Townsend. With me is my colleague, Kevin Bell.

MR. BELL: Good morning.

THE COURT: Good morning.

MR. REED: And our local counsel, Travis Underwood.

MR. UNDERWOOD: Good morning, Your Honor.

THE COURT: Good morning. And thank you,

Mr. Reed.

I will note for the record that earlier this morning we delivered to counsel for both sides a set of preliminary constructions of the disputed terms. The purpose of issuing those preliminary constructions was not to prevent either side from taking whatever positions they think are appropriate on these terms. Rather, the purpose was to allow counsel to focus their attention on where they think the Court may have missed the mark in the initial review of the briefing and the record.

I do reserve the right to alter these preliminary constructions and not uncommonly do alter them based on the arguments received at this hearing. So I hope they will be accepted in that spirit.

I have reviewed the plaintiff's technology tutorial, but I'm happy to receive whatever additional arguments either side has on the technology and the patents. I do want to hear the arguments on a term-by-term basis, but I'm happy to take them in whatever order counsel think is most efficient, and to group them if counsel think that is appropriate.

I will start off by turning it over to counsel for plaintiff.

MR. HEIM: Yes, Your Honor. Plaintiff does

not object to any of the Court's constructions, and so we will defer to defense counsel.  It is my understanding that they are not going to argue all the terms, but I'll leave it to them to identify which terms that they are going to argue.

THE COURT:  All right.  Thank you, Mr. Heim.

Mr. Reed.

MR. REED:  Thank you, Your Honor.  Kristopher Reed for defendants.  Thank you for the preliminary constructions and the description of those and how they should be interpreted.  While we maintain our arguments that we put in our briefs, we're not going to argue every term today.

THE COURT:  All right.

MR. REED:  But we are going to begin and we'll just follow the order in the Court's preliminary constructions just to keep everyone on the same page, and so no surprises as to what's coming next.

Of course, our participation today should not be viewed as any kind of waiver or consent to our jurisdictional arguments or motions which are still pending.

THE COURT:  That's understood.

MR. REED:  So we'll start by briefly addressing the '520 patent.  Now, in the '520 patent

we've alleged that a number of terms were described in your preliminary constructions as A, B1, B2 are indefinite. For efficiency sake, we'll just argue the A term here today because it captures the spirit of the arguments in all three terms.

So the problem with this particular term -- and we're talking about the term of "the downlink multi-user frame including a plurality of resource units" -- the problem with this particular claim is that the claim requires that the downlink multi-user frame, which is also called the DL MU, includes this plurality of resource units.

However, when you read this claim in view of the specifications, which we're required to do under *Phillips*, that no longer makes sense because you have a situation where the resource units themselves are actually the wireless channel streams on which those frames are transmitted.

In other words, we're talking about you'd have to have the resource units somehow as part of the frame, included in the frame, but then the resource unit itself is the mechanism by which the frames are transmitted, and those two things can't be reconciled. This doesn't make sense in this context.

Now, with respect to Atlas, we're not

talking about books, we're not talking about houses here, the example that's provided to try to justify this disconnect.  We're talking about transmission of frames and wireless communication channels.  And "including" and "upon" do not mean the same thing in that context.

Now, I have great respect for Atlas' expert, Dr. Shoemake.  We've worked with him in the past.  But in this instance, to paraphrase *Hamlet*, "The expert doth protest too much, methinks," because it took him literally 14 paragraphs, almost the better part of six pages, in reference to obscure [u/i] triple-E submission just to come up with any kind of theory where he could try to reconcile these this disconnect between the claim and the specification.

The bottom line with this claim is that, well, Dr. Shoemake -- so it takes Dr. Shoemake 14 paragraphs, six pages, and he is clearly one of beyond ordinary skill of the art.  And what we have is a situation where it is not reasonably certain to one of ordinary skill as to what this claim term means when it says it has to be including the resource units in the frame.

Bottom line, it's probably a drafting end.  It probably screwed up his claim.  They made a

8

mistake and now it's a bad claim.  And so the Court should find it to be indefinite, it's a bad claim.

The only way the Western District of Texas actually got around this in its order was literally to say that the words "includes" and the word "upon" are interchangeable.  We think that not only contradicts the specification, but contradicts plain English.  And we ask the Court here simply to call balls and strikes, find this claim a bad claim and hold it indefinite.

THE COURT:  Thank you, Mr. Reed.

MR. HARRIS:  Good morning, Your Honor.

THE COURT:  Good morning, Mr. Harris.

MR. HARRIS:  I think that TP-Link's arguments today largely reiterate the points that they've made in their claim construction brief, so I'll be very brief today and reserve the remainder of our time, unless the Court has any questions.  But I'll make three very brief points in rebuttal.

First of all, the specification does use the word "including" to describe the relationship between the downlink multi-user frame and resource units.  An example of that can be found in column 2, at lines 49 through 50.  So there is no tension between the use of the word "include" and the use of the word

"upon" within the specification.  The claims reflect that.

Second, as a matter of linguistics of the English language, we give several examples of how the words "include" and "upon" are not in tension with each other at all.  A book includes its pages and is printed upon its pages.  A house includes its foundation and is also built upon its foundation.

Now, TP-Link's counsel made the point that we're not talking about books here, we're not talking about houses here, we're talking about radio waves.  And that's the third point I want to make, which is, as a matter of physics, as a matter of the way that radio waves behave, there is no distinction between a radio wave including a frequency and being transmitted upon a frequency.  It's because radio waves don't use a medium to travel.

Sound does, for example.  In order for you to hear me, three has to be air between us.  If there was no air in the courtroom, that would be a problem, obviously, but you wouldn't be able to hear me because there wouldn't be a medium.  There wouldn't be a medium upon which my sound could travel.

But radio waves don't need a medium. They travel through deep space to reach probes, to

reach satellites.  Radio waves travel upon themselves. They don't have a separate medium.  And so when we describe a radio wave, including, for example, a set of frequencies, it's equally valid from a physical perspective to describe it as being transmitted upon a set of frequencies.

And that's why the specification in the claim used those words interchangeably.  And there was no drafting error.  There is nothing unclear about the choice of words in the claim.  It's entirely consistent with physics, it's entirely consistent with the English language, and it is entirely consistent with the specification's disclosures, which use these words interchangeably.

So we agree the Court got it right. Unless Your Honor has any questions, I'll reserve the remainder of our time.

THE COURT:  Mr. Harris, the point about this term that I find most persuasive is the fact that what we're talking about in these claims is radio waves, signals, something that don't really have separate frames and other physical structures that we're trying to measure them in.

And, therefore, I agree that it is hard to expect the ordinary English language that would be true

if these were other physical devices, or other physical means might apply.  And for that reason I do find that Dr. Shoemake is persuasive on that point.

But anyway, I appreciate your argument.

MR. HARRIS:  Thank you.

THE COURT:  Mr. Reed, if you want to respond to that, I'll be happy to hear.

MR. REED:  Thank you, Your Honor.  No, we'll move to the next term, the next term being "network device" --

THE COURT:  All right.

MR. REED:  -- in Claims 1 through 6, also the '520 patent.

Turning to that claim, as you know, it's probably over used, but there is an old adage from Federal Circuit Chief Judge Richards' tenure, that "the name of the game is the claim," and that particular adage resolves this dispute here, we believe.

The term standing alone, "network device," does not have that much inherent meaning.  But the rest of the claim language that we have here, the next two that we're talking about, is an access point, also known as an AP.  We're not talking about a non-AP station.

Specifically, as you see in the slide, a

non-access point situation is not capable of performing the functions described in the remainder of the claim. In particular, a non-AP station is not capable of generating a downlink multi-user frame addressed to a plurality of stations in the wireless network, it's not capable of transmitting that downlink multi-user frame for obvious reasons, and it's not capable of receiving from the multitude of stations the uplink multi-user response transmission because it's not an access point, it's not providing an access point to a wireless network.

And so although the word "network device," again standing alone, may not be pregnant with the inherent meaning, we believe in the context of the this claim the Court should find that the network device is not a non-active point station, but is indeed an active point.

Thank you.

THE COURT:  One question, Mr. Reed.

Typically, when I hear the argument that the surrounding claim language requires a certain understanding of the term, if that is required by the surrounding language, why do we need to separately construe the term in that limited way?

MR. REED:  Your Honor, the answer to that is

that claim construction -- one of the purposes of the claim construction is to assist not only the Court, but the trier of fact to understand how to apply these particular limitations to the -- to use technology to the prior art.  While we agree with you that the claim limitation itself provides those limitations, providing that additional explanation, understanding of the meaning of "network device" assists the trier of fact in being able to perform its necessary function of understanding and differentiating between what is under this claim an access point, and what is not an under this claim, that being the non-access point station.

So, for that reason, we request that the Court provide that additional clarification and meaning for the assistance of the trier of fact.

THE COURT:  Isn't it true that the specification does disclose that a non-access point station could act as an access point?

MR. REED:  A non-access point station can serve as an access point if it's configured in a particular way to do that.  One example is when you have a phone, for instance, which acts as a local access point.  But when it does that, it ceases to be a non-access point station.  It turns into something

else.  It becomes its own access point into a different sub-network.  So it's not the same network we're  talking about.  Now we've created a new sub-network where it then serves as the access point from the original network.  And so it becomes something else in that instance where it serves that function.

But when we're talking about a particular wireless network, the non-access point stations are not capable of performing this in the context of that particular network.

THE COURT:  All right.  Thank you, Mr. Reed.

MR. LEWIS:  Good morning, Your Honor. Armstead Lewis on behalf of Atlas.  I'm just going to briefly address some of the arguments made by defendant's counsel.

So I'd like to just start off saying that this Court should not adopt defendant's limited construction that seeks to limit this term to an access point.  The *Sercomm* Court also addressed this similar issue and construed this term in favor of Atlas.

Moving to, I guess, my first point that was brought up by Your Honor, the specification does, in fact, state that a wireless communication device

which a person of ordinary skill in the art understands to be a network device, may be an access point station and also a non-access point.

And this is in column 6, 24 through 32. Also in column 6, 38 to 46, it states that a non-access point may be a device with wireless communication capability, showing that a network device is not always confined to be an access point, but can also serve as a non-access point station.

THE COURT:  Do you agree that the network device within these claims is acting as an access point?

MR. LEWIS:  Yes, I do, Your Honor.  But also, a network device is able to act as a non-access point. And with defendant's counsel's argument that an access point is only capable of generating or transmitting a downlink transmission, that is not entirely true.

Because here, if you look at Figure 2 that sets forth the different devices -- and these devices have gone on to be described in column 6 -- some of these devices can serve as access points and non-access points.  So, in this situation there is the capability of downlink transmission, but it's also important because, when it's something serving as a station, it's capable of uplink transmission.  So, therefore, it

undercuts defendant's argument there.

And I would just like to just end with the fact that the *Sercomm* Court addressed this issue and the same construction, and their conclusion was on point.  And they said that, "The specification describes that a 'wireless communication device' -- which a person of ordinary skill in the art would understand, in the context of the '520 Patent, to be a network device -- includes non-access points."

And this decision should be given substantial weight, and we ask that this Court similarly construe this term using plain and ordinary meaning.

THE COURT:  All right, thank you, Mr. Lewis.

MR. REED:  Your Honor, I believe I responded to counsel's argument in response to your question, as well, so we can move on to the next term, which will be presented by my colleague, Kevin Bell.

THE COURT:  All right, thank you, Mr. Reed.

MR. BELL:  Good morning, Your Honor.

THE COURT:  Good morning, Mr. Bell.

MR. BELL:  With respect to Claim D in the Court's preliminary constructions, the defendants will be standing on their arguments that are in their briefs. So we'll move forward to the '738 Patent and E1 and E2,

which are related -- as the arguments we make in there are related to each other.

So, Your Honor, our focus for terms E1 and E2 is on the word "function."  We believe that because the patent -- neither the patent nor the specifications define what the function is that is used in the claim, it must be indefinite.  The phrase "a function of a total number of space-time streams," for example, does not appear in the specification.  It's just a language that is found in the claim itself.

And as Dr. Roy testified in his declaration, a function is unbounded.  It just refers to a mathematical dependence between quantities.  And as you can see in the plaintiff's argument, they've identified a table where numbers are correlated with each other, but that doesn't itself define what the function is.  It just simply provides two sets of numbers.

And plaintiff notably never identifies anywhere in the '738 Patent what that function is.  In fact, Dr. Shoemake's testimony, it defines that you have a variable and a variable and then a function. Well, he is not defining a function.  He just says there is a function that's present.

And because the function is not defined

by the patent itself, we believe that this claim is indefinite for that purpose.

THE COURT:  Isn't that the normal understanding of "function" is that it indicates that one variable depends on what is determined by another?

MR. BELL:  Yes.  And that is what the definition of a "function" is, as Dr. Roy testified, a mathematical dependence between quantities.  But we need more than just a relationship between them.  We need to understand how the two are calculated amongst each other, and that is just simply not present in the patent itself.

THE COURT:  All right, I see all the time claim terms in which what is claimed is that one value is dependent upon a particular other value.  And I've never understood that a mathematical formula has to be revealed in the specification when that relationship is claimed.  But I do understand the argument.

MR. BELL:  Thank you, Your Honor.

THE COURT:  Thank you, Mr. Bell.

MR. HEIM:  Your Honor, Michael Heim for plaintiff Atlas.

I'm going to go to slide 4 in the presentation on term E.  The term "function" is well defined, it's well understood by engineers, by persons

of ordinary skill in the art.  This is the definition that both experts.  Dr. Shoemake on behalf of Atlas, and Dr. Roy on behalf of TP-Link, this is the definition that they both point to.  And it requires that when a quantity "u" depends on a variable quantity "x" so that for each value of "x" there corresponds one or more values of "u", then you have a function.  So there  is a dependency that exists between the two.

"x" is the independent value that will control or dictate what the value is of "u".  In the case of the claim, the second information, which is included in the common information part of the uplink setup information, is the dependent variable, and the independent variable is the total number of space-time streams.

Defendants, in their brief on page 11, note that.  They say that a function simply connotes a mathematical dependence between quantities.  The parties agree that "function" has a meaning and it's a well understood meaning.  The issue here is they are complaining about breadth.  They are saying that it's too broad.  And the cases are legion that breadth is not indefiniteness.

So I have *In re Miller* up on the screen from Judge Rich.  In 1971 he was saying that "breadth

is not to be equated with indefiniteness, as we have said many times."

We cited the *BASF* case in our briefs. That's the catalytic converter limitation where they had a limitation that said:  A composition effective for performing a catalytic conversion.  And the Court said that that's not indefinite.  That's just breadth. It's a broad claim.  And that's the situation that we have here, we have a broad claim.

The specification identifies the functional relationship that exists -- at least one example of that, if not more -- relative to the total number of data streams.  It indicates that the total number of data streams is located in the common information.

And then at the end of this paragraph in columns 22, 39 through 53, it says that you can determine the number of long training fields, the HEW-LTFs, based on the number of space-time streams -- "may determine ... based on the number of space time streams."  It is identifying a functional relationship between the number of long training fields, the HEW-LTFs, and the number of space time streams.

The functional relationship, there is one that is specifically identified in the specification.

21

And to go even further, Column 22, 17 through 30, makes that same point.  It says, "the number of HEW long training fields may be determined in accordance with the number of antennas ... i.e., the number of space-time streams." And then it provides a very specific example where there is a one-to-one correlation between the number of space-time streams and the number of long training fields.

Again, the number of space-time streams is the independent variable and it will dictate the number of long training fields, in this example, in showing a functional relationship, a very specific functional relationship that we can convert into a table so that for each value of the space-time streams there is a corresponding value of the long training fields.  This is a very specific mapping, if you will, of a functional relationship identified in the specification.

Defendants are suggesting that we have to identify this sort of mapping in the claim.  There is absolutely no requirement that we cannot claim this more broadly and not limited to the number of long training fields or the specific relationship that exists.  That's the law.

And then just to make one final point,

the provisional application, which was incorporated by reference, specifically noted that the uplink setup packet could include the total number of HEW-LTFs that are used for an uplink multi-user MIMO transmission. That's a transmission where multiple station devices are uploading information at the same time.  And the uplink setup packet is going to include the total number of HEW-LTFs.

So this is identifying exactly the example that we just saw in the specification.  And then down further it indicates that the total number of data streams can allow the station to know the number of LTFs.

So the patent, time and time again, both in the specification and in the provisional, is showing what the functional relationship can be as an example. It has just been claimed broadly.

That's all I have, Your Honor, unless you have any questions.

THE COURT:  Thank you, Mr. Heim.

MR. BELL:  We don't have any further argument with respect to E1 and E2, so we'll move forward to claim term G.

And for claim term F, we would stand -- defendants would stand on their briefs.

For claim term G, defendants would propose a construction "wherein the acknowledgement frame includes information per TID subfield, a block ACK starting sequence control field, and a block ACK bitmap subfield for one or more of the plurality of stations."

And here we think the construction should be adopted as the inventor has acted as his own lexicographer in defining what the "acknowledgement information" must include.

THE COURT:  Can you show me where in the specification you find what you believe to be lexicography on acknowledgment information?

MR. BELL:  Yes, Your Honor.  I would point you to the abstract as a first reference.  There's many throughout here.

In the abstract, "An ACK information field for a data unit satisfying a first condition among the plurality of ACK information fields includes a Traffic Identifier (TID) and a block ACK bitmap indicating whether the data unit has been successfully received."

And then further --

THE COURT:  I mean, that is telling me that an acknowledgment information field includes that.  Do you have any authority for the proposition saying that one

term includes something is a definition limiting it to that?

MR. BELL:  Your Honor, we would point to other parts of the specification where it goes beyond just saying "includes," but it says "per."

I direct Court's attention to Column 14, amongst other places in the patent.  Column 14, it should be lines 12 through 28.  And it describes a number of embodiments, but each of the embodiments uses the same language.

"The ACK frame uses the information per TID subfield, the block ACK starting sequence control subfield, and the block ACK bitmap."

The next embodiment, "an information per TID subfield, a block ACK starting sequence control subfield, and a block ACK bitmap subfield may be used as ACK information."

And then the third embodiment just below that, "an information per TID subfield, a block ACK starting sequence control subfield, and a block ACK bitmap subfield may be used as ACK information."

So these are numerous times in this patent where, when the patentee is describing the acknowledgement frame, it is using those three elements as the definition of that information -- for the

acknowledgment information.

THE COURT:  What is your best authority that describing an embodiment should be understood to be lexicography?

MR. BELL:  Well, yeah, we continue pointing to the *Thorner* case where the patentee is clear in how he is defining an individual reference -- or sorry, an individual claim term consistently through it that is evidence of their own lexicography.

THE COURT:  And can you show me a passage from *Thorner* that you think covers just the various embodiments?

MR. BELL:  I do not have that in front of me, Your Honor.  I can get that, though, for you.

THE COURT:  That is just not my understanding of what the Federal Circuit has told us would constitute lexicography.  But I will look at the *Thorner* case.

MR. BELL:  Thank you, Your Honor.

THE COURT:  Thank you.

MR. HEIM:  Michael Heim for Plaintiff Atlas, Your Honor.

Defendant's construction is very specific and it requires information that relates to a -- as part of an acknowledgment frame, it's requiring

information per a TID subfield, a block ACK starting sequence control field, and a block ACK bitmap subfield.

The only time -- the only time you could possibly include that sort of information is if the multi-user uplink included TID information.  There are multiple embodiments disclosed in this patent, Figures 22 through 28, none of which include anything with respect to a TID transmission uplink.

And so, necessarily, the acknowledgment is not going to include any information on a TID subfield. They are referring to those specific embodiments. They're ignoring the fact that there are a host of embodiments that have nothing to do with TID subfields.

If we look at Claim 6, it's very simple. It says, "the acknowledgment frame includes acknowledgement information for one or more of the plurality of stations."  That's 6.

14 requires something similar, but it requires "acknowledgment information for the station and one other of the stations of the plurality stations."  So at least two ACKs in the example of 14, potentially only one ACK in 6.

Importantly, there is not a whisper in here of including TID.  TID is Traffic Identifier.  And

so in some instances the station may upload information and might have different types of traffic information that it wants to identify because it may receive higher priority if it does that.  It may say, "I have some video, I have  some audio."  That's not a necessary requirement that you include TID information in every transmission.  It is an optional feature, it's certainly not mandated.  They are trying to get a construction  which includes example embodiments from this specification for features that are optional.

If we go back and look at Claim 1, it doesn't say a word about transmitting anything with a TID field.  Nothing in here about that, whether in the independent claim, whether in the dependent claim. This is coming from left field.

Let's talk about *Thorner*.  That's the case that they like so much.  Here's the language on the screen.  This is slide 5.  And what *Thorner* said very clearly is that "claims are given their ordinary meaning absent lexicography or disclaimers,"  And it provides a very exacting standard, exactly as Your Honor is familiar with, about what is going to be required for both of those cases.

And the Court says -- consistent with the question that you just asked, the Court says, "It is

not enough for a patentee to simply disclose a single embodiment, the patentee must clearly express an intent to redefine the term." That's the standard for lexicography.

Disavowal -- they haven't argued that -- has the same sort of standard, "similarly exacting," according to the Federal Circuit.

And once again, they say it's "not enough that the only embodiments, or that all the embodiments, contain a particular limitation."

We have a situation where there's many different embodiments that are disclosed.  We can walk through -- it's in our brief.  For example, there's no requirement that you have a block ACK.  Plaintiff's exhibit -- the '738 Patent at 12, 40 through 41, makes that point very clear relative to Figure 9.

In addition, if you look at Table 1 in column 15, it provides a bunch of different features and options -- and we can go through it in a second -- some of which are a normal ACK, some of which are a block ACK.  Some of them have a single access category. Some of them have multiple access categories.  The multiple access categories relate to the multi-TID. The other ones don't.  There is no TID.  And I'll go to that in a second and I'll explain that in a little more

29

detail.

Other examples:  Specifically, it's in the abstract, as well, where the abstract itself, the very thing that they are pointing to, says that you don't have to have a block ACK bitmap subfield.  You don't need to starting sequence control subfield.  That's in the specification at 12, 59 through 67.

And then as I said earlier, there's many embodiments, Figures 22 through 28, where there is no TID subfield at all that's required.

And so at the end of the day, the plain and ordinary meaning should apply here.  We have provided that in PX-8.  There is no reason to construe this claim.  Your Honor got it exactly right.

And if we could just go quickly to the '738 Patent, can you blow up the abstract on the first page there?  This is what they say shows a clear intent to define the term.  And just to note, so the second sentence, "The receiving device receives a plurality of data units" that have traffic identifiers.  So that's the condition that we're talking about relative to this abstract.

In the claims that we're looking at, Claims 1 and 9, Claims 6 and 14, there is no requirement of any transmission with traffic

identifiers, with a plurality of traffic identifiers. The condition that's being described here simply doesn't exist in the claims in the '738 Patent.

And then if we look at the language that they say is the defining phrase, even that says, "The ACK information field for a data unit" -- this is in the middle of the paragraph -- "satisfying a first condition."

So, clearly, there's different conditions. Even this language, even if this was the only embodiment -- and it's not -- even if it was, this would not be enough. It's referring to a first condition. But then it later says a second condition that's received does not include a block ACK bitmap. So even the passages they are referring to aren't going to be enough.

Can we go to column 15? I think it's about on PDF 36. So can you blow up Table 1 so we can see that a little bit better?

This is one of the many embodiments that are described in the patent, Your Honor. And what I'll note, Table 1, on the left there is "Single AC transmission." On the right it's "Multiple AC transmission." AC refers to "access categories". You have different categories that you are going to be

transmitting.  You could just have a single.  You could have multiple.  In the case of a single, you never have TID information.  You can look at this -- this is an ACK policy that can be used.  There is no TID whatsoever in a single AC transmission.

In addition, the MAC Protocol Data Unit that is included in this uplink transmission, if there is just a single one of those, you have a normal ACK.  You don't have a block ACK.  You don't have anything about a TID.  So there are options that are identified in here that have zero of the requirements that they are trying to add to this claim.

If you go to the multi-AC transmission, yes, some of those have multi-TID ACKs, but that's not every single transmission.  You could have other types of transmission.

So they are ignoring embodiments that don't have this requirement.  They are ignoring embodiments that show that you don't have to have multi-TIDs at all.  And so their construction is inconsistent with numerous embodiments that are disclosed in this patent.

Thank you, Your Honor.

THE COURT:  Thank you, Mr. Heim.

MR. BELL:  Thank you, Your Honor.  We'll move

forward here.  With respect to all of the claim terms with respect to the '513 Patent and that would be H1, H2, H3, H4 and I, defendants will stand on the arguments that are set forth in our briefs.

THE COURT:  All right.

MR. BELL:  And as such, we will move the Court's attention forward to claim terms J1 and 2, which are for the '679 Patent.

Now, for the '679 Patent, Your Honor, our arguments focus primarily on the word "format."  And the term "format" does not appear in any place else -- let me strike that.  The term "single-user format" and "multi-user format," that particular format only appears in the claim terms.  They don't appear in the specification.  There is no other discussion of them throughout the patent.

And the reason for that is that those claims terms were added in -- the terms "single-user format" and "multi-user format" and the related MU format and the SU format were added in prosecution to overcome a specific reference where the claim language was amended from single-user type and multi-user type to format without ever defining what that particular format is.

And I'll point in the middle part of our

slide here.  The patentee already has demonstrated its ability in other parts of that particular patent to define what a format could be.  For example, on Table 1, they define the HE PPDU format.  So the patentee was capable of defining what the format for it should be. But with respect to single-user and multi-user formats, there is nothing there.

And for example, in Dr. Shoemake's testimony, he talks about that the acknowledgement frame in the format will be transmitted simultaneously. Well, that's just saying that the frame in a format will be transmitted.  It doesn't define what that format is.  There is no definition found in the specification.

To cover for that, plaintiff points to either the definition of SU format in extrinsic evidence, namely the 802.11ac standard.  And then for the multi-user format, they point to extrinsic evidence in the 802.11ax standard, where the 802.11ax standard with specific respect to MU format issues and becomes public knowledge after the priority date.

So the patent -- the specification can't -- that particular specification cannot define what the MU format is because it wasn't available at the time when these claims were drafted and when the amendments were

made.  Because there is no definition of the MU format and the SU format, it makes the patent claims inherently indefinite.

THE COURT:  So, are you arguing that the existing WiFi5 standard, the 802.11ac, does not use format in connection with these issues?

MR. BELL:  With the MU format.

THE COURT:  So it does use single-user or SU format?

MR. BELL:  It does, Your Honor.

THE COURT:  So what is your argument on that term?

MR. BELL:  Our argument is that they are still relying on the extrinsic evidence in order to define a term that was otherwise not available to them in the specification.  Since these two claim terms are related to each other, there would be questions in the mind of a POSITA as to whether or not they would understand the term.

But we would your attention on the MU format, where there is no such definition from the 802.11 standard until after the priority date for these patents.

THE COURT:  So, with respect to the single-user format, your argument is what?

MR. BELL:  Our argument is what we stand on in the briefs, that it's not defined in the patents.  They added in a construction without defining it in the specifications, so they don't have it.  They are having to rely on the extrinsic evidence in order to overcome the inherent flaws in the patent.

THE COURT:  Do you dispute that a person of ordinary skill in this field would be aware of the 802.11ac standard?

MR. BELL:  We don't dispute as to that, Your Honor.

THE COURT:  So how would a person of ordinary skill not know the single-user format as described in that standard?

MR. BELL:  I would agree, Your Honor, that a person of ordinary skill in the art could look to that.  But with respect to the MU format, that does not apply.

THE COURT:  All right.

MR. BELL:  And the MU format is a critical part of these claims.  Without that being defined in the patent itself and not being available in the earlier standard, that would be on its own to make that claim term indefinite.

THE COURT:  All right, thank you, Mr. Bell.

Let me hear from the plaintiff.

MR. ENGER:  Good morning, Your Honor.  Eric Enger on behalf of Plaintiff Atlas.

THE COURT:  Good morning, Mr. Enger.

MR. ENGER:  Your Honor, the issue here is whether TP-Link has proven by clear and convincing evidence that these two terms, "single-user format" and "multi-user format" are indefinite because a person of ordinary skill would not understand them with reasonable certainty.  So this dispute is naturally going to center around what a person of ordinary skill understands.

Atlas' expert, who again you heard defendants characterize with superlatives, they have worked with him before, he's at least a person of ordinary skill.  And he testifies unequivocally, "A person of skill understands the boundaries of these claims with at least reasonable certainty.  None of these terms is indefinite."

Now, on the other side of the ledger, what do we have?  What does TP-Link's expert, Dr. Roy, have to say about this?  Nothing.  Crickets.  Despite offering numerous indefiniteness opinions in this case, Dr. Roy has refused to opine that these terms are indefinite.  His silence speaks volumes.

THE COURT:  What does Dr. Shoemake say would

be the basis for a person of ordinary skill's understanding of the multi-user format?

MR. ENGER:  So he relies on a ton of evidence, Your Honor.  I'm going to hit a few of the high points.

First, he talks about the claims.  He says the claims -- here I've got "MU format" bolded kind of near the second to last frame limitation.  It says MU format is transmitted "simultaneously with transmission of at least one acknowledgement frame at least one other STA." So a person of ordinary skill looking just at the claims would understand that an MU format is a transmission that's transmitted simultaneously with other multiple users.

He also points to the specification and he notes that it relates to wireless local area networks, or 802.11 WLAN.  And then the specification divvies that up into two different kind of buckets, calls it the Legacy 802.11 standards, which are a, b, g, n, and ac; and in also the new, which is the 802.11ax.  And what  he notes is that the old "Legacy" bucket, that was only for single-user in the uplink direction.  What's new about the "ax" is it has multi-user in the uplink direction.

Now, we'll get to the intrinsic specification evidence that Dr. Shoemake relies on.

Here, there's two embodiments.  The Figure 22 embodiment, that's the single-user embodiment, the specification shows that a single -- here in green, that is a single station sending data in the uplink direction.  And the patent calls that an "uplink single-user block ACK PPDU" or a "Legacy block ACK PPDU" because it corresponds to those old standards.

Conversely, you've got the multi-user format where multiple stations -- you can see them right there, stations 1, 2 and 3, simultaneously transmit this acknowledgement in red -- call them "Uplink multi-user block ACK PPDU."

And Dr. Shoemake says that a person of ordinary skill in the art recognizes that this red multi-user acknowledgement is in the multi-user format that's described in two places:  In the 802.11ax specification that you heard defendants talk about, but also in the '679 specification itself.  You don't have to just look at this 802.11ax standard.

And let me -- with that specifically, let me direct Your Honor to Plaintiff's Exhibit 5, the '679 Patent.  There at Figure 13 the patent explicitly said this is what an uplink multi-user block ACK PPDU looks like.  You can see in yellow you've got four -- data

from four different stations that are transmitting simultaneously.  And it has all these other fields in that kind of talk about what the format might look like.

Now, this is not the only way that you might have a multi-user format.  This is not some sort of a picture patent on this particular Figure 13.  But this is an example that would provide the reasonable certainty that a person of ordinary skill in the art is looking for when they are trying to figure out what a multi-user format would be.

Less interesting, probably, Your Honor, you know, taking a step back, these are not rocket science terms.  Single user, multiple format, you know, lay dictionaries have this all the time, and they use them exactly consistently with the way that the patent does in the more technical sense.

So, you know, for all these reasons, TP-Link has not proven by clear and convincing evidence that these terms are indefinite and the Court should adopt Atlas' plain and ordinary meaning construction.

Unless Your Honor has any specific questions, I'll rest on the briefs for the rest.

THE COURT:  All right, thank you, Mr. Enger.

MR. BELL:  Your Honor, with respect to the

'919 Patent, we would direct the Court's attention, I think, primarily to K3.  The arguments are highly inter-related, so WE may touch on all of them, but the focus will be on K3 and that would be for the dependent claims as being indefinite as creating an impossibility.

And the reason for this -- I'm sorry.

The two independent claims of the '919 Patent that are at issue here are Claims 1 and 11.  And in both of them, Claims 1 and 11, the patent claims define "the number of the one or more station information fields in the NDPA is one."  "Is one."

So, in order for it to infringe Claim 1, the number of station information fields for the NDPA must be one, and you will see that through both Claim 1 and Claim 11.

Now, with Claims 2, 8, 12 and 19, which are the dependent claims from Claims 1 and 11 respectively, the language changes to be speaking to the number of station information fields to be greater than one, two or more.  And that language is also clear, more than one, greater than one.

Our argument has to do with the impossibility that is created, that if the number of station information fields in the NDPA is more than one, the independent claim is not practiced.  And in

order for the dependent claim to be practiced, all steps, including steps of the independent claim, must be practiced.

So this isn't an opportunity where you get to skip over the independent claim.  You must practice that independent claim.  And the mismatch between the dependent claims and the independent claims creates a situation where the dependent claims would not be infringed because the underlying independent claim cannot be infringed if the station information field is more than one.

THE COURT:  Why doesn't the limitation of Claim 1 that you are referring to, which is the "in response to determining" limitation, why doesn't that create a condition, which is that the number is one, which is varied then in Claim 2, which deals with a condition where it's more than one?

MR. BELL:  We don't believe that that's conditional, Your Honor.  It's one or it's more than one.  And if it's more than one, Claim 1 can't be practiced.

THE COURT:  Well, Claim 1 says, in response to determining that, that this certain event happened. Why isn't that compatible with there being a different result when the determination is that it's more than

one?

MR. BELL:  Because if it determines that it's more than one, then the infringement analysis is simply are you skipping those parts of Claim 1, and that isn't allowed.  If they had written Claims 2 and Claims 12 as a separate independent claim, I don't think this argument would be happening.  But they drafted it as a dependent claim, which means that the first step still must occur.

This isn't an either/or situation.  It's does it happen or does it not happen?  And if it doesn't happen, then Claim 1 isn't being practiced.

THE COURT:  What is your best case in a situation like this it is indefinite?

MR. BELL:  We direct the Court's attention to the *Synchronoss Tech* case from 2021 from the Federal Circuit:  When a dependent claim is "nonsensical and requires an impossibility," that claim is indefinite. And here we consider this nonsensical and an impossibility because of the one versus more than one nature of these claims that are tied together.  So the dependent claims are indefinite because they cannot practice the independent claim when the dependent claims are being practiced.

THE COURT:  And do you remember what it was

that was nonsensical and impossible in the *Synchronoss* case?

MR. BELL:  Standing here, Your Honor, I would have to look at it.  I don't recall off the top of my head.

THE COURT:  All right, thank you.

MR. HARRIS:  Your Honor, the Court has this one exactly right.  These are conditional method claims and the law is quite clear on this.  "Method steps may be contingent.  If the condition for performing a contingent step is not satisfied, the performance recited by this step need not be carried out in order for the claimed method to be performed."  So, as a matter of law, the Court is absolutely correct.

And we can see in the language of these claims quite clearly that they are in fact contingencies.  So, with Claim 11, "when a number of the one or more station information fields in the NDPA is one," that's a conditional statement.  "When it's raining outside, take an umbrella with you," that's a conditional statement.  The fact that I didn't specify what to do when it's a beautiful sunny day outside doesn't make that any less of a conditional statement.

So there's nothing improper about conditional method claims and the Federal Circuit has

repeatedly reiterated that that's proper.

There is no impossibility here.  There's nothing contradictory about the ability to practice Claim 1, for example, when there is more than one station information field.  And in fact, the claim goes out of its way to make that possibility explicit.

We all know that the word "A" means "one or more."  So the patentee could have just written "A" instead of "one or more."  But the patentee chose to spell that out in Claims 1 and 11 that there can be one or more station information fields in those independent claims.

And I won't belabor the specification, but we cite this in our briefing that the specification explicitly describes these two possibilities, these contingent possibilities that are being claimed here and gives examples of them in these embodiments.  Of course, Dr. Shoemake also agrees that these claims are clear.

And finally, I just wanted to draw the Court's attention to something I thought was interesting in the Western District Court's Order, and I think it's useful because it really spells out in logical terms how these claims work and shows that they are contingent and that they're in no way impossible or

contradictory.  This is what the Court refers to as "pseudo code," which is essentially a set of logical statements.

And if you look at lines 1 through 5, those are the logical statements summarizing the behavior in Claim 1.  And we can see that if there is one station information field that's determined at line 1, then you do the step listed at line 2, "transmit first CSI feedback in response to receiving the NDP," else you don't see that.  It's compatible with both possibilities.  There is nothing inconsistent about it.

And then Claim 2, the dependent claim, narrows Claim 1 and adds additional conditional requirements that specify what happens when the number of the one or more station information fields is greater than one.

So it makes sense logically, it makes sense in the set of conditional statements, entirely consistent with the law of claim construction.

So, unless Your Honor has any further questions, we'll rest on our brief.

THE COURT:  It's certainly unusual that Claim 1 does not state what happens in the alternative condition that the number is not one.  I think Judge Albright described this as a "clunky claim"?  I

wouldn't disagree with that.

MR. HARRIS:  I appreciate that, Your Honor.  I think given that this is a comprising claim, it doesn't have to.  That possibility in Claim 1 is open-ended and there is no legal requirement to specify the alternative.  But, of course, Claim 2 comes in and takes care of that in that case.

So we think the language is clear and as I said, unless Your Honor has any questions, I'll reserve the remainder of my time.

THE COURT:  All right, thank you, Mr. Harris.

MR. HARRIS:  Thank you.

MR. BELL:  Your Honor, if I may respond just real briefly on that point.

THE COURT:  Certainly.

MR. BELL:  If we could leave that page up.

Your Honor, I think this is -- you got to the point with respect to Judge Albright's order, in which he calls this clunky.  And this "pseudo code" that's in the construction is, to us, and respectfully to Judge Albright, an example of the court rewriting essentially the claim terms in order to preserve infringement, which the Federal Circuit has cautioned courts against doing during claim construction.

If the claim is clunky because, as you

note, Claims 1 and 11 do not define what happens when it's greater than one, then this is a point in which that clunkiness should be held against the patentee. And if they fail to clear that up during the drafting of the claims, then they should be stuck with that. And in this instance, this "pseudo code" is a prime example of what we're concerned about in terms of an overbreadth construction that would save these claims were infringement when they otherwise should not be safe.

THE COURT:  You know, Mr. Bell, Claim 1 indicates -- you know, it provides method steps for what happens if the number in the field is one.

MR. BELL:  Uh-huh.

THE COURT:  Why isn't that a sufficient claim in and of itself?

MR. BELL:  For Claim 1, yes.  For claims -- the dependent claims is where the issue primarily arises, where because the patentee didn't define what would happen when it's greater than one within that claim, they just move on to dependent claims.  That means that the dependent -- the independent claim still must be practiced as part of those dependent claims.

So, if they had set a condition within the independent claim, we'd be having a different argument.

Or if they had set aside the dependent claims as their own independent claims, you would be having a different argument.  But the patentee didn't do that.

THE COURT:  How is the condition required in the second claim, the dependent claim, that the number be more than one?  How is that inconsistent with the method that describes what happens in response to a determination that the number is one?  That step is simply not satisfied; right?  There is no determination that the number is one, so --

MR. BELL:  If it doesn't satisfy the number is one, then the independent claim, which is part of the dependent claim, is in practice, that element is in practice, and that means that it can't be infringed.

THE COURT:  Well, so you would disagree with the argument that you can have contingent steps in a method claim?

MR. BELL:  What we're talking about here is the contingent steps are split amongst multiple claims and not with -- the conditional steps are not within the independent claim.  Again, if these had been drafted as independent claims, it would be different. They are drafted as dependent.

THE COURT:  All right.

MR. BELL:  Thank you, Your Honor.

THE COURT:  Thank you, Mr. Bell.  I understand the issue.

MR. REED:  Your Honor, we'll conclude today with arguments on what has been termed "claim term" and on your preliminary construction that is from the '851 Patent.  We're talking about the construction of the term "scheduling extension."

Now, there is a fair amount of overlap, as you can see in the slide, between the construction proposed by Atlas and the construction proposed by defendants here.  Both agree that the term "scheduling extension" relates to the control field of the data frame.  Both of the constructions agree that it includes scheduling information.  So the key dispute before the Court is what the word "extension" is referring to in the context of this particular patent.

Now, if the context is helpful here with respect to the specification of this particular patent, I'm not sure I have ever seen, frankly, a patent that uses so many names to describe the exact same concept.

This is one example from the specification.  They say an HE frame can be referred to as an OFDMA frame, it can be referred to as PDU, it can be a PPDU format, it can be an OFDMA PPDU, it can be an MU PPDU, or it can be something else, a similar

term, it says, or vice versa.  I'm not sure how that applies here.

And then it says an HE frame can also be referred to simply as a frame for convenience.  In other words, a shorthand that can be used to refer to this.  So, again, all these names, including the shorthand, is referring back to the same concept.  And that's exactly what we're talking about when we're talking about this particular claim term.

There are all these different names, variety of names are used to refer to the same concept of an extension.  The word "extension," in the context of this particular patent, is just shorthand.  It's shorthand for the extended HT control field, also referred as a subfield of the HT control field.

This is just another example of the '851 using a bunch of different names, a lot of different labels, for the same concept.  You can call it an extended control field, an HT controlled extended subfield, an HT controlled subfield/field.  All of these are referring back to the same concept.

So, referring to Your Honor's question earlier today, so, if that's the case, with all these synonyms for the same concept, why do we need a construction.  And the answer to that is, similar to

earlier, claim construction is not just this academic exercise.  You know, the claim construction is designed and intended to assist both the Court and the trier of fact to help them understand how to apply this particular claim.

And defendant's proposed construction represents what we feel is the least ambiguous of the names for this particular concept that will help the trier of fact when assessing infringement, when assessing invalidity, to be able to take this term, this idea of an extension, and know where to look and know how to apply it when faced with the 802.11 spec, when faced with the prior art.  So we suggest that is the best construction here to apply in this particular case.

Now, turning to one argument they make with respect to Figure 13.  They say that that somehow Figure 13 is trying to limit "scheduling extension" to Figure 13.  That's not what we're trying to do.  Yes, Figure 13 is an embodiment of this concept.  We're not trying to bring in some aspect of Figure 13 into the definition.  Again, what we're talking about are different names for the same concept.  Figure 13 is an embodiment of this concept, but we're not trying to bring in something from that embodiment into the

concept itself.  We're not trying to import some kind of sub-concept into this main concept, the same concept. And that's why we believe our construction is the best.

Now, with respect to the back half of our proposed construction, talking about for the uplink multi-user response, Your Honor asked earlier, if that limitation is in the claim already, why do you need it as part of the construction?  That particular aspect in this instance, frankly, is part of the claim, later in the claim.  And so if Your Honor doesn't feel any kind of redundancy is necessary, then it could omit that last section of the uplink multi-user response, we would have no objection to that.  But the really point of concentration is that the first half of our proposed construction, that "extension" should be referred to as a subfield and included in the HT control field.

Thank you.

THE COURT:  All right, thank you, Mr. Reed.

MR. HARRIS:  Your Honor, for this term, the issues are pretty simple.  The defendants want to limit this term to a preferred embodiment and they say they don't want to limit it to Figure 13, but nonetheless, they are trying to limit this claim term to particular examples disclosed in the specifications that are described as non-limiting.  They don't allege

lexicography.  They don't allege disclaimer.  And so, as a matter of law, there is no basis to limit this term in the way that they want to.

Again, there really are only two exceptions legally to the rule of plain and ordinary meaning construction and that's lexicography and disclaimer.

Dr. Shoemake -- and I encourage the Court to take a look at his declaration, as I'm sure you have -- goes into great detail about how this concept works and explains that the ordinary meaning of "scheduling extension" is exactly what the Court has arrived at, "an extension to the control field that includes scheduling information."

There is no basis to limit this to an HT control field, and that's a major point of contention here.  There are many examples in the specification that talk about it being simply in a control field rather than an HT control field.

And likewise, there is no reason to limit this to an extension that's appended.  They haven't used the word "appended' in their construction.  But they say quite clearly in their briefing that that's what they are intending to do here is describe the extension and some embodiments as being located in the

54

control field.

THE COURT: I understand that argument has been dropped. What is the effect of including HT as the control field?

MR. HARRIS: Yeah, what they are trying to do is limit it to an embodiment. An HT stands for "high throughput" and it refers to the prior version of the 802.11 standard. I believe it's 802.11ac. It's referred to as HT. HE is the term that's typically used to refer to 802.11ax.

And so what they are trying to do is point to certain embodiments that were talking about the prior version of the standard and say that the prior version of the standard is somehow incorporated into these claims. That's simply not what the patentee intended to do. It's clear from the language of the claim that that was not a limitation that the patentee intended. And again, it's also clear from the specification that the patentee envisioned a broader side of embodiment.

Again, this slide is another example where there are multiple examples of the control field generically, not necessarily just an HT control field. And whenever the specification does refer to the HT control field, it uses terms like "an example" or "in

some embodiments," as you can see in those last two bullet points. So it's a rather clear statement that there is no disclaimer or lexicography to limit these terms to that concept.

It looks like they have dropped the "uplink multi-user response" point, but this was an issue where the language that they were proposing was intention with the claims. And so we agreed, as well, in not including that in the construction.

And finally, there is an issue that TP-Link didn't address here, but another potential problem with their construction is that it doesn't encompass the idea of an extension. The language of their construction would include something that's always present. And again, I think they are just trying to read this on the prior art. They are trying to read it on the 802.11ac, a control field that would include certain fields by default rather than them being extensions. And that's what they are trying to drive at here.

And, of course, the Court in the Western District of Texas agreed with Atlas on this point that there is no limiting this term to the particular embodiments that are described as exemplary.

So, unless Your Honor has any other

questions, I have no further argument.

THE COURT:  All right, not at that time. Thank you, Mr. Harris.

MR. REED:  Your Honor, if I can just address one point, that somehow we're trying to read a default into this.  I mean, the claim language itself, the remainder of Claim 1 of the '851 Patent describes exactly how the extension is used.  The use of the term "subfield," again, it's as you saw that was on the slide earlier.  It uses "subfield/field" just interchangeably.  It's not saying that -- the word "subfield," they are trying to endow the word "subfield" as having some kind of pregnant meaning of default or it has to be included in some way.  It has to be included to extent the claim tells you it has to be included, and it gives very specific examples of when the scheduling extension is present or not present based on a particular setting being used.

So I just want to make clear that we're not trying to do what he's accusing us of doing in that last argument, or trying to bring in some hidden meaning in "subfield."  We trying to use the meaning that provides more clarity to one of ordinary skill in the art in terms of how to determine whether it's present or not.  But we're not doing what he accuses us

of doing in his prior argument.

Thank you.

THE COURT:  Do you dispute, Mr. Reed, that referring to it or limiting it to an "HT control field" would tie it to the prior version of the standard?

MR. REED:  It would tie it to the prior version of the standard in the sense that this entire standard, 802.11ax, is built on the prior standard. This is not a brand new standard.  It's all backwards compatible.  But when we're talking about the control field here, the extended HT control field, we're talking about the HT control field.  It's brought in from the prior standard, but we're still talking about the same thing.

So they haven't pointed to anything else that uses a shorthand in different places in the specification where it just says "control field" or just says "extension."  But even with those, it doesn't mean that it's not talking about that same concept. So, even though it is present, the "HT control field" is present in the prior standard, it doesn't mean that it's not also present in the 802.11ax.

THE COURT:  And what would be your best reference in the specification that would limit this control field that's being talked about here to an HT

control field?

MR. REED:  It would go to what was described in -- actually showing the slide up here that's on the screen right now.  It's talking about this extended control field, this concept of the extended control field, sometimes referred to as "HE control extended subfield/field" or "HE control subfield/field."

It also talks about "the HT control field is High Efficiency control field."  It talks about the "extended HT control field" later on.  It's just using these terms, in our view, synonymously for describing the same concept as the extension to the control field.

And we believe "HT" provides clarification to one of ordinary skill in the art as to what you're looking for once actually you dive into the nitty-gritty of the standard, which you actually have to go through that exercise to try and to apply these claims.  That provides the most clarity, the least ambiguity.  Rather than if you would say "extension" in their proposed construction, it doesn't provide the clarity or direction to help them understand what's being talked about.

THE COURT:  It looks to me in column 30 that the references you have on the screen there are described as examples in some implementations.  Is

there anything in there that appears to define the control field as an HT control field?

MR. REED:  Well, we're not arguing the lexicography here.  It's not defining as the HT control field.  That's just what it is.  It's the HT control field.

So we're not saying that they gave some special meaning to it.  We're saying that is what we're talking about in the context of this particular technology.  A control field we're talking about is the HT control field in this instance.

THE COURT:  All right.

MR. REED:  Thank you, Your Honor.

THE COURT:  Thank you, Mr. Reed.

Are there other arguments that the defendant would want to present on these constructions, Mr. Reed?

MR. REED:  No, Your Honor, that concludes the arguments that we intend to make today, Your Honor.

THE COURT:  All right, thank you, sir.

What about for the plaintiff, are there other arguments?

MR. HEIM:  No, Your Honor, we have no objection to the Court's preliminaries and so we have no further arguments that we want to present.

THE COURT:  All right.  Well, I appreciate the arguments.  They have been helpful and I'll consider them further and attempt to get out a claim construction order promptly.  So thank you and we are adjourned.

*[10:25 a.m. - Proceedings adjourned]*

REPORTER'S CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled cause.


/s/ Ed Reed                          1-19-23
Edward L. Reed                       Date
Court Reporter