```
                  IN THE UNITED STATES DISTRICT COURT
                 FOR THE EASTERN DISTRICT OF TEXAS
                         MARSHALL DIVISION

ATLAS GLOBAL TECHNOLOGIES, LLC,(  CAUSE NO. 2:21-CV-430-JRG
                                )
            Plaintiff,          (
                                )
vs.                             (
                                )
TP-LINK TECHNOLOGIES CO., LTD.,(
et al.,                         )  MARSHALL, TEXAS
                                (  SEPTEMBER 13, 2023
            Defendants.        )  8:30 A.M.
_____


                          VOLUME 4

_____

                    TRIAL ON THE MERITS


              BEFORE THE HONORABLE RODNEY GILSTRAP
               UNITED STATES CHIEF DISTRICT JUDGE

_____
```

SHAWN McROBERTS, RMR, CRR
100 E. HOUSTON STREET
MARSHALL, TEXAS  75670
(903) 923-8546
shawn_mcroberts@txed.uscourts.gov

Shawn M. McRoberts, RMR, CRR
Federal Official Court Reporter

```
 1                    A P P E A R A N C E S

 2        FOR THE PLAINTIFF:     SUSMAN GODFREY, LLP
                                 1000 LOUISIANA STREET
 3                               SUITE 5100
                                 HOUSTON, TEXAS  77002-5096
 4                               (713) 651-9366
                                 BY: MR. MAX TRIBBLE
 5                                   MR. JOSEPH GRINSTEIN
                                     MS. ALEJANDRA SALINAS
 6                                   MR. ERIC ENGER
                                     MR. BLAINE LARSON
 7                                   MR. ALDEN HARRIS

 8                               SUSMAN GODFREY, LLP
                                 401 UNION STREET, SUITE 3000
 9                               SEATTLE, WASHINGTON  98101
                                 (206) 516-3880
10                               BY:  MR. ALEXANDER AIKEN

11                               WARD, SMITH & HILL, PLLC
                                 1507 BILL OWENS PARKWAY
12                               LONGVIEW, TEXAS  75604
                                 (903) 757-6400
13                               BY:  MR. JOHNNY WARD
                                     MS. ANDREA FAIR
14
          FOR THE DEFENDANTS:    KILPATRICK TOWNSEND & STOCKTON
15                               LLP - DALLAS
                                 2001 ROSS AVE, STE. 4400
16                               DALLAS, TEXAS  75201
                                 (214) 922-7100
17                               BY:  MR. KRISTOPHER REED
                                     MR. COLE RAMEY
18
                                 KILPATRICK TOWNSEND & STOCKTON
19                               LLP - DENVER
                                 1400 WEWATTA STREET, SUITE 600
20                               DENVER, COLORADO  80202
                                 (303) 571-4000
21                               BY:  MR. KEVIN BELL
                                     MR. EDWARD MAYLE
22
                                 KILPATRICK TOWNSEND & STOCKTON
23                               LLP - SEATTLE
                                 1420 FIFTH AVENUE, SUITE 3700
24                               SEATTLE, WASHINGTON  98101
                                 (206) 516-3094
25                               BY:  MS. KATHLEEN GEYER
```



1                               KILPATRICK TOWNSEND & STOCKTON
                                LLP - ATLANTA
2                               1100 PEACHTREE STREET NE
                                SUITE 2800
3                               ATLANTA, GEORGIA   30309-4530
                                (404) 815-6585
4                               BY:  MR. ANDREW SAUL

5                               GILLAM & SMITH, LLP
                                102 N. COLLEGE, SUITE 800
6                               TYLER, TEXAS  75702
                                (903) 934-8450
7                               BY:  MR. TRAVIS UNDERWOOD

8         OFFICIAL REPORTER:    SHAWN M. McROBERTS, RMR, CRR
                                100 E. HOUSTON STREET
9                               MARSHALL, TEXAS  75670
                                (903) 923-8546

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## INDEX

**EXAMINATION**

| Witness Name | Page |
|---|---|
| CHRISTOPHER HANSEN, PH.D. | |
|    Direct By MR. MAYLE | 764 |
|    Direct By MR. GRINSTEIN | 788 |
|    Redirect By MR. MAYLE | 826 |
| EVAN WOOLLEY | |
|    BY VIDEO DEPOSITION | 831 |
| THOMAS McGAHEE, PH.D. | |
|    Direct By MR. BELL | 836 |
|    Cross By MS. FAIR | 887 |
|    Redirect By MR. BELL | 937 |
|    Recross By MS. FAIR | 948 |

1          THE COURT:  Be seated, please.

2       Are the parties prepared to read into the record those

3    items from the list of pre-admitted exhibits used during

4    yesterday's portion of the trial?

5          MS. FAIR:  Yes, Your Honor.

6          THE COURT:  Please proceed.

7          MS. FAIR:  The exhibits admitted yesterday are JX 2

8    through 6 and PX 2.  And regarding PX 26, Plaintiff through

9    agreement with third-party Intel only offered pages 21, 33,

10   35, and 40 where the source code was discussed.

11         THE COURT:  All right.  Do Defendants have any

12   objection to that rendition?

13         MR. BELL:  No objection, Your Honor.

14         THE COURT:  Do Defendants have anything further to

15   offer from the list of pre-admitted exhibits?

16         MR. BELL:  Not from the list of pre-admitted

17   exhibits, Your Honor.

18         THE COURT:  All right.  Thank you.

19      Counsel has advised the Court that the Defendants would

20   like to make a proffer in the record regarding matters

21   addressed during the pretrial process before the magistrate

22   judge.  This would probably be the appropriate time to do that

23   outside the presence of the jury.

24      So whoever's going to speak for the Defendants, if you'll

25   go to the podium and make your proffer into the record.

1          MR. BELL:  Thank you, Your Honor.  Kevin Bell for

2     the Defendants.

3          Defendants respectfully submit the following proffer in

4     response to the Court's order adopting the memorandum and

5     order granting Atlas' motion that certain facts be considered

6     established, Docket 261.

7          In light of the Court's ruling, Defendants were precluded

8     from offering evidence or argument relating to the sales data

9     produced in this case from Defendant TP-Link Corporation.

10    Instead, the Court deemed established projections from the

11    industry analyst's report prepared by a company known as IDC.

12         Defendants' position is that the IDC report conflicts

13    with the actual business records that Defendants were

14    precluded from introducing at trial.  Defendants are therefore

15    making a proffer identifying the following evidence they would

16    have presented to the jury as well as the supporting testimony

17    that would have been presented by its expert, Dr. Thomas

18    McGahee.

19         In particular, Defendants would have presented evidence

20    regarding its sales data, which was identified as Joint

21    Exhibit 20 with the Bates number of TPL0020643, and

22    calculations a reasonable royalty from the Defendants' expert,

23    Doctor McGahee.  Doctor McGahee's calculations were reflected

24    in his Exhibits 4, 5.1, and 5.2 to his May 23, 2023 rebuttal

25    report.

1          The evidence is relevant because Defendants would have

2     presented the sales data using information produced in

3     discovery, and the evidence is admissible because Defendants'

4     sales data was not objected to on the basis of hearsay or lack

5     of authenticity, and the parties -- Doctor McGahee's testimony

6     was not challenged on the basis of *Daubert* or other basis in

7     the pretrial process.

8          The sales data was also identified as JX 20 on the joint

9     exhibit list, further establishing its admissibility.

10          Defendants opposed the relief requested in Atlas' motions

11     referenced earlier and further move to exclude the IDC report

12     and those -- the motion was -- the motion to deem the IDC

13     record established was granted by the Court and the motion to

14     exclude the IDC report was denied.

15          Defendants' filings regarding the IDC report and

16     Defendants' sales data are available at Dockets 219, 246, 249,

17     184, 259, 261, and 289.

18          And in view of the Court's ruling, Defendants would have

19     presented the following specific evidence:  JX 20 and then

20     specific testimony from Doctor McGahee.  And, Your Honor, in

21     light of the fact that this is the TP-Link's actual sales

22     data, I would like to read into the record -- I respectfully

23     request that the courtroom be sealed very briefly while I put

24     this on the record.

25               THE COURT:  All right.  To accommodate Defendants'

1    request, I am going to order the courtroom sealed at this

2    time.

3         If you're present and you're not subject to the

4    protective order that's been entered in this case, please exit

5    the courtroom and remain outside until it's reopened and

6    unsealed.  Hopefully this will be brief.

7                        (Courtroom sealed.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1

 2

 3

 4

 5

 6

 7

 8

 9

10

11                        (Courtroom unsealed.)

12          THE COURT:  All right.  The courtroom is unsealed.

13      When we recessed at the end of the day yesterday,

14  Dr. Christopher Hansen was on the witness stand.

15          Doctor Hansen, if you will return to the witness stand.

16  I remind you, sir, you remain under oath.

17          And, counsel, you may go to the podium and prepare to

18  continue with your direct examination for the defendants.

19          MR. MAYLE:  Thank you, Your Honor.

20          THE COURT:  All right.  Mr. Barnett, would you bring

21  in the jury, please?

22              (Whereupon, the jury entered the courtroom.)

23          THE COURT:  Welcome back, ladies and gentlemen.

24  It's good to see you.  Please have a seat.  Thank you for

25  being on time.
```

1      We're going to continue with the Defendants' direct

2  examination of Dr. Christopher Hansen.

3      Counsel, you may continue where you left off.

4          MR. MAYLE:  May it please the Court.

5          CHRISTOPHER HANSEN, PhD., PREVIOUSLY SWORN,

6  testified further under oath as follows:

7                  DIRECT EXAMINATION continued

8  BY MR. MAYLE:

9  Q.   Good morning, Doctor Hansen.

10  A.   Good morning.

11  Q.   Doctor Hansen, on this slide 24 there is a screenshot.

12  Is there testing that generates images such as this one?

13  A.   Yes, there is.

14  Q.   And what is that called?

15  A.   There are a number of tools, but the most common one I

16  would believe is something called Wire Shark which captures

17  packets off the air that are generated by WiFi devices.

18  Q.   And on this image, there's an acronym GI.  Do you see

19  that?

20  A.   Yes.

21  Q.   And what does that stand for?

22  A.   GI stands for guard interval.

23  Q.   Does data like this one shown on the screen show that the

24  '513 Patent is infringed?

25  A.   No, it doesn't.  The data on this screen only shows that

```
 1    the device is capable of transmitting packets that use that

 2    particular guard interval.  It doesn't mean that the device

 3    would actually meet that claim limitation.

 4            MR. MAYLE:  Mr. Crumbley, my clicker is not working.

 5    Could you advance to slide 26, please?  Next slide, please.

 6    Q.   (BY MR. MAYLE)  Doctor Shoemake -- sorry.  Doctor Hansen.

 7    I'm sorry.  I apologize.  Doctor Hansen, are you familiar with

 8    the WiFi Alliance testing that was presented in this case?

 9    A.   Yes, I am.

10    Q.   Is there any testing where -- under the WiFi Alliance

11    where an access point generates certain trigger frames?

12    A.   Yes, there is, uh-huh.

13    Q.   Does that sort of testing show infringement of the '679

14    Patent?

15    A.   It could for a particular device, but it does not apply

16    for the devices here.

17    Q.   And why is that?

18    A.   As you can see, the devices here were not actually tested

19    with that test.

20    Q.   And so if that is the evidence offered for infringement,

21    should Doctor Shoemake have checked the box on certain claim

22    elements where he tried to show infringement?

23    A.   No, I don't think he should have checked that box.  I

24    don't think that that was fair.

25    Q.   And which, if any, claim elements should he have not
```

1    checked the box for?

2    A.   As I show here on this slide, that would be 1[b], 1[d],

3    6[b], and 6[d] would not be met.

4    Q.   And which patent is that?

5    A.   This is on the '679 Patent.

6         MR. MAYLE:  Mr. Crumbley, next slide.

7    Q.   (BY MR. MAYLE)  Doctor Shoemake [sic], are you familiar

8    with the -- with the testing that's circled in red on this

9    slide?

10   A.   Yes, I am familiar with that test, uh-huh.

11   Q.   Would testing like that show the presence of a multiuser

12   format acknowledgement frame?

13   A.   Not necessarily, no.

14   Q.   Would testing of this nature show infringement of the

15   '679 claims?

16   A.   I don't believe it necessarily would show that the claims

17   are infringed.

18   Q.   And so if this is the evidence that was offered for this

19   claim, should Doctor Shoemake have checked all of those boxes

20   for infringement on this claim?

21   A.   No, I don't believe he should have.

22        MR. MAYLE:  Next slide, Mr. Crumbley?

23   Q.   (BY MR. MAYLE)  Does 802.11ax have an Ack or

24   acknowledgement policy indicator?

25   A.   Yes.  The Ack policy indicator is actually an old feature

1    in 802.11 that has existed for a long time, and this was

2    carried forward into 802.11ax.

3    Q.   Could information that's in the Ack policy indicator show

4    infringement for the '679 Patent?

5    A.   I don't believe it -- it could, no.

6         MR. MAYLE:  Next slide, Mr. Crumbley.

7    Q.   (BY MR. MAYLE)  What are your basis for saying that you

8    don't believe that it could show infringement on the '679?

9    A.   The basis is -- is that this Ack policy indicator field

10   is -- is used to tell -- tell a client device or a responding

11   device how it should acknowledge the packet, but it doesn't --

12   it doesn't describe the particular packet type that's used.

13   That's done somewhere else.  That would be done with either a

14   trigger frame or a TRS control frame.

15   Q.   Are there any other reasons for your opinion?

16   A.   Yes.  In fact, even if a trigger frame is used, that can

17   be used for either a single user or a multiuser response.  And

18   so what happens is, is that it's not -- it doesn't necessarily

19   indicate that it's a -- there's a multiuser response there.

20   So it's not -- it's not sufficient.  It has other uses other

21   than as described in the claim element.

22   Q.   And why, if at all, is that relevant for the '679 claim?

23   A.   Well, the '679 claim requires a response -- multiuser

24   response.

25   Q.   Are there any other reasons for your opinion in this

1    regard?

2    A.    The -- this slide shows that, you know, I disagree with

3    Doctor Shoemake on the particular Ack policy field because

4    the -- this clearly shows that this HETP Ack can be used for

5    either a multiuser or a single user context.  And that's --

6    that's as shown in the middle part there where it says SU or

7    MU.

8    Q.    This table on the bottom of the slide, where is that

9    from?

10   A.    That is from 802.11ax.

11   Q.    And why is that text underlined?

12   A.    Underlining is used in amendments like 802.11ax to show

13   that it's a modification to the base standard.  So what that's

14   showing is that this part of the standard is new text that's

15   being added to the 802.11 2020 standard.

16   Q.    Are there any other reasons for your opinion on the '679

17   in this regard?

18   A.    I've outlined a few here.  I can just quickly summarize

19   it.  The QoS control field is not used to differentiate

20   between single user and multiuser as the claim requires.  It

21   has a different use and -- and it's just not related to that.

22        And then transmitters must always use the correct type of

23   packet, or we say PPDU, if an immediate Ack is expected.  So

24   those are differences with the '679 Patent.

25   Q.    Now, Doctor Hansen, were you present and did you see

1    Doctor Shoemake present every claim element in the case and

2    put little check boxes to show infringement for every single

3    claim element?

4    A.    Yes, I did.

5    Q.    And do you agree that that was correct?

6    A.    No, I don't.  I don't believe -- I don't agree with his

7    analysis.

8    Q.    Are there any claim elements where you think he should

9    not have checked the box?

10   A.    Yes.  And those are summarized on this slide here.  It

11   covers sort of for every patent, there are numerous claim

12   elements that I believe don't have sufficient analysis in

13   Doctor Shoemake's work to show infringement.

14   Q.    But didn't Doctor Shoemake present source code for every

15   product for each of these elements to show infringement?

16   A.    No, he didn't.  Doctor Shoemake showed a very small

17   amount of source code for -- for one chip, the one -- one for

18   the Broadcom chip that only applies to certain claim elements

19   in a very small number of products.

20   Q.    But didn't Doctor Shoemake present testing evidence like

21   wire shark packet sniffing to show that every single one of

22   these claim elements is met in every single product in the

23   case?

24   A.    Doctor Shoemake did show wire shark analysis, but it

25   wasn't related to every claim and it wasn't -- I would say

1    that, you know, it was perhaps not even related to the

2    particular claim elements.  It just really want relevant.

3    Q.   But didn't Doctor Shoemake show WiFi Alliance testing

4    that would prove that every product in this case performs

5    every element and every claim exactly as written in the claim?

6    A.   No.  Doctor Shoemake only showed a couple -- a small

7    number of WiFi Alliance tests over a very small set of the

8    products that would -- were not sufficient to show

9    infringement of any of the claims.

10   Q.   But didn't Doctor Shoemake show that the accused products

11   are sold in boxes that say WiFi 6 right on the box?  Doesn't

12   that prove that all of these elements are infringed?

13   A.   No.  No.  The labels on the box are -- are really, as I

14   think I mentioned this yesterday, are really for marketing

15   purposes and those -- we need to remember that that's

16   different from, you know, what -- what the products are

17   actually doing inside.

18   Q.   Didn't Doctor Shoemake show some other type of evidence

19   to show that every single product in this case implements all

20   of these features?

21   A.   No.  No, he didn't -- in my opinion, he did not show

22   sufficient evidence for these features.

23   Q.   And so would you check the box to indicate, yes,

24   infringement for all of these elements for any of the asserted

25   claims -- for any of the accused products?

```
 1    A.    No, I wouldn't -- I don't -- I don't think that's a

 2    reasonable -- I don't think that's reasonable.  I don't think

 3    those boxes should be checked.

 4    Q.    Doctor Shoemake showed evidence from the 802.11ax

 5    standard.  Correct?

 6    A.    Yes, he did.

 7    Q.    But didn't he show that the patents cover features in the

 8    standard that prove every product infringes?

 9    A.    No.  No.  I would say that he presented a comparison

10    between certain claim elements and certain features in the

11    standard, but those are not necessarily infringed by the

12    products.

13    Q.    Did Doctor Shoemake rely only on features in the standard

14    that are mandatory?

15    A.    No.  He also seemed to rely on features that would

16    definitely be marked as optional.

17    Q.    And if those optional features are not used, could the

18    products still infringe?

19    A.    No, they -- they wouldn't -- if the optional feature is

20    not included in the product, not enabled in the product, then

21    Doctor Shoemake's analysis wouldn't be correct.  The

22    product -- there's no way the product would meet -- as we say,

23    meet the claim limitation.  It wouldn't -- it wouldn't do what

24    the claim says.

25    Q.    But did Doctor Shoemake also rely on for some elements
```

1    certain features in the AX standard that are indeed mandatory?

2    Is that right?

3    A.    I believe he did, yes, uh-huh.

4    Q.    Well, would that show infringement of a chip in one of

5    the products?

6    A.    Not -- not necessarily, because a particular feature in

7    and of itself being mandatory does not -- does not mean that

8    the entire claim -- that the entire claim is -- is actually

9    being used or followed by the device.  It's not -- it's not

10    sufficient to just point to one particular -- the -- a

11    particular -- one particular claim element is related to a

12    mandatory feature.  That's just not sufficient.

13    Q.    And for this claim on the slide from the '259 Patent,

14    would you check all of these boxes with the green checkmark to

15    show infringement based on the evidence you've seen?

16    A.    No, I would not.

17    Q.    On this slide, what you've circled here, generally what

18    is that?

19    A.    Once again, this is -- this appears to be an example of

20    an indication from a testing tool, and that's merely the

21    device advertising or, you know, that it -- showing that it

22    can do beamforming.

23    Q.    But isn't that enough to show that the product that can

24    do beamforming infringes this claim?

25    A.    No, it's not, because the claim is actually related to a

1    very specific way of getting the information to do

2    beamforming, and -- and just because a device can do

3    beamforming doesn't mean it uses the method in this claim.  So

4    just knowing that the device is beamforming is not sufficient.

5    Q.    But is beamforming new for 802.11ax/WiFi 6?

6    A.    No.  In fact, beamforming has been discussed in the

7    WiFi -- in the IEEE standards bodies since at least 2004.

8    We -- and we put beamforming as a feature into what's

9    called -- now called WiFi 4 or 802.11n, and then it was

10   improved for WiFi 5 in what's called 802.11ac which was

11   ratified in, I believe, 2013.  So beamforming was a part of

12   WiFi products long before 802.11ax or WiFi 6.

13   Q.    So if evidence like this on the screen is submitted,

14   would that be enough to check the boxes for this claim on the

15   screen for infringement?

16   A.    No, it would not.

17   Q.    On the -- on the bottom right of this screen, you see

18   some WiFi Alliance product testing?

19   A.    Yes, I do, yes.

20   Q.    Are tests like that, assuming they pass, sufficient to

21   show infringement of this claim on the screen?

22   A.    No, I -- I don't believe they are.

23   Q.    And so would you have checked each and every element of

24   this '513 claim on the basis of this evidence to show

25   infringement?

1    A.    No, I would not.

2    Q.    Does TP-Link make the WiFi chips that are in the accused

3    products?

4    A.    No.

5    Q.    And who does?

6    A.    As listed here on the slide, my understanding is, is that

7    TP-Link purchases chipsets from four different companies,

8    including Broadcom, Qualcomm, Intel, and MediaTek.

9    Q.    And do you -- did you formally develop WiFi chips for any

10   of those companies?

11   A.    Yes, I -- I did.  I worked on the development of WiFi

12   chips at Broadcom Corporation.

13   Q.    But aren't the Broadcom chips exactly the same as the

14   Qualcomm chips?

15   A.    No.  They're actually very different.  The chipset

16   designs are different from manufacturer to manufacturer.  They

17   are designed by different people in different places, and

18   they -- the designs are just inherently different.

19   Q.    What if both chips are compliant with 802.11ax, wouldn't

20   they be the same from Broadcom and Qualcomm?

21   A.    No.  In fact, they won't be the same.  They'll be

22   interoperable in the sense that they'll be able to exchange

23   data with one another, but the inherent designs and the

24   features that enable -- that are enabled are different in the

25   different chips.

775

1    Q.   Well, within a chip company, let's take Broadcom as an

2    example, are all of their WiFi chips the same?

3    A.   No.  In fact, a company like Broadcom will sell different

4    types of chips with different code in them, different

5    software, and also the chips themselves will have -- they have

6    different hardware in them that may enable different features

7    or in some chips that are not in other chips.

8    Q.   Is that the same for Intel and MediaTek?

9    A.   Yeah, yes, I believe it is, uh-huh.

10   Q.   If you have two different products and they each have

11   this same exact chip, do those products function exactly the

12   same?

13   A.   No.  In fact, even -- even in that case they -- they may

14   be different, because two different products, even if they

15   have the exact same chip in them, can have different software

16   that runs on the chips that would enable or disable different

17   features.

18        And so if the software is configured in a certain way to

19   only enable certain features of one chip, the -- the end

20   product will actually work -- work differently than even

21   another product that uses the same chip.

22   Q.   And what do you mean by software?

23   A.   Okay.  Software is like the code that actually runs on

24   the chips.  It's actually a set of instructions that is step

25   by step of what is turned on in the chip, what is turned off

1    in the chip, so whether the chip enables one WiFi feature or

2    it can send one kind of packet or another is -- is turned on

3    and turned off, what we say is enabled by that software.

4    Q.    Does -- did Doctor Shoemake's testing show that if one

5    chip infringes, they all infringe?

6    A.    No, he didn't show that.

7    Q.    And why do you say that?

8    A.    Well, as I stated previously, the different chips, you

9    know, actually work differently, and, you know, these chips

10   implement a different feature.

11   Q.    Did Doctor Shoemake show that all of the products

12   implement something called an uplink multi user, multiple

13   input, multiple output feature?

14   A.    No.  Well, what he did, he showed that three of them did

15   not, specifically did not implement that feature.

16   Q.    And how many did he check?

17   A.    My understanding is, is that he only tested six products.

18   Q.    And you mentioned software.  Didn't Doctor Shoemake's

19   software analysis show that he only has to show that one chip

20   infringes and then we can conclude that they all infringe?

21   A.    His -- Doctor Shoemake showed software particularly from

22   one particular chip and -- and that -- that would not apply to

23   other chips.

24   Q.    What's a beacon frame?

25   A.    A beacon frame is something that is -- it's a special

1    packet sent by the AP or the wireless router that -- that

2    tells all the stations or client devices like your phone or

3    something like that what capabilities or what that -- what

4    that router is, what that -- what that router can do.

5    Q.   Is that something that an expert -- could an expert test

6    a product and read off a beacon frame from that product?

7    A.   Yes, I believe so, uh-huh.

8    Q.   Did Doctor Shoemake show that all the beacon frames for

9    all the products are all the same in any way?

10   A.   No, he did not.  My -- my understanding is he presented

11   results that appeared to be beacon frames from a small number

12   of products.

13   Q.   And for those products, did the beacon frame show

14   infringement of any of the claims?

15   A.   No.  As I mentioned earlier, a beacon frame just -- just

16   says -- just indicates a certain capability.  It doesn't

17   provide the details of -- of what the chip is actually doing

18   inside, so it doesn't -- it's not sufficient to determine

19   whether or not the -- the product would infringe the claim.

20   Q.   If a product gets certified by the WiFi Alliance that's

21   WiFi certified 6, what does that mean?

22   A.   WiFi Alliance is an industry body that provides

23   certification testing for products, and the certification

24   testing is essentially they have a list of -- of what are

25   actually not really compliance tests but interoperability

1    tests.  And the difference is is what they do is they test

2    products to basically WiFi products to make sure they can

3    communicate and talk with each other under certain conditions,

4    is what they're doing.

5    Q.   Do you know how many of the products in the case are

6    certified WiFi 6?

7    A.   My -- my understanding that -- that only -- that

8    certification -- the complete set of testing certification was

9    only done on three products.

10   Q.   For those three products --

11   A.   Yeah, for those three products.

12   Q.   Okay.  Those three products, just those, the fact that

13   they're certified WiFi 6, does it mean they infringe any of

14   these claims?

15   A.   Not -- once again, not -- not necessarily.

16   Q.   You heard testimony this week about benefits of WiFi 6.

17   Correct?

18   A.   Yes, I did.

19   Q.   Do you agree that WiFi 6 indeed has some benefits over

20   the previous generation of WiFi 5?

21   A.   There is no question that WiFi 6 has benefits over WiFi

22   5.  The project that created WiFi 6 was intended to improve

23   efficiency of wireless networks, and I believe it did that,

24   yes, uh-huh.

25   Q.   What are midambles?

779

```
 1   A.   A midamble is a feature added in WiFi 6 that basically

 2   allows long packets at high data rates, in other words, very

 3   fast packets to be sent more reliably, is basically what it

 4   does, uh-huh.

 5   Q.   Is that a benefit of WiFi 6?

 6   A.   Yes, it can -- it's been shown that it can significantly

 7   increase the speed of WiFi 6 devices.

 8   Q.   And do you have an opinion on whether any of the

 9   claims -- the patent claims in this case cover that sort of

10   technology?

11   A.   Yes.  The patents in this case are not related to

12   midambles at all.  There's no relationship.

13   Q.   Did you hear Doctor Shoemake talk about an acronym OFDMA?

14   A.   Yes, uh-huh.

15   Q.   Does OFDMA provide any gained benefit for WiFi 6?

16   A.   It -- it does.  OFDMA primarily provides a gain

17   in -- under certain conditions of very congested networks, but

18   in most situations OFDMA provides a small gain, not a large

19   gain.

20   Q.   And what is this text box on the screen, what is that

21   taken from?

22   A.   So this on the screen here, this is actually a page from

23   an IEEE contribution that was made in 802.11, and

24   this -- there was presented to the standards body, in other

25   words, and as you can see, it's -- yeah, it's an 802.11
```

1    contribution.

2    Q.   And do you recall how you came across this -- this paper?

3    A.   Yeah.  These are -- these are -- since -- the standards

4    are open, these are openly available standards documents.  You

5    can download them from the internet, uh-huh.

6    Q.   Did you see documents like this as part of your role and

7    a voting member in fact IEEE 802.11?

8    A.   Yes.  So the way this works is that people who

9    participate in the standards write documents such as this one,

10   they upload them to a file server, and then they present them

11   at the meetings.

12   Q.   On the bottom right of this slide in that text box, it

13   indicates LG Electronics.  Do you see that?

14   A.   Yes, I do, uh-huh.

15   Q.   And what is LG Electronics?

16   A.   My understanding, LG Electronics is a corporation.

17   Q.   And what do they do?

18   A.   Well, they -- they make products, and they also, you

19   know, send people to the IEEE meetings to participate.

20   Q.   Is that a small company?

21   A.   No, no.  LG Electronics, my understanding is it's a big

22   company.

23   Q.   Are they the ones that make the TVs?

24   A.   I believe they are.

25   Q.   Does WiFi 6 provide increased area coverage relative to

1  WiFi 5?

2  A.   Yes, it does.

3  Q.   Was the area coverage of WiFi 5, how would you

4  characterize that?

5  A.   The area coverage of WiFi 5 was already very good,

6  uh-huh.

7  Q.   And what -- can you quantify that?

8  A.   Yeah.  I give it a quantification on this slide here

9  that, you know, WiFi 5 could cover an area of about 17,000

10  square feet, so that's a pretty large room actually, uh-huh,

11  or pretty large home.

12  Q.   I take it your home is smaller?

13  A.   Yeah, quite a bit smaller, yeah.

14  Q.   We heard BSS coloring.  What is that?

15  A.   BSS coloring is a way that different -- wireless network

16  efficiency can be improved by different wireless routers

17  indicating that they're -- you know, signaling that they're

18  different to stations essentially.  So it provides -- the end

19  result is it provides an efficiency improvement.

20  Q.   Have you seen any marketing documents that tout BSS

21  coloring as a new feature of WiFi 6?

22  A.   Yes, I believe it's been touted quite a bit.

23  Q.   Have you seen any such documents from TP-Link?

24  A.   I believe I have, yeah, uh-huh.

25  Q.   Do any of the claims cover this sort of technology?

1    A.    No.  This BSS coloring is a completely different feature.

2    It's not related to any of the patents in this case.

3    Q.    Does the WiFi Alliance publish what they deem are the key

4    capabilities of WiFi 6?

5    A.    Yes, they do, uh-huh.

6    Q.    What is the acronym MU-MIMO?

7    A.    MU, it's a -- it means multiuser, multiple input multiple

8    output, which is a mouthful, but what it means in short is

9    it's a technique where a WiFi router can -- can transmit data,

10    internet data to two client devices or two different phones or

11    laptops or -- at the same time, uh-huh.

12    Q.    And is that -- is that brand new for WiFi 6?

13    A.    No.  In fact, it was introduced earlier in what we call

14    WiFi 5 or 802.11ac, the earlier standard.

15    Q.    And we talked about beamforming?

16    A.    Right, uh-huh.

17    Q.    What is 160 megahertz?

18    A.    160 megahertz is actually a description of the size of

19    the WiFi channel.  So WiFi actually uses channels much like a

20    TV channel except that they're much wider than a TV channel.

21    And over time what has happened is WiFi networks have been

22    able to operate on wider and wider channels.  And -- and

23    that's very, very useful because it allows the data to be

24    transmitted much faster on these wider channels.

25    Q.    Is that new for WiFi 6?

```
1   A.   No.  No.  160 megahertz was actually introduced in WiFi
2   5, 802.11ac.
3   Q.   Do any of these asserted claims in the case cover that
4   technology?
5   A.   No, they don't.  That technology is different from the
6   asserted claims.
7   Q.   What's TWT?
8   A.   TWT is a feature called target wake time.
9   Q.   Is that a new feature for WiFi 6?
10  A.   Yes, it's new in WiFi 6.
11  Q.   What, if anything, does it do?
12  A.   It basically allows devices to stay asleep more often,
13  and it -- it helps to solve a problem with WiFi -- WiFi
14  actually, when it's running on your phone, for example, uses a
15  lot of battery life.  And so the goal is to keep the WiFi
16  actually turned off as much as you can.  And so by using a
17  TWT, the -- you can allow these phones to actually keep the
18  WiFi only -- they only turn on when they absolutely need to,
19  and so it improves battery life, uh-huh.
20  Q.   How would you characterize that?  Is that a trivial,
21  medium, or important feature?
22  A.   I think it's a relatively important feature.  Battery
23  life is generally considered an important feature.
24  Q.   Do any of the claims in the case cover that technology?
25  A.   No, they don't.
```

784

Q.    How about BSS coloring?  Briefly, what is that?

A.    Yeah.  BSS coloring is a way to improve efficiency in situations where you have a large number of WiFi routers in one place, uh-huh.

Q.    And do any claims in the case cover that?

A.    No, they don't.

Q.    Very briefly, what is 1024 I believe it's QAM.  Is that correct?

A.    Yes.  QAM, it means quadrature amplitude modulation.  This is a -- once -- this is a technique that determines how fast you can send data over the air, which of course is like one of the great developments of WiFi, that we can send data very fast over the air.  And just 1024 QAM is just a faster mode that was first put into WiFi 6, the 802.11 standard.

Q.    And how much faster is it?

A.    I think it's about 20, 25 percent, depending on how you measure it, uh-huh.

Q.    And you say 20 or 25 percent faster relative to what?

A.    Relative to WiFi 5 or 802.11ac.

Q.    When marketing documents tout the blazing fast speed of the WiFi 6 products, is this feature 1024 QAM relevant to that?

A.    Yes, it is.  I mean, that increase in speed is a part of the -- is the -- it's -- it's one way that a -- that a WiFi 6 product can be faster than a WiFi 5 product.

1    Q.    Do any of the claims cover this technology?

2    A.    No, the claims in this case are not related to this

3    technology.

4    Q.    Are there any other features in WiFi 6 that aren't new?

5    A.    Yes, there are many, many features in WiFi 6 that

6    are -- have merely been carried forward from previous

7    standards.

8    Q.    Very briefly, could you very briefly explain some of

9    those?

10   A.    Sure.  There are -- there is a list here on my slide.

11   You know, in the past few days you probably heard a number of

12   these acronyms, but these are all techniques, you know,

13   that -- that are not -- not new.  OFDM -- I could read through

14   them all, but essentially what -- the point here is that

15   there's a large number of features in WiFi 6 that just aren't

16   new, they've just been carried forward from previous WiFi

17   standards.

18   Q.    And can someone patent something that existed before?

19   A.    In general, no, uh-huh.

20          MR. GRINSTEIN:  Your Honor, may we approach?

21          THE COURT:  Approach the bench.

22          (The following was had outside the hearing of the

23          jury.)

24          MR. GRINSTEIN:  I move to strike that last question

25   and answer.  The invalidity is out of the case, and he

1    basically just testified that the patents can be invalid

2    because they cover old features.

3            THE COURT:  What's your response?

4            MR. MAYLE:  It's -- the Plaintiff's expert report on

5    infringement goes all -- into all these benefits, not just

6    infringement.  We respond to that in our non-infringement

7    report.  They didn't object to any of these slides.  This is

8    taken directly out of our report.  It goes to damages.  It is

9    not for invalidity.  It goes to the value of what's claimed.

10           THE COURT:  Did the Plaintiff's expert testify as to

11   these type matters as opposed to simply addressing it in his

12   report?  In other words, did the Plaintiff open the door to

13   this in some way?  The report doesn't open the door to it.  If

14   he's testified to it in open court, that's different.

15           MR. MAYLE:  He's testified to benefits.  I don't

16   know if he hit each one of these on the screen.  He did

17   testify to benefits.

18           MR. GRINSTEIN:  Your Honor, that's not the point.

19   The point is the question and answer was just did the patent

20   cover these old benefits.

21           MR. MAYLE:  I can rephrase it.

22           MR. GRINSTEIN:  So that is implying that these

23   patents can't be valid because they're covering old benefits.

24   That is a straight invalidity argument it has nothing to do

25   with benefits he mentioned.

```
1              THE COURT:  Well, I'm not going to countenance a
2    straight invalidity argument.  That's clearly not a part of
3    the case.  I am, though, not going to strike the last question
4    and answer.  I'm going to direct Defense counsel to readdress
5    it in a way that does not raise the direct invalidity
6    argument.
7         And I'll certainly give you latitude on cross to address
8    it, Mr. Grinstein.
9              MR. GRINSTEIN:  Thank you, Your Honor.
10             THE COURT:  All right.  Let's proceed.
11             (The following was had in the presence and hearing
12             of the jury.)
13             THE COURT:  Let's proceed, counsel.
14             MR. MAYLE:  Thank you, Your Honor.
15   Q.   (BY MR. MAYLE)  Doctor Hansen, do the patents-in-suit
16   cover these technologies?
17   A.   No.  My understanding is that the patents-in-suit
18   may -- some of the claim elements in some of the
19   patents-in-suit may be related to these technologies, but they
20   don't -- they don't -- I don't think it's fair to say they
21   cover these technologies.
22   Q.   Are there any other factors that we haven't talked about
23   that contribute benefits to WiFi 6?
24   A.   Yes, there are, uh-huh.
25   Q.   Can you summarize a few of those briefly?
```

1    A.    Yeah.  So I -- I think a large -- a large part of the

2    demand for WiFi 6 comes about from the fact that WiFi has

3    become embedded in -- in everyday life and we all use WiFi.

4    And so naturally when a new version of WiFi comes out, well,

5    that's the version we're going to use.

6         So I think that that -- a lot of the natural WiFi

7    actually comes from that.  And new features help, but that's

8    where it comes from, uh-huh.

9    Q.    Aside from the five patents in this case and actually

10   aside from all of the patents that started with Newracom, are

11   there other patents out there, United States patents that

12   cover WiFi 6 technologies?

13   A.    Yes.  My understanding is there are.

14             MR. MAYLE:  Pass the witness.

15             THE COURT:  Cross examination by the Plaintiff.

16             MR. GRINSTEIN:  Your Honor, may I approach the

17   witness?

18             THE COURT:  You may.

19                      CROSS EXAMINATION

20   BY MR. GRINSTEIN:

21   Q.    Good morning, Doctor Hansen.

22   A.    Good morning.

23   Q.    We haven't met before.  My name is Joe Grinstein.  I am

24   one of the lawyers that represents Atlas in this case.  It's

25   nice to meet you from 30 feet away.

1    A.    Yes.  Thank you.

2    Q.    Doctor Hansen, are you surprised to be testifying here

3    today?

4    A.    I wouldn't say I'm surprised.

5    Q.    Well, were you here yesterday to hear the testimony of

6    TP-Link's corporate representative, Ms. Sun?

7    A.    Yes, I was, uh-huh.

8           MR. GRINSTEIN:  Mr. Spalding, could I have

9    demonstrative No. 1?

10   Q.    (BY MR. GRINSTEIN)  Were you here to hear Ms. Sun testify

11   to this jury that TP-Link may infringe these patents?

12   A.    Well, I was here in the room, yeah.

13          MR. GRINSTEIN:  And may I have cross examination

14   demonstrative No. 2, Mr. Spalding?

15   Q.    (BY MR. GRINSTEIN)  Were you here to hear Ms. Sun testify

16   that TP-Link may take a license to these patents, it's just

17   the price is too high?

18   A.    Yes, I was here yesterday, uh-huh, for that.

19   Q.    I think you said that you've worked on other patent cases

20   before.  You mentioned that yesterday.  Right?

21   A.    Yes, I have, uh-huh.

22   Q.    And I think you testified that you were surprised you've

23   never seen in another patent case a Plaintiff's patent expert

24   not review all the source code.  That was your testimony.

25   Right?

1    A.    I'm not certain if that was my exact testimony.

2    Q.    You testified that you'd never seen a plaintiff in

3    another patent case not review the source code.  Right?

4    A.    Once again, I'm not sure if that's exactly what I said.

5    I do -- I do understand that it's common and normal practice

6    in cases I've been involved in that plaintiffs review source

7    code.

8    Q.    Have you ever seen another patent case where the

9    defendants' corporate representative admits to the jury that

10   the defendant may not infringe?

11   A.    No.  But I've never been involved in a case where the

12   corporate representative was present, so this is the first

13   time I've seen anything like this.

14   Q.    I'm sorry.  Have you ever seen a patent case where the

15   defendant's corporate representative said they would take a

16   license but just the price was too high?

17   A.    No.  Once again, same reason.  You know, I haven't been

18   in a case where there was a corporate representative present.

19   Q.    TP-Link, of course, could have conceded infringement and

20   just had a trial about damages.  Right?

21   A.    I really don't know.

22   Q.    It's something they could have done.  Right?

23   A.    Once again, I don't know.

24   Q.    Is the reason why you are here is to put up resistance on

25   the issue of infringement to help TP-Link bargain down the

1    license price?

2    A.   I -- I really can't answer that.  You know, I -- I'm here

3    to present my expert opinions on -- on non-infringement.

4    Q.   Did you hear Mr. Reed tell the jury in his opening

5    statement that this case was about three simple

6    principles--what is fair, what is reasonable, and what treats

7    everybody the same?

8    A.   Yes, I was here for that, uh-huh.

9    Q.   Those all sound like damages principles, not infringement

10   principles.  Right?

11   A.   I -- you know, once again, I'm an expert on WiFi

12   technology.  I'm not an expert on damages.  So I really can't

13   say one way or the other.

14   Q.   And you are here as TP-Link's non-infringement expert.

15   Right?

16   A.   Well, I'm -- I'm here as an -- as an expert on WiFi

17   technology, is my understanding.

18   Q.   And, in fact, you're not even here to tell the jury that

19   you have reviewed the evidence in this case and the evidence

20   proves that TP-Link does not infringe.  Right?

21   A.   Well, I think my role, as I understand it, is to -- you

22   know, as a -- on the defensive side is to basically review the

23   evidence presented by the Plaintiffs.

24        MR. GRINSTEIN:  Objection, Your Honor, move to

25   strike as non-responsive.

```
 1              THE COURT:  Sustained.
 2    Q.   (BY MR. GRINSTEIN)  Sir, you are not here to tell the
 3    jury that you have reviewed the evidence in this case and that
 4    the evidence proves TP-Link does not infringe, are you?
 5    A.   I am here to present evidence on -- of non-infringement
 6    is my understanding of why I'm here.
 7    Q.   Well, you don't know whether TP-Link infringes because
 8    you actually haven't conducted that analysis, have you?
 9    A.   I have done -- I have performed analysis on -- on -- on
10    the evidence given to me.
11    Q.   Well, you can't tell the jury what evidence would prove
12    that TP-Link infringes because you haven't undertaken any
13    analysis to determine if they infringe.  Right?
14    A.   I don't believe that's correct.
15    Q.   Sir, do you remember giving a deposition in this case?
16    A.   Yes.
17    Q.   And during that deposition you were placed under oath?
18    A.   Yes.
19    Q.   And you told the truth in that deposition.  Is that
20    correct?
21    A.   My understanding is that I did, uh-huh.
22    Q.   And during that deposition, did you give an answer that
23    was inconsistent with the answer you just gave to my last
24    question?
25    A.   I don't know if I did.
```

1    Q.    Well, sir, would you mind if I refreshed your

2    recollection?

3    A.    Please, uh-huh.

4    Q.    In your binder, you'll find, I think it's the third tab,

5    a copy of your deposition.  And, sir, if you wouldn't mind

6    turning to that tab and looking at page 96, lines 1 through

7    11.  Let me know when you've gotten there, please.

8    A.    Yes, uh-huh.

9    Q.    Does reading that right now refresh your recollection

10   that you answered my question a different way in your

11   deposition?

12   A.    Yeah, to be honest, you know, these questions in my mind

13   seem different.  So I don't -- I can't really compare -- I

14   mean, my -- the questions seem to be different so my answers

15   are different, is my understanding.

16         MR. GRINSTEIN:  Your Honor, at this point I request

17   permission to publish to the jury Doctor Hansen's deposition,

18   page 96.

19         THE COURT:  Having refreshed his recollection, ask

20   your question again, and then you may ask to publish depending

21   on his answer.

22   Q.    (BY MR. GRINSTEIN)  Doctor Hansen, you can't tell what

23   evidence would prove TP-Link infringes because you haven't

24   undertaken any analysis to determine if they infringe.  Right?

25         MR. MAYLE:  Objection, Your Honor.

1              THE COURT:  What's your objection?

2              MR. MAYLE:  It's relevancy.  The Plaintiff bears the

3    burden and the Defendant will review Plaintiff's evidence.  He

4    doesn't have to do any analysis.

5              THE COURT:  Overruled.  You can answer the question,

6    Doctor Hansen or I'll have counsel restate it if you'd like.

7              THE WITNESS:  Yeah.  I would appreciate it if you

8    could just restate the question.  Sorry.

9    Q.   (BY MR. GRINSTEIN)  You can't tell us what evidence would

10   prove that TP-Link infringes because you haven't undertaken

11   any analysis to determine if they infringe.  Right?

12   A.   Yes, I have not taken -- I have not undertaken a complete

13   analysis -- I think, as I stated, I would -- I agree with how

14   I responded in my deposition.  I have not.

15   Q.   Okay.  So you have not undertaken analysis to determine

16   if TP-Link actually infringes.  Right?

17   A.   I'm not sure about that.  I don't -- I would not agree

18   with that statement.

19             MR. GRINSTEIN:  Your Honor, at this point --

20             THE COURT:  You have leave to publish his prior

21   deposition testimony.

22             MR. GRINSTEIN:  May we please have the video clip of

23   Doctor Hansen's video deposition, page 96, lines 1 through 11.

24        "Well, let's say if you're trying to determine whether

25   any TP-Link product infringed any claim of the asserted

1    patents, what sort of evidence would you look to to make that

2    determination?

3        "I haven't -- you know, I don't believe I -- I've done

4    that analysis, and I don't -- I would have to -- you know,

5    there would be -- I would have to perform some analysis

6    on -- on the products and the patent claims.  And I haven't

7    done that analysis."

8            MR. GRINSTEIN:  Can we please see Doctor Hansen's

9    slide No. 10, Mr. Spalding?

10   Q.   (BY MR. GRINSTEIN)  This is a slide that you showed the

11   jury during your direct testimony.  Is that correct, Doctor

12   Hansen?

13   A.   Yes, it is, uh-huh.

14   Q.   And at the top of the slide you said, Atlas' burden of

15   proof not met.  Do you see that?

16   A.   Yes, I do, uh-huh.

17   Q.   You didn't title this slide, TP-Link does not infringe,

18   did you?

19   A.   No, I did not.

20   Q.   Instead, you said Atlas hasn't met its burden to prove

21   infringement.  Right?

22   A.   That's correct.

23   Q.   But you're not the person who decides whether Atlas met

24   its burden or not.  Right?

25   A.   I -- I provide information, but I -- I don't make that

1    decision, no.

2    Q.   The ladies and the gentlemen of the jury decide whether

3    Atlas has met its burden.  Correct?

4    A.   Of course, yes.

5    Q.   And you're not telling them affirmatively in this slide,

6    I hereby declare TP-Link does not infringe, are you?

7    A.   No.

8    Q.   If you wanted to prove TP-Link doesn't infringe, one of

9    the things you might do is talk to an engineer from TP-Link.

10   Right?

11   A.   I could do that, but I'm not sure if that would give me

12   the information I would need.

13            MR. GRINSTEIN:  Objection, Your Honor,

14   non-responsive.  Move to strike.

15            THE COURT:  The answer's responsive so far as it

16   says "I could do that."  The remainder of the answer is

17   non-responsive, and I'll strike everything after "I could do

18   that."

19   Q.   (BY MR. GRINSTEIN)  In forming your opinions about

20   infringement in this case, you didn't talk to anyone at

21   TP-Link, did you?

22   A.   No, I don't believe I did.

23   Q.   Ms. Sun probably has access to TP-Link engineers, doesn't

24   she?

25   A.   I -- I don't know.

1    Q.    And she's the one who told the jury that TP-Link may

2    infringe.  Right?

3    A.    I believe she made that statement.

4    Q.    Broadcom is a third party that supplies chips to some of

5    the TP-Link products.  Right?

6    A.    Yes, that's correct.

7    Q.    And you used to work for Broadcom.  Correct?

8    A.    Yes, I did.

9    Q.    So if you wanted to prove TP-Link doesn't infringe, maybe

10    you could go talk to some of your buddies who used to work

11    with you at Broadcom.  Right?

12    A.    No, I couldn't do that.

13    Q.    Well, you didn't talk to anyone from Broadcom about

14    whether TP-Link infringes.  Right?

15    A.    No, I didn't.

16    Q.    Same with Intel.  Right?

17    A.    No, I didn't.

18    Q.    Same with Qualcomm?

19    A.    I did not speak with anyone at Qualcomm.

20    Q.    Same with MediaTek.  Right?

21    A.    I did not speak with anyone at MediaTek.

22    Q.    As part of his infringement analysis, Doctor Shoemake

23    conducted some product testing on some TP-Link products.  Is

24    that correct?

25    A.    Yes, he did do -- he did so some testing.

1   Q.   And if you wanted to prove that TP-Link didn't infringe,

2   maybe one of the things you could have done is your own

3   testing on TP-Link products.  Right?

4   A.   Yes.

5   Q.   But you didn't do that, did you?

6   A.   No, I didn't test any TP-Link products.

7   Q.   You could have called up your client and said, Send me

8   some WiFi routers so I can test them.  But you didn't do that.

9   Right?

10  A.   I'm not sure if I could have done that or not, but I -- I

11  didn't do that.

12  Q.   And by the way, sir, yesterday you testified that you

13  were being compensated by the hour for your testimony today.

14  Is that correct?

15  A.   Yes, it is, uh-huh.

16  Q.   But you didn't mention your hourly rate to the jury, did

17  you?

18  A.   I don't believe I did.

19  Q.   It's $500 an hour, isn't it?

20  A.   Yes, it is.

21  Q.   And how many hours have you spent charging $500 an hour

22  for your work in this case?

23  A.   I don't know the exact number.  It would be in the

24  neighborhood of 150 hours, I believe.

25           MR. GRINSTEIN:  You can take down 10, please,

1    Mr. Spalding.

2    Q.   (BY MR. GRINSTEIN)   There are five patents asserted in

3    this case by Atlas.   Right?

4    A.   Yes.

5              MR. GRINSTEIN:   May I have the third demonstrative,

6    please?

7    Q.   (BY MR. GRINSTEIN)   I put the five patents down there on

8    the left side of this column.   Do you see that?

9    A.   Yes, uh-huh.

10   Q.   And I've also put the claims that are being asserted from

11   each patent.   Do you see that?

12   A.   Yes, uh-huh.

13   Q.   Does that look about right to you?

14   A.   I believe it's correct, yeah.

15   Q.   And one of Atlas' infringement theories in this case is

16   direct infringement.   Correct?

17   A.   Yes, uh-huh.

18   Q.   And a company is liable for directly infringing a patent

19   if that company actually performs the act of making, using,

20   selling, offering for sale in the United States, or importing

21   into the United States, a product or method that embodies the

22   patented invention.   Right?

23   A.   Yes, that's my understanding.

24   Q.   And you understand that in this case Atlas is alleging

25   that TP-Link directly infringes one claim of one patent.

1    Right?

2    A.    Yes, I believe that's correct, uh-huh.

3            MR. GRINSTEIN:  And slide 7, can I see, please,

4    Doctor Hansen's slide 7?

5    Q.    (BY MR. GRINSTEIN)  In this slide you summarized some of

6    your opinions about why TP-Link does not directly infringe.

7    Is that correct?

8    A.    Yes, I believe that's correct, uh-huh.

9    Q.    And one of the arguments you made is that the actual

10   entity selling the accused products in the United States is

11   TP-Link USA, not the TP-Link Defendants in this case.  Right?

12   A.    Yes, that's correct, uh-huh.

13   Q.    Atlas obviously disagrees with you.  Right?

14   A.    To be honest, I don't know exactly -- I don't know

15   exactly what Atlas' opinion is, but...

16   Q.    Were you finished?

17   A.    Yeah.  I would assume so, yes.

18           MR. GRINSTEIN:  Can we please go back to the chart,

19   Mr. Spalding?

20   Q.    (BY MR. GRINSTEIN)  In any event, that argument only

21   applies to one -- the one claim that Atlas is asserting is

22   directly infringed.  Right?

23   A.    Yeah, I would believe that would -- that's what's on the

24   chart here, yeah.

25   Q.    Atlas is also asserting a second theory of infringement

1    called induced infringement.  Right?

2    A.   Yes, that's correct.

3    Q.   Did I miss it or did you never even mention the words

4    induced or inducement in your testimony yesterday or today?

5    A.   I don't recall mentioning induced infringement.

6    Q.   An entity is liable for induced infringement if the

7    entity has actual knowledge of the patent and takes action

8    with the specific intent to encourage others to directly

9    infringe the patent claim.  Right?

10   A.   I believe that's at least part of induced infringement,

11   but I -- yes, uh-huh.

12   Q.   You were here to hear Doctor Shoemake's testimony.

13   Right?

14   A.   I believe I was here for at least part of Doctor

15   Shoemake's testimony.

16   Q.   Well, did you hear him testify that the TP-Link

17   Defendants infringe the method claims by inducing customers in

18   the United States to use the accused products in an infringing

19   manner?

20   A.   I believe I heard at least some of that testimony, yes.

21   Q.   So Atlas is arguing in this case that TP-Link Corporation

22   and TP-Link Technologies induced the end users.  Right?

23   A.   I believe that's at least part of what you're arguing,

24   yes, uh-huh.

25   Q.   Atlas is not arguing that TP-Link Technologies and

1    TP-Link Corporation induce TP-Link USA to infringe the method

2    claims, is it?

3    A.    I'm not certain, to be honest.

4    Q.    Of the nine patent claims that Atlas is asserting in this

5    case, eight of them are method claims.  Right?

6    A.    I don't recall exactly, but that may be correct, yeah,

7    uh-huh.

8             MR. GRINSTEIN:  Can I please see Doctor Hansen's

9    slide 9?

10   Q.    (BY MR. GRINSTEIN)  This is a slide you put up talking

11   about knowledge.  Is that correct?

12   A.    That's correct, yes, uh-huh.

13   Q.    But the title of the slide only covers pre-lawsuit

14   knowledge.  Right?

15   A.    Yes, I believe that's correct, uh-huh.

16   Q.    Obviously TP-Link had knowledge of the asserted patents

17   when TP-Link got sued.  Right?

18   A.    I would expect that they had, yes, uh-huh.

19   Q.    I mean, Atlas sued it in November of 2021.  Right?

20   A.    I don't know if that's the right date or not.

21   Q.    You understand that Atlas contends that TP-Link had

22   knowledge about these patents dating back to June 2021 because

23   of these letters.  Right?

24   A.    No.  As -- I'm not certain of that, no.

25   Q.    Then why did you put up these letters?

```
 1    A.    I'm sorry.  I got confused by your question.  Can you

 2    repeat the question?

 3    Q.    You understand that Atlas is contending that TP-Link had

 4    knowledge of the patents in this suit because of these June

 5    2021 letters.  Right?

 6    A.    I heard that argument.

 7    Q.    So the point of this slide is to quibble with whether or

 8    not TP-Link had knowledge when it was sued in November 2021 or

 9    when it received notice letters five months earlier.  Right?

10    A.    Well, right.  I mean, the point of this is that the

11    letters were not sent to TP-Link.  The letters were sent to a

12    different company was the point of this slide.

13    Q.    Would you mind if we talked about the letters?

14    A.    I don't mind, no.

15    Q.    Well, let's look at Plaintiff's -- or, I'm sorry, Joint

16    Exhibit 19.  These are the various letters that you cite in

17    your slide.  Right?

18    A.    Yes, uh-huh.

19    Q.    And the letters were sent from Mr. Craig Yudell, the

20    president of Atlas.  Right?

21    A.    Yes, uh-huh.

22    Q.    And the first letter was sent to a gentleman named Jeff

23    Barney.  Correct?

24    A.    Yes, uh-huh.

25    Q.    The second letter, which is on page 6 of this exhibit,
```

1    was sent to a gentleman--I apologize for the

2    pronunciation--Bijoy Alaylo.  Do you see that?

3    A.   Yes, I do, uh-huh.

4    Q.   And the third letter was sent on page 9 of this exhibit

5    to a gentleman named Louis Lieu.  Right?

6    A.   Yes, uh-huh.

7    Q.   And, in fact, you heard testimony that Mr. Yudell also

8    emailed these letters to these individuals.  Right?

9    A.   I don't specifically recall it, but I believe that's -- I

10   mean, I believe that testimony was presented in this trial,

11   uh-huh.

12        MR. GRINSTEIN:  Can we go to the first letter,

13   please, Mr. Spalding?

14   Q.   (BY MR. GRINSTEIN)  If you look at the first paragraph of

15   the first letter, the second sentence, Mr. Yudell writes, "Our

16   company Atlas Global Technologies, LLC., a wholly-owned

17   subsidiary of Acacia Research Group, LLC., acquired Newracom's

18   substantial WiFi 6 802.11ax SEP portfolio and has launched a

19   campaign to license early adopters at highly discounted

20   rates."  Do you see that?

21   A.   Yes, I do.

22   Q.   "We would welcome the opportunity to discuss licensing

23   your company to this highly valuable SEP portfolio."  Do you

24   see that?

25   A.   Yes, I do, uh-huh.

1    Q.   It sounds like he's giving TP-Link the opportunity to get

2    some early discounts, isn't he?

3    A.   Yeah.  I -- I -- really don't know.

4    Q.   And you heard Mr. Yudell testify on Monday that no one

5    responded to these letters.  Right?

6    A.   I'm not -- I don't believe I was present for that

7    testimony.

8    Q.   Okay.  You say that these letters were sent to TP-Link

9    USA locations in California.  Right?

10   A.   That is my understanding is that they were sent to

11   TP-Link USA.

12   Q.   And I think you testified yesterday you haven't seen any

13   evidence that these letters were passed on to China.  Right?

14   A.   I -- I don't recall if I said that specifically, but I'm

15   not aware that they were sent to China, uh-huh.

16   Q.   So you think the three gentlemen who received these

17   letters just threw them in the trash?

18   A.   I really don't know what they did to the letter.

19   Q.   Yeah.  In fact, you don't know because you didn't ask

20   anyone at TP-Link what they did with these letters.  Right?

21   A.   Well, I really -- no, I -- I didn't.  As I said

22   previously, I don't believe I spoke with anyone at TP-Link

23   about this case.

24   Q.   You have zero information about what TP-Link did with

25   these letters -- TP-Link USA did with these letters after they

806

1    received them.  Right?

2    A.    That's right, yes, uh-huh.

3    Q.    And by the way, you have a Ph.D. in electrical

4    engineering.  Is that correct?

5    A.    Yes, I do, uh-huh.

6    Q.    Which of your Ph.D. classes dealt with corporate

7    processes for handling mail?

8    A.    None of them did.

9    Q.    So you're certainly an expert in wireless technologies.

10   You're not an expert in how TP-Link handles its mail, are you?

11   A.    No, not an expert in TP-Link's mail.

12            MR. GRINSTEIN:  Can we please see slide 7 again of

13   Mr. -- Doctor Hansen's presentation?

14   Q.    (BY MR. GRINSTEIN)  I'm going to show you a slide you put

15   up to discuss the issue of no direct infringement.  Do you

16   recall this slide, sir?

17   A.    Yes, I do, uh-huh.

18   Q.    And one thing you say here is that TP-Link does not make

19   you sell products in the U.S.  Do you see that?

20   A.    Yes, uh-huh.

21   Q.    It is an act of infringement to make, use, offer to sell,

22   sell, or import infringing products within the United States.

23   Right?

24   A.    Can you repeat the question again?

25   Q.    It is an act of infringement to make, use, offer to sell,

1    sell, or import infringing products within the United States.

2    Right?

3    A.    Yes, I believe that's correct.

4    Q.    So one specific way you can infringe a patent is by

5    offering to sell an infringing product in the United States.

6    Right?

7    A.    I believe that's correct, yes, uh-huh.

8    Q.    So if TP-Link Corporation is informing other people that

9    it is willing to sell an infringing product in the United

10    States, that's an act of infringement.  Right?

11    A.    I'm not sure if that's sufficient.

12    Q.    You note here in the third bullet point that it's TP-Link

13    USA that controls the tp-link.com/us website.  Right?

14    A.    That's my understanding, yes.

15    Q.    You understand that if you are web-surfing in America and

16    you enter the URL www.tp-link.com, you will get redirected to

17    TP-Link.com/us.  Right?

18    A.    I'm not certain of that.

19          MR. GRINSTEIN:  Well, can we look at Plaintiff's

20    Exhibit 19, please, Mr. Spalding?

21    Q.    (BY MR. GRINSTEIN)  This exhibit is all the legalese that

22    one encounters on the tp-link.com website.  Right?

23    A.    Yeah, I'm not certain of that.

24    Q.    Have you seen this before?

25    A.    It's possible I have seen this document before.

808

```
1    Q.   I mean, before preparing to testify about who owns the

2    TP-Link website, did you familiarize yourself with the

3    tp-link.com/us privacy policy in terms of use?

4    A.   It's possible I did, but I don't specifically recall

5    reading this document.

6    Q.   The first part of this document is entitled TP-Link

7    Privacy Policy.  Right?

8    A.   It says that there, yes, uh-huh.

9    Q.   And the first paragraph refers to TP-Link Corporation.

10   Right?

11   A.   Yes, it does.

12   Q.   It says you can also refer to TP-Link Corporation in this

13   document as TP-Link, we, us, or our.  Right?

14   A.   Yes, it does.

15   Q.   It doesn't say TP-Link USA, does it?

16   A.   No, it does not say TP-Link USA.

17   Q.   And this document goes on to discuss how TP-Link

18   Corporation is or is not going to keep American consumers'

19   data private.  Right?

20   A.   I don't recall specifically if it says that or not.

21          MR. GRINSTEIN:  Can we go nine pages into the

22   exhibit, please, Mr. Spalding?

23   Q.   (BY MR. GRINSTEIN)  Now we've got the part of the exhibit

24   that says terms of use.  Right?

25   A.   Yes, it says terms of use.
```

1    Q.   And this is the part of the website where someone in the

2    United States agrees how they're going to use the website.

3    Right?

4    A.   Yeah, I'm not certain of that.

5    Q.   It says right there at the top, Welcome to TP-Link!

6    Right?

7    A.   Yes, it says that.

8    Q.   It doesn't say, Welcome to TP-Link USA, does it?

9    A.   No, it does not.

10   Q.   First sentence says, "The services defined herein are

11   provided by TP-Link Corporation, Ltd."  Right?

12   A.   Yes, it says that.

13   Q.   It doesn't say the services defined herein are provided

14   by TP-Link USA, does it?

15   A.   No, it does not.

16   Q.   Then it says, "This document may refer to the service

17   provider as TP-Link Corporation, Ltd., TP-Link, we, us, or

18   our."  Right?

19   A.   Yes, it does say that.

20   Q.   So those all mean the same thing for purposes of this

21   document.  Right?

22   A.   I believe so.

23   Q.   Then immediately next sentence, it says, TP-Link

24   provides.  Right?

25   A.   Yes, uh-huh.

```
1    Q.   And it says, "TP-Link hardware products."  Right?

2    A.   Yes, it does, uh-huh.

3    Q.   TP-Link, as we just saw, refers to TP-Link Corporation,

4    Ltd.  Right?

5    A.   Yes, I think that's correct, uh-huh.

6    Q.   A WiFi router is a hardware product.  Right?

7    A.   A WiFi router is a hardware product.

8    Q.   It doesn't say in this document TP-Link USA provides

9    TP-Link hardware products, does it?

10   A.   It doesn't say that in this document, no.

11   Q.   No. 2 says TP-Link provides websites.  Right?

12   A.   Yes, it does say websites.

13   Q.   It doesn't say TP-Link USA is providing that, does it?

14   A.   No, it does not.

15   Q.   No. 3 says services, including technical support and

16   services, accessible through the sites, web apps.  Right?

17   A.   That's correct, uh-huh.

18   Q.   Again, doesn't say TP-Link USA is providing that stuff,

19   does it?

20   A.   No, it does not.

21   Q.   If you look down a little further, there is a

22   title -- there is a section entitled Your Acceptance.  Right?

23   A.   Yes, uh-huh.

24   Q.   That section says, "These terms are a binding contract

25   between you and TP-Link."  Right?
```

1    A.    Yes, it does.

2    Q.    So, in fact, if a U.S. consumer does not agree to the

3    terms of this binding contract between the consumer and

4    TP-Link Corporation, they do not have a right to use the

5    products or services.  Right?

6    A.    Well, yeah, I don't -- those words are -- that's what it

7    says there.

8    Q.    It doesn't say anything about agreeing to any contract

9    with TP-Link USA, does it?

10   A.    I don't see that there, no.

11   Q.    And do you know what the website tells you is the entity

12   you should contact if you've got a concern or a complaint

13   about the web services?

14   A.    I don't recall.

15   Q.    Well, let's look at the next to last page of this

16   exhibit.  Do you see, How to Contact Us?

17   A.    Yes, uh-huh.

18   Q.    Do you see how it says, Please forward any comments or

19   complaints about the services to TP-Link Corporation, Ltd.?

20   Right?

21   A.    Yes, uh-huh.

22   Q.    It doesn't say TP-Link USA, does it?

23   A.    No, it does not.

24          MR. GRINSTEIN:  Can we look at Plaintiff's Exhibit

25   18, please?

1    Q.   (BY MR. GRINSTEIN)  Now, the TP-Link website that we've

2    been discussing, it actually is owned by TP-Link Corporation,

3    isn't it?

4    A.   I'm not certain exactly how it's owned, the ownership of

5    the website.

6    Q.   Well, why don't we look at the end of Plaintiff's Exhibit

7    18.  There do you see the box there that says, Copyright

8    TP-Link Corporation, Ltd.?

9    A.   I see that there.

10   Q.   Doesn't say copyright TP-Link USA, does it?

11   A.   No, it does not.

12   Q.   Now, did you hear Ms. Sun testify about that copyright

13   notice?

14   A.   I believe I heard some of that testimony, yeah, uh-huh.

15   Q.   I believe she testified that, oh, that copyright notice

16   refers to the template, the colors, the look and feel of the

17   website.  Do you remember that testimony?

18   A.   I don't remember that exact testimony.

19   Q.   Do you see anything here that says copyright to the

20   template, colors, look and feel, TP-Link Corporation?

21   A.   No.  I just see copyright TP-Link Corporation.

22   Q.   Is there anywhere on the website that says copyright

23   TP-Link USA?

24   A.   On the entire website?  I don't know.

25   Q.   You didn't look.

1    A.   I did not look at the entire TP-Link website.

2              MR. GRINSTEIN:  Let's look at Plaintiff's Exhibit 10

3    next, please.

4    Q.   (BY MR. GRINSTEIN)  You do know that the TP-Link website

5    has a section for each accused product.  Right?

6    A.   I'm not certain if the website has a section for every

7    product or not.

8    Q.   Well, did you review Plaintiff's Exhibit 10 in

9    preparation for your testimony here today?

10   A.   I believe I did.

11   Q.   It's like 2900 pages long, isn't it?

12   A.   I can't recall how long it is.

13   Q.   It's really big, isn't it?

14   A.   There were many big documents in this case.  I agree with

15   you it's probably a very big document.

16   Q.   And it's really big because it shows the web page for

17   every accused product.  Right?

18   A.   Yeah, I'm not certain of that, but...

19   Q.   Is TP-Link just providing web entries for its accused

20   products for educational purposes, or is it trying to sell

21   them to people?

22   A.   I'm not -- I'm not certain of TP-Link's reasoning for how

23   it structures its website.

24   Q.   And off of TP-Link's website, you can actually purchase

25   the accused products.  Right?

```
1    A.   I don't believe that's correct.

2    Q.   You haven't tried the 'buy it now' feature on the

3    website, have you?

4    A.   It's possible I clicked on it.  I'm not certain.  I

5    believe I probably did.

6         MR. GRINSTEIN:  You can take that down, please,

7    Mr. Spalding.

8    Q.   (BY MR. GRINSTEIN)  Now, one of the patents for which you

9    provided a non-infringement argument in this trial was the

10   '259 Patent.  Is that right?

11   A.   Yes, that's correct, uh-huh.

12   Q.   And Atlas is asserting two claims from the '259 Patent,

13   claims 1 and 18.  Right?

14   A.   I believe that's correct, yeah.

15   Q.   And among the things Doctor Shoemake testified about the

16   '259 Patent, he said the claims of the '259 Patent line up

17   with the WiFi 6 standard.  Right?

18   A.   I don't recall if he stated that exactly.

19   Q.   Well, he mapped the elements of claims 1 and 18 of the

20   '259 Patent onto the WiFi 6 standard.  He spent quite a bit of

21   time doing that.  Right?

22   A.   I recall he made a long presentation about the '259

23   Patent, but I don't recall every detail.

24   Q.   You don't recall if Doctor Shoemake said this element in

25   the '259 Patent is present in the WiFi 6 standard, this
```

1    element is present, and went all the way down?

2    A.   Well, he went through a list of the claim elements, and

3    he presented sections -- he presented sections of the standard

4    that were -- that he believed were related.

5    Q.   In your testimony to the jury on the '259 Patent, you

6    never disputed Doctor Shoemake's opinions that the '259 Patent

7    claims line up with parts of the WiFi 6 standard, did you?

8    A.   I don't recall if I did or not, no, sir.

9    Q.   The only thing you did with respect to the '259 Patent is

10   say Doctor Shoemake didn't provide enough evidence to show

11   that the accused products use those parts of the standard.

12   Right?

13   A.   Well, I believe I did make that statement, but I may have

14   made other statements along with that.

15   Q.   You're the one who made the statements.  Can you remember

16   what you said?

17   A.   Well, I've had a lot of questions yesterday and today.  I

18   don't remember every question and every exact response, but

19   I'd be happy -- if you want to put them up on the screen, I'd

20   be happy to, you know, review and explain.  I mean, that's --

21          MR. GRINSTEIN:  Can we please look at Doctor

22   Hansen's slide 17?

23   Q.   (BY MR. GRINSTEIN)  This is a slide you put up with

24   respect to your argument that Doctor Shoemake failed to show

25   the '259 Patent is infringed.  Right?

1    A.    Yes, I believe that's correct, uh-huh.

2    Q.    And you're here discussing Doctor Shoemake's opinion

3    about figure 26-8 from the WiFi standard.  Right?

4    A.    Yes.  I'm providing a -- yeah, some additional

5    information.  Right.

6    Q.    And your argument to the jury was, well, it may be that

7    TP-Link's products implement figure 26-7 and not 26-8.  That's

8    what you told the jury.  Right?

9    A.    I'm not certain if that's exactly what I said to the

10   jury, but you mean -- I believe that's correct, that a product

11   could employ the method shown in figure 26-7.

12   Q.    And if it did employ the method in 26-7, you told the

13   jury that would mean non-infringement.  Right?

14   A.    If it used this method instead of the other method, my

15   understanding is -- is that -- right, that that particular

16   claim element would not be -- would no longer be met, and then

17   there would be no infringement.

18   Q.    Were you finished with your answer?

19   A.    Yes, uh-huh.

20   Q.    But you didn't present any evidence to the jury that the

21   TP-Link products actually do implement figure 26-7, did you?

22   A.    Well, actually -- I mean, this is -- you know, this is

23   from the standard so, you know, there's -- but I've -- with

24   regard to the specific products, no, this is an example of an

25   alternative that the product could be using.

1  Q.   Is the answer to my question, no, you did not provide any

2  evidence to the jury that the TP-Link products actually use

3  26-7?

4  A.   Well, I mean, I -- this could be considered evidence, but

5  I -- if -- it's really an example.

6  Q.   Did you show the jury a document from TP-Link that shows

7  the accused products use 26-7?

8  A.   No, I don't believe I did.

9  Q.   Did you show the jury source code from the accused

10  products that show that they used 26-7?

11  A.   No, I did not.

12  Q.   Did you show the jury any type of deposition testimony or

13  trial testimony from anyone that suggests that the TP-Link

14  products actually do use 26-7?

15  A.   Well, I mean, you know, that's a very complicated

16  question because there are -- you know, there is a lot of

17  testimony that's been presented here, you know, related to

18  this particular standard, and there may be some relationship

19  between some piece of that and this.  So, you know, I'm not

20  certain of how to answer that.

21  Q.   Whose deposition testimony did you play -- present to the

22  jury where they said, I'm familiar with the TP-Link products

23  and they don't implement 26-8 like Doctor Shoemake says they

24  implement 26-7?  Who said that?

25  A.   I don't recall.

1    Q.    Anybody say that in this trial?

2    A.    I don't recall that.

3    Q.    In fact, your opinion on the '259 Patent basically boils

4    down to TP-Link may not infringe.  Right?

5    A.    I think it's -- I think it's stronger than that.  I think

6    it's -- it's that -- it's -- it's actually quite unlikely that

7    TP-Link infringes.

8    Q.    Oh.  What evidence have you cited to the jury to show

9    that it is more likely than not that TP-Link uses 26-7 and not

10   26-8.

11   A.    Oh, this slide here I think is evidence of that.

12   Q.    The slide doesn't say anything about TP-Link products as

13   far as I can see, does it?

14   A.    No, it -- well, it's -- of course, it's related in the

15   sense that this -- this is, you know, another method in the

16   standard that could be employed by the products.

17            MR. GRINSTEIN:  Your Honor, objection,

18   non-responsive.  Move to strike.

19            THE COURT:  The response begins with "no."  That's

20   responsive.  The remainder of the response is non-responsive.

21   I'll maintain the answer "no" and strike the rest of the

22   response.

23   Q.    (BY MR. GRINSTEIN)  Sir, another patent that you

24   discussed in your direct testimony was the '513 Patent.

25   Right?

```
1    A.   Yes, that's correct, uh-huh.

2    Q.   Atlas asserts infringement of claims 1 and 15 of that

3    patent.  Right?

4    A.   Yes, I believe that's correct, uh-huh.

5    Q.   But, again, in your testimony at trial, you didn't take

6    any issue with Doctor Shoemake's lining up the elements of the

7    '513 Patent with the WiFi 6 standard.  You didn't say that,

8    did you?

9    A.   I don't believe I did.

10   Q.   Instead --

11           MR. GRINSTEIN:  If we take a look at slide 23,

12   please.

13   Q.   (BY MR. GRINSTEIN)  -- you criticized Doctor Shoemake's

14   testing evidence as it relates to the '513 Patent.  Right?

15   A.   Yes, that's correct.

16   Q.   And your point was the testing evidence doesn't prove

17   that the TP-Link products actually implement those parts of

18   the standard.  Right?

19   A.   That's right.  I believe that's correct, uh-huh.

20   Q.   Of course, you didn't do any of your own testing.  Right?

21   A.   I didn't test this product.

22   Q.   And for that matter, you didn't show any TP-Link

23   documents or testimony that show that the method of the '513

24   Patent is actually not used by TP-Link.  Right?

25   A.   No, I didn't.
```

```
 1    Q.   And that's the same approach you followed with respect to

 2    the other patents in this case.  Right?

 3    A.   Well, there were -- I believe I had -- in these slides I

 4    outline different approaches.  So I would say no.

 5    Q.   For which patents did you challenge Doctor Shoemake's

 6    testimony that those patents line up with the WiFi 6 standard?

 7    A.   Yeah, I don't recall specifically, but the -- the -- I

 8    think, you know -- I mean -- yeah, I don't recall the specific

 9    slide, but I'd be happy to review the slides again.

10    Q.   You just gave your testimony like 20 minutes ago.  Right?

11    A.   Yes, uh-huh.

12              MR. GRINSTEIN:  You can take down that, please,

13    Mr. Spalding.

14    Q.   (BY MR. GRINSTEIN)  WiFi 6 enables communications in

15    excess of 2.4 gigabits per second.  Right?

16    A.   Right.  I -- I would -- I would be more careful and say

17    that the WiFi -- WiFi 6 in the -- in the standard associated

18    would allow products to be designed that support data rights

19    like -- higher data rates like that.

20    Q.   It also permits simultaneous communications in both the

21    downlink and uplink directions.  Right?

22    A.   Once again, I think to be more precise the WiFi 6

23    protocol has modes in it that allow the communications of that

24    type.

25    Q.   It has modes in it that enable operations in crowded
```

1  environments.  Right?

2  A.   There are modes in WiFi 6 -- well, that would -- yeah,

3  improve communications in a crowded environment.

4  Q.   WiFi 5 had techniques for simultaneous multiuser

5  communications on the downlink from an access point to

6  multiple stations.  Right?

7  A.   Right.  That's the MU MIMO feature that we discussed

8  earlier.

9  Q.   But WiFi 6 introduced MU MIMO on the uplink.  Right?

10 A.   Right.  It added an optional feature for MU MIMO on the

11 uplink.

12 Q.   In your direct testimony you mention that there were

13 features of WiFi 6 that were not covered by the patents in

14 this case.  Right?

15 A.   Yes, I believe I did.

16 Q.   And I think you mentioned two specific examples that were

17 not covered by the asserted claims.  Is that right?

18 A.   Yes, I believe I covered a number of examples, uh-huh.

19 Q.   Well, in slide 36 of your presentation, you mentioned

20 midambles.  Right?

21 A.   Yes, that's correct, uh-huh.

22 Q.   And you said midambles are not covered by any asserted

23 claim in these patents.  Right?

24 A.   Yes, I did, uh-huh.

25 Q.   Were you here for Mr. Weinstein's testimony yesterday?

1    A.   I believe I was here for part of Mr. Weinstein's

2    testimony, uh-huh.

3    Q.   Did you hear him testify that he excluded midambles from

4    the 92 cents -- I'm sorry, the 92-cent Atlas licensing rate?

5    A.   Yeah, I don't recall.  He may have, uh-huh.

6    Q.   Did you hear him say that by excluding midambles, that

7    was one of the reasons 92 cents went down to 79 cents?

8    A.   Yeah, he may well have said that.  I don't recall that

9    specific testimony.

10   Q.   He may well have said that, but you didn't put on your

11   slide, by the way, Atlas excluded this from damages, did you?

12   A.   Well, no, because this -- in fact this slide was

13   generated before that testimony.  Right?  So, yeah --

14   Q.   You didn't update the slide, did you?

15   A.   Well, no, no.

16        MR. GRINSTEIN:  Can we see slide 39?

17   Q.   (BY MR. GRINSTEIN)  Slide 39 relates to BSS.  Is that

18   correct?

19   A.   Well, no.  Specifically it's BSS coloring is what it's

20   referring to.

21   Q.   I'm sorry.  BSS coloring.  Correct?

22   A.   Yes, that's correct.

23   Q.   Were you here for Mr. Weinstein's testimony when he said

24   he excluded BSS coloring from the 92-cent Atlas licensing

25   rate?

1    A.    Yeah, I may have been present, uh-huh.

2    Q.    And that's one of the reasons 92 cents went down to 79.

3    Right?

4    A.    I'm not certain of that, but, yeah, I wouldn't disagree

5    with that.

6    Q.    And when you were saying the asserted patents in this

7    case don't cover BSS coloring, you didn't also mention to the

8    jury and, by the way, Atlas excluded those from their damages,

9    did you?

10   A.    No, I didn't mention it.

11            THE COURT:  Counsel, approach the bench, please.

12            (The following was had outside the hearing of the

13            jury.)

14            THE COURT:  How much longer do you expect the cross

15   to be?

16            MR. GRINSTEIN:  Five to 10 minutes.

17            THE COURT:  And do you have redirect?

18            MR. MAYLE:  Ten minutes.

19            THE COURT:  We're going to need a recess in about 10

20   minutes so let's see if we can speed things up.

21            MR. GRINSTEIN:  Yes, sir.

22            (The following was had in the presence and hearing

23            of the jury.)

24            THE COURT:  Please continue, counsel.

25            MR. GRINSTEIN:  Now, may I please see slide 37 from

824

1    Doctor Hansen's presentation?

2    Q.    (BY MR. GRINSTEIN)  This is a slide that you put up about

3    OFDMA.  Is that correct?

4    A.    Yes, it is, uh-huh.

5    Q.    And in this slide you state a submission to the IEEE by

6    LG.  Is that correct?

7    A.    No, actually that's not correct.

8    Q.    I'm sorry.  What did I get wrong?

9    A.    Well, it's actually a submission from Doctor Suhwook Kim.

10    The submissions to IEEE on 802.11 are made on an individual

11    basis.

12    Q.    I'm sorry.  I apologize.  And did you mention the date of

13    this slide that says, OFDMA gain is not much?

14    A.    I don't -- I don't recall if I did, uh-huh.

15    Q.    The date's January 2017, isn't it?

16    A.    That's -- that's right.  That's -- that's what's on the

17    slide.

18    Q.    The WiFi 6 standard was not finalized until September

19    2020.  Right?

20    A.    I don't -- I don't recall the exact date, but it would

21    be -- it would be in that neighborhood that the last sponsor

22    ballot was conducted.

23    Q.    The first WiFi-certified products like phones and access

24    points, those didn't start rolling out until late 2019.

25    Right?

1  A.   I don't recall the exact date, but I do recall that --

2  that there were -- there were early WiFi 6 products available

3  in 2019.

4  Q.   You didn't cite to the jury any evidence about OFDMA

5  gains from after the time that the WiFi 6 standard was

6  finalized, did you?

7  A.   I don't believe I did.

8  Q.   You didn't cite to the jury any actual evidence about

9  released products and the OFDMA gains they experienced as to

10 the WiFi 6 standard, did you?

11 A.   No, I don't believe I did.

12         MR. GRINSTEIN:  Your Honor, may I obtain a box of

13 the --

14         THE COURT:  You may.

15 Q.   (BY MR. GRINSTEIN)  Do you remember earlier in this trial

16 we've been talking about this TP-Link router box that you can

17 go to the local Walmart and buy?

18 A.   I think I've seen that box, yeah, this week, yes, uh-huh.

19         MR. GRINSTEIN:  Ma'am, may we please use the elmo?

20 Q.   (BY MR. GRINSTEIN)  There we go.  Do you see the second

21 bullet on this box?  It says, connect more, stay fast?

22 A.   Yes, I do, uh-huh.

23 Q.   This box from TP-Link says, "Supports MU MIMO and OFDMA

24 to reduce congestion and quadruple your average throughput."

25 Is that what this box says?

1    A.    Yes, that's what it says, uh-huh.

2    Q.    Is TP-Link lying to the folks around here in Marshall

3    about how good their products are?

4    A.    I really don't know.

5    Q.    You don't know if TP-Link is lying?

6    A.    I don't believe --

7                MR. MAYLE:  Calls for speculation.

8                THE WITNESS:  I don't have any information.

9                THE COURT:  Just a minute, Doctor Hansen.  When

10    there is an objection raised, the witness needs to stop

11    talking.

12                THE WITNESS:  Sorry.

13                THE COURT:  I'll sustain the objection.  It does

14    call for the witness to speculate about TP-Link's motives.  I

15    think you made your point.  Let's move on, please.

16                MR. GRINSTEIN:  Your Honor, no further questions.

17    Pass the witness.

18                THE COURT:  Okay.  Is there redirect?

19                MR. MAYLE:  Yes, Your Honor.

20                THE COURT:  Then let's proceed with redirect.

21                        REDIRECT EXAMINATION

22    BY MR. MAYLE:

23    Q.    Doctor Hansen, which party bears the burden of proof on

24    infringement?

25    A.    It's the Plaintiff has the burden of proof.

1   Q.   Does the Defendant have to prove that it doesn't

2   infringe?

3   A.   No, it does not.

4   Q.   You testified that you didn't talk to people at Broadcom,

5   Qualcomm, MediaTek, and Intel.  Correct?

6   A.   That's right.  That's correct.

7   Q.   Did Doctor Shoemake present any evidence that he talked

8   to any of those people?

9   A.   I don't believe he did, no.

10  Q.   And did Doctor Shoemake look at any Qualcomm or MediaTek

11  source code?

12  A.   My understanding is that he did not, no.

13  Q.   And did you?

14  A.   I actually reviewed some Qualcomm source code in this

15  case, uh-huh.

16  Q.   Did you look at every piece of evidence that Doctor

17  Shoemake submitted when he tried to show infringement in this

18  case?

19  A.   I -- I believe -- I've reviewed a lot of documents.  I

20  believe I reviewed, you know, most of them, if not all of

21  them, uh-huh.

22  Q.   Did you go out and try to look for more evidence on your

23  own?

24  A.   No, I did not.

25  Q.   Mr. Grinstein asked you if you did testing on your own.

1    Do you remember that?

2    A.    Yes, yes.

3    Q.    And did you?

4    A.    No, I did not.

5    Q.    And you talked about the wire shark testing.  Do you

6    remember that that Doctor Shoemake did?

7    A.    Yes.

8    Q.    Is that type of testing, is that sufficient to show

9    infringement?

10    A.    No, it's not.

11    Q.    Would it show non-infringement?

12    A.    No, it really wouldn't show that, either.  It wouldn't be

13    sufficient to show that.

14    Q.    Mr. Grinstein asked about the letters.  There was three

15    letters that were sent to someone in California.  Do you

16    remember that?

17    A.    Yes, I do.

18    Q.    And did you go and talk to those recipients to see what

19    they did with the letters?

20    A.    No, no, I did not.

21    Q.    Did Doctor Shoemake present any evidence that he talked

22    to these people?

23    A.    No, I don't believe he did.

24    Q.    Have you seen any evidence from Atlas that they talked to

25    those people?

1    A.   I mean, other than the letters themselves, no, not that

2    I'm aware of.

3    Q.   Mr. Grinstein asked you if you were here for Ms. Sun.

4    Correct?

5    A.   Yes, I he did.

6    Q.   Do you know if Ms. Sun is an engineer?

7    A.   I don't believe she is an engineer, no.

8    Q.   Do you believe she's an expert on WiFi?

9    A.   No, I don't believe she's an expert on WiFi.

10   Q.   If you wanted to know about the accused products, is she

11   someone that you would have talked to?

12   A.   No.

13   Q.   Mr. Grinstein asked you if you talked to the engineers at

14   TP-Link.  Correct?

15   A.   That's correct.

16   Q.   Did those people at TP-Link design the WiFi chips that

17   are in the products?

18   A.   No.  My understanding is they did not.

19   Q.   Is there any reason you didn't talk to those people?

20   A.   I don't have a specific reason, but, no, I didn't speak

21   to anyone at TP-Link.

22   Q.   Did you provide a damages opinion in this case?

23   A.   No, I did not.

24   Q.   Are you a damages expert?

25   A.   No, I'm not a damages expert.

1  Q.   Mr. Grinstein asked you about whether Mr. Weinstein,

2  their damages expert, excluded certain features.  Do you

3  remember that?

4  A.   Yes, he did, yeah, uh-huh.  I remember his questions,

5  yes, uh-huh.

6  Q.   Was that midambles?

7  A.   I believe the question he had was related to midambles.

8  Q.   Were there other benefits that you discussed that are new

9  to WiFi 6 other than midambles in your direct testimony?

10  A.   Yes, I think I mentioned others, yeah, uh-huh.

11  Q.   Did you mention 1024 QAM?

12  A.   Yes, I did, uh-huh.

13  Q.   Did Mr. Weinstein exclude 1024 QAM from his numbers?

14  A.   I'm not certain, but I don't believe he did.

15  Q.   How about target wake time?

16  A.   I don't recall Doctor Grinstein [sic] describing target

17  wake time.

18          MR. MAYLE:  Pass the witness.

19          THE COURT:  All right.  Is there further cross?

20          MR. GRINSTEIN:  No, Your Honor.

21          THE COURT:  You may step down, Doctor Hansen.

22      Ladies and gentlemen of the jury, we are going to take

23  this opportunity to have a short recess.  If you would simply

24  close and leave your notebooks in your chairs.

25          While on recess, please remember to follow all my

1    instructions, including not to discuss the case with each

2    other.  And we'll be back shortly to continue with the next

3    Defense witness.

4        The jury's excused for recess.

5            (Whereupon, the jury left the courtroom.)

6            THE COURT:  The Court stands in recess.

7                (Brief recess.)

8            THE COURT:  Be seated, please.

9        Are the Defendants prepared to call their next witness?

10            MR. BELL:  Yes, Your Honor, we are.

11            THE COURT:  Let's bring in the jury then.

12            (Whereupon, the jury entered the courtroom.)

13            THE COURT:  Please be seated, ladies and gentlemen.

14        Defendants, call your next witness.

15            MR. BELL:  Your Honor, Defendants call via

16    deposition designation Evan Woolley.  He's vice president for

17    Acacia Research Group, LLC.

18        Total run time on the video is 2 minutes and 34 seconds

19    of which 1 minute and 23 seconds is allocated to Defendants, 1

20    minute 11 seconds allocated to Defendant.

21            THE COURT:  Proceed with this witness by deposition,

22    please.

23                    EVAN WOOLLEY

24            BY SWORN VIDEOTAPED DEPOSITION

25    Q.  Can you please state and spell your name for the record?

1    A.    Yes.  My name is Evan Woolley, and that's E-V-A-N

2    W-O-O-L-L-E-Y.

3    Q.    Mr. Woolley, what company do you work for?

4    A.    I work for Acacia Research Group, LLC.

5    Q.    Okay.  And, Mr. Woolley, what is your job title at

6    Acacia?

7    A.    My title is vice president, licensing.

8    Q.    Mr. Woolley, do you also do work for a company named

9    Atlas Global Technologies, LLP.?

10   A.    Yes, I do.  Or LLC, I believe, actually.

11   Q.    LLC.  Do you have a title at Atlas Global Technologies,

12   LLC?

13   A.    I don't have a specific title at Atlas.

14   Q.    It's my understanding that the Arcadyan lawsuit settled

15   with a lump sum payment.  Is that correct?

16   A.    The agreement is a settlement and patent license

17   agreement.

18          MR. BELL:  Your Honor --

19          THE COURT:  Go to the podium, counsel.  What's the

20   problem?

21          MR. BELL:  I forgot to request that the

22   Court -- respectfully request that the court be sealed as it's

23   going to address briefly confidential information of

24   Plaintiffs.

25          THE COURT:  Okay.  Then based on counsel's request,

1    I'll order the courtroom sealed, and I'll direct that those

2    present not subject to the protective order in this case

3    excuse themselves and remain outside the courtroom until it is

4    reopened and unsealed.

5                          (Courtroom sealed.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23                          (Courtroom unsealed.)

24              THE COURT:  All right.  While the public is

25    returning to their seats, let me ask Defendants to call their

1    next witness.

2            MR. BELL:  Your Honor, Defendants call Dr. Thomas

3    McGahee.

4            THE COURT:  All right.  Doctor McGahee, if you'll

5    come forward, please, and be sworn.

6            (Whereupon, the oath was administered by the Clerk.)

7            THE COURT:  Please have a seat on the witness stand,

8    sir.

9        Mr. Bell, you may proceed with direct examination when

10   you're ready.

11           MR. BELL:  Thank you, Your Honor.

12               THOMAS McGAHEE, PhD., SWORN,

13               DIRECT EXAMINATION

14   BY MR. BELL:

15   Q.   Doctor McGahee, can you please tell the jury who you are

16   and why you are here?

17   A.   Yes.  Good morning.  I am Tom McGahee, I'm an economist,

18   and I was retained by TP-Link to evaluate Atlas' royalty

19   damages and the opinions that Mr. Weinstein has presented.

20   Q.   Doctor McGahee, where do you work?

21   A.   I work for a company called Analysis Group.  It's an

22   economic consulting firm, and I'm a vice president there.

23   Q.   What are your responsibilities at Analysis Group?

24   A.   Well, primarily my responsibilities are consulting for

25   clients, either economic or financial consulting, but I also

1    help manage our Dallas office.

2    Q.    Doctor McGahee, have you prepared slides to assist in

3    your testimony today?

4    A.    I have.

5    Q.    Doctor McGahee, I'd like to first direct your attention

6    to your slide about education and work experience.  Can you

7    please tell us about your education?

8    A.    Yes.  I earned my Bachelor in business administration as

9    well as my Ph.D. in economics both from the University of

10   Georgia in Athens, and I had two areas of specialization in my

11   Ph.D.

12   Q.    What are those areas of specialization for your Ph.D.?

13   A.    The first is econometrics, which is just a fancy word for

14   analyzing economic data.  And the second is industrial

15   organization, which just means the study of how businesses

16   make decisions and how they compete.

17   Q.    Doctor McGahee, when did do you receive your Ph.D.

18   A.    2011.

19   Q.    When you were earning your Ph.D., did you have any

20   teaching or research responsibilities at the University of the

21   Georgia?

22   A.    I did.  I taught courses in economics and also conducted

23   research on patent litigation actually under a grant from the

24   National Science Foundation.

25   Q.    Doctor McGahee, what did you do when you finished your

1    Ph.D.?

2    A.    I joined the Dallas office of Analysis Group, and my

3    family and I moved from Athens, Georgia, to Dallas, Texas.

4    Q.    And what type of work have you done at Analysis Group?

5    A.    It's solving economic problems and answering economic

6    questions for clients, much like I've been asked to do in this

7    case.  And, of course, I've also helped with recruiting and

8    training and those types of efforts at our Dallas office.

9    Q.    Have you done a damages analysis in a patent case before?

10   A.    Many times.

11   Q.    How many patent cases have you worked on?

12   A.    Over the last 12 years, I would estimate it's in the

13   range of 80 to 100 patent cases.

14   Q.    And are you always retained by the defendant in those

15   cases?

16   A.    I'm retained by the defendant in some cases and the

17   plaintiff in others.  It's the same economic tool kit I'd be

18   applying.

19   Q.    Doctor McGahee, do you have any notable former clients

20   that you would be able to identify for the jury that you've

21   done this type of work for?

22   A.    Sure.  I've been retained as a damages expert for

23   companies like Target and McDonald's and patent infringement

24   cases about their mobile apps and also done consulting for

25   many notable companies, including Qualcomm, Samsung, Verizon,

1    AT&T, many others.

2    Q.   Have you been invited to speak on patent infringement

3    damages outside of your consulting work?

4    A.   I was asked by the Boston Patent Law Association to give

5    an expert perspective on patent infringement damages last

6    fall, and every year I lead the training on patent

7    infringement damages for Analysis Group.

8    Q.   Since you joined the Analysis Group or -- Analysis Group,

9    have you also taught economics classes?

10   A.   I have.  So in addition to my consulting work, I also

11   held a lecture position at the University of Georgia back in

12   Athens from 2018 to 2022.

13   Q.   And did you teach any notable Georgia Bulldogs while you

14   were there?

15   A.   I did.  I actually taught our quarterback Stetson Bennett

16   who was an econ major among others, but nothing about

17   football.

18   Q.   What were your responsibilities at the University of

19   Georgia during that time when you were a lecturer?

20   A.   I certainly taught courses in economics at the

21   undergraduate level and at the graduate level in a program

22   called Master's of science in business analytics they needed

23   an econ class, so that was my role.

24        In addition to the teaching, I also supervised research

25   that econ major undergrads were performing as part of

 1    finishing their degree and writing their senior thesis.

 2    Q.    Doctor McGahee, did any of your classes cover topics

 3    relevant to patent infringement damages?

 4    A.    Absolutely.  So those topics would include economic

 5    incentives for technological innovation, R&D strategy, how do

 6    you protect that innovation, licensing and bargaining.  And in

 7    addition to those things, I try to fit into every class this

 8    concept that it's important, you know, to have a good strategy

 9    for research and development.

10    Q.    Was your teaching in those topics based in part on your

11    experience in the field?

12    A.    It was in part.  I taught using a combination of

13    textbooks, case studies from Harvard Business, and my own

14    experience in the field.

15    Q.    And can you give us an example of your experience?

16    A.    I can.  A few years ago, Harvard published this case

17    study about a major patent licensing dispute, one that made

18    the news, between Qualcomm and Apple.  And when I saw that

19    case study, I recognized, well, you know, I consulted for

20    Qualcomm on that case.  So in the classroom I taught using a

21    combination of that case study from Harvard and my own

22    experience working on the case, and I've heard from students

23    that they really enjoyed that.

24    Q.    Doctor McGahee, are you being compensated for your time

25    in this matter?

1    A.    Analysis Group is being compensated for my time on an

2    hourly basis.

3    Q.    And what is your hourly rate?

4    A.    They charge $650 per hour.

5    Q.    Would compensation for your services in this case be

6    dependent on the outcome of this trial?

7    A.    Not in any way.

8              MR. BELL:  Your Honor, at this time Defendants would

9    proffer Dr. Tom McGahee as an expert in economics and

10   calculation of patent damages in the case.

11             THE COURT:  Is there objection?

12             MS. FAIR:  No, Your Honor.

13             THE COURT:  Without objection, the Court will

14   recognize this witness as an expert in those designated

15   fields.

16        Please continue with your direct examination.

17             MR. BELL:  Thank you, Your Honor.

18   Q.    (BY MR. BELL)  Doctor McGahee, what were you asked to do

19   for this case?

20   A.    I was asked to do two things.  First, to provide an

21   independent evaluation of reasonable royalty damages if the

22   jury finds that TP-Link has infringed these five

23   patents-in-suit.

24        Secondly, I've been asked to evaluate the analyses and

25   opinions that Mr. Weinstein has presented.

1    Q.   Doctor McGahee, what is your understanding of TP-Link's

2    position on infringement of the patents-in-suit?

3    A.   My understanding is TP-Link's position is that they do

4    not infringe the patents-in-suit.

5    Q.   Why were you asked to evaluate damages if that is

6    TP-Link's position?

7    A.   So regardless of TP-Link's position, my role is to help

8    evaluate compensation to Atlas if the jury does find that

9    TP-Link has infringed the five patents-in-suit.

10   Q.   Did you consider materials in reaching your opinions in

11   this matter?

12   A.   I did; quite a bit.

13   Q.   What materials did you consider in forming those

14   opinions?

15   A.   There are a few buckets that I've shown on this slide.

16   The first is stuff from Atlas, the patents-in-suit, the

17   license agreements, and rate cards, and deposition testimony

18   about those license agreements.

19   Q.   Doctor McGahee, can you tell us a little bit more about

20   what you mean by rate cards?

21   A.   Yes.  This was what Mr. Yudell testified about earlier in

22   the trial.  I believe he described it as his sort of notes and

23   scratch work where sometimes that would result in an offer

24   that he was making to the licensee.  And so you get to see a

25   little bit of the math.

1   Q.   With respect to TP-Link, what information did you review?

2   A.   Well, I also had internal documents that TP-Link has

3   produced in the case, including their license agreements, and

4   also had deposition testimony from TP-Link witnesses.

5   Q.   And on the slide, there's a reference other information.

6   What is that referring to?

7   A.   Well, that includes the very exciting legal documents

8   that are produced as part of the case, and discovery responses

9   and so forth, but also my independent research where I'm going

10  out and researching these companies, the products and the

11  competitors, other patents that are relevant to the field.

12  And then I also got to read expert reports from both sides,

13  both parties, and prepare my own expert reports.

14  Q.   Doctor McGahee, have you been present here at trial

15  throughout the course of the evidence?

16  A.   I have.

17  Q.   And did you -- have you listened and incorporated that as

18  part of your analysis?

19  A.   Yes.

20  Q.   Doctor McGahee, based on that evidence, have you reached

21  opinions as to appropriate damages in this case?

22  A.   I have.

23  Q.   And did you have a high-level summary that you can

24  provide to us?

25  A.   I certainly can start with a high-level summary, and

1    we'll see where these numbers come from.  But at a high level,

2    if there is infringement of all five patents-in-suit, my

3    opinion is that a reasonable royalty would be a running

4    royalty of two-and-a-half cents per unit, and on past sales,

5    that totals $109,813.

6    Q.    Doctor McGahee, did you reach an opinion as to a lump sum

7    as well?

8    A.    I did.  So I also have an alternative opinion that if the

9    parties would negotiate a lump sum, then a reasonable royalty

10   would be in the range of $730,000 to $871,000 over the life of

11   the patents-in-suit, and that is based on application of a

12   lower royalty rate of 1.6 cents per unit, which accounts for

13   the time value of money.

14   Q.    And did you analyze Mr. Weinstein's opinions as well?

15   A.    Quite thoroughly, yes.

16   Q.    And do you have a high-level summary of your opinions as

17   to Mr. Weinstein's testimony?

18   A.    Yes.  Of his analysis in this case, my opinion is that

19   Mr. Weinstein's analysis in this case is flawed, unreliable,

20   and at least has significantly overstated claim damages.

21   Q.    Doctor McGahee, I would like to direct your attention to

22   reasonable royalty damages first.

23        With respect to reasonable royalty damages, did you apply

24   a framework?

25   A.    Yes.  I applied the same framework as Mr. Weinstein which

1    is called a hypothetical negotiation framework, and that's the

2    generally accepted framework for determining a reasonable

3    royalty.

4    Q.    And has -- could you describe the hypothetical

5    negotiation for this case?

6    A.    Yes, I will.  So essentially there's an economic question

7    that we need to answer, and that's why folks like me get

8    hired.  The economic question is, if the owner of the patents

9    and TP-Link had gotten together to negotiate a license to

10   these patents prior to the alleged infringement, what royalty

11   payment would they have agreed on at that hypothetical

12   negotiation.

13   Q.    And in this case when would the hypothetical negotiation

14   have taken place?

15   A.    January 2019, which is right around the time where

16   TP-Link began selling WiFi 6 wireless routers.

17   Q.    And who was the patent owner at that time?

18   A.    At that time it would have been Newracom.  This was prior

19   to the sale of their patent portfolio to Atlas.

20   Q.    Do you and Mr. Weinstein both agree on the date of the

21   hypothetical negotiation and the parties to the hypothetical

22   negotiation?

23   A.    In fact, we do agree on both of those points.

24   Q.    Within this hypothetical negotiation framework, are there

25   assumptions that you apply?

846

1    A.    Yes, there are the four assumptions I've listed on the

2    screen.

3    Q.    Can you tell us about the first assumption?

4    A.    Sure.  The first assumption is that Newracom and TP-Link

5    would enter this negotiation as a willing licensor and a

6    willing licensee, respectively.  So they're both willingly

7    choosing to negotiate with each other.

8    Q.    And what is the second assumption that you applied?

9    A.    The second is that they both would have reasonable

10   knowledge and expectations about relevant facts and

11   circumstances.  So, in other words, no one's hiding anything.

12   Q.    And what is the third assumption that you would apply?

13   A.    The third is that in this negotiation, the patents are

14   assumed to be valid and it's assumed that they would be

15   infringed in the absence of the license that the parties are

16   there to negotiate.

17   Q.    And what is the final assumption you would apply?

18   A.    The last one, so the parties must reach an agreement.

19   Neither side can just hold out and, you know, ignore the other

20   side; they have to actually come together and agree upon a

21   reasonable royalty.

22   Q.    And in this case, would Newracom's FRAND obligation apply

23   at the hypothetical negotiation?

24   A.    Yes, it would.

25   Q.    And how do you know that?

1  A.   Because Newracom had already signed a letter of assurance

2  to the IEEE prior to the date of this negotiation.

3  Q.   And what are the implications of that FRAND obligation on

4  the hypothetical negotiation?

5  A.   Right.  So remember the economic question is what royalty

6  payment would they have agreed upon.  The implication of the

7  FRAND obligation is that royalty payment that they agree upon

8  would be fair, reasonable, and non-discriminatory.

9  Q.   When you're evaluating the hypothetical negotiation, are

10  there particular factors that you apply?

11  A.   Well, there are--many.  And 15 of them are outlined in a

12  case called *Georgia-Pacific*.  I recall seeing Mr. Weinstein

13  put these up on the screen during his testimony, and I've

14  considered these same 15 factors.

15  Q.   And you considered all of them?

16  A.   Yes.

17  Q.   Are each of these factors of equal importance in every

18  case?

19  A.   That varies from case to case depending on the evidence

20  that's available in each case.  So in some instances we have

21  examples of royalties paid by others, license agreements.  In

22  some cases, if you can imagine this, we don't have any.  And

23  so the weight you can assign to each of these factors just

24  depends on what the evidence is that's available in each case.

25  Q.   When there's a FRAND obligations, like in this case, does

1    that affect the weight of any one of those factors?

2    A.    It does affect the weight of a few of these.

3    Q.    Can you give us an example?

4    A.    Sure.  I can give you an important example.  With respect

5    to factors 9 and 10 you see talking about advantages and

6    benefits, it's actually important in a FRAND case to not

7    consider the benefit or the value of complying with the

8    standard that the asserted patents are claimed to be essential

9    to.  So in this case, the WiFi 6 standard.

10   Q.    And what does it mean to not consider the value of

11   complying with the standard?

12   A.    Well, it just means that the royalty payment that the

13   parties are going to agree upon, it should reflect the value

14   of the specific technologies that are claimed in the asserted

15   patents, not the value of complying with the WiFi 6 standard

16   overall.

17   Q.    So in your analysis, which of the factors did you

18   identify as being most important?

19   A.    So in my analysis, I found the most important factor to

20   start with is the royalties paid by others.  Fortunately in

21   this case we have very good evidence of that.

22         From there, I made adjustments for certain other factors,

23   such as the scope of the license and the advantages and

24   benefits of these particular patents as compared to the

25   broader portfolio that others received in their licenses.

1    Q.   Were there any other factors you considered to be

2    important in this particular case?

3    A.   Yes.  I also accounted for other factors such as the

4    extent of use, customary royalties for similar inventions, and

5    the relative contributions.  This is factor 13, you see here,

6    says portion of profit credited to the patents.  Well, I

7    considered the relative contributions of the asserted patents

8    versus everything else that goes into making these products

9    successful.

10   Q.   Okay.  With respect to No. 1, at a high level, what

11   evidence did you consider in your evaluation of that factor?

12   A.   I considered all of the license agreements that Atlas has

13   produced, and I also considered the rate cards, deposition

14   testimony, and trial testimony that we've heard about those

15   agreements.

16        MR. BELL:  At this time, Your Honor, Defendants

17   respectfully request the courtroom be sealed to address

18   confidential information.

19        THE COURT:  All right.  Based on counsel's request,

20   I'll order the courtroom sealed to protect confidential and/or

21   proprietary information.

22        I'll direct that those persons present who are not

23   subject to the protective order in this case excuse themselves

24   and remain outside the courtroom until it is reopened and

25   unsealed.

1          And, Mr. Bell, please advise me when you've covered all

2     matters confidential and I can reopen the courtroom.

3               MR. BELL:  I will do so.  Thank you, sir.

4                    (Courtroom sealed.)

866

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23                    (Courtroom unsealed.)

24            THE COURT:  And I don't need hand signals from the

25    gallery.  Counsel at the table are competent to address what

867

1    needs to be addressed.

2         All right.  The courtroom is reopened and unsealed.

3    Please continue with your examination, Mr. Bell.

4    Q.   (BY MR. BELL)  Doctor McGahee, what other factors did you

5    consider in your analysis?

6    A.   I considered the relative contributions of TP-Link versus

7    the asserted patents to the commercial success of the accused

8    products.

9    Q.   Why did you consider that?

10   A.   Well, the reason this is important is that the negotiated

11   royalty payment should reflect the relative contributions of

12   the asserted patents and not value unrelated to the asserted

13   patents, such as value from TP-Link's contributions.

14   Q.   And what do you mean by TP-Link's contributions?

15   A.   Well, I have a few examples on this slide that based on

16   my research I found that industry analysis shows TP-Link

17   products are of high quality, are affordable, and that TP-Link

18   is an innovative company.

19   Q.   And how can you distinguish that the quality, for

20   example, comes from TP-Link and not from the patents-in-suit?

21   A.   Well, it's based on what you see here, that TP-Link is

22   rated as "our pick, the best WiFi router," and that's a list

23   of WiFi routers which generally include several that are WiFi

24   6, and yet TP-Link is rated at the top.

25   Q.   And how would that -- how would this factor affect the

868

1    outcome of the hypothetical negotiation?

2    A.    In my opinion, this would put downward pressure on the

3    negotiated royalty payment because of the importance of

4    TP-Link's contributions.

5    Q.    Doctor McGahee, do you have an understanding of a term

6    called royalty base?

7    A.    Yes.  A royalty base is a calculation that reflects the

8    extent of alleged use of the asserted patents.

9    Q.    Did you calculate the number of units of accused products

10   that TP-Link has sold?

11   A.    Yes.

12   Q.    And what was your calculation?

13   A.    I calculated through the end of the available sales data,

14   TP-Link has sold 4,392,532 units of accused products.

15   Q.    Would that be a royalty base for the running royalty?

16   A.    That's exactly right.

17   Q.    And have you calculated a royalty base for a lump sum

18   payment?

19   A.    I did so using two methods.  Using that flat-line

20   projection that I mentioned earlier, I calculated 45,602,254

21   units through the expiration of the patents-in-suit.  And then

22   using the other method, which I'll refer to as a product

23   lifecycle approach, I calculated 54,443,977 units through the

24   expiration of the patents-in-suit.

25   Q.    And what do you mean by a flat-line projection method?

1    A.    Well, a flat-line projection is one that assumes the same

2    sales from here through the expiration.

3    Q.    Okay.  And how did you apply this method, the flat-line

4    projection, to the facts of this case?

5    A.    I looked at the available sales data we had, and I looked

6    at the most recent four quarters, in other words, year's worth

7    of sales data, and I assumed that that same amount would

8    continue to be sold every year from now through the expiration

9    of the patents-in-suit.

10        And when I apply that quarterly average or annual amount

11    for the last four quarters going forward, that's how I get

12    that total of the 45.6 million total accused units through the

13    expiration.

14    Q.    And why did you think a flat-line projection would be

15    appropriate in these circumstances?

16    A.    This is consistent with methods Atlas has used for its

17    existing licensees.

18    Q.    What is a product lifecycle approach?

19    A.    Well, this is a way to think about what Mr. Weinstein

20    described doing.  Of course, I had to make a correction to his

21    calculation, but essentially he looked at where we are in the

22    lifecycle of WiFi 6 routers compared to the lifecycle of WiFi

23    5 routers, and he assumed that the growth going forward would

24    be at the same rate as actually experienced for WiFi 5 routers

25    at the same point in their lifecycle as we are in WiFi 6

1    today.

2    Q.   Okay.  And can you describe how that works with the

3    numbers?

4    A.   Sure, yeah.  So you can see some growth rates here, and

5    these are the same growth rates that Mr. Weinstein calculated

6    for the most recent four quarters of the WiFi 6 sales.  And

7    those are the numbers he has, but the numbers he needs are

8    what growth to expect going forward.  And how he calculated

9    that was based on what WiFi 5's growth rates were at the same

10   point in their lifecycle.

11   Q.   Now, do you agree with this approach?

12   A.   I don't agree with that assumption of exactly the same

13   growth as WiFi 5.

14   Q.   And why not?

15   A.   Because I have data to investigate that assumption.  And

16   based on that investigation, I found that, for example, in

17   these last four quarters that you see here, that growth is 78

18   percent of the growth that WiFi 5 was experiencing at the same

19   point in its life cycle.

20   Q.   What do you attribute the lower growth rates?

21   A.   Market saturation.  In other words, at some point we all

22   have WiFi routers and that starts to limit growth.

23   Q.   Did you address this lower growth rate in your

24   projections?

25   A.   I did.

1    Q.    And how did you do that?

2    A.    What I did was replace the projected growth rates that

3    Mr. Weinstein calculated with growth rates that assume instead

4    of 100 percent of the growth that we saw with WiFi 5, we'll

5    continue to see 78 percent of the growth that we had seen with

6    WiFi 5.  And so it's a very simple calculation to multiply the

7    WiFi 5 growth rate that Mr. Weinstein just accepted by the

8    actual ratio of what WiFi 6 growth looks like compared to WiFi

9    5.

10   Q.    Is that a significant difference between you and

11   Mr. Weinstein's opinions?

12   A.    It is strikingly significant because I have students who

13   would be happy with a 78 on a test instead of 100, but because

14   it's a projection over such a long period of time and this

15   difference compounds over time, when you make this one

16   correction, 78 percent instead of a hundred percent, it

17   actually reduces his result by cutting it in half.  So he's

18   projected about 110 or 111 million, and by making this one

19   correction, that collapses to 54.4 million.

20   Q.    I know that you spoke about it at the beginning of your

21   summary, but can you tell us your ultimate opinions as to the

22   outcome of the hypothetical negotiation?

23   A.    Yes, sir.  Now we've seen all the inputs into this.  So

24   my opinion is that the parties would negotiate a running

25   royalty payment structure, and that the rate would be

1   two-and-a-half cents per unit times the actual sales on an

2   ongoing basis.  Looking at the past sales that we have

3   available to us, that total is 4,392,532.  So the royalty

4   damages under a running royalty would be $109,813 on those

5   past sales.

6   Q.   Did you reach a second opinion?

7   A.   Yes.  In the alternative, in my opinion, if the parties

8   had negotiated a lump sum, then the lump sum royalty payment

9   would have been in the range of $730,000 to $871,000 based on

10   that royalty rate of 1.6 cents per unit, which accounts for

11   the time value of money, and the projected total sales through

12   the expiration of the patents-in-suit, which I've just

13   described.

14   Q.   Doctor McGahee, in addition to your analysis of the

15   -- what the hypothetical negotiation would be, did you also

16   evaluate Mr. Weinstein's opinions?

17   A.   I did.

18   Q.   At a high level, what are your -- what flaws have you

19   identified in Mr. Weinstein's analysis?

20   A.   So we can put them in these four buckets.  The first is

21   that there is no economic support for a 92-cent rate even as a

22   starting point for Mr. Weinstein's analysis.

23   Q.   What would be the second flaw you identified?

24   A.   The second is that Mr. Weinstein's analysis in this case

25   ignores all the economic evidence of a reasonable royalty that

1    you just heard me discuss.

2    Q.   And what is his third flaw?

3    A.   The third flaw is that 79 cents mathematically is still

4    far too high for only the five patents-in-suit.

5    Q.   And what is the final flaw that you identified?

6    A.   And the final flaw relates to his lump sum opinion

7    only--that is, when he uses projected future sales to

8    calculate that lump sum, he's overstated that projection, so

9    he's overstated his lump sum.

10            MR. BELL:  Your Honor, at this time, and for the

11   last time, I respectfully request that the courtroom be sealed

12   to address confidential information.

13            THE COURT:  At counsel's request, I will order the

14   courtroom sealed at this time.  Those present who are not

15   subject to the protective order in this case should exit the

16   courtroom and remain outside until it is reopened and

17   unsealed.

18                    (Courtroom sealed.)

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21                    (Courtroom unsealed.)

22          THE COURT:  All right.  The courtroom is unsealed.

23      You may continue with your direct examination.

24  Q.  (BY MR. BELL)  Doctor McGahee, is Mr. Weinstein's 79-cent

25  rate reasonable, in your opinion?

```
1   A.    No.

2   Q.    Why not?

3   A.    Because we're talking about a negotiated royalty payment

4   for only the five patents-in-suit, and 79 out of 92 is

5   obviously much, much more than five out of 38.

6   Q.    And if we do the math?

7   A.    Sure.  So five out of 38 is 13 percent of the portfolio,

8   whereas 79 out of 92 is 86 percent of the royalty rate.

9   Q.    You talked about Mr. Weinstein's projections.  Did you

10  identify another specific error in his projections using his

11  method?

12  A.    So his projection, recall, is that one based on growth

13  rates of WiFi 5, and it's the same error, but I have

14  identified the numbers that you see when you make this error,

15  and so that -- I can describe that, if that's helpful.

16  Q.    Which particular numbers should we -- should I direct you

17  to?

18  A.    Right.  So the number that I'm thinking of is what's the

19  first quarter where Mr. Weinstein makes this assumption 100

20  percent of the growth rate of WiFi 5, and that's this Q4 2022

21  number where he's assuming 30 percent growth that quarter

22  solely because that was the growth from WiFi 5, whereas what

23  we see above for WiFi 6 is the growth had been falling every

24  quarter before that.  So I call that a bump.  He projects a

25  bump.
```

1    Q.   What stands out to you about that bump?

2    A.   Well, it's just contradicted by the pattern that we see

3    above it because of this assumption of 100 percent of the

4    growth rate of WiFi 5.

5    Q.   So what does that mean -- is there a way for us to graph

6    this bump?

7    A.   Yeah.  I've created a graph where you can see the actual

8    growth rates from the data that we have, and that's in green

9    on the slide.  And then I've shown what Mr. Weinstein projects

10   for growth rates in the dashed red line.  And you can see the

11   bump that happens there at the very beginning of his

12   projection.

13       And then I've also graphed the corrected version where

14   instead of assuming 100 percent of the growth rate of WiFi 5,

15   we assume, consistent with the past sales data, 78 percent of

16   the growth of WiFi 5.  And that's the bump right there that

17   starts at the very beginning of his projection.

18   Q.   What does this bump mean for Mr. Weinstein's final sales

19   projection number?

20   A.   So to get from there to the final number, that error,

21   that bump gets compounded over time, and so the difference may

22   start small when you graph it out, but by the end of the data,

23   you know, the total projected sales end up being double under

24   Mr. Weinstein's projection, double the corrected projection.

25   Q.   And if we follow your corrected line?

```
1    A.    Right.  So my corrected line is the outlined green line

2    below Mr. Weinstein's on this slide.

3    Q.    And we see that there's a difference over time?

4    A.    Right.  That's right.  The difference grows over time

5    because growth rates, by their nature, compound over time.

6    Q.    Does that result in a difference in your opinions?

7    A.    Right.  Mr. Weinstein's opinion is more than double the

8    corrected number.

9    Q.    And so, in your opinion, Mr. Weinstein's number presented

10   to the jury is based on an error in his analysis?

11   A.    Absolutely.

12   Q.    And has Atlas used Mr. Weinstein's method of projecting

13   sales based on growth rates in the past?

14   A.    I've not seen any analysis where Atlas used

15   Mr. Weinstein's projections for -- in the past.

16   Q.    Is this the flat line projection that we saw earlier?

17   A.    We have seen this flat line projection before, yes, and

18   this is the one I discussed earlier in my testimony.

19   Q.    Was that the one that was used for the one license we

20   looked at earlier?

21   A.    This is.  And the reason that this is relevant is because

22   this is consistent with projections that determine what people

23   have been willing to pay, whereas we don't have any evidence

24   that anyone's ever been willing to pay a royalty based on

25   Mr. Weinstein's projection approach, even with my correction.
```

1    Q.    Okay.  To sum this all up, Doctor McGahee, can you

2    provide a summary of your conclusions briefly for the jury?

3    A.    I can, yes, very briefly.

4        So I have determined, based on my analysis of what

5    Mr. Weinstein has done, that his analysis and opinions in this

6    case have significant flaws which cause it to be unreliable

7    and significantly overstated.

8    Q.    And with respect to your analysis of the reasonable

9    royalty, can you remind us what that is?

10   A.    I can.  So my opinion is that the answer to that economic

11   question what would Newracom and TP-Link have agreed on for a

12   license to these five patents is a running royalty of

13   two-and-a-half cents per unit to be applied on an ongoing

14   basis, which for past sales totals $109,813, or, in the

15   alternative, if they had negotiated a lump sum, it would be in

16   the range of $730,000 to $871,000 based on applying a rate of

17   1.6 cents per unit to the projected sales.

18   Q.    Thank you, Doctor McGahee.

19           MR. BELL:  I pass the witness.

20           THE COURT:  Ladies and gentlemen, it's about 14, 15

21   minutes until noon.  We're going to break for lunch at this

22   point.

23       I'm going to ask you to take your juror notebooks with

24   you to the jury room for lunch.  It's either there or will be

25   shortly delivered by the Clerk's Office to you.  We're going

 1    to take about a 45-minute lunch break.  After that we'll be

 2    back in here and the Plaintiffs will proceed to cross examine

 3    this witness.

 4         Please follow all my instructions, including not to

 5    discuss the case with each other, enjoy your lunch, and we'll

 6    be back after that period of time to continue the process.

 7         The jury's excused for lunch at this time.

 8              (Whereupon, the jury left the courtroom.)

 9              THE COURT:  All right, counsel.  Be seated.

10         Is there anything that either party needs to raise with

11    the Court before we break for lunch?

12              MR. TRIBBLE:  Nothing from Plaintiff, Your Honor.

13              MR. REED:  Nothing from Defendants, Your Honor.

14              THE COURT:  All right.  We stand in recess for lunch

15    then.

16                   (Lunch recess.)

17              THE COURT:  Be seated, please.

18         Ms. Fair, are you prepared to proceed with cross

19    examination?

20              MS. FAIR:  Yes, Your Honor.

21              THE COURT:  All right.  You may go to the podium.

22         Doctor McGahee, if you'll return to the witness stand.

23              MS. FAIR:  And, Your Honor, would you like for me to

24    pass out binders now or wait for the jury?

25              THE COURT:  Let's do it now.

1          All right.  Let's bring in the jury, please.

2               (Whereupon, the jury entered the courtroom.)

3               THE COURT:  Welcome back from lunch, ladies and

4    gentlemen.  Please have a seat.

5          When we broke for lunch, the Defendant had passed the

6    witness, so we'll proceed with cross examination of Dr. Thomas

7    McGahee by the Plaintiff.

8          Ms. Fair, you may proceed.

9               MS. FAIR:  Thank you, Your Honor.

10                    CROSS EXAMINATION

11   BY MS. FAIR:

12   Q.   Good afternoon, Doctor McGahee.

13   A.   Good afternoon.

14   Q.   My name is Andrea Fair.  We haven't met before.  Right?

15   A.   We have not.

16   Q.   Now, I want to start where you started.  You started by

17   telling this jury that if the jury finds no infringement,

18   TP-Link pays nothing.  Right?

19   A.   I don't recall being asked that particular question, but

20   I do recall conditioning my testimony on a finding that it's

21   only relevant if the jury were to find infringement.

22   Q.   And this issue of whether or not the jury finds

23   infringement, that's what we heard Mr. Reed talk about.  We

24   got to make sure Atlas doesn't miss a single box that we

25   checked in the infringement analysis.  Right?

1    A.    Fair enough.

2              THE COURT:  Let me ask you to pull the microphone a

3    little closer, please, Doctor.

4              THE WITNESS:  Yes, Your Honor.

5              THE COURT:  We want to make sure we hear you.

6        Go ahead, counsel.

7    Q.    (BY MS. FAIR)  Then we heard Doctor Hansen tell us in

8    fact Atlas had checked every box; he just didn't think there

9    was enough evidence of that.  Right?  You were here for that?

10   A.    I was here for Doctor Hansen's testimony.  I don't recall

11   him saying Atlas had checked every box.

12   Q.    You're here because if that's all wrong, if TP-Link

13   misses its shot on goal to get a zero, you say, well, TP-Link

14   should pay less than what Atlas is asking.  Right?

15   A.    Well, the reason I'm here is not exactly what you

16   described.

17   Q.    You're here telling this jury that Atlas should pay

18   pennies per unit instead of 79 cents per unit.  Right?

19   A.    My reasonable royalty opinion is less than a dollar, if

20   that's what you mean.

21   Q.    It's pennies per unit, isn't it?

22   A.    It is in the range of 1.6 to 2.5 cents per unit.

23   Q.    So not even multiple pennies per unit.

24   A.    Yeah, it's interesting to think about a fraction of a

25   penny.

1    Q.    We heard in opening -- you were here for that.  Right?

2    A.    Yes, I was.

3    Q.    And we heard at the beginning of opening TP-Link tell us

4    what it wants is they want to be treated the same as everybody

5    else.  Right?

6    A.    That sounds familiar.

7    Q.    That the rate that everyone else gets, that's what we

8    should be looking at.  Right?

9    A.    I don't know if it was worded exactly that way, but the

10   sentiment sounds familiar.

11   Q.    And all of that comes from this letter of assurance that

12   we've been talking about.

13   A.    I don't know that that's the only place that comes from.

14   Q.    That's what Mr. Reed tied it to in his

15   opening--right?--fair, reasonable, and non-discriminatory.

16   You heard that, didn't you?

17   A.    I heard his opening.

18   Q.    And he said TP-Link just wants to be treated the same as

19   everyone else.

20   A.    Yes, I think that's right.

21          MS. FAIR:  Mr. Spalding, can we please have JX 29?

22   Q.    (BY MS. FAIR)  This is that letter of assurance.  Right?

23   A.    Yes, it appears to be.

24   Q.    And you know that this is a form that companies that

25   participate in the standard-setting process fill out.

```
 1   A.   Yes.

 2   Q.   And you know that the patent committee at the IEEE writes

 3   this letter of assurance, this form.  Right?

 4   A.   You're asking if they write a form.  The form comes to

 5   exist and someone signs it.  So, yes, it's provided to a

 6   potential participant who is contributing patents to the

 7   standard and that contributor can choose to fill out and sign

 8   the form.

 9   Q.   Yeah.  And somebody has to write the form.  I mean, it

10   doesn't just appear.  Somebody writes it.  Right?

11   A.   To date, yeah.  The AI doesn't do that yet.

12   Q.   And the patent committee of the IEEE is who writes that

13   form?

14   A.   Sure.  I'll accept that representation.

15   Q.   Well, you told this jury earlier about all your

16   experience with FRAND and patent licensing.  You surely know

17   that the people who put this form together and decide what it

18   says is the patent committee at the IEEE.  Right?

19   A.   I don't think that's relevant where the form originates

20   in terms of, you know, who creates the blank form.

21            THE COURT:  Doctor McGahee, it's not your job to

22   determine what's relevant or not.  If Mr. Bell thinks the

23   question's been asked that's not relevant or improper under

24   the rules, he'll object.  You are here to answer the questions

25   unless I instruct otherwise.  Okay?
```

1           THE WITNESS:  Yes, Your Honor.

2           THE COURT:  Let's proceed.

3    Q.   (BY MS. FAIR)  And so everybody who completes this form

4    is working from the same document.  Right?

5    A.   Yes.

6    Q.   I mean, that's what a form is.

7    A.   Sure.

8    Q.   Would it surprise you to know that the patent committee,

9    when they put this form together, they have outside counsel

10   involved?

11   A.   No, that would not surprise me.

12   Q.   And it's not hard to write everybody should pay the same

13   rate, is it?

14   A.   I suppose not.

15   Q.   That's not what this letter says, though, is it?

16   A.   Those words are not here.

17           MS. FAIR:  Mr. Spalding, can we go to page 2?

18   Q.   (BY MS. FAIR)  The commitment is the submitter, that's

19   the contributor you were talking about that fills out this

20   form.  Right?

21   A.   Right.

22   Q.   In this case Newracom, and Atlas now has that obligation.

23   A.   Right.

24   Q.   "Will grant a license under reasonable rates to an

25   unrestricted number of applicable discounts on a worldwide

1    basis with reasonable terms and conditions that are

2    demonstrably free of unfair discrimination."  That's what it

3    says.  Right?

4    A.    Absolutely right, yes.

5    Q.    And to be clear, it's not impossible to have discounts

6    under FRAND terms and conditions.  Right?

7    A.    That's not impossible.  I agree.

8    Q.    And did you know that the IEEE patent committee has since

9    clarified that a reasonable rate can consider existing

10   licenses where the circumstances and resulting licenses are

11   sufficiently comparable to the circumstances as the

12   contemplated license?

13   A.    Everything you said sounds reasonable and fair, yeah.

14   Q.    They didn't change it to say everybody pays the same

15   rate, did they?

16   A.    That's right.

17   Q.    And we've been hearing about similarly-situated

18   licensees.  Right?

19   A.    Yes, I'm familiar with that term.

20   Q.    And I think in your report at least your opinion was that

21   we should be looking at similarly-situated licensees, that's

22   how we know what TP-Link should be paying.

23   A.    It's one of the considerations in my report, yes.

24   Q.    We heard criticism during Mr. Yudell's cross examination

25   of his use of that term, but that's not just his words.

1    Right?  I mean, you've used those words.

2    A.    I'm going to need it one more time.  Mr. Yudell's use of

3    which words?

4    Q.    Similarly-situated?

5    A.    Licensees?

6    Q.    Licensees.

7    A.    I don't -- I don't think I can characterize whether it

8    was criticism, but I did hear the cross examination you're

9    asking about.

10   Q.    Well, you wouldn't criticize him for using those words,

11   would you?

12   A.    For using the words similarly-situated licensees?  No.

13   Q.    And a licensee who fights all the way through trial and

14   says, make sure they check every box, and then says, well,

15   they checked them all, but there wasn't enough proof; well, we

16   just want a penny-and-a-half on the dollar, that's not

17   similarly-situated to someone who comes to the table and takes

18   a license before they even respond to a lawsuit or get sued in

19   the first place.  Right?

20   A.    Yes and no.

21   Q.    You know Atlas has discounts.  Right?

22   A.    I've heard Mr. Yudell describe discounts.

23   Q.    You're not suggesting these are made up, are you?

24   A.    I'm not suggesting they're made up, no.

25   Q.    I mean, you were here for Mr. Yudell's testimony.  Right?

1    A.   Yes.

2    Q.   And you know that when Atlas bought the patents, they

3    didn't just haphazardly go into trying to license the WiFi 6

4    industry.  Right?

5    A.   I agree.

6    Q.   They hired a FRAND expert.  Right?

7    A.   Yes.

8    Q.   And you don't quibble with Mr. Weinstein's qualifications

9    as a FRAND expert, do you?

10   A.   I do not.

11   Q.   They didn't hire an investment banking firm.  Right?

12   A.   Not to my knowledge.

13   Q.   They didn't hire an academic.  Right?

14   A.   Not to my knowledge.

15   Q.   They hired a man who had decades of experience and has

16   been dealing with FRAND for more than 15 years.  Right?

17   A.   Mr. Weinstein, yes.

18   Q.   Uh-huh.  And in your direct, I think you told the jury,

19   if I heard you right, that you had been retained for something

20   like 80 to 100 consulting cases.  Is that right?

21   A.   That was not my testimony.

22   Q.   Consulting matters?

23   A.   The question that I was asked when I said 80 to 100 was

24   not -- didn't have the word 'retained' in it.

25   Q.   You testified about 80 to 100 cases to this jury.  Right?

1    A.    That's correct.

2    Q.    You didn't tell the jury, though, that you weren't the

3    one retained on those cases, did you?

4    A.    The word 'retained' was not in there, so that's right.

5    Q.    You were working in a supporting role in those cases.

6    Right?

7    A.    I was part of the consulting team on those cases, yes.

8    Q.    You personally have only been retained -- this would be

9    your sixth case to offer an opinion in your own name.  Right?

10   A.    I don't have the number right in front of me.  It changes

11   on a regular basis.

12   Q.    You gave us your CV in this case.  Right, Doctor McGahee?

13   A.    I did.

14   Q.    And you told the jury about the McDonald's case you

15   worked on?

16   A.    Yes.

17   Q.    And that case was supposed to go to trial in July, I

18   believe it was.  Right?

19   A.    It was, yes.

20   Q.    But it ended up settling right before trial?

21   A.    The very last minute.

22   Q.    So this is actually the first time you've ever testified

23   at trial.  Right?

24   A.    That's right.

25   Q.    You've never testified in a FRAND case before at all.

1    Right?

2    A.    That's correct.  I've never testified in one.

3    Q.    And you personally have never offered an opinion as the

4    testifying expert in a FRAND case even at the report stage.

5    Right?

6    A.    That's right.  As the testifying expert, that's right.

7    Q.    So Atlas hired Mr. Weinstein, a FRAND expert.  Right?

8    A.    Yes.

9    Q.    And he gave them a report of his analysis at the very

10   beginning before they went out and tried to license anyone.

11   A.    Yes.

12   Q.    And that's JX 30.

13          MS. FAIR:  Mr. Spalding, can we have that?

14   Q.    (BY MS. FAIR)  You've seen this?

15   A.    I have, yes.

16   Q.    And if we turn to the first page, paragraph 2, this is

17   the summary.

18   A.    It is.

19   Q.    The idea of these discounts has been part of Atlas'

20   licensing program from the very beginning.  Right?

21   A.    From the beginning of Atlas' licensing program, yes.

22   Q.    And here Mr. Weinstein says -- he gives his 38- to

23   92-cent per unit rate, and then he says, "These rates would be

24   subject to an adjustment for volume discounts, willingness to

25   take an early license, the strength of the patent coverage

1    outside the United States."

2         This case is just about the U.S. patents.  Right?

3    A.    Yes.

4    Q.    "Other discounts and adjustments may also justify a lower

5    license rate," and the examples he gives are agreeing to an

6    upfront payment, and then at the end taking a license without

7    requiring Atlas to engage in patent infringement litigation.

8    Right?

9    A.    Yes, that's what it says.

10   Q.    That's what Mr. Weinstein, the FRAND expert, provided to

11   Atlas before it even started.

12   A.    Before litigation started, yes.

13   Q.    Before its licensing efforts started?

14   A.    Yes.

15   Q.    You just don't believe that Atlas's licenses match these

16   discounts.

17   A.    It depends what you mean by match.

18   Q.    You don't give credit to these discounts in Atlas'

19   licenses.  Right?

20   A.    Well, I'm not giving credit or not giving credit to the

21   discounts.

22   Q.    You just ignore them.

23   A.    That's fair, yeah.  I am ignoring them.

24              MS. FAIR:  Your Honor, at this time I'd ask that we

25   seal the courtroom.  I'm going to be talking about

1    confidential information related to the licenses.

2           THE COURT:  All right.  Based on counsel's request,

3    I'll order the courtroom sealed.

4         Those present who are not subject to the protective order

5    entered in this case should leave the courtroom at this time

6    and remain outside of it until it's reopened and unsealed.

7                    (Courtroom sealed.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15                            (Courtroom unsealed.)

16          THE COURT:  All right.  The courtroom is reopened.

17      Please continue, counsel.

18          MR. BELL:  Thank you, Your Honor.

19   Q.   (BY MR. BELL)  Now, Doctor McGahee, I want to direct your

20   attention back to the first part of the cross examination when

21   you were asked questions about your qualifications and

22   Mr. Weinstein's qualifications.

23      Now, when I made an offer -- a proffer to the Court about

24   whether or not you were qualified as an expert, you have a

25   recollection what Ms. Fair said?

1    A.    No objection.

2    Q.    And with respect to Doctor -- or my apologies.  With

3    respect to Mr. Weinstein, Mr. Weinstein may have a lot of

4    experience when it comes to FRAND.  Would you agree?

5    A.    Yes.

6    Q.    And he's testified a number of times at trial.  Correct?

7    A.    Yes.

8    Q.    Is Doctor Weinstein's opinions not subject to criticism?

9    A.    No.

10   Q.    As an expert, you can criticize the work of another

11   expert.  Correct?

12   A.    That's right.

13   Q.    And, in fact, here were you present when Mr. Weinstein

14   testified?

15   A.    I was.

16   Q.    During that testimony, were you aware of any discussions

17   of errors that had been made by Mr. Weinstein in his analysis?

18   A.    I recall an error in his analysis that was discussed.

19   Q.    And it was an error that he had -- had identified just

20   before trial.  Do you remember that?

21   A.    Yes.

22   Q.    And do you recall that he was asked questions about how

23   that was identified?  Is that right?

24   A.    Yes, I recall that.

25   Q.    Do you have a recollection of who identified the error to

1    him?

2              MS. FAIR:  Objection.  Your Honor, this is far

3    outside the scope of cross examination.

4              MR. BELL:  May I respond, Your Honor?

5              THE COURT:  What's your response?

6              MR. BELL:  Ms. Fair put the relevant qualifications

7    of the two witnesses side by side and just exploring further

8    the qualifications of Mr. Weinstein in regards to that putting

9    them side by side during cross examination.

10             THE COURT:  I don't know how who identified a

11   mistake for Mr. Weinstein falls within that area of

12   discussion.  You can certainly explore the fact that he said

13   on direct he made a mistake and he corrected it and he

14   certainly went through that, but I don't see any relevance or

15   probative value to go beyond what he testified to earlier.

16             MR. BELL:  Understood, Your Honor.

17             THE COURT:  And I don't see that putting side by

18   side qualifications opens the door to that.

19             MR. BELL:  Understood, Your Honor.

20             THE COURT:  All right.  I'll sustain the objection.

21   Not on a scope basis, but on a 403 basis.

22             MR. BELL:  Thank you, Your Honor.

23   Q.   (BY MR. BELL)  Doctor McGahee, during your review of

24   Mr. Weinstein's analysis, did you identify an error in his

25   analysis?

1    A.    I did.

2    Q.    And was that an error that was -- we characterized as the

3    bounce or the bump?

4    A.    Yes, that's right.

5    Q.    So you're aware of errors of Mr. Weinstein during the

6    preparation of his opinions in this case.

7    A.    Yes.

8              MR. BELL:  Pass the witness, Your Honor.

9              THE COURT:  Additional cross?

10             MS. FAIR:  Yes, Your Honor.

11                         RECROSS EXAMINATION

12   BY MS. FAIR:

13   Q.    Doctor McGahee, you were here when Mr. Park testified

14   about how that Houlihan Lokey analysis came together?

15   A.    Yes.

16   Q.    And he told us that it was just two months of work.

17   Right?

18   A.    He may have said that.  I'm not disputing it.

19   Q.    He told us there was no technical analysis that went into

20   it.  Right?

21   A.    I recall him saying that Newracom had done the technical

22   analysis.

23   Q.    For the paper that he put together to send out to

24   potential buyers, Newracom did the technical component and

25   Houlihan Lokey separately did the value component.  Right?

```
1    A.    That's not my recollection of his testimony.

2    Q.    Now, in this case there was definitely technical

3    analysis.  Right?

4    A.    Yes.

5    Q.    We had Doctor Shoemake come at $725 an hour.  Right?

6    A.    Yes.

7    Q.    He testified it cost more than $300,000 for his technical

8    work.  Right?

9    A.    Yes.

10   Q.    And then Mr. Weinstein, another $500,000 to get his

11   analysis put together.  Right?

12   A.    Yes.

13   Q.    That doesn't sound like the type of work that Houlihan

14   Lokey did, does it?

15   A.    I don't know one way or the other.

16              MS. FAIR:  Your Honor, I'm going to have to ask that

17   we seal the courtroom.

18              THE COURT:  All right.  Based on counsel's request

19   to protect confidential information, I'll order the courtroom

20   sealed.

21        I'll direct that those present who are not subject to the

22   protective order exit the courtroom and remain outside until

23   it's reopened and unsealed.

24                        (Courtroom sealed.)

25
```

1

2

3                           (Courtroom unsealed.)

4            THE COURT:  And, Doctor McGahee, you may step down.

5            THE WITNESS:  Thank you, Your Honor.

6            THE COURT:  Defendants, call your next witness.

7            MR. REED:  Your Honor, Defendants rest their case.

8            THE COURT:  All right.  Defendants have rested their

9   case in chief.

10       Does Plaintiff have a rebuttal case to present?

11           MR. TRIBBLE:  We are not going to present a rebuttal

12  case, Your Honor.

13           THE COURT:  All right.  Then in light of that,

14  subject to the Court's final instructions and closing

15  arguments, do both parties rest and close?

16           MR. TRIBBLE:  Plaintiff rests and closes, Your

17  Honor.

18           MR. REED:  Defendants as well, Your Honor.

19           THE COURT:  All right.  Ladies and gentlemen of the

20  jury, that means you have now heard all the evidence in this

21  case.

22       There are certain matters that I need to take up with the

23  parties and their counsel outside of your presence before I'll

24  be in a position to give you my final instructions on the law

25  and let the parties present their closing arguments to you.

1          Said another way, I'm about to let you go for the day at

2     2:15 in the afternoon.  The other side of that coin is I need

3     you back in the morning right on time at 8:30, at which time I

4     anticipate I'll be able to give you my final instructions and

5     then let both Plaintiff and Defendants present their closing

6     arguments to you.

7          After they've presented their closing arguments and I've

8     completed my instructions, that's the moment when I will say,

9     "Ladies and gentlemen of the jury, you may retire to the jury

10    room to deliberate on your verdict."  That's the moment I've

11    told you about all along that you go from being prohibited to

12    discussing the evidence you've heard to being required to

13    discuss the evidence among yourselves that you've heard over

14    the course of this trial as you work to reach a unanimous

15    decision on how to answer the questions that will be in that

16    verdict form that I will send back with you to the jury room.

17         But we are not at that point, so you are still under my

18    earlier instructions not to discuss the case with each other

19    and not to communicate about it in any way with anyone.

20         Please follow all those same instructions, please be safe

21    in your travel today and tomorrow morning.  Believe it or not,

22    I think there may be a few wet roads in East Texas.  It's been

23    so long, I'm not sure what any of us remember what a wet road

24    looks like.

25         Please take your notebooks with you as you leave the

1    courtroom and leave them closed on the table in the jury room.

2    Be safe and we'll see you in the morning.  You're excused for

3    the remainder of the day.

4              (Whereupon, the jury left the courtroom.)

5              THE COURT:  Be seated, please.

6         Counsel, just for informational purposes, we ended the

7    evidence with the Plaintiff having 42 minutes and 15 seconds

8    remaining and the Defendants having 5 hours and 25 minutes and

9    43 seconds remaining of designated trial time.

10        It is about 20 minutes after 2:00.  We're going to take a

11    brief recess until about 2:30.  When I come back at 2:30, I

12    will take up motions from either or both parties pursuant to

13    Rule 50(a) of the Federal Rules of Civil Procedure.

14        After I've heard your arguments and given you rulings on

15    any motions offered under Rule 50(a), then I'll conduct an

16    informal charge conference to discuss the working draft of the

17    final jury instructions and the verdict form.

18        As is typical in this court, if you are going to present

19    closing arguments tomorrow, you are not required to be present

20    for the remainder of what I will take up this afternoon.  You

21    may use that time to work on your closing arguments for

22    tomorrow.  There are certainly enough lawyers on both sides of

23    this case to cover the remaining portions of what are before

24    us.

25        Once I've completed that informal charge conference, I

1    will take the benefit of the discussions we've had and the

2    input you've given and I will generate what I believe to be

3    the final appropriate and proper final jury instructions and

4    verdict form, I'll deliver those to you with an opportunity to

5    review them, and then I'll conduct a formal charge conference

6    on the record where either party may tender such objections as

7    they believe the interests of their clients require.

8        I'd like to get that all done before we recess for today.

9    We'll see how it goes.  It is possible I would bring you back

10   at 8:00 in the morning to conduct the formal charge conference

11   tomorrow morning.  We'll see.  But I'd like to get as much

12   done today as we can.

13       All right.  Let's take about a 10-minute recess, and then

14   I'll be back to address motions under Rule 50(a).

15       The Court stands in recess.

16                      (Brief recess.)

17            THE COURT:  Be seated, please.

18       All right.  At this time the Court is prepared to

19   entertain motions that either party may wish to offer pursuant

20   to Rule 50(a) of the Federal Rules of Civil Procedure.

21       What I would like to do, counsel, is let each side

22   identify for me the substantive matters upon which you intend

23   to move, then I'll come back afterward and hear argument.

24   It's very typical, as many of you know, to have

25   diametrically-opposed motions that lend themselves to

1    concurrent argument, so I'll determine what the best way to

2    present the argument will be after you've identified for me

3    what you want to move on.

4        What does the Plaintiff care to move on, if anything,

5    pursuant to Rule 50(a)?

6            MR. HARRIS:  Your Honor, the Plaintiff has no

7    motions under Rule 50(a).

8            THE COURT:  Thank you Mr. Harris.

9        What do Defendants care to move on pursuant the Rule

10   50(a)?

11           MR. SAUL:  Your Honor, Andrew Saul for Defendants.

12       Defendants will move under 50(a) on five grounds.

13           THE COURT:  All right.  Why don't you list those

14   five grounds for me.

15           MR. SAUL:  The first ground is no direct

16   infringement of the asserted method claims based on

17   extraterritoriality.  The second ground is no direct

18   infringement of the single asserted apparatus claim based on

19   extraterritoriality.  The third ground is no pre-suit induced

20   infringement.  The fourth ground is no infringement based on a

21   failure of proof on the claim limitations.  And the fifth

22   ground is no reasonable jury could find the FRAND rate

23   proffered by Plaintiff because the damages theory is contrary

24   to law.

25           THE COURT:  Clarify for me, counsel, your fourth

1    ground is, in essence, you are asking for a judgment as a

2    matter of law of no infringement because you believe Plaintiff

3    failed to meets it burden of proof?

4              MR. SAUL:  Yes.

5              THE COURT:  All right.  I understand the first two

6    grounds are both based on territoriality.  I don't see any

7    reason why you shouldn't present combined argument on both of

8    those, and I'll hear from you on that first and then I'll hear

9    a response from Plaintiff.

10       If you're going to present the argument, please proceed.

11   If not, whoever's going to, please go to the podium.

12             MR. SAUL:  Thank you, Your Honor.  May it please the

13   Court.

14       Your Honor, no reasonable jury could find based on the

15   evidence presented at trial that Defendants have directly

16   infringed either the asserted method claims or the sole

17   asserted apparatus claim.

18       Specifically, on the asserted method claims there was no

19   evidence presented at trial that the Defendants themselves

20   have performed any of those method claims within the United

21   States.  It's Plaintiff's burden, of course, to prove

22   infringement.  It's lack of evidence entitles the Defendants

23   to JMOL on this claim.

24       Moreover, it is undisputed that Defendants are foreign

25   corporations with no presence in the United States.  Thus,

1    Defendants could not have performed the method in the United

2    States.  Plaintiff's expert Doctor Shoemake also testified

3    that he was unaware of any evidence that Defendants themselves

4    performed any of the asserted method claims within the United

5    States.

6        As to the apparatus claim, the evidence proved that

7    Defendants sell the accused products to TP-Link USA

8    Corporation outside of the U.S. in Hong Kong, as evidenced by

9    at least the FCA Hong Kong notation on the invoices of record.

10   Plaintiff's expert Doctor Shoemake confirmed this, testifying

11   on Tuesday that FCA Hong Kong signifies that TP-Link USA takes

12   delivery and then controls the accused products in Hong Kong.

13            THE COURT:  All right.  Let me hear a response from

14   the Plaintiff, please.

15            MR. LARSON:  Good afternoon, Your Honor.  Blaine

16   Larson on behalf of the Plaintiff Atlas.

17            THE COURT:  Please proceed, Mr. Larson.

18            MR. LARSON:  Let me split this into the direct

19   infringement and the indirect infringement.

20       Atlas is not asserting a direct infringement case on the

21   method claims, Your Honor.  There are no allegations of direct

22   infringement by performing the method claims for the eight

23   method claims in this case.

24       On the --

25            THE COURT:  Your only allegation of direct

1    infringement goes to the single apparatus claim?

2            MR. LARSON:  That's correct, Your Honor.  That's

3    claim 1 of the '513 Patent.  For claim 1, a reasonable jury

4    could find that that claim has been infringed because TP-Link

5    offers for sale WiFi 6 products on its website.

6        Doctor Shoemake testified about the 'shop now' feature

7    available on TP-Link's U.S. website, which is PX 10.  There's

8    testimony from Doctor Shoemake and Doctor Hansen that the

9    copyright of that website is owned by TP-Link Corporation, and

10   the terms of use of that website state that TP-Link

11   Corporation controls operation of the website.  And that's PX

12   19.

13       Additionally, a reasonable jury could find that TP-Link

14   directly infringes by importing the accused products into the

15   United States.  There was testimony and evidence that TP-Link

16   International ships the accused products to the United States.

17   That's JX 22, which were those sales invoices.

18            THE COURT:  All right.  Anything further?

19            MR. LARSON:  Nothing from Plaintiff, Your Honor.

20            THE COURT:  Anything additional from Defendants on

21   this?  I assume that's a yes since you walked back to the

22   podium.

23            MR. SAUL:  Yes, Your Honor.  My apologies.

24       Your Honor, there was compelling testimony that the

25   copyright at the bottom of the tp-link.com/us web page and the

1    terms of use on that web page referenced, I believe it was,

2    TP-Link Technologies because of a template that was adopted

3    from the Chinese entities.

4        As to the invoices, I believe they were referenced at

5    JX 22.  It's clear on the invoices that the delivery was FCA

6    Hong Kong.  So I don't know how -- how the invoices support

7    Plaintiff's case on that issue.

8            THE COURT:  Anything further?

9            MR. SAUL:  Not for Defendants.

10           THE COURT:  All right.  Thank you.

11       All right.  With regard to the first two issues raised

12   under Rule 50(a), I'll accept the representation by Plaintiffs

13   that they only seek to assert direct infringement as to the

14   single method claim and, accepting that, I see no basis to

15   otherwise grant the remainder of these -- or Defendants'

16   motion as to the remaining claims.

17       So we're certainly not going to submit to the jury a

18   question that Plaintiff doesn't even urge.  But as to the

19   remainder of what Plaintiff does urge, the Defendants' motion

20   in this regard is overruled.

21       All right.  Let's move to the third ground identified by

22   Defendants, which I believe was no pre-suit induced

23   infringement?

24           MR. SAUL:  Yes, Your Honor.

25           THE COURT:  Let me hear from Defendant on that.

960

1            MR. SAUL:  Your Honor, no reasonable jury could find

2    based on the evidence presented at trial that Defendants have

3    induced infringement of any asserted claim prior to the date

4    this lawsuit was filed.

5            Specifically, there was no evidence presented at trial

6    that the three pre-suit notice letters Plaintiff sent to

7    TP-Link USA Corporation were received by either of the

8    Defendants such that they might confer pre-suit notice, or

9    that Defendants were willfully blind to the asserted patents.

10           Again, this is Plaintiff's burden.  There was no evidence

11   presented that the two Defendants in this case, TP-Link

12   Technologies and TP-Link Corporation, were aware of those

13   letters.

14           THE COURT:  What says Plaintiff in response?

15           MR. LARSON:  Your Honor, Atlas sent three notice

16   letters to three different TP-Link employees on June 8th,

17   2021, which is prior to the date of this lawsuit.

18           Ms. Sun testified that TP-Link and TP-Link USA have a

19   common ownership.  So from that, a reasonable juror could

20   infer that those letters were passed along to TP-Link

21   Corporation.

22           Additionally, the distribution agreement between TP-Link

23   and TP-Link USA, which is JX 21, contains an indemnity

24   provision.  That indemnity provision requires TP-Link USA to

25   notify TP-Link Corporation and TP-Link Technologies of any

1    allegations of patent infringement in order for the parent

2    companies--or, apologies; not the parent companies--in order

3    for TP-Link Corporation and TP-Link Technologies to have an

4    indemnity obligation on behalf of TP-Link USA.

5         From that information, a reasonable juror could infer

6    that that information had been passed along to TP-Link

7    Corporation.

8              THE COURT:  Anything further, Mr. Larson?

9              MR. LARSON:  No, Your Honor.

10             THE COURT:  Any further response from Defendants?

11             MR. SAUL:  Yes, Your Honor.  Three brief things.

12        Mr. Larson mentioned that TP-Link USA Corporation

13   and the Defendants have common ownership.  Ms. Sun actually

14   testified that there was a restructuring about two months ago.

15   So at the time of the letters, that was not the case.

16        The indemnity provision in the letters, it's Plaintiff's

17   burden to prove that -- you know, that that provision was

18   adhered to, that that contact was made, and there's no

19   evidence of that.

20        One final thing, Your Honor.  The letters I understand do

21   not identify the patents by name or number, which would be

22   required to confer notice.

23             THE COURT:  All right.  Thank you, counsel.

24        The Court's persuaded there is adequate circumstantial

25   evidence for this issue to get to the jury.  Therefore, I'm

1    going to deny Defendants' motion under 50(a) in this regard.

2        Let's go to the fourth ground raised by the Defendants

3    which, as I understand it, is that Plaintiffs failed to put on

4    a prima facie case of infringement.

5        MR. SAUL:  Yes, Your Honor.

6        No reasonable jury could find that Defendants have

7    directly or indirectly infringed the asserted claims for the

8    additional reason that Plaintiff has failed to meet its burden

9    of proving that all limitations of any asserted claim are met

10   by any accused product.  This is for two reasons.

11       First, Plaintiff's expert Doctor Shoemake's purported

12   product testing and discussion of the WiFi 6 standard, WiFi

13   chip data sheets, and TP-Link marketing materials are

14   insufficient for a reasonable jury to conclude that all

15   limitations of any asserted claim are met by any accused

16   product.

17       For the vast majority of the claim limitations at issue,

18   Plaintiff and its expert provided only expert testimony that

19   the limitations cover certain functionality of the WiFi 6

20   standard.  However, inclusion in the standard does not mean

21   that a claim is practiced by Defendants' products, and for at

22   least one element of every asserted claim, Plaintiff's expert

23   provided no evidence to show that such functionality is in any

24   event implemented in the accused products.

25       Second, Plaintiff has failed to show that any accused

1    product is representative of other accused products in this

2    case.  Thus, assuming for argument's sake that Plaintiff

3    showed that any product infringes, that, of course, does not

4    mean that any other product infringes based on the failure of

5    proof as to representativeness.

6        In sum, Plaintiff does not -- did not submit sufficient

7    evidence to show that any of the 69 accused products meet each

8    and every claim limitation of any asserted claim.

9            THE COURT:  All right.  What's the response from

10   Plaintiff?

11           MR. HARRIS:  Your Honor, Defendants' motion should

12   be denied.  Atlas has shown substantial evidence that every

13   TP-Link accused product infringes every element of every

14   asserted claim.  The jury has more than sufficient basis to

15   find in Atlas' favor on this issue for every product.

16       In his testimony, Doctor Shoemake compared every asserted

17   claim limitation to every accused product and showed

18   infringement.  He testified, quote, "To summarize my findings,

19   I found based on all of that analysis that all of the asserted

20   claims of the asserted patents are infringed by the TP-Link

21   products."

22       To prove infringement, Doctor Shoemake analyzed a

23   significant body of evidence, including the WiFi 6 standards,

24   TP-Link's website and documentation, WiFi chip documentation

25   for each WiFi chip in each accused product, WiFi Alliance

1    certification and testing documentation, Broadcom and Intel

2    source code, Doctor Shoemake's own testing of the accused

3    products, deposition testimony of TP-Link's witnesses, and

4    TP-Link discovery responses, including TP-Link's response to

5    Interrogatory No. 3 in which TP-Link identifies the products

6    that are, quote, compliant with the WiFi 6 standard, close

7    quote.

8         For every limitation of every asserted claim, Doctor

9    Shoemake analyzed the claim limitation and concluded that it

10   is infringed based on one or more of the categories of

11   evidence I've just listed.  And I won't go through all of

12   those exhibit numbers because they're voluminous, but suffice

13   it to say they are in the record.

14        Doctor Shoemake also presented substantial evidence that

15   specific TP-Link accused products are representative of all

16   TP-Link accused products for purposes of determining

17   infringement.

18        First, Doctor Shoemake demonstrated that every accused

19   product is compliant with the WiFi 6 standard.  In addition to

20   TP-Link's response to Interrogatory No. 3 in which TP-Link

21   admits all of its accused products are WiFi 6 compliant,

22   Doctor Shoemake also analyzed technical and marketing

23   documents for each accused product and each chip showing that

24   each accused product is WiFi 6 compliant.

25        Second, Doctor Shoemake prepared compilation exhibits

1  PX 4, 5, 6, and 7, which list every accused product and cite

2  evidence for each.  For example, Doctor Shoemake testified

3  regarding PX 4, quote, "What you're seeing here in Plaintiff's

4  Exhibit 4 is a table.  So in this table I've listed -- on the

5  first column I've listed every single model number that

6  TP-Link identified as being compliant with WiFi 6, and the

7  middle columns, the second third and fourth columns, identify

8  the version number, and then also the number of the WiFi chip

9  name that's used in the product and then the supplier for that

10  chip.  And the last column identifies a reference to TP-Link

11  website and marketing documents that correspond to that

12  specific model number."

13      Each of these compilation exhibits corresponds to an

14  exhibit that includes the underlying technical infringement

15  evidence for each accused product that Doctor Shoemake

16  analyzed and testified about.  Those exhibits include PX 10,

17  11, 12, and 13.

18      Doctor Hansen had no meaningful rebuttal to Doctor

19  Shoemake's opinions.  His only response was to state that

20  Doctor Shoemake has not met his burden of proof, but that is

21  incorrect for the reasons I have just explained.

22      So, in summary, the motion should be denied.

23          THE COURT:  Anything further from Defendants on

24  this?

25          MR. SAUL:  No, Your Honor.

1          THE COURT:  This request for relief under Rule 50(a)

2     by Defendants is denied.

3          Let's next take up the request for relief under Rule

4     50(a) from Defendants regarding the damages claims and their

5     characterization as standard essential patents subject to a

6     FRAND commitment.

7          Let me hear from Defendants.

8          MR. SAUL:  Plaintiff's damages theory is contrary to

9     the *Georgia-Pacific* framework and should be rejected as a

10    matter of law.

11         Plaintiff's damages case is based on a theory that

12    Defendants, given they are litigating this dispute, are not

13    entitled to the discounts that Plaintiff purportedly granted

14    its prior licensees.

15         The Plaintiff's damages case ignores that the reasonable

16    royalty must be evaluated at the time of the hypothetical

17    negotiation, which the parties agree would have occurred in

18    January 2019.  At that point in time, there would have been no

19    basis for Newracom, the then owner of the patents, to withhold

20    from Defendants the same discounts Plaintiff purportedly

21    granted its prior licensees, as conceded by Mr. Weinstein.

22         Additionally, there's no basis not to apportion the rate

23    given the hypothetical license for Defendants would have been

24    to only 5/38ths of the families.

25         Further, as conceded by Mr. Weinstein, the hypothetical

1    negotiation framework requires the jury and the Court to

2    assume that the asserted patents were infringed and invalid

3    such that the parties would have willingly entered into a

4    license.  Under this framework, subsequent litigation conduct

5    is irrelevant because the law necessarily assumes a willing

6    agreement, not an adversarial litigation.  Plaintiff has

7    presented no evidence of damages beyond a theory, which is

8    contrary to law.

9        For these reasons, Defendants ask for judgment as a

10    matter of law of no damages.  Alternatively and in the event

11    there is infringement found, damages should be calculated

12    according to Defendants' expert testimony.

13            THE COURT:  Thank you, counsel.

14        Let me hear from Plaintiff in response.

15            MR. AIKEN:  Your Honor, Alexander Aiken on behalf of

16    the Defendants.

17        Defendants' motion should be denied.  First, Defendants

18    take issue with whether this was properly -- the hypothetical

19    negotiation was properly conducted.  Mr. Weinstein, as he

20    admitted in his testimony, used that hypothetical negotiation

21    framework, he walked through its assumptions, he walked

22    through its factors, he walked through which of those factors

23    were relevant here.

24        He explained why, in his opinion, TP-Link would be

25    entitled to certain of the discounts that Atlas offers under

1     its framework and why it wouldn't be entitled to others.  For

2     instance, it's not an early adopter at this point because we

3     are here years on after there have been other licenses taken

4     to the asserted patents.

5          He also agreed that the parties would be willing to enter

6     a license and, in fact, entered a license, and he gave an

7     opinion as to what those licensed amounts would be.

8          On their apportionment argument, they say that the

9     apportionment necessarily must be the -- whatever the royalty

10    rate from the licenses multiplied by 5/38ths.  That is a

11    quintessential expert disagreement that Atlas has presented

12    more than sufficient evidence to go to the jury on.

13         Mr. Weinstein took the royalty rate he derives from the

14    licenses and then apportioned out the benefits attributable to

15    other patents in Atlas' portfolio that are not asserted here.

16    The jury is free to credit that testimony over Doctor

17    McGahee's very simplistic mathematical calculations, which his

18    own dissertation calls into -- into question.

19         And so for that reason, Your Honor, there is simply here

20    -- a disagreement here about apportionment that cannot be

21    granted against Plaintiffs at this stage.

22         Thank you.

23              THE COURT:  All right.  Anything further from the

24    Defendants in response?

25              MR. SAUL:  Very briefly, Your Honor.

1      What I've just heard is a concession that the

2  hypothetical negotiation framework has not applied.  The

3  purported discounts granted by Atlas to its prior licensees

4  did not exist at the time of the hypothetical negotiation.

5      Thank you, Your Honor.

6          THE COURT:  All right.  Thank you, counsel.

7      With regard to the final area of relief requested under

8  Rule 50(a) by the Defendants concerning the issue of damages

9  and FRAND, the Court's going deny this motion.

10     Now, I do want to briefly revisit the first two issues

11 that we took up concurrently just to make sure there's no lack

12 of clarity in the record.

13     And I'll address this question to you, Mr. Larson.

14     It's my understanding that the Plaintiff is seeking a

15 verdict of induced infringement on all of the claims it has

16 raised from the asserted patents, both method and apparatus,

17 but it is seeking a finding of direct infringement only as to

18 the single apparatus claim that it's urged.  Is that correct?

19          MR. LARSON:  Yes, Your Honor.  And that single

20 apparatus claim is claim 1 of the '513 Patent.

21          THE COURT:  Well, I intend to submit any

22 infringement issues to the jury on that basis, and I'm

23 certainly not going to submit an issue of alleged or presumed

24 direct infringement on the method claims when the Plaintiff is

25 telling me on the record they're not urging direct

1    infringement as to the method claims.

2        But with that clarification, I'll also make it clear in

3    the record the remainder of Defendants' motion for relief

4    under Rule 50(a) with regard to both the single apparatus

5    claim and the several method claims is denied.  I just want to

6    be very clear in the record about where we are.

7        MR. LARSON:  Thank you, Your Honor.

8        THE COURT:  All right.  Does either party have

9    anything further for the Court with regard to motions under

10   Rule 50(a)?

11       MR. HARRIS:  Nothing further, Your Honor.

12       THE COURT:  Anything further from Defendants?

13       MR. SAUL:  No, Your Honor.

14       THE COURT:  All right.  I've got 2:58, counsel.  I

15   told you yesterday I wanted to see a new submission on the

16   charge and verdict form by 3:00, so I guess we have two

17   minutes to spare.

18       Can somebody represent to me where you are on that more

19   current iteration?

20       MS. SALINAS:  Yes, Your Honor.  We just received an

21   addition from the Defendants 30 minutes ago.  We're drafting

22   our response to it right now and will submit it to you in the

23   next minute.

24       THE COURT:  All right.  Let's do this then.  Let's

25   take a short recess.  I'll look for those documents by email

1    submission to my staff in the next minute or two, and as soon

2    as possible thereafter I'll have those of you that wish to

3    participate in the informal charge conference brought into my

4    chambers.

5        And we'll do this informally and off the record where I

6    can have a free-flowing discussion with both sides about not

7    only those areas in the proposals where you don't agree, but

8    any areas where the Court wants to probe you further, even if

9    you are in agreement as to those areas.

10       I welcome anybody who's made an appearance for any party

11   in the case to participate.  As I told your more senior

12   counsel earlier, if they're going to present closing

13   arguments, they don't need to be there, but anyone else that

14   would like to participate, you are more than welcome to

15   participate in the informal charge conference.

16       After I've had an opportunity to get the benefit of that

17   input informally, I'll make any adjustments that I think are

18   necessary and produce what I believe to be the appropriate

19   final jury instruction and verdict form, and I will get it to

20   you with an opportunity for you review it, and then I'll

21   proceed to conduct a formal charge conference on the record

22   where any objections can be made on the record.

23       So let's take a brief recess, and if those of you that

24   are going to participate in the informal charge conference

25   will stay in or near the courtroom, I'll send someone to get

1    you as soon as I'm ready.

2        The Court's in recess.

3                    (Brief recess.)

4            THE COURT:  Be seated, please.

5        All right.  The Court has met with counsel in chambers

6    and had the benefit of an informal and free-flowing discussion

7    regarding the final jury instructions and verdict form.

8        The Court has had an opportunity to ask any questions of

9    counsel that it thought were appropriate and has taken

10   advantage of the input furnished by counsel for both of the

11   competing sides, and the Court has now generated what it

12   believes to be the proper and appropriate final jury

13   instruction and verdict form for use with this jury in this

14   trial.

15       I'm now going to conduct a formal charge conference on

16   the record where either side may lodge such objections as they

17   believe are necessary and proper.

18       What I would like to do, counsel, and as the Court's

19   usual practice is, is to ask that a single spokesman for both

20   Plaintiff and Defendants go to the podium and remain there.

21   We will begin with the final jury instructions.  We'll address

22   these or I'll address them on a page-by-page basis to make

23   sure we don't overlook anything that might be appropriate for

24   your consideration.

25       If there are objections, I'll hear them and rule on them

1    as we get to that particular area where something that you

2    believe is improper has been included or something that you

3    believe is important and necessary has been omitted.

4        I will tell you before you go to the podium that the

5    copies you have on the case number do not show the initials of

6    the magistrate judge, and I've added the RSP initials after my

7    own initials on the case number.

8        All right.  Whoever's going to speak for Plaintiff and

9    Defendant, please go to the podium and we'll proceed.

10        MR. HARRIS:  Your Honor, I apologize for the

11    interruption.  Plaintiff believes we may have discovered a

12    typographical error in the instructions and we would request a

13    short recess to confer with Defendant to determine whether we

14    need to address that with the Court.

15        THE COURT:  You've not had an opportunity to discuss

16    it with Defendants?

17        MR. HARRIS:  Not yet.  I apologize.  I inadvertently

18    told Your Honor's law clerks we were ready to proceed and we

19    need a few more minutes to do that.

20        THE COURT:  Well, if it's of a typographical nature,

21    Mr. Harris, I'll be happy to address it as a part of the

22    charge conference.  If it's substantive, that may be

23    different.  But you believe it's typographical?

24        MR. HARRIS:  It's substantive.  We think it's a

25    substantive mistake that the parties included some language

1    that both parties wish to remove, but we haven't had an

2    opportunity to confer, and I apologize.

3           THE COURT:  Okay.  Well, let's do this.  It's late

4    in the day.  We'll go off the record.  You can consult with

5    opposing counsel here in the courtroom.  And as soon as you've

6    done that, we'll come back on the record and proceed with the

7    formal charge conference.

8        Let's go off the record.

9               (Pause in proceedings.)

10       MR. HARRIS:  Your Honor, we're ready to proceed

11   whenever you are.

12          THE COURT:  All right.  Just a moment.

13       All right.  Let's go back on the record.

14       Counsel have met informally off the record, and we'll now

15   proceed with the formal charge conference as indicated

16   earlier.  Whoever's going to speak for the Plaintiff and for

17   the Defendants, please go to the podium.

18       All right.  Let's begin with the final jury instructions.

19   We'll begin with the first page or page 1 of those final jury

20   instructions.  Are there objections here from either Plaintiff

21   or Defendant?

22          MR. AIKEN:  No objection, Your Honor.

23          MS. GEYER:  No objection from Defendants.

24          THE COURT:  All right.  Turning then to page 2, are

25   there any objections here from either party?

```
 1              MR. AIKEN:  No objection from Plaintiff.

 2              MS. GEYER:  No objection from Defendants.

 3              THE COURT:  Page 3, are there any objections from

 4    either party?

 5              MR. AIKEN:  No objection from Plaintiff.

 6              MS. GEYER:  No objection from Defendant.

 7              THE COURT:  Next is page 4.  Are there any

 8    objections here?

 9              MR. AIKEN:  No objection from Plaintiff.

10              MS. GEYER:  No objection from Defendant.

11              THE COURT:  Page 5 of the final jury instructions,

12    are there any objections here from either party?

13              MR. AIKEN:  No objection from Plaintiff.

14              MS. GEYER:  No objection from Defendant.

15              THE COURT:  Turning then to page 6, are there any

16    objections here?

17              MR. AIKEN:  No objection from Plaintiff.

18              MS. GEYER:  No objection from Defendant.

19              THE COURT:  Turning then to page 7, are there any

20    objections here?

21              MR. AIKEN:  No objection from Plaintiff.

22              MS. GEYER:  No objection from Defendant.

23              THE COURT:  Turning then to page 8, are there any

24    objections here?

25              MR. AIKEN:  No objection from Plaintiff.
```

```
 1              MS. GEYER:  No objection from Defendant.

 2              THE COURT:  Next is page 9.  Are there any

 3     objections?

 4              MR. AIKEN:  No objection from Plaintiff.

 5              MS. GEYER:  No objection from Defendants.

 6              THE COURT:  Next is page 10.  Are there any

 7     objections?

 8              MR. AIKEN:  No objection from Plaintiff.

 9              MS. GEYER:  No objection from Defendants.

10              THE COURT:  Next is page 11.  Are there any

11     objections here?

12              MR. AIKEN:  Not an objection, Your Honor, but the

13     parties in their meet-and-confer process noted in the last

14     sentence of the middle paragraph concerning method claims, we

15     believe that the last sentence should be excised because, as

16     discussed during JMOLs, Plaintiff is not seeking liability for

17     direct infringement of the method claims.

18              THE COURT:  What's Defendant have to say on this

19     issue?

20              MS. GEYER:  Defendant agrees with that position.

21              THE COURT:  So both sides are requesting the Court

22     to remove the last sentence in the middle paragraph of page

23     11.  Is that correct?

24              MR. AIKEN:  That's correct.

25              THE COURT:  All right.  I'll grant your joint
```

1    request and delete the last sentence, which is primarily the

2    last three lines of the middle paragraph on page 11.

3          Having done that, are there any other objections on the

4    page 11 from either party?

5                MR. AIKEN:  No objections from Plaintiff.

6                MS. GEYER:  No objections from Defendants.

7                THE COURT:  Turning then to page 12, are there any

8    objections here?

9                MR. AIKEN:  No objection from Plaintiff.

10               MS. GEYER:  No objection from Defendants.

11               THE COURT:  Turning then to page 13, are there any

12   objections?

13               MR. AIKEN:  No objection from Plaintiff.

14               MS. GEYER:  No objection from Defendants.

15               THE COURT:  Turning next to page 14, are there any

16   objections here?

17               MR. AIKEN:  No objection from Plaintiff.

18               MS. GEYER:  Your Honor, Defendants object to page 14

19   and specifically in the fourth full paragraph or the second

20   full paragraph from the bottom, fourth full paragraph from the

21   top, we object to not including the sentence that clarifies

22   that the hypothetical negotiation does not consider the

23   real-world willingness of the parties in this investigation.

24         Throughout trial, Plaintiff has elicited testimony I

25   believe from every witness, introduced evidence, and made

 1    arguments about Defendants' real-world unwillingness to take a

 2    license.  Defendants' damages expert also gave his opinion

 3    that the real-world unwillingness of Defendants should be

 4    taken into account in the hypothetical negotiation.

 5         The Federal Circuit has found that that is contrary to

 6    the law and specifically in Hansen versus Alpine Valley Ski

 7    Area, 718 F.2d 1025, the Federal Circuit said that the willing

 8    buyer/willing seller concept does not depend on the actual

 9    willingness of the parties, and says, quote, whether the

10    Defendant was never willing to pay a reasonable royalty is

11    irrelevant.

12         Therefore, we believe an instruction to this is

13    necessary, given the amount of evidence and argument in this

14    case to the contrary.

15              THE COURT:  Well, let me say this to the Defendants.

16    I intended to include an additional sentence at the end of

17    that paragraph.  Somehow in the drafting process, it is

18    omitted here.  If you will give me just a minute, I will --

19              MR. AIKEN:  Your Honor, if I may.

20              THE COURT:  Yes.

21              MR. AIKEN:  At the very top of page 15 is a

22    sentence, However, the hypothetical negotiation itself is not

23    impacted by or dependent upon the real-world level of

24    willingness, if any, of the parties to engage in such

25    negotiations.

1          Is that the addition Your Honor was referencing?

2               THE COURT:  That's the sentence, and it should be at

3     the end of second from the bottom paragraph on page 14.  It

4     should not be there on the top of page 15.

5          Let me ask Defendants this:  If that sentence were moved

6     from the top of page 15 to the place you've indicated on page

7     14 at the end of the second paragraph from the bottom of page

8     14, would that satisfy your objection?

9               MS. GEYER:  Yes, Your Honor.

10              THE COURT:  All right.  I apologize, counsel.

11    That's just one of the wonderful aspects of word processing.

12         I'll move that -- I'll move the sentence beginning with

13    the word 'however' that's now located on the third line from

14    the top of page 15 to follow the existing paragraph on page 14

15    which is second from the bottom.

16         Now, with that, is there anything else on page 14 before

17    we move further?

18              MS. GEYER:  Nothing further from Defendants.

19              MR. AIKEN:  And nothing from Plaintiff, Your Honor.

20              THE COURT:  All right.  We'll turn then to page 15.

21    And with the movement of the sentence already noted, is there

22    anything else here on page 15 that either party objects to?

23              MR. AIKEN:  No objection from Plaintiff.

24              MS. GEYER:  No objection from Defendants.

25              THE COURT:  All right.  Turning next to page 16 of

1    the final jury instructions, are there any objections here?

2              MR. AIKEN:  No objection from Plaintiff.

3              MS. GEYER:  No objection from Defendants.

4              THE COURT:  Next is page 17.  Are there any

5    objections here?

6              MR. AIKEN:  No objection from Plaintiff.

7              MS. GEYER:  No objection from Defendants.

8              THE COURT:  Next is page 18.  Are there any

9    objections here?

10             MR. AIKEN:  No objection from Plaintiff.

11             MS. GEYER:  No objection from Defendants.

12             THE COURT:  All right.  Next is page 19.  Any

13   objections here?

14             MR. AIKEN:  No objection from Plaintiff.

15             MS. GEYER:  No objection from Defendants.

16             THE COURT:  And page 20 of your copies is the last

17   and final page of the final jury instructions.  Are there any

18   objections here from either party?

19             MR. AIKEN:  Your Honor, we actually have a 21st

20   page.

21             THE COURT:  Okay.

22             MR. AIKEN:  No objection on page 20, though.

23             MS. GEYER:  No objection from Defendants on page 20.

24             THE COURT:  Any objections on page 21?

25             MR. AIKEN:  No objection from Plaintiff.

1          MS. GEYER:  No objection from Defendants.

2          THE COURT:  Any objection anywhere else within the

3     proposed final jury instructions?

4          MR. AIKEN:  No objection from Plaintiff.

5          MS. GEYER:  No objection from Defendants.

6          THE COURT:  All right.  Thank you, counsel.

7       Let's transition to the verdict form.  The verdict form,

8     likewise, has been a part of the informal conference process.

9     You've had an opportunity to review it.  We'll approach it in

10    the same manner as we did the final jury instructions.

11      And I will also note on the case number on the cover

12    page, I've added the initials for the magistrate judge,

13    recognizing this has been a referral case.  Other than that,

14    the document should be as you have it.

15      So with that, are there any objections to the cover page

16    or page 1 of the verdict form from either party?

17         MR. AIKEN:  No objection from Plaintiff.

18         MS. GEYER:  No objection from Defendants.

19         THE COURT:  Any objection then on page 2 where

20    various definitions are included?

21         MR. AIKEN:  No objection from Plaintiff.

22         MS. GEYER:  No objection from Defendants.

23         THE COURT:  Turning then to page 3 of the verdict

24    form where specific instructions are set forth, are there

25    objections here?

1              MR. AIKEN:  No objection from Plaintiff.

2              MS. GEYER:  No objection from Defendants.

3              THE COURT:  Turning to page 4 where Question 1 is

4    found, are there objections here from either party?

5              MR. AIKEN:  No objection from Plaintiffs.

6              MS. GEYER:  Your Honor, Defendant respectfully

7    objects to Question No. 1 as having a single question related

8    to infringement.  There are two distinct allegations of

9    infringement in this case involving distinct parties with

10   distinct actions.

11            There is an allegation of direct infringement of the

12   Defendants TP-Link Technologies and TP-Link Corporation based

13   on selling, offering to sell, or importing into the United

14   States for one claim of the '513 Patent.  And then there is a

15   separate distinct allegation of induced infringement based on

16   the actions of TP-Link USA and users of the accused product.

17            And based on those distinct issues and distinct evidence,

18   we object and believe it is appropriate to have two questions

19   addressing each of those.

20            THE COURT:  All right.  The Court intends to

21   adequately and thoroughly instruct the jury on both theories

22   of recovery and infringement, and sees no compelling reason

23   why they must be split out or presented as separate questions,

24   and with full, complete, and adequate instruction, the Court

25   sees no error in including the issue of infringement, both

 1    direct and induced in the single question which is Question

 2    No. 1.  Therefore, Defendants' objection's overruled.

 3         Turning next to page 5 of the verdict form where

 4    questions 2A and 2B are found, are there objections here from

 5    either party?

 6              MR. AIKEN:  No objections from Plaintiff.

 7              MS. GEYER:  Defendants respectfully object to

 8    Question No. 2A.  There are two damages theories in this case,

 9    a running royalty and a lump sum, and one of the core disputes

10    between the parties is whether the royalty rate is fair,

11    reasonable, and non-discriminatory.

12         Based on a running royalty, the total compensation would

13    give the parties enough information to determine what that

14    FRAND royalty rate is because the amount of volume, the

15    royalty base for that number has been set by the Court through

16    September 30th, 2022.  However, for a lump sum, that is not

17    the case.  There are projected damages after September 30th,

18    2022, which are in dispute by the parties, and, therefore, if

19    there is a lump sum -- if there is a lump sum granted by the

20    jury and with the total compensation, there's not enough

21    information on the verdict form for us to determine what that

22    FRAND royalty rate is, and, therefore, we would be unable to

23    determine if it was, in fact, fair, reasonable, and

24    non-discriminatory.

25              THE COURT:  All right.  Well, a lump sum reasonable

1    royalty award is always prospective to some degree by its very

2    nature because it, in essence, produces a fully paid-up

3    license for the life of the patents-in-suit.  There is never a

4    lump sum award where there is past history of the number of

5    units sold or the other factors that might go into a running

6    royalty calculation.

7         The Court does not believe that that necessary portion of

8    any potential lump sum award necessitates the relief that

9    Defendants are requesting.  The Court, as is set forth in

10   question 2B, clearly intends to elicit from the jury whether

11   whatever amount of money they might award in question 2A is

12   either a lump sum award or a running royalty award.  The

13   numbers included in the evidence presented to the jury between

14   the options of a lump sum and a running royalty are vastly

15   different and are nowhere close to each other in size.  I

16   don't think there is any possible confusion with the jury that

17   if the larger number is awarded it will be a lump sum and if a

18   smaller number is awarded it may be a running royalty, but the

19   Court intends to require the jury to identify the nature of

20   any monetary award it makes as either a lump sum or a running

21   royalty through question 2B.

22        The inherent differences between a running royalty and a

23   lump sum are not such that the Court feels compelled to break

24   question 2A into two separate parts and, therefore, the

25   Defendants' objection is overruled and denied.

```
 1          Are there any other objections on page 5 of the verdict
 2     form?
 3               MR. AIKEN:  No objections from Plaintiff.
 4               MS. GEYER:  No further objections from Defendants.
 5               THE COURT:  Turning, then, to page 6, which is the
 6     final page of the verdict form where the foreperson's
 7     signature and date are called for, are there any objections
 8     here from either party?
 9               MR. AIKEN:  No objection from Plaintiff.
10               MS. GEYER:  No objections from Defendants.
11               THE COURT:  Thank you, counsel.
12          That completes the formal charge conference.  I'll make
13     the changes necessitated by our interaction and I will furnish
14     both sides electronic versions of both the final jury
15     instructions and verdict form by email with these attached as
16     PDF documents shortly.  You may share them with your trial
17     teams.  And I will see you in the morning, at which time I
18     will proceed to charge the jury and present -- or allow the
19     parties to present closing arguments from the respective
20     sides.
21          Is there anything else either side is aware of that we
22     need to take up and address before reconvening in the morning
23     and beginning the Court's final charge to the jury?
24               MR. AIKEN:  Nothing from Plaintiff, Your Honor.
25               MR. BELL:  Nothing from Defendants, Your Honor.
```

1            THE COURT:  All right, counsel.  Thank you for your

2    cooperation and input.  The Court stands in recess.

3            (The proceedings were concluded at 5:30 p.m.)

1       I HEREBY CERTIFY THAT THE FOREGOING IS A

2    CORRECT TRANSCRIPT FROM THE RECORD OF

3    PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

4    I FURTHER CERTIFY THAT THE TRANSCRIPT FEES

5    FORMAT COMPLY WITH THOSE PRESCRIBED BY THE

6    COURT AND THE JUDICIAL CONFERENCE OF THE

7    UNITED STATES.

8

9    S/Shawn McRoberts              09/13/2023

10   _____DATE_____
     SHAWN McROBERTS, RMR, CRR
11   FEDERAL OFFICIAL COURT REPORTER

12

13

14

15

16

17

18

19

20

21

22

23

24

25