```
1                IN THE UNITED STATES DISTRICT COURT
                FOR THE EASTERN DISTRICT OF TEXAS
2                        MARSHALL DIVISION

3    ATLAS GLOBAL TECHNOLOGIES, LLC,(  CAUSE NO. 2:21-CV-430-JRG
                                    )
4             Plaintiff,            (
                                    )
5    vs.                            (
                                    )
6    TP-LINK TECHNOLOGIES CO., LTD.,(
     et al.,                        )  MARSHALL, TEXAS
7                                   (  SEPTEMBER 14, 2023
              Defendants.           )  8:30 A.M.
8    _____

9

                             VOLUME 5
10

11   _____

                        TRIAL ON THE MERITS
12

13            BEFORE THE HONORABLE RODNEY GILSTRAP
                UNITED STATES CHIEF DISTRICT JUDGE
14

15   _____

16

17

18

19

20

21

22                  SHAWN McROBERTS, RMR, CRR
                     100 E. HOUSTON STREET
23                   MARSHALL, TEXAS  75670
                         (903) 923-8546
24            shawn_mcroberts@txed.uscourts.gov

25
```

A P P E A R A N C E S

FOR THE PLAINTIFF:      SUSMAN GODFREY, LLP
                        1000 LOUISIANA STREET
                        SUITE 5100
                        HOUSTON, TEXAS   77002-5096
                        (713) 651-9366
                        BY: MR. MAX TRIBBLE
                            MR. JOSEPH GRINSTEIN
                            MS. ALEJANDRA SALINAS
                            MR. ERIC ENGER
                            MR. BLAINE LARSON
                            MR. ALDEN HARRIS

                        SUSMAN GODFREY, LLP
                        401 UNION STREET, SUITE 3000
                        SEATTLE, WASHINGTON  98101
                        (206) 516-3880
                        BY:  MR. ALEXANDER AIKEN

                        WARD, SMITH & HILL, PLLC
                        1507 BILL OWENS PARKWAY
                        LONGVIEW, TEXAS   75604
                        (903) 757-6400
                        BY:  MR. JOHNNY WARD
                             MS. ANDREA FAIR

FOR THE DEFENDANTS:     KILPATRICK TOWNSEND & STOCKTON
                        LLP - DALLAS
                        2001 ROSS AVE, STE. 4400
                        DALLAS, TEXAS   75201
                        (214) 922-7100
                        BY:  MR. KRISTOPHER REED
                             MR. COLE RAMEY

                        KILPATRICK TOWNSEND & STOCKTON
                        LLP - DENVER
                        1400 WEWATTA STREET, SUITE 600
                        DENVER, COLORADO  80202
                        (303) 571-4000
                        BY:  MR. KEVIN BELL
                             MR. EDWARD MAYLE

                        KILPATRICK TOWNSEND & STOCKTON
                        LLP - SEATTLE
                        1420 FIFTH AVENUE, SUITE 3700
                        SEATTLE, WASHINGTON  98101
                        (206) 516-3094
                        BY:  MS. KATHLEEN GEYER

```
 1                                    KILPATRICK TOWNSEND & STOCKTON
                                      LLP - ATLANTA
 2                                    1100 PEACHTREE STREET NE
                                      SUITE 2800
 3                                    ATLANTA, GEORGIA   30309-4530
                                      (404) 815-6585
 4                                    BY:  MR. ANDREW SAUL

 5                                    GILLAM & SMITH, LLP
                                      102 N. COLLEGE, SUITE 800
 6                                    TYLER, TEXAS  75702
                                      (903) 934-8450
 7                                    BY:  MR. TRAVIS UNDERWOOD

 8              OFFICIAL REPORTER:    SHAWN M. McROBERTS, RMR, CRR
                                      100 E. HOUSTON STREET
 9                                    MARSHALL, TEXAS  75670
                                      (903) 923-8546
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

988

1          THE COURT:  Be seated, please.

2      All right.  Are the parties prepared to read into the

3  record those items from the list of pre-admitted exhibits used

4  during yesterday's portion of the trial?

5          MS. FAIR:  Yes, Your Honor.

6          THE COURT:  Please proceed.

7          MS. FAIR:  DX 21 is the only exhibit from yesterday.

8          THE COURT:  All right.  Any objection to that

9  rendition from the Defendants?

10          MR. BELL:  No objection.

11          THE COURT:  And I assume Defendants don't have

12  anything further to offer of the same type?

13          MR. BELL:  No, Your Honor.

14          THE COURT:  All right.  Thank you.

15      Let me say a word to those of you in the gallery before

16  we go further with my final instructions to the jury and the

17  closing arguments from counsel.

18      Two things:  Number one, the Court considers its final

19  instructions on the law and counsels' closing arguments as the

20  most serious part of an inherently serious process.

21  Accordingly, once I bring the jury in this morning, I don't

22  want people leaning over and whispering to each other.  I

23  don't want you passing papers back and forth.  I don't want

24  you making noise of any kind.  I don't want you coming and

25  going.  I don't want some paralegal with three boxes in her

989

1    arms walking through the back doors of the courtroom.

2        I want as much stillness and quiet as possible, and I

3    want to avoid at all costs any disruptions or anything that

4    would divert the jury's attention from what's about to happen.

5        Second of all, there are certain items of confidential

6    information that have been an inherent part of this trial

7    throughout the whole process.  It is entirely likely that I am

8    going to be asked to seal the courtroom during closing

9    arguments.

10       If you're in the gallery and you're not subject to the

11   protective order in this case and upon sealing of the

12   courtroom you would have to get up and leave the courtroom, I

13   want you to sit on the back two rows of the gallery.  And if

14   and when counsel for either party asks me to seal the

15   courtroom, I want you to get up and move quickly to get in and

16   out of the courtroom.

17       The lawyers that are presenting closing arguments have a

18   defined and set amount of time, and I don't want to eat into

19   their argument time because somebody is slow and forgot their

20   device and have to come back and takes a lot of time to get in

21   and out of the courtroom.

22       So before I bring the jury in, if you're going to be

23   subject to having to leave the courtroom under my standing

24   order on sealing to protect confidential information, sit on

25   the back two rows of the gallery.  And when that happens, move

1    expeditiously to get out of the courtroom so that it doesn't

2    cause, A, a disruption or, B, a break in presentations from

3    opposing counsel.

4        Any questions from anybody in the gallery about that?  We

5    haven't had any problems so far, but for heaven's sake

6    double-check any devices you have to make sure that they are

7    silent and that they don't ring or disrupt anything.

8        All right.  Mr. Tribble, is the Plaintiff ready to

9    proceed with final instructions to the jury and closing

10   arguments?

11             MR. TRIBBLE:  Plaintiff is ready, Your Honor.

12             THE COURT:  Are Defendants ready, Mr. Reed, for

13   final instructions to the jury and closing arguments?

14             MR. REED:  Yes, they are, Your Honor.

15             THE COURT:  All right.  Let's bring in the jury,

16   please.

17             (Whereupon, the jury entered the courtroom.)

18             THE COURT:  Good morning, ladies and gentlemen.

19   It's good to see you.  Please have a seat.  Thank you for

20   being on time as you have throughout the trial.

21        Ladies and gentlemen of the jury, you've now heard all

22   the evidence in this case, and I will now instruct you on the

23   law that you must apply.

24        I want each of you to know that these instructions I'm

25   about to give you orally have also been reduced to writing,

991

1    and I have seven printed copies of these final instructions in

2    writing that I'm going to send back with you when you retire

3    to the jury room to deliberate on your verdict, which means as

4    a practical matter I'd much rather you listen to me as I give

5    them to you orally and not feel compelled to take notes

6    because you're going to have your own printed copy to review

7    once you get to the jury room.

8        It's your duty to follow the law as I give it to you, but

9    on the other hand, as I've said, you, the jury, are the sole

10   judges of the facts in this case.  Do not consider any

11   statement that I have made over the course of the trial or may

12   make in the course of these instructions as an indication that

13   the Court has any opinion about the facts in this case.

14       Now, you are about to hear closing arguments from the

15   attorneys for both of the competing parties.  Statements and

16   arguments of the attorneys, ladies and gentlemen, are not

17   evidence, and they are not instructions on the law.  Closing

18   arguments by the attorneys are intended only to assist the

19   jury in understanding the evidence and the parties'

20   contentions.

21       A verdict form has been prepared for you, and you will

22   take this verdict form with you to the jury room when I

23   instruct you to consider, and when you've reached a unanimous

24   agreement as to your verdict, you will notify the Court

25   Security Officer and you will have your foreperson fill in the

1    blanks in the verdict form reflecting your unanimous answers

2    to those questions.

3         Do not decide who you think should win this case and then

4    answer the questions to reach that result.  Again, your

5    answers and your verdict must be unanimous.

6         Now, in determining whether any fact has been proven in

7    this case, you may, unless otherwise instructed, consider the

8    testimony of all the witnesses, regardless of who may have

9    called them, and you may consider any stipulations or

10   agreements of the parties.  You may also consider all of the

11   exhibits that have been received and admitted into evidence,

12   regardless of who introduced them.

13        As I've told you, and this is worth repeating, you, the

14   jury, are the sole judges of the credibility of all the

15   witnesses and the weight and effect to give to all the

16   evidence.  Now, in deciding the facts in this case, you may

17   have to decide which testimony to believe and which testimony

18   not to believe.  You alone are to determine the questions of

19   credibility or truthfulness of the witnesses.

20        In weighing the testimony of the witnesses, you may

21   consider a witness' manner and demeanor on the witness stand,

22   any feelings or interest they may have in the case, any

23   prejudice or bias that they may have about the case, and the

24   consistency or inconsistency of their testimony, considered in

25   the light of the circumstances.

1    Has the witness been contradicted by other evidence?  Has

2    he or she made statements at other times and in other places

3    contrary to what they said on the witness stand?  You, ladies

4    and gentlemen, must give the testimony of each witness the

5    amount of credibility and weight that you think it deserves.

6    You must also keep in mind that a simple mistake does not

7    mean that a witness is not telling the truth.  You must

8    consider whether any misstatement was an intentional falsehood

9    or a simple lapse in memory and what significance should be

10    attached to that testimony.

11    As I've told you previously, the attorneys in this case

12    are acting as advocates for their competing clients, and they

13    have a duty to raise objections when they believe evidence

14    being offered that should not be admitted under the rules of

15    the Court.

16    When the Court sustained an objection to a question

17    addressed to a witness, you must disregard that question

18    entirely, and you may draw no inference from its wording or

19    speculate or guess about what the witness would have said if

20    the Court had allowed them to answer the question.

21    On the other hand, if the objection was overruled, then

22    you must treat the answer to the question just as you would

23    treat any other answer to any other question, that is, just as

24    if the objection had not been made.  Now, by allowing the

25    testimony or other evidence to be introduced over the

1    objection of an attorney, the Court did not indicate any

2    opinion as to the weight or the effect of that evidence.

3        Now, at various times during the course of the trial, it

4    was necessary for the Court to talk to the lawyers outside of

5    your hearing either here at the bench or by calling a recess

6    and talking to them while you were outside of the courtroom.

7    This happens because often during trials things arise that do

8    not involve the jury.  You should not guess or speculate,

9    ladies and gentlemen, about what was said during such

10   discussions that may have taken place outside of your

11   presence.

12       Now, there are two types of evidence that you may

13   properly consider in finding the truth as to the facts in this

14   case.  One is direct evidence, such as the testimony of an

15   eyewitness.  The other is indirect or circumstantial evidence,

16   that is, the proof of a chain of circumstances that indicates

17   the existence or non-existence of certain other facts.  As a

18   general rule, the law makes no distinction between direct

19   evidence or indirect, that is, circumstantial evidence, but

20   simply requires that you find the facts based on all the

21   evidence presented.

22       Now, during the trial certain testimony has been

23   presented to you through depositions.  A deposition is the

24   sworn recorded answers to questions asked to a witness in

25   advance of the trial.  If a witness cannot be physically

1    present to testify in person, then the witness' testimony may

2    be presented under oath in the form of a deposition.

3        Before the trial began, the attorneys representing the

4    parties in this case questioned these deposition witnesses

5    under oath.  At that time a court reporter was present and

6    recorded their sworn testimony.  Deposition testimony is

7    entitled to the same consideration by you as testimony given

8    by a witness in person from the witness stand in open court.

9    Therefore, ladies and gentlemen, you should judge the

10   credibility and importance of deposition testimony to the best

11   of your ability just as if the witness had appeared in person

12   before you in open court.

13       Now, while you should consider only the evidence in this

14   case, you are permitted to draw such reasonable inferences

15   from the testimony and exhibits as you feel are justified in

16   the light of common experience.  In other words, ladies and

17   gentlemen, you may make deductions and reach conclusions that

18   reason and common sense lead you to draw from the facts that

19   have been established by the testimony and evidence in this

20   case.  However, you should not base your decision on any

21   evidence not presented by the parties during the case,

22   including your own personal experiences with any of the

23   products that may be at issue here.

24       Now, unless I instruct you otherwise, you may properly

25   determine that the testimony of a single witness is sufficient

1    to prove any fact, even if a greater number of witnesses may

2    have testified to the contrary, if after considering all the

3    evidence, you believe that single witness.

4        Also, when knowledge of a technical subject may be

5    helpful to the jury, a person who has special training or

6    experience in that technical field--we call them an expert

7    witness--is permitted to state his or her opinions on those

8    technical matters to the jury.  However, ladies and gentlemen,

9    you're not required to accept any of those opinions.  As with

10   any other witness, it is solely up to you to decide whether to

11   rely or not rely on what's been presented to you.

12       Now, certain exhibits have been shown to you over the

13   course of the trial that were illustrations.  We call these

14   types of exhibits demonstrative exhibits or simply

15   demonstratives for short.  Demonstrative exhibits are a

16   party's depiction, picture, or model to describe something

17   involved in the trial.  If your recollection of the evidence

18   differs from these demonstratives, you should rely on your

19   recollection.

20       Demonstrative exhibits are sometimes called jury aids,

21   and demonstrative exhibits themselves, ladies and gentlemen,

22   are not evidence, but a witness' testimony concerning a

23   demonstrative exhibit is evidence.  Let me be clear.

24   Demonstrative exhibits are not going to be available for you

25   to view or consider during your deliberations.

1          Now, in any legal action, facts must be proven by a

2     required amount of evidence, known as the burden of proof.

3     The burden of proof in this case is on the Plaintiff for all

4     the issues.  It's burden of proof that you will apply in this

5     case is the preponderance of the evidence standard which I've

6     already discussed with you.

7          As you know, the Plaintiff in this case, Atlas Global

8     Technologies, LLC, which you heard referred to simply as the

9     Plaintiff or as Atlas, has the burden of proving patent

10    infringement by a preponderance of the evidence.  Atlas also

11    has the burden of proving damages for any patent infringement

12    by a preponderance of the evidence.

13         The two Defendants in this case, TP-Link Technologies

14    Company, Ltd., and TP-Link Corporation, Ltd., which you've

15    heard referred to throughout the trial together or

16    collectively simply as TP-Link, they do not have any burden of

17    proof in this case.

18         Now, the preponderance of the evidence standard, which

19    we've already discussed, let me remind you, means evidence

20    that persuades you, the jury, that a claim is more probably

21    true than not true.  Sometimes this is talked about as being

22    the greater weight and degree of credible testimony.

23         Now, as I've previously told you, ladies and gentlemen,

24    this burden of proof, the preponderance of the evidence

25    standard, is not to be confused with any other burden of

1    proof, and it is certainly not to be confused with beyond a

2    reasonable doubt, which is the burden of proof applied in a

3    criminal case and which has no application here in a civil

4    case.  Beyond a reasonable doubt is a higher standard than the

5    preponderance of the evidence.

6         Earlier in the case we talked about a standard of proof

7    known as clear and convincing evidence.  That also is a higher

8    standard than the preponderance of the evidence.  Again, the

9    only burden of proof that applies in this case, which is a

10   burden carried by the Plaintiff, is the preponderance of the

11   evidence standard.

12        Now, in determining whether any fact has been proven by a

13   preponderance of the evidence, you may, unless otherwise

14   instructed, consider any agreements or stipulations between

15   the parties, you may consider the testimony of all the

16   witnesses regardless of who called them, and all the evidence,

17   including all the exhibits received into evidence over the

18   course of the trial, regardless of who may have produced or

19   introduced them.

20        Now, as I did at the start of the case, I'll give you a

21   summary of each side's contentions and I'll then provide you

22   with detailed instructions on what each side must prove in

23   order to win on its contentions.  As.

24        I've previously told you, this is an action for patent

25   infringement.  The Plaintiff, Atlas, contends that TP-Link,

1    that is TP-Link Technologies and TP-Link Corporation, the two

2    Defendants, infringe certain claims of the five

3    patents-in-suit.

4        Remember, there are five patents-in-suit, which you've

5    also heard referred to as the asserted patents.  And these

6    patents are United States Patent No. 9,532,187, which you've

7    heard referred to throughout the trial as the '187 Patent;

8    United States Patent No. 9,763,259, which you've heard

9    referred to as the '259 Patent; United States Patent No.

10   9,825,738, which you've heard referred to as the '738 Patent;

11   and United States Patent No. 9,912,513, which you've heard

12   referred to as the '513 Patent; as well as United States

13   Patent No. 9,917,679, which you've heard referred to as the

14   '679 Patent.

15       Now, the Plaintiff, Atlas, contends that the Defendants

16   TP-Link, directly infringe claim 1 of the '513 Patent by

17   offering for sale in the United States or importing into the

18   United States products that Atlas argues are covered by this

19   claim.

20       Atlas also argues that the TP-Link Defendants, that is

21   TP-Link Technologies and TP-Link Corporation, have actively

22   induced infringement of claims 4 and 12 of the '187 Patent;

23   claims 1 and 18 of the '259 Patent; claim 1 of the '738

24   Patent; claims 1 and 15 of the '513 Patent; and claims 1 and 6

25   of the '679 Patent.  These are the asserted claims which come

1    from the patents-in-suit.

2        These Defendants, TP-Link Technologies and TP-Link

3    Corporation, deny that they infringe any of the asserted

4    claims from the patents-in-suit.  TP-Link -- and, again, when

5    I say TP-Link, I mean both of these Defendants.  TP-Link also

6    denies that the Plaintiff Atlas is entitled to any money

7    damages.

8        Now, if you decide that any asserted claim has been

9    infringed, you will then need to decide the amount of money

10   damages, if any, to be awarded to the Plaintiff to compensate

11   it for that infringement.

12       At the beginning of the trial, I gave you some general

13   information about patents and the patent system and a brief

14   overview of the patent laws relevant to this case.  I'll now

15   give you more detailed instructions about the patent laws that

16   relate to this case.

17       Before you can decide many of the issues in this case,

18   you'll need to understand the role of the patent claims.  The

19   patent claims, ladies and gentlemen, are those numbered

20   sentences at the end of a patent.  The claims are important

21   because it's the words of the claims that define what the

22   patent covers.

23       The figures and the text in the rest of the patent

24   provide a description and/or examples of the invention and

25   they provide a context for the claims, but it is the claims

1    themselves that define the breadth of the patent's coverage.

2         Each claim is effectively treated as if it were a

3    separate patent, and each claim may cover more or cover less

4    than another claim.  Therefore, what a patent covers depends,

5    in turn, upon what each of its claims covers.

6         You will first need to understand what each claim covers

7    in order to decide whether or not there is infringement of the

8    claim.  Now, the law says that it's my role to define the

9    terms of the claims and it's your role to apply my definitions

10   to the issues that you're asked to decide in this case.

11        Therefore, as I explained to you at the beginning of the

12   case, I've already determined or construed the meanings of

13   some of the language from the asserted claims, and I've

14   provided these definitions or constructions to you in your

15   juror notebooks.  You must accept these definitions from the

16   Court as to these words from the claims as being correct.

17   It's your job to take these definitions that I have supplied

18   and apply them to the issues that you are deciding, including

19   the issue of infringement and damages.

20        Now, you should disregard any evidence presented at the

21   trial that contradicts or is inconsistent with these

22   constructions and definitions that the Court has given you.

23   For claim limitations or language that I have not specifically

24   construed--that is, language which I have not interpreted or

25   defined--you're to use and apply the plain and ordinary

1    meaning of those elements or limitations as understood by one

2    of ordinary skill in the art, which is to say, in the field of

3    the technology of the patent, at the time of the alleged

4    invention.

5        You have been provided with copies of the five asserted

6    patents which are inside your juror notebooks and you may rely

7    upon them and refer to them throughout your deliberations.

8        Now, several times in these instructions I've referred to

9    or will refer to a person of ordinary skill in the field of

10   the invention, or a person of ordinary skill in the art.  The

11   parties have agreed that a person of ordinary skill in the art

12   here would have at least an undergraduate or a Bachelor of

13   Science degree in electrical engineering, computer science, or

14   computer engineering, or an equivalent field; knowledge of the

15   IEEE 802.11 standard, including its MAC and PHY protocols; and

16   at least two years of experience in the development of

17   wireless local area networks, WLANs.

18       Now, the claims are intended to define in words the

19   boundaries of the inventor's rights and only the claims of the

20   patent can be infringed, ladies and gentlemen.  Neither the

21   written description nor the drawings or figures of a patent

22   can be infringed.  And each of the claims must be considered

23   individually by the jury.

24       I will now explain to you how a claim defines what it

25   covers.

1    A claim sets forth in words a set of requirements.  Each

2  claim sets forth its requirements in a single sentence.  If a

3  product or method satisfies each of these requirements, then

4  it is covered by the claim.  There can be several claims in a

5  patent, and each claim may be narrower or broader than another

6  claim by setting forth more or fewer requirements.

7    The coverage of a patent is assessed on a claim-by-claim

8  basis.  In patent law, the requirements of a claim are often

9  referred to as the claim elements or the claim limitations.

10  And when the product -- a product or method meets all of the

11  requirements of a claim, the claim is said to cover that

12  product or method, and that product or method is said to fall

13  within the scope of that claim.  In other words, a claim

14  covers a product or method where each of the claim elements or

15  limitations is present in that product or method.

16    If a product or a method is missing even one limitation

17  or element of a claim, then the product or method is not

18  covered by the claim.  And if the product or method is not

19  covered by the claim, the product or method cannot infringe

20  the claim.

21    Now, the beginning portion or preamble of a claim often

22  uses the word 'comprising'.  The word 'comprising' when used

23  in the preamble of a claim means including but not limited to,

24  or containing but not limited to.  And when comprising is used

25  in a preamble, if you decide that the accused product includes

1    all the requirements of the claim, then the claim is

2    infringed, and this is true even if the accused product

3    contains additional elements.

4        Let me remind you of an example I gave you.  If you

5    consider a claim comprising a tabletop, legs, and glue, then

6    that claim would be infringed by any table that includes a

7    tabletop, legs, and glue, even if a table also contains other

8    structures such as leaves to expand the size of the tabletop

9    or wheels that would go on the ends of the legs.

10        Now, this case involves two types of patent

11    claims--independent claims and dependent claims.  In this

12    case, claims 1 and 18 of the '259 Patent and claim 1 of the

13    '738 Patent, as well as claims 1 and 15 of the '513 Patent,

14    and claims 1 and 6 of the '679 Patent, are independent claims.

15    Claims 4 and 12 of the '187 Patent are dependent claims.

16        An independent claim sets forth all the requirements that

17    must be met in order to be covered by the claim.  It's not

18    necessary to look at any other claim to determine what an

19    independent claim covers.

20        On the other hand, a dependent claim does not itself

21    recite all the requirements of the claim, but refers to or

22    depends from another claim for some of its requirements.  In

23    this way, the claim refers to or depends upon another claim.

24    A dependent claim incorporates all the requirements of the

25    claim to which it refers or from which it depends, and then

1005

1    the dependent claim adds its own additional requirements.

2        So to determine what a dependent claim covers, ladies and

3    gentlemen, it's necessary to look at both the dependent claim

4    itself and any other claim to which it refers or from which it

5    depends.  Now, a product that meets all the requirements of

6    both the dependent claim and the claim to which it refers or

7    depends -- to which it refers or from which it depends is

8    covered by that dependent claim.

9        Now, if a person or a corporation makes, uses, sells, or

10   offers to sell within the United States, or imports into the

11   United States what is covered by a patent claim without the

12   patent owner's permission, that person or corporation is said

13   to infringe the patent.

14       In reaching your decision on infringement, keep in mind

15   again that only the claims of a patent can be infringed.  You

16   must compare the asserted claims as I have construed some of

17   the language in them, to the accused products to determine

18   whether or not there is infringement.  This is the only

19   correct comparison--the language of the asserted claims

20   compared to the accused products.

21       You should not compare the accused products with any

22   specific example set out in the patent or with any prior art.

23   In determining infringement, again, the only correct

24   comparison is between the accused products and the limitations

25   of the claims as the Court has construed them.  You must reach

1    your decision as to each assertion of infringement based on my

2    instructions about the meaning and scope of the claims, the

3    legal requirements for infringement, and the evidence that has

4    been presented to you over the course of the trial from both

5    sides in this case.

6        Let me now instruct you about some specific rules that

7    you must follow in order to determine whether the Plaintiff

8    Atlas has proven that the two Defendants TP-Link has directly

9    infringed any patent claim involved in this case.

10       A patent can be directly infringed even if the alleged

11   direct infringer did not have knowledge of the patent and

12   without the direct infringer knowing that what it did was

13   infringement of a claim.  A patent may also be directly

14   infringed even though the accused direct infringer believed in

15   good faith that what it did was not infringement of the

16   patent.

17       Now, you must determine separately and for each of the

18   asserted claims whether or not there has been infringement.

19   However, ladies and gentlemen, if you find that an independent

20   claim on which other claims depend is not infringed, there

21   cannot be infringement of any dependent claim that refers

22   directly or indirectly to that independent claim.

23       But on the other hand, if you find that an independent

24   claim has been infringed, you must then still decide

25   separately whether the product meets the additional

1007

requirements of any of the claims that depend from that independent claim; that is, whether those claims have also been infringed.  A dependent claim includes all the requirements of any of the claims to which it refers or from which it depends plus the additional requirements of the dependent claim itself.

In this case, claims 4 and 12 of the '187 Patent, claims 1 and 18 of the '259 Patent, claim 1 of the '738 Patent, claim 15 of the '513 Patent, and claims 1 and 6 of the '679 Patent recite method claims.  Direct infringement of a method claim occurs if all the steps of the claimed method are performed in the United States.

Claim 1 of the '513 Patent recites an apparatus claim. The Plaintiff Atlas must show by a preponderance of the evidence that the accused products include each and every element or limitation of the claim.  In determining whether the accused products directly infringe a patent claim in this case, you must compare the accused product with each and every one of the requirements or limitations of that claim to determine whether the accused products contain each and every requirement or limitation recited in that claim.  An accused product infringes a claim if it satisfies each of the claim elements, even though it may also be capable of non-infringing modes of operation.

Now, the two TP-Link Defendants are liable for direct

1008

1    infringement if you find that the Plaintiff Atlas has proven

2    that it is more likely than not that they have offered to sell

3    in the United States or imported into the United States the

4    invention defined in claim 1 of the '513 Patent.

5        A claim requirement is literally present if it exists in

6    an accused product just as it is described in the claim

7    language, either as I have explained that language to you or,

8    if I did not explain it to you, as it would be understood by

9    its plain and ordinary meaning to a person of ordinary skill

10   in the art.  If an accused product, ladies and gentlemen,

11   omits any claim recited in the claim, then you must find that

12   the accused product does not literally infringe the claim.

13       In this case, Atlas has also accused the TP-Link

14   Defendants of indirect infringement by actively inducing

15   TP-Link's U.S. distributor, which is called TP-Link USA, and

16   the users of the accused products to directly infringe the

17   asserted claims of the asserted patents.  As with direct

18   infringement, you must determine whether there has been active

19   inducement on a claim-by-claim basis.

20       TP-Link Technologies and TP-Link Corporation, which

21   you've heard me refer to throughout these instructions jointly

22   as TP-Link, are liable for induced infringement of a claim

23   only if the Plaintiff Atlas proves by a preponderance of the

24   evidence that:

25       1.  Acts have been carried out by the Defendants' U.S.

1    distributor, TP-Link USA, or users of the accused products

2    that directly infringe that claim;

3        2.  The TP-Link Defendants have taken action during the

4    time the asserted patents were in force, intending to cause

5    the infringing acts by their U.S. distributor TP-Link USA or

6    by users of the accused products; and

7        3.  The TP-Link Defendants have been aware of the

8    asserted patents and have known that the acts of TP-Link USA

9    or the acts of the users of the accused products constitute

10   infringement of the asserted patents, or that they were

11   willfully blind to that infringement.

12       Willful blindness, ladies and gentlemen, is established

13   if the TP-Link Defendants believed there was a high

14   probability that the acts, if taken, would constitute

15   infringement of the asserted claims, but they deliberately

16   avoided confirming that belief.

17       Now, to establish induced infringement, it is not

18   sufficient that someone else directly infringes a claim, nor

19   is it sufficient that the company accused of inducing

20   another's direct infringement merely had knowledge or notice

21   of the asserted patent or had been aware of the acts by

22   another that allegedly constitutes direct infringement.

23       Further, the mere fact that the company accused of

24   inducing another's direct infringement had known or should

25   have known that there was a substantial risk that someone

1010

1   else's act would infringe is not sufficient.  Rather, in order

2   to find inducement, you must find that the TP-Link Defendants

3   specifically intended or willfully blinded themselves to that

4   infringement.

5       Atlas and the TP-Link Defendants disagree on the date

6   when the TP-Link Defendants first learned about the patents in

7   this case.  Atlas contends that the TP-Link Defendants had

8   knowledge of the patents-in-suit and their alleged

9   infringement, or willfully blinded themselves to Atlas'

10  patents and its infringement, at least as of June the 8th,

11  2021.  The TP-Link Defendants contend that they first learned

12  of the patents-in-suit and their alleged infringement as of

13  the filing of Atlas' complaint in this case on November the

14  22nd, 2021.

15      Now, if you find that TP-Link has infringed any claims of

16  the asserted patents, then you must then consider what amount

17  of damages, if any, to award to the Plaintiff Atlas.

18      I'm now going to instruct you, ladies and gentlemen,

19  about the measure of damages, but by instructing you on the

20  measure of damages, I am not suggesting which party should win

21  this case on any issue.

22      If you find that TP-Link has not infringed any claim of

23  the patents-in-suit, then Atlas is not entitled to any patent

24  damages.

25      Atlas has the burden to establish the amount of its

1    damages by a preponderance of the evidence.  In other words,

2    you should award only those damages that Atlas establishes

3    that it more likely than not suffered as a result of TP-Link's

4    infringement.  While Atlas is not required to prove the amount

5    of its damages with mathematical precision, it must prove them

6    with reasonable certainty.  Atlas is not entitled to damages

7    that are remote or only speculative.

8        Now, the damages that you might award, if any, must be

9    adequate to compensate Atlas for any infringement that you may

10   find.  You must not award Atlas more damages than are adequate

11   to compensate it for the infringement, and you must not

12   include any amount in any damages award that you would make

13   for the purpose of punishing TP-Link or for setting an

14   example.

15       Now, the patent law specifically provides that damages

16   for infringement may not be less than a reasonable royalty.

17   In this case, Atlas seeks damages in the form of a reasonable

18   royalty.

19       A royalty, ladies and gentlemen, is a payment made to a

20   patent holder in exchange for the right to make, use, or sell

21   the claimed invention.  A reasonable royalty is the amount of

22   royalty payment that the patent holder and the infringer would

23   have agreed to in a hypothetical negotiation taking place at a

24   time prior to when the infringement first began.

25       Now, in considering this hypothetical negotiation, you

1    should focus on what the expectations of the patent holder and

2    the alleged infringer would have been had they entered into an

3    agreement at that time and had they been acting reasonably in

4    their negotiations.  In determining this, you must assume that

5    both parties believe the patents were valid and infringed and

6    that both parties were willing to enter into an agreement.

7    However, the hypothetical negotiation itself is not impacted

8    by or dependent upon the real-world level of willingness, if

9    any, of the parties to engage in such negotiations.

10        Now, the reasonable royalty you determine must be a

11   royalty that would have been established from this

12   hypothetical negotiation and not simply a royalty that either

13   party would have preferred.  Evidence of things that happened

14   after the infringement first began can be considered in

15   evaluating the reasonable royalty only to the extent that the

16   evidence aids in assessing what the royalty would have

17   resulted -- what royalty would have resulted from a

18   hypothetical negotiation.

19        Although evidence of the actual profits of an alleged

20   infringer -- that an alleged infringer made may be used to

21   determine the anticipated profits at the time of the

22   hypothetical negotiation, a royalty may not be limited or

23   increased based on the actual profits the alleged infringer

24   made.

25        Now, in considering the evidence of a reasonable royalty,

1    you're not required to accept one specific figure or another

2    for the reasonable royalty.  You're entitled, ladies and

3    gentlemen, to determine what you consider to be a reasonable

4    royalty based upon your consideration of all the evidence

5    presented by all the parties during this trial, whether that

6    evidence is of a specific figure or a range of figures.

7        A reasonable royalty must reflect that the original owner

8    of the patents-in-suit declared the asserted patents to be

9    essential to cellular standards and committed those patents to

10   the Institute of Electrical and Electronics Engineers, which

11   you've heard referred to during this trial as the IEEE, to

12   license those patents on fair, reasonable, and

13   non-discriminatory terms.  And you've heard this referred to

14   as FRAND, F-R-A-N-D--fair, reasonable, and non-discriminatory

15   terms.

16       The original owner of the asserted patents made a

17   commitment to the IEEE to grant a license regarding the

18   asserted patents under reasonable rates to an unrestricted

19   number of applicants on a worldwide basis with reasonable

20   terms and conditions that are demonstrably free of unfair

21   discrimination.  These are sometimes referred to as FRAND

22   terms and conditions.  Atlas has committed to license the

23   asserted patents on the same FRAND terms.

24       You must make sure that any reasonable royalty

25   determination takes into account Atlas' FRAND obligations, as

1    I've just read them to you.  A reasonable royalty in this case

2    must be consistent with the Plaintiff's or Atlas' FRAND

3    obligations.  And the law requires that any royalty awarded to

4    Atlas corresponds to the value of the alleged inventions

5    within the accused products, not to the value of the features

6    of Defendants' products that are not covered by Atlas'

7    asserted patent claims.

8        This is particularly true where the asserted products

9    have multiple features and multiple components not covered by

10   the patent or where the accused products work in conjunction

11   with other non-patented items.  If unpatented features

12   contribute to the accused product, you must apportion that

13   value to exclude any value attributable to unpatented

14   features.  You must determine an appropriate royalty rate and

15   an appropriate royalty base that reflect the value

16   attributable to the patented invention alone.

17       Now, when dealing with standard essential patents, there

18   are two special apportionment issues that arise.  First, the

19   patented features must be apportioned from all of the

20   unpatented features reflected in the standard.  Second, the

21   patentee's royalty must be premised on the value of the

22   patented features, not any added value by the standard's

23   adoption of the patented technology.

24       Now, some of the factors that you may consider in making

25   your determination are as follows:

1       1.  The royalties received by the patentee for the

2   licensing of the patents-in-suit, proving or tending to prove

3   an established royalty;

4       2 the rates paid by the licensee for the use of other

5   patents comparable to the patents-in-suit.  Comparable license

6   agreements include those covering the use of the claimed

7   invention or similar technology;

8       3.  The nature and scope of the license, as exclusive or

9   non-exclusive, or as restricted or non-restricted in terms of

10  territory or with respect to whom the manufactured product may

11  be sold;

12      4.  The duration of the patent and the term of the

13  license;

14      5.  The utility and advantages of the patented property

15  over the old modes or devices, if any, that had been used for

16  working out similar results;

17      6.  The nature of the patented invention, the character

18  of the commercial embodiment of it as owned and produced by

19  the licensor, and the benefits to those who have used the

20  invention;

21      7.  The extent to which the infringer has made use of the

22  invention and any evidence probative of the value of that use;

23      8.  The portion of the realizable profits that should be

24  credited to the invention as distinguished from non-patented

25  elements, the manufacturing process, business risks, or

1   significant features or improvements added by the infringer;

2        9.  The opinion and testimony of qualified experts; and

3        10.  The amount that a licensor (such as the patentee)

4   and a licensee (such as the infringer) would have agreed upon

5   at the time the infringement began if both had been trying

6   reasonably and voluntarily to reach an agreement; that is, the

7   amount which a prudent licensee who desired as a business

8   proposition to obtain a license to the patented invention

9   would have been willing to pay as a royalty and yet be able to

10  make a reasonable profit and which amount would have been

11  acceptable to a prudent patentee who was willing to grant a

12  license.

13       Now, ladies and gentlemen, you have heard of these

14  factors referred to during the trial as the *Georgia-Pacific*

15  factors.  No one of these factors is dispositive, and you can

16  and you should consider all the evidence that's been presented

17  to you during the trial on each of these factors.

18       You may also consider any other factors which, in your

19  mind, would have increased or decreased the royalty that the

20  alleged infringer would have been willing to pay and the

21  patent owner would have been willing to accept, acting as

22  normally prudent business people.

23       Now, comparable license agreements are one factor that

24  may inform your decision as to the proper amount and form of

25  the reasonable royalty award, similar to the way in which the

1    value of a house is determined relative to comparable houses

2    sold in the same neighborhood.

3    Whether a license agreement is comparable to the license

4    under the hypothetical license scenario depends on many

5    factors, such as whether they involve comparable technologies,

6    comparable economic circumstances, comparable structure, and

7    comparable scope.  If there are differences between the

8    license agreement and the hypothetical license, you must take

9    those into account when you make your reasonable royalty

10   determination.

11   If you find that Atlas, the Plaintiff, is entitled to

12   damages, you must decide whether the parties would have agreed

13   to a running royalty or whether they would have agreed to a

14   fully paid up lump sum royalty at the time of the hypothetical

15   negotiation.

16   A running royalty, ladies and gentlemen, is a fee paid

17   for the right to use the patent that is paid for each unit of

18   the infringing products that have been sold.  If there are

19   additional units sold in the future, any damages for these

20   sales will not be addressed by you.  If you decide that a

21   running royalty is appropriate, then the damages that you

22   award, if any, should reflect the total amount necessary to

23   compensate Atlas for the TP-Link Defendants' past

24   infringement.

25   However, a lump sum royalty is when the infringer pays a

1    single price for a license covering both past and future

2    infringement.  If you decide that a lump sum royalty is

3    appropriate, then the damages you should award, if any, should

4    reflect the total amount necessary to compensate the Plaintiff

5    for the Defendants' infringement throughout the life of the

6    patents.

7        If you find that Atlas has established that the TP-Link

8    Defendants have indirectly infringed by inducement, as

9    previously discussed, but have also found that Atlas has not

10   established that the TP-Link Defendants themselves directly

11   infringed any claim of the asserted patents, any award of

12   damages must be limited to the date you find that the TP-Link

13   Defendants had knowledge of the patents, or if you find that

14   the TP-Link Defendants first willfully blinded themselves to

15   the existence of the patents, then that date.

16       Atlas contends that the TP-Link Defendants' indirect

17   infringement, if any, began as of June the 8th, 2021.  The

18   TP-Link Defendants contend that indirect infringement, if any,

19   began no earlier than November the 22nd, 2021.

20       The parties also agree, however, that if you decide a

21   running royalty is appropriate, then the end date for damages

22   is September the 30th, 2022.

23       Now, with these instructions, ladies and gentlemen, we're

24   ready at this point to hear closing arguments from the

25   attorneys for the parties in this case.

1019

```
 1              The Plaintiff may now present its first closing argument.

 2                   MR. TRIBBLE:  Thank you.

 3                   THE COURT:  Would you like a warning on your time,

 4       Mr. Tribble?

 5                   MR. TRIBBLE:  Your Honor, I'd like a warning when I

 6       reach 20 minutes.

 7                   THE COURT:  I'll warn you when you have used 20

 8       minutes.

 9                   MR. TRIBBLE:  Thank you.

10                   THE COURT:  You may proceed with the Plaintiff's

11       first closing argument.

12                   MR. TRIBBLE:  Good morning.

13              We're at the end of the road.  The case is soon going to

14       be to be in your hands, but I'd like to take a second to just

15       thank you for your service.  As the Court has explained, trial

16       by jury is a fundamental right in this country.  I mean,

17       people have fought and died to preserve our Constitution and

18       our rights, and trial by jury is the one thing that totally

19       distinguishes the United States justice system from that of

20       any other country in the world.

21              And I know you've had to take time out of your lives and

22       your work.  Thank you.  This case and the trial by jury, it's

23       important -- trial by jury is important not just to help

24       resolve this particular dispute, but also in resolving that,

25       it sends a message to other companies on how they should
```

1020

1     behave, and it avoids future disputes and future lawsuits.

2          And so let's go to the next slide.

3          At the beginning of this case, counsel for TP-Link told

4     you that this is a simple case and that this case should be

5     decided upon what's fair, what is reasonable, and what treats

6     everybody the same.  It was striking because that's not an

7     argument that they don't infringe the patents; it's an

8     argument about damages.  And we'll get more to that a little

9     later.

10         This is an unusual case.  When I was questioning the

11    corporate representative of both Defendants, it was stunning.

12    I asked her, do they admit that they infringe the claims, that

13    they may infringe the claims.  And I was floored when she said

14    yes.  In fact, I asked her again, may infringe?  Yes.  That is

15    incredible.  That is a stunning admission.  That's what this

16    case is all about.

17         They don't seriously contest infringement, but they still

18    put it up there, made us walk through with Doctor Shoemake,

19    sitting right over there, for over four hours to throw it up

20    there, throw it against the wall, and see if maybe you'll

21    award us zero.

22         And the other thing she admitted, that TP-Link will take

23    a license.  I asked her why, why haven't you done it yet.  She

24    said, the price was too high.  And so that's the other thing

25    they're here.  They're hoping you will fill in a low ball

1    number on damages.

2        Let's go to the next slide.

3        And so I'll talk briefly about infringement.  Just -- I

4    have to walk you through the evidence.  And at the end of the

5    day, the first question you'll be asked to decide is, was

6    there infringement.

7        Next slide.

8        And in deciding this, the Court has instructed you that

9    you are the sole judge of the credibility and the weight of

10   the evidence.  And so if you do that judgment as to the

11   credibility and the weight of the evidence on infringement and

12   as to damages, I hope and I think you will find that the

13   greater weight of the evidence is in favor of Atlas.

14       Next slide.

15       And so we presented testimony from Doctor Shoemake.  25

16   years of WiFi experience.  You saw the huge WiFi standard that

17   he read through, every page.  He considered the infringing

18   products.  He's actually designed WiFi products himself.  He

19   has industry experience.  He looked at the patents, looked at

20   the products.

21       Let's go on.

22       And going through that, in addition to the standard, he

23   looked at the TP-Link website and documentation about its

24   products, and the WiFi chips inside.  He looked at the data

25   sheets and the documentation.  He looked at the WiFi Alliance

1    certifications at issue in this case.  And he looked at the

2    source code of Intel and Broadcom.

3         And so he looked -- he presented primarily his analysis

4    of just a few of the WiFi products that TP-Link offers.  But

5    as he testified, he looked at the documentation of every

6    single accused product in this case, tested the products

7    himself to confirm infringement.  He looked at the deposition

8    testimony and the responses to interrogatories that TP-Link

9    filed with the Court.

10        And so he also testified about the features, these

11   revolutionary features enabled by the patents, and explained

12   how each of the patents contributed to these features--the

13   download, the multiuser download enabled by OFDMA, the

14   multiuser upload, and the MIMO and the trigger frames.

15        And so -- next slide.

16        He also explained how these features enabled by the

17   patents gave important benefits to users of the access points

18   and other devices of TP-Link, the higher network throughput,

19   the increased efficiency, the lower latency, and the lower

20   power consumption, which in our world becomes very important.

21        Let's go on.

22        And he also walked you through for those benefits.  Those

23   are the same benefits that TP-Link is selling.  They are using

24   it to sell to their consumers.  The three times faster speed,

25   four times higher capacity, the greater efficiency, they say,

1    because of that, you need WiFi 6.  They don't say, WiFi 6 is

2    out there, you might want to get it--they tell their

3    customers, you need WiFi 6.

4         And the product packaging even, the boxes that TP-Link

5    Technologies puts the devices in.  Again, when you're looking

6    in the store, they're promoting these same benefits that are

7    enabled by the Atlas patents.

8         Next slide.

9         So at the end of the day when you're weighing evidence,

10    you have two experts.  You have Doctor Shoemake who testified

11    for over four hours.  Four hours.  And why did we have to

12    spend four hours?  Because officially TP-Link wouldn't admit

13    that they infringed until their corporate rep got up on the

14    stand and said, well, maybe we infringe after all, after she

15    heard Doctor Shoemake's testimony.

16         And then on the other side you have Doctor Hansen, and

17    his testimony was flimsy at best.  I mean, it was really

18    another unusual aspect of this case.  It was so weak.  They're

19    just throwing it against the wall.

20         And, in fact, if you look at it, he was asked on cross

21    examination a key question, you know, did you do an

22    infringement analysis.  I mean, why would you hire a

23    non-infringement expert and not have him do a real analysis of

24    whether the products infringe or not?

25         And he didn't -- wouldn't admit it on the stand at first,

1024

1    and we have a video depo of his prior sworn testimony in

2    deposition, and here is what he said:

3        "Well, let's say if you're trying to determine whether

4    any TP-Link product infringed any claim of the asserted

5    patents, what sort of evidence would you look to to make that

6    determination?

7        "I haven't -- you know, I don't believe I've done that

8    analysis, and I don't -- I would have to -- you know, there

9    would be -- I would have to perform some analysis on the

10   products and the patent claims, and I haven't done that

11   analysis."

12       And so essentially what he's saying is he didn't do an

13   infringement analysis.  He's an engineer.  Half his testimony

14   at the beginning was about TP-Link's -- how they handle

15   letters and emails like the notice letters that we sent and

16   how they ship products to the United States.  You don't need

17   an engineer to do that.  Okay?  He was up parroting some

18   canned defense arguments that were given to him by the

19   lawyers.

20       And so -- let's go back a slide.

21       And so in our case here's what we assert.  We assert

22   direct infringement of claim 1 of the '513 Patent and induced

23   infringement.  And as to the others, they're methods of

24   operation, and we say that TP-Link induces customers to

25   practice the methods in the invention by using their devices,

1    and it induces infringement by selling to TP-Link USA.

2         And so back up.

3         So every claim that we assert, we're asserting induced

4    infringement.  So that would be a pretty big part of a

5    legitimate analysis by the Defense expert.

6         Let's go to the next slide.

7         And yet amazingly he admitted -- Mr. Grinstein asked him,

8    "Did I miss it or did you never even mention the words induced

9    or inducement in your testimony yesterday or today?"

10        And he admits, "I don't recall mentioning induced

11   infringement."

12        And so next slide.

13        So when you're weighing the evidence, remember what

14   Doctor Hansen said was, well, in his view Atlas didn't meet

15   its burden of proof.  Well, that's not his job.  Okay?  You

16   are the sole deciders of whether we've met our burden of

17   proof.  And it's the scales of justice, as the Court pointed

18   out at the beginning.  And you weigh the evidence.

19        And let's give them some false credit and say they had a

20   little evidence.  Look at the mountain of evidence that we've

21   presented to you.  And if the scales tip ever so slightly,

22   even just a little bit in our favor, then it's more probably

23   true than not.

24        And as I said, there's a mountain of this evidence.  But

25   don't be confused.  We don't have to prove beyond a reasonable

1026

1    doubt.  We don't have to prove with certainty was there

2    probably infringement.  And, ladies and gentlemen, to me the

3    evidence is all one-sided.  And so we ask on Question 1 as to

4    infringement, that you check yes.

5        Next slide.

6        So let's talk about the real issue in this case--damages.

7    The key to this is, does TP-Link, after waiting years after

8    receiving notice, years of litigation, the hundreds of

9    thousands of dollars of expenses Atlas has had to incur for

10   expert analysis to present to you, are they entitled to the

11   same early discounts and other discounts that other licensees

12   got who -- licensees who went immediately to the table and

13   started negotiating?  Their own expert admits that he's

14   ignoring the discounts.  And then, of course, after unsealing

15   the courtroom, he then denied it right afterwards.  That's

16   credibility.  You have to judge his credibility.

17       Next slide.

18       Treat everyone the same way.

19       Next slide.

20       And so our FRAND obligation.  Okay?  It doesn't say

21   license everybody for the exact same per unit rate.  That's

22   not what it says.  Let's take a look.

23       Next slide.

24       It says that we'll grant a license under reasonable rates

25   without unfair discrimination.

1       Next slide.

2       So as you saw, Mr. Yudell, they offer everybody the same

3  structure.  You want to settle early, you get a 50 percent

4  discount.  You had high volume, you get a discount.  You're

5  one of the first adopters in your particular field, you get a

6  discount.  And everyone agreed that that is a proper way to

7  license this.  Mr. Yudell talked about it.  Their own expert

8  considered it.  And Mr. Weinstein testified at length about

9  this is the way to do it.  In fact --

10      Next slide.

11      In fact, what he said was not only is this proper, but he

12  said this is not unique to Atlas or this industry; these types

13  of discounts are common; this is a common structure that

14  complies with FRAND.  And that's all we're asking for.

15      Next slide.

16      And Mr. Weinstein walked through the four discounts.

17      Next slide.

18      Oh, Your Honor, at this point I request respectfully that

19  the Court seal the courtroom.

20          THE COURT:  All right.  Based on counsel's request,

21  I'll order the courtroom sealed.  I'll direct those not

22  subject to the protective order to excuse themselves until the

23  courtroom is reopened and unsealed.

24                  (Courtroom sealed.)

25

1028

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6                    (Courtroom unsealed.)

7           THE COURT:  Once the public has returned, Mr. Reed,

8    you may present Defendants' closing argument.

9         Would you like a warning on your time?

10          MR. REED:  Yes, Your Honor.  A warning at five

11   minutes, please.

12          THE COURT:  I'll warn you when you have five minutes

13   remaining.  You may proceed with Defendants' closing argument.

14          MR. REED:  Good morning, ladies and gentlemen.

15        Let me start also by thanking you for your service on

16   this jury.  I know that no one plans to spend a week listening

17   to evidence about WiFi 6 standards, listening to evidence

18   about what's fair and reasonable in damages.  I thank you for

19   making the sacrifice, taking time to help us, to help the

20   parties, resolve this dispute that's come up between us.

21        Now, back when I did my opening, you remember that I told

22   you that Atlas was going to throw a lot of technical

23   information at you, and that's exactly what happened.  But I

24   also told you that this case can be resolved on simple

25   principles.

1031

1    Now, with all due respect to Mr. Tribble, he didn't

2    correctly characterize my opening.  I didn't just say it's

3    only resolved on damages.  You recall we talked about the

4    burden of proof in my opening, who has the burden of proof of

5    proving infringement.  We talked about how Atlas is the only

6    company in this case that has the burden of proof.  You heard

7    that in the judge's jury instructions this morning.  Atlas has

8    the burden of proof.

9        And so the first question you have to answer in this case

10   is, have they met their burden of proof on infringement?  And

11   then if you decide that they have, then you reach the second

12   question.  That's where those other principles come into play,

13   the principles of what is fair, what is reasonable, and what

14   treats everyone the same way.  And those are the four

15   principles that you really need to decide the case today,

16   despite all the technical information and things you've seen.

17       Now, in particular, you're going to be asked to answer

18   four basic questions.  First, did Atlas satisfy its burden of

19   proof in showing that the TP-Link products infringe these

20   claims?  That's the first question.  If you answer that

21   question no, then you don't have to answer the next three

22   questions because that's the end of the inquiry.  That's the

23   end of the case.

24       But if you decide that they have somehow met their

25   burden, then you need to move on to the next two, three, and

1    four questions.  You have to decide what is fair, reasonable,

2    and non-discriminatory for a royalty rate.  You have to decide

3    how much you need to reduce that rate based on the fact that

4    the rates out there are for the whole portfolio.  How much do

5    you need to reduce it for the fact that in this case there are

6    only five patents out of the total of 38 patent families in

7    the portfolio?

8         And then, finally, you would need to answer the question

9    of what are the total sales to which to apply the royalty.

10   Those are the four questions that need to be answered in this

11   case.

12        Now, let's start with the first:  Did Atlas satisfy its

13   burden of proving infringement?  Now, before we get too far

14   into that, I want to talk about what's called a common

15   fallacy.  Now, a fallacy is kind of a lawyer word that we use

16   to describe an argument that's just not logically correct, and

17   so if it's not logically correct, it's a false argument.

18        Let me give you an example.  Take a look at this first

19   statement on the screen and ask yourself the question, is this

20   statement true:  If it is a lime, then it must be green.  Is

21   that a true statement?  Well, we all know that limes are green

22   so the answer is, yes, that's a true statement.  If it is a

23   lime, then it must be green.  That is true.

24        But what about the inverse of that statement?  What about

25   this statement:  If it is green, it must be a lime.  Is that

1    statement true?  Well, of course, that statement's false.  And

2    why is it false?  Because there are lots of things in the

3    world that are green that are not limes.

4        So whereas the first statement could be true, the inverse

5    of that statement is false.  That's the fallacy.  And when you

6    say a statement is true, the inverse is also true.  That's the

7    fallacy.

8        So how does that apply to this case?  Well, in this case

9    we don't have any lime fallacy, we have an infringement

10   fallacy.  Take a look at that first sentence on the screen.

11   If it practices Atlas' patents, then it must use WiFi 6.

12       Now, we saw a lot of testimony from Doctor Shoemake

13   showing that many of the elements of Atlas' patents are found

14   in the WiFi 6 standard.  So for the sake of argument, he may

15   be right.  That statement may be true.  If you do everything,

16   every element in Atlas' claims, you may be practicing or using

17   the WiFi 6 standard.  That statement may be true.

18       But that does not mean that the inverse of that statement

19   is true.  It does not mean that if it uses WiFi 6, then it

20   must practice Atlas' patents.  That is a fallacy.  And why is

21   it a fallacy?  Because, as Doctor Hansen testified, there are

22   many ways to implement the WiFi 6 standard that don't touch

23   Atlas' patents.

24       And why is that the case?  Well, as you've heard

25   testimony in this case, the WiFi 6 standard is very large.  It

has over 750 pages with I don't know how many features,

countless features. Atlas' patents are very narrow. They

allegedly only cover three of those features. So you can

practice the WiFi 6 standard, you can use the WiFi 6 standard,

you can be compliant with the WiFi 6 standard, and you can use

a whole host of features and be operable without touching

those three features that are in the Atlas patents.

Now, why is that important? Well, it's important because

it goes directly to the question of whether Atlas has

satisfied its burden of proof in this case. Remember, to

satisfy its burden, Atlas must show that every element, every

element, of every claim is found in an accused product. It's

not enough to say the claim elements are found somewhere in

the standard. That's not what they have to prove. That's the

fallacy I showed you. It's not whether it's found in the

standard; it's whether it's found in the product. And Atlas,

ladies and gentlemen, has not shown you that in this case.

Now, I need to address something Mr. Tribble said earlier

about the supposed stunning admission that our corporate

representative made at this trial. There's been no stunning

admission at this trial. What did she say? He asked her, a

non-engineer, do your products infringe the patents? And what

does she say? She says, they may. She didn't say they do,

she didn't say they don't, she said they may.

And why did she say that? It's because, as I told you in

1    our opening statement, we've heard testimony here today,

2    TP-Link -- or during the trial, TP-Link does not make the WiFi

3    chips that go into these products.  TP-Link does not have

4    access to the source code that describes how those WiFi chips

5    actually function.

6        So TP-Link does not have a mechanism to go into the

7    product and figure out whether it infringes Atlas' patents.

8    Only the chipmakers, Broadcom, Qualcomm, Intel, MediaTek,

9    those are the only companies that have the information that is

10   needed to show whether or not TP-Link infringes.  So when she

11   said they may infringe, it's not a stunning admission.  That's

12   simply telling the truth, that TP-Link does not have the

13   source code needed to determine infringement.

14       Now, recall we sat through four hours and 172 PowerPoint

15   slides from Doctor Shoemake, and you saw him put a hundred or

16   more checkmarks on his PowerPoint.  But what did he really

17   show you in that presentation?  Did he show you that every

18   element of even one single claim is found in a TP-Link

19   product?  No.

20       What he showed you was that a couple of elements may be

21   found in certain TP-Link products, but everything else he

22   pointed to was not the product, but the WiFi standard.  He

23   didn't show you what the products do; he showed you what's in

24   this 750 pages.  That's not the infringement question in this

25   case.

1    So instead of providing you with evidence of

2    infringement, he provided you evidence of the fallacy that I

3    showed you earlier, the fallacy that if you use WiFi 6, you

4    must infringe these patents.

5        In fact, for every single claim, for every claim without

6    exception, he used the WiFi 6 standard to check his box.

7    Every claim.  And I'll show you briefly that's true.  '259,

8    claim 18, for this element, he didn't show that it was found

9    in the product; he showed it was found in the WiFi standard.

10        For claim 1, he said same evidence applies.  So he didn't

11    show it's not in the product, only found in the standard.

12        '513, claim 15, for this element, didn't show that it was

13    found in a product, only showed it was found in a standard.

14        '513, claim 1, same evidence, didn't show it in the

15    product, only in the standard.

16        '738, claim 1, for this element, didn't show it in the

17    product, only showed it in the standard.

18        '679, claim 6, didn't show it in the product, only showed

19    it in the standard.

20        And claim 1, same evidence as claim 6, it's the same

21    flaw.

22        '187, claim 4, this element didn't show it in the

23    product, only showed it in the standard.

24        '187, claim 12, same evidence as claim 4, didn't show it

25    in the product, only showed it in the standard.

1037

1    Now, ladies and gentlemen, do you know what is most

2    surprising about this, what's surprising about Doctor

3    Shoemake's approach?  It's that Doctor Shoemake actually had

4    access to the source code.  He could have gone into the source

5    code, and if it was there, he could have showed you, okay,

6    here in the source code is every element of each of the

7    practicing claims.

8    Doctor Shoemake admitted the source code is a software

9    that runs inside processors inside the chips that dictates how

10   the product actually functions.  The source code dictates how

11   the product actually functions, and he had that source code.

12   And he had it for Broadcom, he had it for Intel.  He said he

13   could have looked at it for Qualcomm and MediaTek and just

14   decided not to do so.

15   So why would you not do that?  Why would you not use the

16   source code to show infringement?  Why would you just keep

17   using the standard?  The only reasonable inference to take

18   from that is because he looked in the source code and it

19   wasn't there.  For the Broadcom and Intel source code he

20   showed you, he didn't show a single claim -- that a source

21   code satisfied the elements of a single claim.  He showed you

22   an element here or source code shows an element here or source

23   code shows an element over there or maybe in this claim 1,

24   maybe in this other claim 1, but he never showed you a whole

25   claim satisfied by source code.

1038

1    And why?  What's the inference you have to draw from

2    that, is that it wasn't there.  He looked and it wasn't there

3    and then he stopped and said, okay, it's not in Broadcom, not

4    Intel, I'm done.  I'm not going to look at Qualcomm, I'm not

5    going to look at MediaTek.  But he still had to try to prove

6    infringement.  So what did he do?  Instead of trying to prove

7    the product infringes the claims, he tried to prove the

8    fallacy, the fallacy that, oh, well, if it says WiFi 6, it

9    infringes the patents.

10    Ladies and gentlemen, you saw the same thing with Doctor

11    Shoemake's product testing.  Mr. Tribble mentioned, oh, he did

12    all this testing to prove the products infringe.  What did he

13    really do?  There are 69 products in this case.  How many did

14    he test?  He tested only six.  Why stop at 6?  There's no

15    testimony from Doctor Shoemake that he couldn't have gone to

16    Walmart or couldn't have gone to Amazon and acquired all 69

17    products.  Nothing to suggest that.

18    So why didn't he do it?  Again, the only reason that

19    makes sense is he realized the evidence just wasn't there.

20    And he tested six products, and even though he tested six

21    products, he did not show you once, not once, that an entire

22    claim, every element, is proven by that testing.

23    And so he tried one, two, three, four, five, six

24    products, couldn't do it, and said, I'm done.  I'm not going

25    to show what the actual product does.  Instead, I'm going to

1039

1    show what the WiFi 6 standard says.  I'm not going to prove

2    infringement; I'm going to prove the fallacy.

3        So how has Atlas tried at this trial to distract you from

4    the fact that it hasn't met its burden?  Well, one of the

5    things you saw yesterday and what you saw again today was them

6    try to distract you by trying to shift the burden to TP-Link.

7        You recall Mr. Grinstein's testimony or cross examination

8    of our technical expert yesterday.  How many times did he ask

9    him, why didn't you look at the evidence to prove you don't

10   infringe?  If you wanted to prove TP-Link doesn't infringe,

11   why didn't you do this?  If you wanted to prove TP-Link

12   doesn't infringe, why did you do that?

13       And the reason why is that TP-Link does not have to prove

14   it doesn't infringe.  TP-Link does not have a burden of

15   proving it doesn't infringe.  Atlas is the only one with the

16   burden in this case.  They have to prove we don't infringe.

17   If they don't meet their burden, we don't infringe.

18       And so our expert -- they showed a clip from our expert.

19   Well, why didn't you evaluate whether they infringe?  Because

20   that's not his job.  He wasn't hired to evaluate whether we

21   infringe.  He was hired to evaluate whether Doctor Shoemake

22   had proven that we infringed.  He was hired to determine

23   whether Doctor Shoemake had met his burden of proving that we

24   infringe.  And he determined in every instance, including by

25   looking at the Qualcomm source code which Doctor Shoemake did

1    not look at, that he had not met that burden.  That was his

2    job.

3        So, ladies and gentlemen, the infringement question in

4    this case really boils down to one simple question:  Who is on

5    trial here?  Is TP-Link on trial in this case or is the WiFi 6

6    standard on trial in this case?  If the WiFi 6 standard was

7    the Defendant in this case, I might actually agree with Doctor

8    Shoemake.  I might agree that maybe it shows that the WiFi 6

9    covers a variety of elements.  But WiFi 6 is not the defendant

10   here.  TP-Link is the Defendant here.

11       And as you heard the Court say during the jury

12   instructions this morning, the only correct comparison is

13   between the accused products and the patent claims.  That was

14   in the instructions you heard from the Court this morning, and

15   you can read those in your instructions back in the jury room.

16   The only correct comparison is between the accused products

17   and the patent claims.

18       You're not going to see an instruction that says, oh,

19   well, another acceptable comparison is between the WiFi 6

20   standard and the patent claims, because that is not the law.

21   That is not Atlas' burden.  Atlas' burden was to prove that

22   the accused product used every element in those patent claims,

23   not that the WiFi 6 standard had those elements in it.  And

24   because they haven't shown that the accused products practice

25   every limitation in Atlas' claims, they haven't met their

1    burden.

2        And because they haven't met their burden, you must find

3    that TP-Link does not infringe in this case.  And you can do

4    that by checking the no box on the first question on the jury

5    form.  And once you've checked that box, you'll see from the

6    instructions on the verdict form, once you check no on the

7    form, your job is actually done.  You don't have to go on to

8    the remaining questions.  You don't have to answer any of the

9    remaining issues.  You go to the back of the verdict form, you

10   sign it, and you get to go home.

11       Well, let's talk for the sake of argument about damages.

12   Again, we don't believe they're entitled to any damages

13   because they haven't met their burden of proof on

14   infringement, but let's assume for the sake of argument that

15   they had, they somehow proved infringement.  The next question

16   becomes, what is fair and reasonable and non-discriminatory

17   for a royalty rate.

18       Let me ask you a question that you may be more familiar

19   with than maybe WiFi 6, and that question is buying a car.

20   When you're buying a car, who do you look to to tell you the

21   fair and reasonable price of that car?  If you're going to buy

22   a car, would you go talk to the dealer, to the salesperson,

23   and say, hey, tell me what is a fair and reasonable price for

24   this car?  I guarantee you their answer would be, well, the

25   fair and reasonable price is what's on this sticker right

1042

1    here.  That's fair, that's reasonable.  Or do you look to what

2    people have actually paid for the car in question, what people

3    in the real world have actually paid to get that vehicle?

4        Now, there's always discounts applied.  There's loyalty

5    discounts, and friend and family discounts.  There's Memorial

6    Day blow-out discounts, and all sorts of discounts that, you

7    know, dealers use to try to get the price to where it should

8    be.  But when you're trying to figure out what is the actual

9    fair and reasonable price, who are you going to talk to, the

10   dealer who's going to point to the sticker or are you going to

11   look to the market, what people are actually paying for the

12   car?

13       And, Your Honor, at this time I'd respectfully request

14   that we seal the courtroom.

15           THE COURT:  All right.  Based on counsel's request,

16   I'll order the courtroom sealed and direct those present not

17   subject to the protective order to exit the courtroom until

18   it's reopened.

19               (Courtroom sealed.)

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23                     (Courtroom unsealed.)

24          THE COURT:  All right.  You may proceed with your

25    final closing statement for the Plaintiff.

1056

1    MR. WARD:  Thank you, Your Honor.

2    May it please the Court, counsel.

3    I, too, want to thank you.  I thank you for your time

4    because time is precious and I'm going to talk to you about

5    time a little bit.

6    One thing that I think we can agree on, I think you'll

7    agree with me, is that this trial should be a search for the

8    truth.  That's what we want to find here.  Right?  Who's

9    telling you the truth?

10    Now, the Court's instructed you about some ways that you

11    can determine credibility of witnesses, credibility of

12    defenses, and that's something that I want to talk to you

13    about are some of the things that I think can help you make

14    that determination of who is credible in this case.

15    We do have limited time.  Right?  The Court keeps a timer

16    on us.  He's told us how much I have to close, how much time

17    we've got for witnesses, because court resources are precious,

18    your time is precious.  We know it's an imposition on you to

19    be here.

20    I asked you during voir dire about frivolous lawsuits.

21    Everyone raised their hand.  There's too many frivolous

22    lawsuits.  I agree.  They take up time.  They take up

23    resources.  But you know one thing we didn't talk about are

24    frivolous defenses.  And I think you've seen that in this

25    case.  They say, oh, TP-Link doesn't want to be here, Atlas

1    wants to be here.

2         I'm sure TP-Link doesn't want to be held to account.  I'm

3    sure that's true.

4         Do you really think Atlas wants to be here fighting

5    defenses that they throw up their hands, don't throw up any

6    opposition to after we spent hundreds of thousands of dollars

7    because for two years they said, we don't infringe, we don't

8    infringe, they get in here and they say, well, maybe.

9         We bring you Doctor Shoemake.

10        Doctor Shoemake, would you please stand up, sir?

11        You all saw Doctor Shoemake on the stand.  We've heard

12   about his four hours.

13        Thank you, Doctor Shoemake.

14        He testifies for four hours.  He's a preeminent expert.

15   He goes through lots of information.  And did you hear all

16   those cross points that Mr. Reed talked about in closing, how

17   they attacked him about, well, Doctor Shoemake, you didn't go

18   through this product, you didn't cite this document, you only

19   mapped the standard here?  You remember all that cross?

20        Huh!  You don't remember it because it didn't happen.

21   What you just heard was what they wish the evidence was.  What

22   he just argued, showing you slides about how Doctor Shoemake

23   didn't check this box right, there wasn't any evidence to

24   support this element.  Did they get up, did they have the guts

25   to ask him any of those questions when he's on the stand?

1058

1    They didn't.  What does that tell you about the strength of

2    this defense of non-infringement?

3         That's what's upsetting to us.  We wasted your time, we

4    wasted our time, we wasted the resources, we wasted the

5    Court's resources, when you-all just saw they spend the

6    majority of their time talking to you about damages because

7    that's what this case is about.  But they throw the Hail,

8    Mary.  They think, well, what if we could maybe convince them

9    they didn't check the box right?  How about if we compare the

10   lines in a patent claim to the lines in the standard?

11        Well, what does that have to do with?  Nothing.

12        They talk about, well, he didn't show you source code for

13   every product.  No, he didn't.  He spent the time, he looked

14   at the code on some of these products, and it confirmed what

15   the chip sheets that they produced to us showed.  He said, I'm

16   not going to spend more of your time and waste more time and

17   money proving what I've already proven.  He went through nine

18   different categories of evidence.  Some things applied to some

19   products, some things didn't.  Did they challenge any of it?

20   No.

21        So why would they do that?  Why would they behave this

22   way?  Because you've gotten to see what we've been dealing

23   with for two years.  They will say anything, they will do

24   anything, to get a cheaper price.

25        They're no longer saying, well, we sued the wrong

1   defendant.  They quit talking about TP-Link should have been

2   here because you-all know that if we'd sued TP-Link, TP-Link

3   would have been saying, oh, you've got the wrong defendant,

4   you should have sued TP-Link Corp or TP-Link Tech.  You've got

5   this rat's nest of corporate structure and, you know, go

6   figure it out because whoever you don't sue, we'll point the

7   finger at them.

8        Now, you've learned that we've got indirect infringement

9   claims on every one of these products.  So we don't have to

10  prove that they make, use, sell, or offer for sale for

11  indirect.  We just have that on one claim.  And you-all saw

12  the website that they now want to distance themselves from and

13  act like, oh, well, that's not ours.  Got their copyright on

14  it.  It's got their terms of service.

15       Can we see that slide 3?

16       Their terms of service say, TP-Link Corporation, Ltd.,

17  provides the website tp-link.com/us.  That's what their terms

18  of service say on the website.

19       And what does Ms. Sun say on the stand?  Oh, that's

20  wrong; that's just a header and a footer.  Don't believe your

21  lying eyes.  Trust me.  That's not what that means.  It

22  doesn't mean what it says.

23       That's who we're dealing with.

24       Doctor Shoemake took you through indirect infringement.

25  I'm not going to spend any more time on this.  He showed you

1060

1    how TP-Link Corp and Tech package up these products, they put

2    the labels on them, they put the user manuals on them, they

3    send them to the United States where people use them just as

4    they are intended, and they infringe the claims of the

5    patents.

6         Well, then they throw up an argument from Doctor Hansen.

7    They know infringement's there, and then they want to tell

8    you, well, WiFi 6 really isn't that much better than WiFi 5.

9         Can we see slide No. 6?

10        This is Doctor Hansen's slide.  He starts talking to you

11   about how WiFi 5 covers a 17,000-square-foot house and WiFi 6

12   gives you a couple of thousand feet more.

13        Did you hear anybody during our presentation say that you

14   get more square footage covered in your McMansion with WiFi 6?

15   No, that's not what we talked about the benefits of WiFi 6 and

16   these inventions.

17        Go to the next slide.

18        The benefits of the patented WiFi 6 technology, this is

19   from Doctor Shoemake's presentation where he took you through

20   the features that are embodied in the patents in this case,

21   and how they improve efficiency, speed, and coverage, and then

22   he mapped them on the products that the Defendants sell.  And

23   that's why it took four hours.  I guess they would have

24   preferred us to go through every product, every product, every

25   element, every claim, which he said he did that homework and

1061

1    he presented the evidence to you-all.  I guess they would say,

2    well, you know what, we need an eight-week trial so that we

3    can just kill a jury walking them through every claim on every

4    product.

5         Again, if they wanted to challenge his analysis, the time

6    to do it was when he was on the stand, not in closing argument

7    when he can't respond to anything.  But, again, that's what

8    we're dealing with.

9         Your Honor, I'm going to have to request that the

10   courtroom be sealed.

11             THE COURT:  All right.  I'll order the courtroom

12   sealed at this time at counsel's request.  If you're not

13   subject to the protective order in this case, you should exit

14   the courtroom until it's reopened.

15                       (Courtroom sealed.)

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12                         (Courtroom unsealed.)

13              THE COURT:  All right.  For the record, the

14      courtroom is reopened.

15          Ladies and gentlemen, you've heard closing arguments from

16      the parties through their counsel.

17          I would now like to provide you with just a few final

18      instructions before you begin your deliberations.

19          You must perform your duty as jurors without bias or

20      prejudice as to any party.  The law does not permit you to be

21      controlled by sympathy, prejudice, or public opinion.  All

22      parties expect that you will carefully and impartially

23      consider all the evidence, follow the law as I have given it

24      to you, and reach a just verdict regardless of the

25      consequences.

1   Answer each question in the verdict form based on the

2   facts as you find them to be following the instructions that

3   the Court has given you on the law.  Again, do not decide who

4   you think should win and then answer the questions to reach

5   that result.  One more time, let me remind you that your

6   answers to the questions in the verdict form must be

7   unanimous.

8   You should consider and decide this case as a dispute

9   between persons of equal standing in the community of equal

10  worth and holding the same or similar stations in life.  This

11  is true in patent cases between corporations, partnerships, or

12  individuals.

13  A patent owner is entitled to protect its rights under

14  the laws of the United States, and this includes bringing a

15  suit in a United States District Court for money damages for

16  infringement.

17  The law recognizes no distinction among types of parties.

18  All corporations, partnerships, other business organizations,

19  and individuals stand equal before the law regardless of who

20  they are, regardless of their size, and regardless of who owns

21  them.

22  When you retire to the jury room in just a few minutes to

23  deliberate on your verdict, as I have told you, you'll each

24  have a copy of these final instructions to take with you and

25  to review.

1    If during your deliberations you desire to review any of

2    the exhibits which the Court has admitted into evidence and

3    which have been presented to you during the trial, you should

4    advise me by giving a written note requesting that exhibit or

5    those exhibits to the Court Security Officer who will bring it

6    to me.  The notes should be signed and dated by your

7    foreperson.  I will then send that exhibit or exhibits to you.

8    Once you retire, you should first select your foreperson

9    and then conduct your deliberations.  If during your

10    deliberations you decide to recess at any time, follow all the

11    instructions that the Court's given you about your conduct

12    during the trial.

13    After you've reach a verdict, your foreperson is to fill

14    in your unanimous answers to those questions in the verdict

15    form, sign it and date it, and then advise the Court Security

16    Officer you've reached a verdict.  Do not reveal your answers

17    until such time as you are discharged, unless otherwise

18    directed by me.  And you must never disclose to anyone, not

19    even to me, ladies and gentlemen, your numerical division on

20    any unanswered question.

21    Any notes that you've taken over the course of the trial

22    are aids to your memory only.  If your memory should differ

23    from your notes, then you should rely on your memory and not

24    your notes.  The notes are not evidence, and a juror who has

25    not taken notes must still rely on his or her own independent

1    recollection of the evidence and should not be unduly

2    influenced by the notes of other jurors.  Notes are not

3    entitled to any greater weight than the recollection or

4    impression of each juror about the testimony.

5         If during your deliberations you want to communicate with

6    me at any time, you should give a written message or a

7    question signed by your foreperson to the Court Security

8    Officer who will bring it to me, and I'll then respond as

9    promptly as possible either by having you brought back into

10   the courtroom where I can address you orally, or I'll respond

11   to your question by written answer returned to you in the jury

12   room.  I will always first disclose to the attorneys in the

13   case any question or message you may send me before I respond

14   to any question or message.

15        Now, after you've reached a verdict and I have discharged

16   you from your position as jurors in this case, I want you to

17   understand you are not required to talk with anyone about your

18   service in this case.  However, ladies and gentlemen, at that

19   time and after I have discharged you from your position as

20   jurors, you will be completely free to talk with anyone of

21   your choosing about your service in this case.  That decision

22   will be left up to each of you 100 percent.  You will each

23   make your own decisions in that regard.  No one will force you

24   to talk about your service, but you will be completely free,

25   if you choose to, to talk about your service as jurors.

1    I'm now going to hand a clean verdict form together with

2  seven copies of these final instructions to the Court Security

3  Officer who will deliver them to you in the jury room.

4    Ladies and gentlemen of the jury, you may now retire to

5  the jury room to deliberate on your verdict.  We await your

6  decision.

7    (Whereupon, the jury left the courtroom.)

8    THE COURT:  Be seated, please.

9    Counsel, while the jury is deliberating, you are welcome

10  to wait here in the courtroom or to have a representative wait

11  here.  You are also free to wait at your respective locations

12  outside the courtroom.  I am going to ask that you not go any

13  further away than that in case we get a question or upon the

14  jury's return of a verdict.  We will contact you by telephone

15  or email if we receive a question or when a verdict is

16  returned.

17    Pending either a question for the jury -- from the jury

18  or a return of their verdict, we stand in recess.

19    (Jury deliberates.)

20    THE COURT:  Be seated, please.

21    Counsel, I've received the following note from the jury.

22  It reads as follows:

23    "We need a calculator.  Two, please."

24    And it's signed by Mr. Jeffery L. Johnson, who is Juror

25  No. 2 as the foreperson of the jury.

1    I have two handheld calculators.  Memories have been

2    cleared.  Any objection from either side as to me sending

3    these into the jury?

4            MR. TRIBBLE:  No objection from Plaintiff.

5            MR. REED:  No objection for Defendants.

6            THE COURT:  All right.  I'll hand the calculators to

7    the Court Security Officer and direct them to deliver them to

8    the jury.  And I'll deliver the original note from the jury to

9    the Courtroom Deputy.

10    Pending either another note from the jury or the return

11    of a verdict, we remain and we stand in recess.

12                (Deliberations continue.)

13            THE COURT:  Be seated, please.

14    Counsel, I've received the following note from the jury:

15    "We have come to a verdict."

16    This is signed by Mr. Johnson as foreperson.  And I will

17    hand the original note to the Courtroom Deputy.

18    Is there any reason I shouldn't bring in the jury and

19    receive their verdict?

20            MR. TRIBBLE:  I don't believe so, Your Honor.

21            MR. REED:  No, Your Honor.

22            THE COURT:  Let's bring in the jury, please.

23            (Whereupon, the jury entered the courtroom.)

24            THE COURT:  Please be seated, members of the jury.

25    Mr. Johnson, I understand you are the foreperson of the

1    jury.  Is that correct?

2            THE PRESIDING OFFICER:  Yes, sir.

3            THE COURT:  Has the jury reached a verdict?

4            THE PRESIDING OFFICER:  Yes, Your Honor.

5            THE COURT:  Will you hand the completed verdict form

6    to the Court Security Officer who will bring it to me?

7        Ladies and gentlemen of the jury, I'm going to announce

8    the verdict into the record at this time, and I'm going to ask

9    each member of the jury to listen very carefully as I do this,

10   because once I have announced the verdict into the record, I'm

11   going to poll the jury to make sure that this is, in fact, the

12   unanimous verdict of all seven members of our jury.

13       Turning to the verdict form and beginning on page 4 where

14   Question 1 is found, "Did Atlas, the Plaintiff, prove by a

15   preponderance of the evidence, that TP-Link, the Defendants,

16   infringed any of the asserted claims?"

17       The jury's answer is, "Yes."

18       Turning to page 5 of the verdict form where Question 2A

19   is found, "What sum of money if now paid in cash has Atlas,

20   the Plaintiff, proven by a preponderance of the evidence would

21   compensate it as a fair, reasonable, and non-discriminatory

22   FRAND royalty for the Defendants' infringement of the asserted

23   claims that you have found to be infringed?"

24       The jury's answer is, "$37,481,264."

25       Question 2B follows on page 5 of the verdict form.  "Is

1075

1    the total amount of the reasonable royalty that you have found

2    in Question 2A a one-time lump sum for past and future sales

3    or a running royalty for past sales only?"

4         The jury's answer is, "Lump sum."

5         Turning to page 6, which is the final page of the verdict

6    form, I find it is dated with today's date, September the

7    14th, 2023, and it is executed by Mr. Johnson as foreperson of

8    the jury.

9         Ladies and gentlemen of the jury, let me poll you at this

10   time to make sure and to evidence in the record that this is,

11   in fact, the unanimous decision of all seven members of the

12   jury.  If this is your verdict as I have read it, would you

13   please stand up?  Thank you, ladies and gentlemen of the jury.

14   Please be seated.

15        Let the record reflect that all seven members of the jury

16   immediately rose and stood in response to the Court's question

17   to poll the jury.  This confirms that this is the unanimous

18   verdict of all seven members of the jury.

19        Ladies and gentlemen, I accept the jury's verdict and I

20   will hand the original executed verdict form to the Courtroom

21   Deputy.

22        This now completes the trial of this case, ladies and

23   gentlemen.  From the very beginning, I have instructed you

24   time and time again about your conduct during the trial.  I

25   had directed you not to do certain things.  I have told you

1    probably more times than you wanted to hear not to communicate

2    with anybody, including the members of the jury itself, about

3    the evidence in this case until you retire to deliberate.  I

4    am releasing you from all those instructions and all those

5    requirements.  I'm releasing you as members of this jury now

6    that you have completed your job and the Court has accepted

7    your verdict.

8        I want to mention one thing to you.  Now that the verdict

9    has been accepted by the Court and you have been discharged as

10   jurors, I'd like to ask a personal favor of each of you.  That

11   is, when you get up from those chairs in just a minute,

12   instead of immediately leaving the courthouse, I'd like you to

13   go back in the jury room, if you would, for just a few minutes

14   and allow me the privilege of coming into the jury room.  I

15   would like to shake each hand, I would like to look each one

16   of you in the eye and tell you personally, person to person,

17   thank you for your service in this case.  I am convinced what

18   you've done is significant and important and is worthy of that

19   kind of personal thanks, and I would consider it a great

20   personal honor if you would allow me to thank you in person

21   before you leave.  This has been a long trial.  You've worked

22   hard.  I promise you I'm not going to keep you very long, but

23   before you leave, if you will let me come back and meet with

24   you in the jury room and thank you for your service in person,

25   I will consider it a great privilege.

1    One other thing I need to tell you about.  The custom and

2    practice in the Marshall Division of the U.S. District Court

3    for the Eastern District of Texas has for decades been as

4    follows in this circumstance:  The lawyers in the case on both

5    sides and all their support teams are not allowed to approach

6    you and try to initiate a conversation with you about your

7    service on this jury.  They are prohibited from doing that by

8    the Court.  You, on the other hand, are free to talk with

9    anyone at any time about your service in the case now that the

10   case is over and you've been released by me as members of the

11   jury.

12   The way this has worked for the last more than 30 years,

13   because I've been watching it happen for more than the last 30

14   years, is there is one way in and out of this courthouse and

15   that is down those front steps.  Don't be surprised when you

16   go out of the building and down those front steps if you don't

17   find lawyers from both sides of this case standing on the

18   sidewalk near the bottom of the steps.  They are hoping you

19   will stop and initiate a conversation with them because win,

20   lose, or draw, they want to know what you thought about what

21   they did, how they did it, what you liked, what you didn't

22   like.  They would very much like to have your input.  It's up

23   to you whether you want to stop and talk to them or whether

24   you want to just smile and walk right past them and go to your

25   vehicles and go on about your way.  It is totally up to you.

1078

1    They will not obstruct your path in any way, they will not do

2    anything to initiate a conversation with you, but they will

3    make it easy for you if you want to initiate a conversation

4    with them.

5        Now, to address that reality, over the last several years

6    I've begun doing something new, and that is before the

7    verdict's returned, I ask the trial teams from both sides of

8    the case to give me a name and a phone number of a contact

9    person for each side, and I have those names and numbers

10   printed on little pieces of paper, and I'm going to put those

11   on the table in the jury room in just a minute when I come

12   back there to thank you for your service.  If you think

13   tomorrow, next week, next month you might want to talk to one

14   or both sides of this case but you don't want to do it today,

15   take one of those slips of paper and you'll have a name and

16   phone number to call from either or both sides of the case, if

17   you choose to do it.  If you know you don't ever want to talk

18   to any of these people, don't pick up the piece of paper and

19   don't take it with you, but you will have that option.

20       And you're also free to stop on your way out of the

21   building and visit in person with anybody that's there that

22   wants to visit with you, but I'm telling you, they will be

23   there hoping you will want to visit with them.  But I don't

24   want you to feel compelled to either do it now or never, and

25   that's why I'll provide those names and phone numbers so that

1    you have the option of doing it at a later time if you want

2    to.  But again, you're not required in any shape, form, or

3    fashion from communicating with anybody about this case.  But

4    by the same token, you are 100 percent free to talk with

5    anybody of your choosing about this case and your experience.

6    I hope that will make it easier for you.

7         With that, ladies and gentlemen, again, if you would

8    allow me just a few minutes to thank you in person before you

9    leave, I will meet you in the jury room.

10        Counsel, I've accepted the jury's verdict.  That

11   completes the trial of this case.  Counsel, you are excused.

12        Court stands in recess.

13             (The proceedings were concluded at 1:05 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

1    I HEREBY CERTIFY THAT THE FOREGOING IS A

2    CORRECT TRANSCRIPT FROM THE RECORD OF

3    PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

4    I FURTHER CERTIFY THAT THE TRANSCRIPT FEES

5    FORMAT COMPLY WITH THOSE PRESCRIBED BY THE

6    COURT AND THE JUDICIAL CONFERENCE OF THE

7    UNITED STATES.

8

9    S/Shawn McRoberts          09/14/2023

10   _____DATE_____
     SHAWN McROBERTS, RMR, CRR
11   FEDERAL OFFICIAL COURT REPORTER