# EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### MARSHALL DIVISION



ATLAS GLOBAL TECHNOLOGIES LLC,  §
§
*Plaintiff*,  §
§
v.  §  CIVIL ACTION NO. 2:21-CV-00430-JRG-RSP
§
§
TP-LINK TECHNOLOGIES CO., LTD. and  §
TP-LINK CORPORATION LTD.,  §
§
*Defendants*.  §
§

## MEMORANDUM OPINION AND ORDER

Before the Court is the Motion Pursuant to Fed. R. Civ. P. 59 for a New Trial (the "Motion for New Trial") filed by Defendants TP-Link Technologies Co., Ltd. and TP-Link Corporation Ltd. ("Defendants"). (Dkt. No. 330). Also before the Court is Defendants' Motion for Judgment as a Matter of Law Under Federal Rule of Civil Procedure 50(b) (the "JMOL Motion"). (Dkt. No. 331). Finally, before the Court is the Joint Motion to Amend and Alter the Final Judgment (the "Joint Motion to Amend") filed by Defendants and Plaintiff Atlas Global Technologies LLC ("Atlas"). (Dkt. No. 328). Having considered these matters, the Court finds that the Motion for New Trial and the JMOL Motion should be **DENIED** and the Joint Motion to Amend should be **GRANTED**.

## I.    DISCUSSION: MOTION FOR NEW TRIAL (DKT. NO. 330)

In the Motion for New Trial, Defendants move "pursuant to Fed. R. Civ. P. 59(a) for a new trial and pursuant to Fed. R. Civ. P. 59(e) to amend or alter the judgment" on six bases. ***First***, Defendants argue that "[t]he Court should vacate the Final Judgment because the Court lacks personal jurisdiction over Defendants and transfer it to the Central District of California under 28 U.S.C. §1406 to cure the jurisdictional defect." (Dkt. No. 330 at 1-2). ***Second***, Defendants argue

that the Court's imposition of pre-trial sanctions against Defendants was a prejudicial error that resulted in an unfair trial and an excessive damages award. (*Id.* at 2-10). ***Third***, Defendants contend that "by asking a single infringement question for all patents, the verdict form violated Defendants' right to jury unanimity." (*Id.* at 10-11). ***Fourth***, Defendants argue that allowing expert testimony from Dr. Shoemake (Atlas's technical expert) and Mr. Weinstein (Atlas's damages expert) "violated Defendants' right to a fair trial." (*Id.* at 11-13). ***Fifth***, Defendants contend that "[t]he damages verdict was contrary to the weight of the evidence as Defendants qualified for discounts during the hypothetical negotiation not reflected in the jury verdict." (*Id.* at 14-15). ***Sixth***, and finally, Defendants "renew their prior objections to the Magistrate Judge's Report and Recommendation on Claim Construction as to the claims ultimately asserted at trial," concluding that "the jury was improperly instructed regarding the meaning of the disputed terms of the asserted claims." (*Id.* at 15). The Court addresses each in turn but finds that no basis that compels setting aside the jury's verdict and granting a new trial.

## A. Applicable Law

Rule 59 provides that a new trial may be granted on all or part of the issues on which there has been a trial by jury for "any reason for which a new trial has heretofore been granted in an action at law in federal court." FED. R. CIV. P. 59(a). Notwithstanding the broad sweep of Rule 59, "courts do not grant new trials unless it is reasonably clear that prejudicial error has crept into the record or that substantial justice has not been done, and the burden of showing harmful error rests on the party seeking the new trial." *Metaswitch Networks Ltd. v. Genband US LLC*, No. 2:14-CV-00744-JRG, 2017 WL 3704760, at *2 (E.D. Tex. Aug. 28, 2017); *Erfindergemeinschaft UroPep GbR v. Eli Lilly & Co.*, 276 F. Supp. 3d 629, 643 (E.D. Tex. 2017). "A new trial may be granted, for example, if the district court finds the verdict is against the weight of the evidence, the damages awarded are excessive, the trial was unfair, or prejudicial error was committed in its course." *Smith*

*v. Transworld Drilling Co.*, 773 F.2d 610, 612–13 (5th Cir. 1985); *see also Laxton v. Gap Inc.*, 333 F.3d 572, 586 (5th Cir. 2003) ("A new trial is warranted if the evidence is against the great, and not merely the greater, weight of the evidence."). Furthermore "[u]nless justice requires otherwise, no error in admitting or excluding evidence—or any other error by the court or a party— is ground for granting a new trial . . . . the court must disregard all errors and defects that do not affect any party's substantial rights." FED. R. CIV. P. 61.

Under Rule 59(e), a party can move the Court to amend an order or judgment within 28 days of entry. FED. R. CIV. P. 59(e). "Rule 59(e) is properly invoked 'to correct manifest errors of law or fact or to present newly discovered evidence.'" *In re Transtexas Gas Corp.*, 303 F.3d 571, 581 (5th Cir. 2002) (internal citations omitted). A motion for reconsideration "is not the proper vehicle for rehashing evidence, legal theories, or arguments that could have been offered or raised before." *Templet v. HydroChem Inc.*, 367 F.3d 473, 479 (5th Cir. 2004). Given that "specific grounds for a motion to amend or alter are not listed in the rule, the district court enjoys considerable discretion in granting or denying the motion." *Allstate Ins. Co. v. Herron*, 634 F.3d 1101, 1111 (9th Cir. 2011) (internal citations omitted). Accordingly, relief under Rule 59(e) is appropriate only when (1) there is a manifest error of law or fact; (2) there is newly discovered or previously unavailable evidence; (3) there would otherwise be manifest injustice; or (4) there is an intervening change in controlling law. *Schiller v. Physicians Res. Grp. Inc.*, 342 F.3d 563, 567 (5th Cir. 2003). As a result, "[r]econsideration of a judgment after its entry is an extraordinary remedy that should be used sparingly." *Templet*, 367 F.3d at 479.

## B. Whether the Court Should Vacate the Final Judgment Due to Lack of Personal Jurisdiction over Defendants

Defendants argue that "[t]he Court's finding of personal jurisdiction in this matter is contrary to the Court's own prior order in *Stingray IP Sols. LLC v. TP-Link Techs. Co.*, No. 2:21-

CV-00045-JRG." (Dkt. No. 330 at 1). Defendants contend that "[t]he *Stingray* action involved the (i) the same Defendants; (ii) the same distributor of Defendants' products (TP-Link USA); (iii) a plaintiff controlled by the same parent (Acacia) as Atlas; (iv) the exact same jurisdictional Rule 30(b)(6) deposition; and (v) materially identical jurisdictional declarations and documents." (*Id.* at 2). Defendants continue that, "[d]espite these identical facts, the Court's Order adopting the Magistrate Judge's Report and Recommendation finding jurisdiction over Defendants in this case does not cite, distinguish, or otherwise attempt to reconcile the *Stingray* holding where the Court held that there was no personal jurisdiction over Defendants," requiring vacatur of the Final Judgment. (*Id.* (citing Dkt. No. 113)).

In response, Plaintiff contends that Defendants' arguments fail for two reasons. First, Plaintiff argues that "Rule 59 'is not the proper vehicle for rehashing evidence, legal theories, or arguments.'" (Dkt. No. 340 at 2 (citing *Templet*, 367 F.3d at 479)). Second, Plaintiff contends that: (1) "[t]his Court's *Stingray* decision is inapposite because it concerned Rule 4(k)(2)—which the Court in this case cited only as an alternative ground establishing its jurisdiction over Defendants" (*id.* (citing Dkt. No. 92 at 1-6)); and (2) "Defendants conspicuously ignore it was *reversed* by the Federal Circuit and is thus of no help to their position." (*Id.* (citing *In re Stingray IP Sols., LLC*, 56 F.4th 1379 (Fed. Cir. 2023))).

In reply, Defendants argue that the *Stingray* decision addressed both Rule 4(k)(1) and 4(k)(2), and "[t]he Federal Circuit's mandamus order addressed only Rule 4(k)(2) because the *Stingray* plaintiff did not challenge the Court's holding that there was no personal jurisdiction under Rule 4(k)(1)." (Dkt. No. 343 at 1). Defendants recognize that "[t]his dispute has been previously raised previously with the Court (Dkt. 94)"—and decided against Defendants— however, Defendants contend that "the Court has not addressed the incongruity in Rule 4(k)(1)

holdings on identical facts between Stingray and here" and that it should do so now. (*Id.*).

In sur-reply, Plaintiff argues that "Defendants' Reply utterly fails to show that the Court should revisit its prior finding that it has personal jurisdiction," noting that "Defendants have no answer to hornbook law holding that Rule 59 'is not the proper vehicle for rehashing evidence, legal theories, or arguments.'" (Dkt. No. 347 at 1 (quoting *Templet*, 367 F.3d at 479)). Furthermore, Plaintiff points out that "while Defendants acknowledge they previously made the exact same arguments (Dkt. 94) and the Court rejected them (Dkt. 113), they offer no reason for the Court to revisit that holding other than the unsupported assertion that the Court should." (*Id.*). Finally, Plaintiff argues that not only was the Court's *Stingray* decision vacated by the Federal Circuit, but "the Federal Circuit decision supports Atlas and confirms this Court's jurisdiction." (*Id.*).

First, the Court finds that Defendants do nothing more than re-raise a legal theory regarding lack of personal jurisdiction that they previously brought (Dkt. No. 94 (objecting to the Magistrate Judge's Report and Recommendation)) and that was previously denied by this Court (Dkt. No. 113). As the Fifth Circuit has instructed, a Rule 59(e) motion "is not the proper vehicle for rehashing evidence, legal theories, or arguments that could have been offered or raised before the entry of judgment." *Templet*, 367 F.3d at 479. Indeed, "Rule 59(e) serves the narrow purpose of allowing a party to correct manifest errors of law or fact or to present newly discovered evidence," and "[r]econsideration of a judgment after its entry is an extraordinary remedy that should be used sparingly." *Id.* (internal citations and quotations omitted). Asking this Court to distinguish a prior decision of the Court—an argument raised by Defendants previously—does not meet the narrow requirements of Rule 59(e). Such argument identifies neither a manifest error of law or fact nor presents newly discovered evidence.

Moreover, Defendants' entire argument is premised on a decision of this Court (*Stingray*) that was vacated by the Federal Circuit.[1] That, in and of itself, is an adequate reason to dispose of Defendants' request. Notably, the Federal Circuit in *Stingray* vacated this Court's finding that personal jurisdiction did **_not_** exist under Rule 4(k)(2) for the TP-Link defendants because this Court improperly relied upon the post-suit consent of the TP-Link. *See In re Stingray IP Sols., LLC*, 56 F.4th at 1386 ("In further proceedings consistent with this order, the district court may find it necessary to assess whether TP-Link can satisfy Rule 4(k)(2)'s negation requirement on the grounds that Stingray 'could have brought suit' in the Central District of California, independent of TP-Link's post-suit consent."). The directive of the Federal Circuit was adhered to in the present case and the conclusion was reached that 4(k)(2)—in addition to 4(k)(1)—provided a basis for personal jurisdiction over Defendants. (Dkt. No. 92 at 3-5 ("Alternatively [to Rule 4(k)(1)], Federal Rule of Civil Procedure 4(k)(2) is applicable. . . . Because defendants cannot merely submit to the personal jurisdiction of the Central District of California for purposes of transfer and because defendants impliedly challenge the personal jurisdiction of the Central District of California, defendants are precluded from relying upon such a submission to defeat the application of Rule 4(k)(2)."). As such, personal jurisdiction exists over Defendants and any further inquiry into the nuances of this Court's 4(k)(1) analysis in the present case as compared to the vacated *Stingray* opinion is of no effect as to this Motion for New Trial. In sum, Defendants' re-urged arguments are rejected once more.

### C. Whether the Imposition of Pre-Trial Sanctions Was Prejudicial Error that Resulted in an Unfair Trial and an Excessive Damages Award

As part of the pre-trial process in this case, the Court, on a motion for sanctions brought by

---

[1] The *Stingray* case settled before the Court was able to re-examine the issue of personal jurisdiction. *See Stingray IP Solutions, LLC*, 2:21-CV-00045-JRG, Dkt. No. 99 (E.D. Tex. Mar. 9, 2023).

Plaintiff (Dkt. No. 175), found that Defendants' failure to comply with its discovery obligations regarding its relationship with TP-Link USA was "nothing short of exceptional." (Dkt. No. 261 (the "Sanctions Order") at 7 (citing *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014))). As a result, the Court imposed a sanction that "the sales figures in the IDC reports relied upon by Plaintiff's expert shall be deemed established and may not be attacked by Defendants." (*Id.*)

Defendants now argue that "[t]his sanction was erroneous and resulted in an unfair trial and an excessive damages award— ███████████████████████████████████████ ████████ (Dkt. No. 330 at 2). Defendants raise five bases for its present dispute: (1) that Defendants did not violate any discovery order; (2) that Defendants' compliance with Federal Rule of Civil Procedure 7.1(b)(2) provided no basis for the Court's sanction; (3) that the sanction imposed was disconnected from the alleged violation; (4) that Atlas exploited the Sanctions Order to advance a false narrative at trial; and (5) the Sanctions Order resulted in excessive damages. (*Id.* at 2-9).

### 1. Defendants' Bases (1), (2), and (3)

In response, Plaintiff first argues that "Defendants are not entitled to relitigate a discovery dispute that the Court already considered, decided, and reaffirmed repeatedly." (Dkt. No. 340 at 3). As Plaintiff correctly notes, "[t]he Court has afforded considerable process to both parties to hear the relevant facts and arguments concerning Defendants' sales data deficiencies, including in three hearings, seven briefs, and four orders." (*Id.*)

The Court agrees with Plaintiff. That Defendants do not like the sanction imposed upon them is no surprise. However, that sanction was necessary to rectify Defendants' exceptional discovery failures and remedy the prejudice Defendants' failures visited upon Plaintiff. Had Defendants properly and timely disclosed their relationship to TP-Link USA, such a sanction

7

would not have been necessary—Defendants chose not to make that disclosure. The blame rests solely with Defendants. Dissatisfied with shouldering responsibility for their discovery failures, Defendants have twice argued that the sanction against them would be and is improper—first in Defendants' opposition to Plaintiff's motion for sanctions (Dkt. Nos. 184, 259) and then in Defendants' objections to the Sanctions Order (Dkt. No. 282)—with those arguments rejected in each instance. (Dkt. Nos. 261, 289). With an apparent reliance on "the third try is the charm," Defendants once more dispute the propriety of the sanction imposed upon them. However, Defendants cite no authority showing that Rule 59 is an appropriate basis for re-litigating a discovery dispute twice resolved against them. Indeed, this is not the proper posture for such a request. *See Templet*, 367 F.3d at 479 ("This Court has held that [a Rule 59(e)] motion is not the proper vehicle for rehashing evidence, legal theories, or arguments that could have been offered or raised before the entry of judgment."); *Raymond v. Blair,* No. CIV.A. No. 09-5507, 2010 WL 3283098, at *3 (E.D. La. Aug. 17, 2010) ("Rule 59(e) should not be used for re-litigating matters that have been resolved to the movant's dissatisfaction."). As the Rules make clear, "[u]nless justice requires otherwise, no error in admitting or excluding evidence—or any other error by the court or a party—is ground for granting a new trial." FED. R. CIV. P. 61.

Ignoring, for purposes of discussion, that Defendants' arguments should be rejected as improperly brought before the Court in the context of a Rule 59 motion, the Court additionally finds that Defendants' arguments are (still) without merit. With respect to Defendants' first three arguments—(1) that Defendants did not violate any discovery order; (2) that Defendants' compliance with Federal Rule of Civil Procedure 7.1(b)(2) provided no basis for the Court's sanction; (3) that the sanction imposed was disconnected from the alleged violation—the Court notes that Defendants advanced the same arguments in opposing the request for sanctions and in

objecting to the Sanctions Order. *See* (Dkt. No. 282 at 1-3 (arguing that "there was no violation of any discovery order by this Court"), 3-4 (arguing that "filing a [Rule 7.1(b)(2)] supplemental corporate disclosure statement as mandated by the Federal Rules is not a violation of any discovery order"), 4-5 (arguing that "[t]he sanction imposed in the Order was itself clearly erroneous" as disconnected from Defendants' discovery failure); *see also* (Dkt. Nos. 184, 259). As was the case previously when Defendants raised these critiques, the Court is not persuaded. *See* (Dkt. No. 289 (Order overruling Defendants' objections)); *cf. Finesse Wireless LLC v. AT&T Mobility LLC*, No. 2:21-CV-00316-JRG, 2023 WL 5613160, at *4 (E.D. Tex. Aug. 30, 2023) (rejecting re-urged complaints of a pre-trial evidentiary ruling by Magistrate Judge Payne where "Defendants have not come forward with any new arguments showing why this ruling was incorrect in the first place").

Defendants' attempts to downplay their discovery failures as minor and unrelated to the sanction imposed upon them are simply unconvincing. As Magistrate Judge Payne stated in the Sanctions Order, the sanction was necessary because otherwise:

> (1) "[t]he added complexity in presenting two separate sets of Defendants' sales data and explaining Defendants' discovery conduct to the jury would distract from addressing the cause of action in the case,"
>
> (2) "the remedy is necessary because Defendants would otherwise undercut the reliability of the IDC sales data," and
>
> (3) "[w]ithout having the information regarding the recurring dispute about Defendants' relationship with TP-Link USA revealed through discovery hearings, the jury would not be able to fully evaluate the lessened reliability of the sales data obtained and produced from the TP-Link Defendants and TP-Link USA, as well as the need for Plaintiff's expert

to use the IDC data."

(Dkt. No. 261 at 6). Based upon Defendants' discovery failures—discussed in detail in the Sanctions Order (Dkt. No. 261) and Plaintiff's Response to the present Motion for New Trial (Dkt. No. 340 at 4-8)—the Court concluded that treating the "IDC unit counts as established facts in this action is an appropriate remedy to cure the prejudice to Atlas Global that occurred during discovery." (Dkt. No. 261 at 6). Defendants have provided the Court with no reason to reconsider that ruling. In short, and for the reasons explained in the Sanctions Order, the sanction imposed upon Defendants was a proper exercise of the Court's "broad discretion under Rule 37(b) to fashion remedies suited to the misconduct." *Pressey v. Patterson*, 898 F.2d 1018, 1021 (5th Cir. 1990)*; see also Hernandez v. Rush Enterprises, Inc*., No. 4:19-CV-638, 2020 WL 7041822, at *1 (E.D. Tex. Dec. 1, 2020) (Rule 37 provides the Court with "the option to bar the disobedient party from introducing evidence or direct that certain facts shall be 'taken to be established for purposes of the action'") (citing FED. R. CIV. P. 37(b)(2)(A)(i)).[2]

### 2. *Defendants' Basis (4)*

Defendants' fourth argument is that Plaintiff exploited the Sanctions Order to advance a "false narrative" by "repeatedly compar[ing] a projected unit sales number derived from [a licensing offer] letter *to the IDC data* Defendants' expert was forced to use under the Sanctions Order (43 million units), not to the *actual sales data* on which the offer letter was truly based, to create a false impression of unreasonableness." (Dkt. No. 330 at 8-9 (excerpting two questions asked by Plaintiff's counsel to Defendants' corporate representative)). Defendants contend that "[t]his exploitation of the Sanctions Order to present a false narrative to the jury was unfair and

---

[2] In addition to Rule 37, the Court "also has inherent powers to enter sanctions," *FURminator, Inc. v. PetVac Grp. LLC.*, 2011 WL 3439309, at *5 (E.D. Tex. Aug. 5, 2011), "to punish recalcitrant parties and to deter those similarly situated," *Batson v. Neal Spelce Assoc., Inc.*, 765 F.2d 511, 516 (5th Cir. 1985).

prejudicial to Defendants, and can only be corrected by ordering a new trial where Defendants can give the jury the actual context in which the letter was written." (*Id.* at 9).

In response, Plaintiff first argues that "Defendants did not lodge a single objection to either question at trial," and as a result "any argument about whether those questions were properly before the jury has been waived, and Defendants' argument should be rejected on that basis alone." (Dkt. No. 340 at 8). Plaintiff next argues that "there was nothing 'false'" in their narrative, as Plaintiff "showed the jury that the licensing offer Defendants paraded about was unreasonable and made in bad faith because it relied on far fewer unit sales (approximately 11 million) than even their own expert used in his analysis." (*Id.* at 8-9). Specifically, Plaintiff notes that it "could have advanced the *exact same* narrative if the Court had permitted Defendants to present their own sales information" because, ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████ (*Id.* (citing Dkt. No. 319 at 762:18-24)).

In reply, Defendants contend that, while they did not object at trial to the two specific questions they quoted in their brief, they did object "to this line of questioning during trial." (Dkt. No. 344 at 3-4 (citing Dkt. No. 319 at 9:14-10 – 9:16:13)).

In sur-reply, Plaintiff contends that "Defendants failed to preserve objections regarding the[] [two] questions [excerpted in their Motion for New Trial], and Defendants' attempt to raise new questions on Reply that were not cited to in the Motion is improper." (Dkt. No. 347 at 4 (citing (Dkt. No. 319 at 914:30–916:13)).

As an initial matter, the Court finds that Defendants did not waive their objections to this line of questioning. While Defendants did not object specifically to the two questions quoted in their Motion for New Trial, they did object to this line of questioning during trial:

Q. Your projection that you're giving this jury for future sales of just the accused products in this case is 45 million units, isn't it?

MR. BELL: Objection, Your Honor. May I approach?

THE COURT: Approach the bench. (The following was had outside the hearing of the jury.)

MR. BELL: Your Honor, projections he made were based off the IDC sales data that was put into evidence at their request and it is deemed established at their request. Doctor McGahee, he made projections based off TP-Link's actual sales data had been precluded from being in this court.

THE COURT: I understand that based on the misconduct the magistrate judge on behalf of TP-Link.

MR. BELL: I understand. **My point is if they're going to characterize it [as, sic] four times more**, it's not based on the same data as was based on data that we were required to use.

(Dkt. No. 317 at 914:7-24 (emphasis added)). Defendants cited this portion of the transcript in the Motion for New Trial (Dkt. No. 330 at 9 (citing Dkt. No. 317 at 913:16 - 916:19)), so Plaintiff's argument that Defendants waived it because it was "not cited in the Motion" fails.

As to the merits, Plaintiff represents that independent of the sanction Plaintiff would have advanced the same narrative regarding the discrepancy between the number of units in the licensing offer letter and the number of units relied upon by Defendants' expert (i.e., 11 million units in the letter versus ███████████████████████ instead of 43 million units (with the sanction)). Indeed, Plaintiff explained as much at trial in response to Defendants' objection:

MS. FAIR: May I be heard?

THE COURT: Go ahead.

MS. FAIR: In his original report that Mr. Bell is referring to, his projections are still not 11,300,000, so this does not solve his problem. ████████████████ ██████████████████████ **The point on cross still stands even with the numbers whether we use the original numbers or what he's presenting to the jury, he is not in agreement with TP-Link's projections**. This does not open the door to those sales, and Mr. Bell shouldn't be asking that question because it suggests that his opinion matched TP-Link's at the time. It never did.

(Dkt. No. 317 at 915:10-21 (emphasis added)). It is difficult to see how Plaintiff's narrative suddenly becomes "false" simply because Defendants' expert was required to rely on the 43

12

million units from the IDC data. ████████████████████████ may have somewhat "blunted Atlas's criticism of TP-Link's FRAND offer letter" (Dkt. No. 344 at 3), that does not make Plaintiff's narrative "false" or warrant a new trial. The Court finds Defendants' argument on this point unpersuasive.

### 3. Defendants' Basis (5)

Finally, Defendants argue that "the sanction imposed was grossly disproportionate to the alleged misconduct" because ████████████████████████████████ ████████████████ (Dkt. No. 330 at 9-10).

In response, Plaintiff argues that "Defendants' assertion that the IDC Order resulted in excessive damages . . . is predicated on a fundamentally incorrect premise," namely that "the cherrypicked data Defendants produced is accurate, but the IDC data is not." (Dkt. No. 340 at 9). Plaintiff contends that, while "there is ample reason to question [the] veracity" of Defendants' produced sales data, including that there exist "inconsisten[cies] with the data produced by TP-Link USA and the discrepancies have never been fully explained or addressed," "the IDC data comes from a reputable third-party that is widely used" including by Defendants and Plaintiff's expert. (Id. (citing Dkt. No. 240-3, ¶104 & n.184; Dkt. No. 318 at 686:11-22 (Mr. Weinstein describing the IDC data "as the gold standard"))). Plaintiff concludes that, given "there is no evidence in the record to suggest there is anything erroneous about the methodology employed by the IDC to compile the sales data," the "IDC data is more reliable than Defendants' questionable data, and there is nothing 'excessive' about the jury awarding damages based on such data." (Id. at 9-10).

The Court finds Defendants' final argument on this issue is also unpersuasive. In essence, Defendants contend that their liability for damages in this case would be lessened if ████████ ████████████████████████████ That is immaterial. As the Court has previously

discussed in imposing the sanction and as elaborated herein, the sanction was properly imposed upon Defendants for their exceptional conduct during discovery. Defendants do not materially contest the reliability of the IDC data, and indeed such would be difficult given Defendants' own reliance upon such IDC data. (Dkt. No. 240-3, ¶104, n.184 (collecting references of Defendants' reliance upon IDC data)). In short, Defendants' final argument re-urges that the sanction is improper because ███████████████████████████████████████████████████████████ ███████ Defendants' argument has been rejected repeatedly and the Court again does so. The sanction was proper, as were the damages the jury deemed appropriate to award in this case.

### D. Whether the Verdict Form Violated Defendants' Right to Jury Unanimity

Defendants argue that "Question 1 of the Court's verdict form asked a single question regarding infringement even though Atlas asserted five separate patents at trial and presented two separate theories of infringement—direct infringement of the one asserted apparatus claim of one patent, and induced infringement of all other asserted method claims," meaning that "[t]he jury's 'Yes' vote did not indicate that all jurors agreed which patent or claim was infringed, or whether Atlas established direct infringement of the single apparatus claim or established on separate facts that Defendants induced infringement of one or more other claims." (Dkt. No. 330 at 10-11). Question 1 of the Verdict Form is shown below:

> **QUESTION NO. 1**
>
> Did Atlas, the Plaintiff, prove by a preponderance of the evidence that TP-Link, the Defendants, infringed ANY of the Asserted Claims?
>
> Yes:___✓___   OR   No: _____

(Dkt. No. 308 at 4).

Defendants contend that "in response to the question posed on the form, every juror could have believed that a single claim of one of the five patents was infringed, but not agreed which claim or under which theory Defendants infringed." (*Id.* at 11). As such, Defendants contend that "a new trial should be ordered with a proper verdict form that addresses infringement of each asserted claim under each asserted theory of infringement." (*Id.*)

In response, Plaintiff first argues that "Defendants' objections to the infringement question on the verdict form are waived and meritless" because they "were not raised before submission to the jury." (Dkt. No. 340 at 10). Plaintiff contends that "[w]hile Defendants raised other objections, they never asserted that the question, as written, would permit jurors to return a less-than-unanimous verdict." (*Id.* (citing Dkt. No. 320 at 982:6-19)).

Plaintiff next argues that, even if not waived, "Defendants' contention fails on the merits in any event because it runs afoul of the law and facts." (*Id.*) As to the law, Plaintiff notes that "the Federal Circuit has never held that trial courts must use verdict forms presenting claim-by-claim infringement questions" and has endorsed the opposite. (*Id.* at 10-11). As such, Plaintiff concludes that "this Court was well within its discretion to ask the jury to answer a general infringement question." (*Id.* at 11). As to the facts, Plaintiff disputes that "the jury could return a verdict of infringement without unanimously agreeing that any of the asserted claims were infringed" because the "[t]he jury instructions . . . repeatedly instructed the jury that its answers must be unanimous" and that the question of infringement must be determined separately for each claim. (*Id.* at 11).

In reply, Defendants contend that they did not waive their objections as they "objected to the verdict form because a single question on liability was used to cover multiple theories of infringement (direct and indirect) across multiple claims and patents." (Dkt. No. 344 at 4).

Defendants also contend that "the verdict form is not cured by the instructions" because they "never instructed the jury that answering 'yes' to the general question required unanimous agreement as to at least one specific claim under at least one specific infringement theory." (*Id.*).

In sur-reply, Plaintiff argues that Defendants did indeed waive their objection to the verdict on this basis because, while they lodged <u>an</u> objection, "they did not lodge <u>their current objection</u>: the infringement question allowed the jury to return a less-than-unanimous verdict." (Dkt. No. 347 at 4). Finally, Plaintiff contends that Defendants simply ignore the numerous instances in the record in which the Court instructed the jury that "(1) their verdict had to be unanimous . . .; (2) they were to go claim-by-claim and agree as to which claims were infringed . . .; and (3) damages could be awarded "only if you [(the jury collectively)] found one or more of the asserted claims to be infringed." (*Id.* at 4-5 (internal citations omitted)).

As to the question of whether Defendants waived this objection, the Court finds that they have. During the Court's formal charge conference with the parties—at which time the parties were to lodge all objections they had to the verdict form and jury instructions—Defendants provided only the following objection to the Court's infringement question (Question No. 1):

> MS. GEYER: Your Honor, Defendant respectfully objects to Question No. 1 as having a single question related to infringement. There are two distinct allegations of infringement in this case involving distinct parties with distinct actions. There is an allegation of direct infringement of the Defendants TP-Link Technologies and TP-Link Corporation based on selling, offering to sell, or importing into the United States for one claim of the '513 Patent. And then there is a separate distinct allegation of induced infringement based on the actions of TP-Link USA and users of the accused product. And based on those distinct issues and distinct evidence, ***we object and believe it is appropriate to have two questions addressing each of those***.

(Dkt. No. 320 at 982:6-19 (emphasis added)). Notably, Defendants did **not** argue, as they do now, that "[t]he verdict form as presented . . . makes it impossible to know whether the jury was unanimous regarding infringement of a given patent claim, or indeed which one." (Dkt. No. 330

at 11). It is well established that "a party may not object to an instruction on one ground at trial and then attempt to rely on a different ground on appeal." *Wright v. Ford Motor Co.*, 508 F.3d 263, 272 (5th Cir. 2007) (citing *Coastal Distributing v. NGK Spark Plug Co.,* 779 F.2d 1033, 1039 (5th Cir. 1986)). The same applies for motions for new trial, as Defendants seek here.[3] Defendants' objection that the verdict form's infringement question should be split in two—one question for direct infringement and another for indirect infringement—wholly failed to alert the Court to any concerns regarding jury unanimity as to any given claim. *See Palmer v. Hoffman*, 318 U.S. 109, 119 (1943) ("In fairness to the trial court and to the parties, ***objections to a charge must be sufficiently specific to bring into focus the precise nature of the alleged error***. Where a party might have obtained the correct charge by specifically calling the attention of the trial court to the error and where part of the charge was correct, he may not through a general exception obtain a new trial.") (emphasis added). Indeed, Defendants' ***own proposal*** at trial of two infringement questions would run into the same concerns regarding jury unanimity now raised, further underscoring Defendants' waiver of the issue. *See Hoechst Celanese Corp. v. BP Chemicals Ltd.*, 78 F.3d 1575, 1581 (Fed. Cir. 1996) (finding that plaintiff, "by its acquiescence in and indeed by its proposal of the verdict form [question disputed on appeal,] waived objection to the verdict form"). As such, the Court finds that Defendants have waived the much broader objection they now bring regarding jury unanimity.

Even if Defendants had not waived this objection by failing to raise it during trial, the Court finds that their jury unanimity concerns fail both as a matter of law and on the specific facts of this case. With respect to the law, Defendants contend that to comply with Rule 48(b)'s requirement

---

[3] *See, e.g.*, 9A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE: CIVIL 2D § 2554 at 426 ("A party may not state one ground when objecting to an instruction to the jury and attempt to rely on a different ground for an objection on appeal or on a motion for a new trial.").

of jury unanimity, "[w]here there are multiple claims, the jury should return a separate verdict 'as to each claim.'" (Dkt. No. 330 at 10 (citing *Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1031 (9th Cir. 2003))). Defendants' citation of *Zhang* is inapposite. Indeed, *Zhang*—an employment law case from the 9th Circuit—does **not**, as Defendants represent, state that "the jury should return a separate verdict as to each claim"; rather, *Zhang* states: "A jury **may** return multiple general verdicts as to each claim, and each party, in a lawsuit, without undermining the general nature of its verdicts." *Zhang*, 339 F.3d at 1031 (emphasis added). *Zhang* provides no support for Defendants' request for a new trial.

Setting aside Defendants' misrepresentation of non-binding precedent, the relevant law on this subject is quite straightforward. It is undisputed that "[t]he specificity of the verdict is within the discretion of the trial judge." *Hoechst Celanese Corp.*, 78 F.3d at 1581. It is further undisputed that general verdicts by the jury are proper in patent trials. Indeed, as the Federal Circuit has stated, "a trial court may, with proper instructions, present a patent case to a jury for a general verdict encompassing ***all of the issues of validity and infringement***." *Structural Rubber Prod. Co. v. Park Rubber Co.*, 749 F.2d 707, 720 (Fed. Cir. 1984) (emphasis added). It necessarily follows that if it is proper to present a case to a jury for a general verdict "encompassing all of the issues of validity **and** infringement," then presenting a single question encompassing only the issues of infringement is also proper. Defendants' argument fails for this additional reason.

Finally, Defendants' argument fails on the specific facts of this case. It is black-letter law that "[a] jury always and necessarily makes findings (albeit unwritten) before it reaches its general verdict," and that "a jury necessarily reaches a legal conclusion, ***presumably in accord with the judge's instructions on the law***, before it reaches its general verdict." *R.R. Dynamics, Inc. v. A. Stucki Co.*, 727 F.2d 1506, 1514 (Fed. Cir. 1984) (emphasis added). Defendants completely ignore

that the jury is presumed[4] to have followed this Court's jury instructions, which **repeatedly** made it clear that infringement was to be decided on a claim-by-claim basis and that the jury's determinations must be unanimous.

> For instance, the Court instructed the jury that their verdict had to be unanimous:

> A verdict form has been prepared for you, and you will take this verdict form with you to the jury room . . . and when you've reached a unanimous agreement as to your verdict, you will notify the Court Security Officer and you will have your foreperson **fill in the blanks in the verdict form reflecting your *unanimous* answers to those questions**.
> Do not decide who you think should win this case and then answer the questions to reach that result. Again, **your answers and your verdict must be *unanimous***.

(Dkt. No. 322 at 991:21–992:5 (emphases added));

> One more time, let me remind you that **your answers to the questions in the verdict form must be *unanimous***.

(*Id.* at 1069:5–7 (emphases added)); and

> After you've reach [*sic*] a verdict, your foreperson is to **fill in your *unanimous* answers to those questions** in the verdict form, sign it and date it, and then advise the Court Security Officer you've reached a verdict.

(*Id.* at 1070:13–16 (emphases added)).

> The Court further instructed the jury that they were to go claim-by-claim and agree as to which claims were infringed:

> Now, **you must determine *separately and for each of the asserted claims*** whether or not there has been infringement.

(*Id.* at 1006:17–18 (emphases added) (instructing regarding direct infringement)); and

> As with direct infringement, **you must determine whether there has been active inducement *on a claim-by-claim basis***.

(*Id.* at 1008:17–19 (emphases added) (instructing regarding indirect infringement)).

---

[4] Indeed, the jury was frequently instructed that they **must** follow the Court's instructions in answering the questions in the verdict form. *See, e.g.*, Dkt. No. 322 at 1069:1-3 ("Answer each question in the verdict form based on the facts as you find them to be following the instructions that the Court has given you on the law.").

Finally, the verdict form specifically instructed the jury that damages could be awarded "only if you [(the jury collectively)] found one or more of the asserted claims to be infringed." (Dkt. No. 308 at 5). The Court provided similar instructions to the jury:

> Now, if you decide that **any asserted claim** has been infringed, you will then need to decide the amount of money damages, if any, to be awarded to the Plaintiff to compensate it for that infringement.

(Dkt. No. 322 at 1000:8–11 (emphases added)); and

> Now, if you find that TP-Link has **infringed** *any claims* **of the asserted patents**, then you must then consider what amount of damages, if any, to award to the Plaintiff Atlas.

(*Id.* at 1010:15–17 (emphases added)). As such, Defendants' contention that the Court "never instructed the jury that answering 'yes' to the general question required unanimous agreement as to at least one specific claim under at least one specific infringement theory" (Dkt. No. 344 at 4) is without merit. Furthermore, Defendants' argument that "every juror could have believed that a single claim of one of the five patents was infringed, but not agreed *which* claim or under *which* theory Defendants infringed" (Dkt. No. 330 at 11) is nothing more than speculation without support in the record and running counter to the presumption that the jury followed the Court's instructions.

In sum, and as the Court stated in response to the objection Defendants raised at trial, "with full, complete, and adequate instruction, the Court sees no error in including the issue of infringement, both direct and induced in the single question which is Question No. 1." (Dkt. No. 320 at 982:20-983:2). The same is true for the new objection raised now by Defendants regarding jury unanimity—the full, complete, and adequate instructions provided by the Court (and not substantively disputed by Defendants) alleviated any potential issues of the jury reaching a non-unanimous verdict. For all these reasons, Defendants' argument fails.

### E. Whether Allowed Expert Testimony Violated Defendants' Right to a Fair Trial

Defendants argue that "[a] new trial should be ordered as the Court allowed expert testimony from Atlas's experts[—Dr. Shoemake and Mr. Weinstein—]that should have been excluded prior to trial, with each of these challenges briefed by Defendants in their motions to exclude testimony." (Dkt. No. 330 at 11 (citing Dkt. Nos. 196 and 201)).

#### 1. Dr. Shoemake

First, Defendants argue that "Dr. Shoemake—who admitted he is not an expert on website terms of service or on shipping terms for invoices—nevertheless offered expert testimony on both topics over Defendants' objections, and such testimony formed the basis for Atlas's theory of direct infringement." (*Id.* at 11-12 (citing Dkt. No. 196 (Motion); Dkt. No. 217 (Reply))). Specifically, Defendants contend that "Dr. Shoemake opined at trial that certain terms of service on a website imply that one of the Defendants, TP-Link Corporation Ltd., offered accused products for sale on a website in the U.S.," and that "Dr. Shoemake's improper opinion testimony was directly refuted by factual testimony from multiple [of] Defendants['] witnesses with direct knowledge." (*Id.* at 12). Defendants further argue that "Dr. Shoemake opined beyond his expertise that certain invoices showed that TP-Link Corporation Ltd. directly infringed by shipping products from Asia to the United States," which "was also refuted by multiple fact witnesses with direct personal knowledge of the invoices and shipping protocols." (*Id.* at 12-13).

In response, Plaintiff argues that "[t]he Court should reaffirm its prior ruling," which has already rejected Defendants' arguments "because Defendants did not 'challenge [Dr. Shoemake's] understanding of direct infringement or his methodology,' and because 'Dr. Shoemake's opinions contain analysis that is helpful to understand disputed facts on the issue of direct infringement.'" (Dkt. No. 340 at 12-13 (quoting Dkt. No. 257 at 6–8 (Order denying Defendants' motion to exclude Dr. Shoemake's opinions))). Plaintiff further contends that "Defendants' argument that Dr.

Shoemake's testimony about the website terms of service was 'improper' fails to explain how or why," noting that Dr. Shoemake simply "concluded that TP-Link Corporation Limited provides the website 'https://www.tp-link.com/us' because the terms of use on the website *say so* in plain English." (*Id.* at 13 (citing Dkt. No. 316 at 429:23–430:20)). Plaintiff next argues that, "though Defendants claim Dr. Shoemake 'opined beyond his expertise' about Defendants' invoices, they fail to point out any problems with his methodology"; rather, Defendants' complaints "are not about Dr. Shoemake's methodology; they simply disagree with his opinions." (*Id.* at 13-14).

The Court finds that Dr. Shoemake's direct infringement testimony was properly admitted. As Defendants themselves recognize, they have previously raised these exact arguments and they have already been rejected by the Court. *See* (Dkt. No. 330 at 11); (Dkt. No. 257 at 6-8 (Court's Order rejecting Defendants' arguments that Dr. Shoemake's direct infringement opinions should be excluded because (1) "Dr. Shoemake lacks relevant specialized training or knowledge regarding 'offers for sale' or how to interpret 'terms of service' of a website to opine on whether Defendants offered for sale or sold an Accused Product in the United States through a website" and (2) "Dr. Shoemake's opinions as to whether Defendants imported an Accused Product into the country based on certain invoices" are inappropriate). As this Court has expressed on several occasions, "it is improper to use a JMOL motion—or a motion for new trial—as a renewed *Daubert* challenge." *Optis Wireless Tech., LLC v. Apple Inc.*, No. 2:19-cv-00066-JRG, Dkt. No. 740 (E.D. Tex. May 17, 2022); *Rembrandt Wireless Techs., LP v. Samsung Elecs. Co., Ltd.*, 2016 WL 362540, at *3–4 (E.D. Tex. Jan. 29, 2016). Indeed, the Federal Circuit has also noted the impropriety of re-arguing *Daubert* issues in the context of post-trial motions:

> Under the guise of sufficiency of the evidence, SAP questions the admissibility of Versata's expert testimony and whether his damages model is properly tied to the facts of the case. Such questions should be resolved under the framework of the Federal Rules of Evidence and through a challenge under *Daubert v.*

*Merrell Dow Pharm., Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469
(1993).

*Versata Software, Inc. v. SAP Am., Inc.*, 717 F.3d 1255, 1264 (Fed. Cir. 2013) (stating that raising

*Daubert*-type issues in the context of post-trial rulings "is the improper context for deciding

questions that . . . boil down to the admissibility of evidence"). Notwithstanding this Court's and

the Federal Circuit's guidance to the contrary, Defendants improperly return to their previously-

rejected *Daubert* arguments, both here and across their post-trial briefing. Defendants' arguments

related to Dr. Shoemake's direct infringement testimony are again rejected on the same grounds.

*See* (Dkt. No. 257 at 6-8).

### 2. Mr. Weinstein

Next, Defendants argue that "Mr. Weinstein, Atlas's damages expert, offered a theory of

apportionment that should have been excluded pretrial." (Dkt. No. 330 at 12 (citing Dkt. No. 201

(Motion); Dkt. No. 226 (Reply))). Defendants concede that "[a]t trial, Mr. Weinstein testified that

he had marginally apportioned his base-line royalty rate of $0.92 for Atlas's entire Wi-Fi 6

portfolio down to $0.79 to account for the value of features covered by non-asserted patents from

that portfolio." (Dkt. No. 330 at 13). However, Defendants argue that "as shown both in

Defendants' pretrial motion to exclude and at trial, Mr. Weinstein's 'apportionment' failed to

account for the fact that Atlas was asserting at trial only a tiny fraction of its patent portfolio." (*Id.*

at 13). As such, Defendants contend that "a new trial should be ordered with Mr. Weinstein's

unapportioned royalty theory excluded." (*Id.*)

In response, Plaintiff contend that Defendants simply argue that Mr. Weinstein "should

have apportioned further," but "as this Court has already correctly held, that argument 'target[s]

the correctness of Mr. Weinstein's opinions,' not the reliability of his methodology." (Dkt. No.

340 at 14 (quoting Dkt. No. 267 at 5)). As such, Plaintiff contends that "[e]xclusion is not required or appropriate." (*Id.*)

The Court finds that Mr. Weinstein's damages opinions were properly admitted. As with Defendants' objections to Dr. Shoemake's testimony at trial, Defendants simply re-urge *Daubert* arguments that the Court has previously rejected. *See* (Dkt. No. 267 at 4-6 (rejecting Defendants' argument that Mr. Weinstein's proffered royalty rate of $0.92 per unit "lacks a proper apportionment analysis" on the basis that it "includes only seven patents (now five), whereas Atlas Global has offered that same rate to license its entire standard essential patent portfolio of at least 133 U.S. patents outside of the litigation context")). As Defendants simply re-raise the same arguments they brought in their *Daubert* motion against Mr. Weinstein, the Court rejects those arguments again here on the same basis. *See* (*id.*).[5] As the Court stated the first time Defendants raised this dispute, "[w]hile Defendants frame their arguments as identifying unreliable methodology, their arguments instead focus on the *correctness* of Mr. Weinstein's opinion that the $0.92 royalty rate is reasonable." (Dkt. No. 267 at 5). That Defendants may "believe that further apportionment [would have been] proper" is immaterial, as that was a "question[] for [the] jury to decide." *Personalized Media Commc'ns, LLC v. Apple, Inc.*, 2021 WL 662238, at *6 (E.D. Tex. Feb. 20, 2021). The jury decided that question in Plaintiff's favor, and the Court has no basis to disturb the jury's finding.

### F.  Whether the Damages Verdict Was Contrary to the Weight of the Evidence

Defendants argue that "[t]he damages verdict was contrary to the weight of the evidence as Defendants qualified for discounts during the hypothetical negotiation not reflected in the jury

---

[5] As the Court noted above with respect to Dr. Shoemake, "it is improper to use a JMOL motion—or a motion for new trial—as a renewed *Daubert* challenge" as Defendants do here. *Optis Wireless Tech.*, No. 2:19-cv-00066-JRG, Dkt. No. 740; *Rembrandt Wireless Techs.*, 2016 WL 362540, at *3–4; *see also Versata*, 717 F.3d at 1264.

verdict." (Dkt. No. 330 at 14). In response, Plaintiff notes that Defendants' argument "relies on the arguments they make in their Rule 50(b) motion." (Dkt. No. 340 at 14). The Court agrees that this is essentially the same argument raised by Defendants in their JMOL Motion. *See* (Dkt. No. 331 at 16-24). As discussed below in detail (*see infra* §§ III.H–I), the Court finds that Defendants' arguments are without merit and that they do not warrant either the entry of judgment as a matter of law or a new trial.

### G. Whether the Jury Was Improperly Instructed Regarding the Meaning of the Disputed Terms of the Asserted Claims

Defendants "renew their prior objections to the Magistrate Judge's Report and Recommendation on Claim Construction as to the claims ultimately asserted at trial, specifically claims 1 and 15 of the '513 Patent, claim 1 of the '738 Patent, and claims 1 and 6 of the '679 Patent." (Dkt. No. 330 at 15 (citing Dkt. No. 126)). Specifically, Defendants contend that "the jury was improperly instructed as to the meaning of 'uplink set-up information' as used in claim 1 of the '738 Patent," and that "the jury considered infringement of claims 1 and 15 of the '513 Patent, claim 1 of the '739 Patent, and claims 1 and 6 of the '679 Patent even though each of those claims should have been found indefinite." (*Id.* (citing Dkt. Nos. 90, 126)). Defendants contend that their renewed objections warrant a new trial. (*Id.*)

In response, Plaintiff argues that "Defendants simply cite their prior objections to Judge Payne's Claim Construction Order without offering anything new," and that "[t]he Court has already considered and correctly overruled those objections." (Dkt. No. 340 at 15 (citing Dkt. Nos. 126, 130)). Plaintiff concludes that "[s]ince Defendants have no new arguments, the Court should simply reaffirm the existing constructions." (*Id.*)

The Court rejects Defendants' arguments—a "renewal" of their previously-rejected Objections (Dkt. No. 126) to Judge Payne's Claim Construction Order (Dkt. No. 117)—for the

same reasons it previously considered. (Dkt. No. 130). As Defendants provide no further explanation or argument on this issue outside of a re-urging of their prior objections, nothing more need be said.

## II.   DISCUSSION: JMOL MOTION (DKT. NO. 331)

In the JMOL Motion, Defendants argue that the Court should enter judgment as a matter of law in favor of Defendants on the following seven issues: *First*, that Defendants do not directly infringe the sole asserted apparatus claim, claim 1 of the '513 Patent. (Dkt. No. 331 at 1-6). *Second*, that Defendants do not infringe the '259 Patent. (*Id.* at 6-11). *Third*, that Defendants do not infringe claim 1 of the '738 Patent and claim 18 of the '259 Patent. (*Id.* at 11-12). *Fourth*, that Defendants do not infringe claims 1 and 6 of the '676 Patent. (*Id.* at 12-13). *Fifth*, that Defendants did not induce infringement of the Asserted Patents. (*Id.* at 13-16). *Sixth*, that "the jury's damages protocol contravenes the mandatory hypothetical negotiation from *Georgia-Pacific*." (*Id.* at 16-22). *Seventh*, that Mr. Weinstein's (Plaintiff's damages expert) 79-cent royalty rate was not supported by evidence and violated apportionment requirements. (*Id.* at 22-24). The Court addresses each argument in turn and finds that no basis compels setting aside the jury's verdict and granting Defendants judgment as a matter of law on any issue.

### A.   Applicable Law

"Judgment as a matter of law is proper when 'a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue.'" *Abraham v. Alpha Chi Omega*, 708 F.3d 614, 620 (5th Cir. 2013) (quoting FED. R. CIV. P. 50(a)). The non-moving party must identify "substantial evidence" to support its positions. *TGIP, Inc. v. AT&T Corp.*, 527 F. Supp. 2d 561, 569 (E.D. Tex. 2007). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Eli Lilly & Co. v. Aradigm Corp.*, 376 F.3d 1352, 1363 (Fed. Cir. 2004).

"The Fifth Circuit views all evidence in a light most favorable to the verdict and will reverse a jury's verdict only if the evidence points so overwhelmingly in favor of one party that reasonable jurors could not arrive at any contrary conclusion." *Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*, 880 F.3d 1356, 1361 (Fed. Cir. 2018) (citing *Bagby Elevator Co. v. Schindler Elevator Corp.*, 609 F.3d 768, 773 (5th Cir. 2010)). A court must "resolve all conflicting evidence in favor of [the verdict] and refrain from weighing the evidence or making credibility determinations." *Gomez v. St. Jude Med. Diag. Div. Inc.*, 442 F.3d 919, 937–38 (5th Cir. 2006).

Rule 50(a)(2) requires the moving party, when moving for JMOL before the case is submitted to the jury, to "specify the judgment sought and the law and the facts that entitle the movant to the judgment." Generally, a party who fails to present a Rule 50(a) motion on an issue at the close of evidence waives both its right to present a Rule 50(b) motion after judgment and its right to challenge the sufficiency of the evidence on appeal. FED. R. CIV. P. 50(b); *Navigant Consulting, Inc. v. Wilkinson*, 508 F.3d 277, 288 (5th Cir. 2007) (citing *Flowers v. S. Reg'l Physician Servs. Inc.*, 247 F.3d 229, 238 (5th Cir. 2001)). Furthermore, "it is improper to use a JMOL motion as a renewed *Daubert* challenge" and "[t]he same is true of claim construction and summary judgment arguments previously rejected by the Court." *U.S. Silica Co. v. Amberger Kaolinwerke Eduard Kick GMBH & Co. KG*, No. 2:20-CV-00298-JRG, 2023 WL 2542600, at *4 (E.D. Tex. Mar. 15, 2023), *appeal dismissed*, No. 2023-1813, 2023 WL 4985730 (Fed. Cir. Aug. 3, 2023).

### B. Whether Defendants Are Entitled to JMOL of No Infringement of Claim 1 of the '513 Patent

Defendants argue that "[n]o reasonable juror could have found that Defendants directly infringed claim 1 of the '513 Patent based on the evidence presented at trial" for two reasons: (1) "shipping invoices do not provide evidence that Defendants imported accused products into the

United States," and (2) "Defendant TP-Link Corporation does not control the tp-link.com/us website and does not use the website to make sales in the United States." (Dkt. No. 331 at 2-6).[6] Plaintiff contends that "[t]he jury was presented with ample evidence to conclude that Defendants directly infringe claim 1 of the '513 Patent by both offering to sell and importing the infringing Wi-Fi 6 products." (Dkt. No. 339 at 1-2). The Court takes Defendants' arguments in turn but finds neither convincing.

### 1.  Shipping Invoices and Proof of Importation

Defendants contend that "the evidence showed that only non-party TP-Link USA Corporation ('TP-Link USA'), not either Defendant, has imported accused products into the United States." (*Id.* at 2). Specifically, Defendants argue that "Ms. Zhang [] testified that finished products from Defendant TP-Link Technologies are sold to non-party distributor TP-Link USA overseas, and that the entire sales transaction takes place in Asia." (*Id.* (citing Dkt. No. 317 at 583:5-16)). Defendants further contend that Plaintiff's expert, Dr. Shoemake, "admitted that the invoice evidence presented to the jury . . . showed that the 'goods change[d] hands' in Hong Kong, and that TP-Link USA takes possession of and responsibility for the products in Hong Kong." (*Id.* at 2-3 (citing Dkt. No. 317 at 568:25-569:11; JX022)). Defendants further contend that "Atlas [did not] present at trial any evidence that any 'contracting and performance' took place in the United States with respect to the accused products." (*Id.* at 3). As such, Defendants conclude that "no reasonable juror could have found that either Defendant is responsible for importing the accused products into the United States." (*Id.* at 3).

---

[6] Defendants also generally aver that Dr. Shoemake is not qualified to discuss website terms of service or shipping terms as proof of direct infringement. (Dkt. No. 343 at 1). For the reasons discussed above with respect to Defendants' Motion for New Trial (*see supra* § II.E.1), the Court once again rejects these arguments.

In response, Plaintiff argues that "[s]ubstantial evidence shows Defendants [] import the infringing products into the United States," for example, "Dr. Shoemake explained how [an] invoice [(JX22)] proves that Defendant TP-Link Corp. (f/k/a TP-Link International Limited) ships the accused AX6000 Wi-Fi 6 routers to California and imports them there." (Dkt. No. 339 at 4). Specifically, Plaintiff notes, quoting Dr. Shoemake's testimony at trial, that "the invoice shows the 'products are being shipped to Fontana, California' and 'they're being shipped from [] Hong Kong…. So this is evidence of importation.'" (*Id.* (quoting Dkt. No. 315 at 431:10-432:7 (Dr. Shoemake's testimony))). Plaintiff refutes that Dr. Shoemake ever "admitted that the invoices prove TP-Link USA imports the infringing products," noting that he instead simply explained that the "FCA Hong Kong" term on the invoice "means the buyer 'would be responsible from Hong Kong if any products were damaged.'" (*Id.* at 5 (quoting Dkt. No. 317 at 569:6-11)). In sum, Plaintiff contends that "[a]t best, Defendants do nothing more than highlight a factual dispute regarding importation that the jury decided in Atlas's favor based on the evidence presented." (*Id.*)

In reply, Defendants argue that "Dr. Shoemake's testimony contradicted Atlas' infringement theory, as Dr. Shoemake admitted that the 'goods change[d] hands' in Hong Kong and that non-party TP-Link USA takes possession of and responsibility for the products in Hong Kong before importation into the United States." (*Id.* at 1 (citing Dkt No. 317 at 568:25-569:11)).

In sur-reply, Plaintiff contends that, despite Defendants' characterizations to the contrary, "Dr. Shoemake only stated that: (1) the generic incoterm free carrier 'has to do with who pays for shipping and where goods change hands;' and (2) FCA Hong Kong means TP-Link USA 'pays for shipping from Hong Kong, and they would be responsible from Hong Kong if any products were damaged.'" (Dkt. No. 346 at 2 (citing Dkt. No. 317 at 568:20-569:11)). Indeed, Plaintiff argues, "Dr. Shoemake was unequivocal that Defendants are the ones who import the accused

products into the United States." (*Id.* (citing Dkt. No. 315 at 431:10-432:12; JX22)).

The Court finds that Defendants simply identify a factual dispute that the jury decided in Plaintiff's favor. Defendants argument is premised on the following exchange with Dr. Shoemake at trial:

> Q. And under the guidelines of the International Chamber of Commerce, the incoterm free carrier designates the location where the buyer assumes possession and responsibility for the goods. Correct?
> A. So it has to do with who pays for shipping and where goods change hands.
>
> Q. And in this case the incoterm FCA Hong Kong specifies that the buyer, TP-Link USA, takes possession and responsibility of the named products in Hong Kong. Correct?
> A. That's correct. So they would pay for shipping from Hong Kong, and they would be responsible from Hong Kong if any products were damaged.

(Dkt. No. 317 at 568:25-569:11). Specifically, Defendants point to Dr. Shoemake's acknowledgment that "the incoterm free carrier" relates to "where goods change hands," and conclude that this requires the Court to grant JMOL of non-infringement. However, that the invoice says "FCA HONGKONG" is not dispositive of the issue. *Cf. Litecubes, LLC v. N. Light Prods.*, 523 F.3d 1353, 1370 (Fed. Cir. 2008) ("[S]imply because an article is delivered 'free on board' outside of the forum, a sale is not necessarily precluded from occurring in the forum."). Notably, Dr. Shoemake also testified that TP-Link Corporation "import[s] infringing products into the U.S." based on his analysis of the invoices:

> Q. How else besides offering to sell does TP-Link directly infringe the apparatus claims of Atlas' patents?
> A. By importing infringing products into the U.S.
>
> Q. How do you know that?
> A. I know that because during my analysis in this case I gained access to commercial invoices.
>
> Q. And are those invoices at Joint Exhibit 22?
> A. Yes, they are.
>
> Q. And what do those invoices tell you about who imports the product?

A. So if you look at this invoice, you can see at the top it says TP-Link International Limited. So in about 2020 or 2021, TP-Link International Limited changed its name to TP-Link Corporation, so this means it's the same company that's a Defendant in this case, TP-Link Corporation. So it shows on this commercial invoice from a Defendant in this case that products are being shipped to Fontana, California, so they're being shipped to the United States. And if you look to the left of that 'ship to' line back to the left, you can see where they're being shipped from--Hong Kong. So that necessarily means that these products are being shipped from outside the United States to inside the United States. So this is evidence of importation.

Q. Well, how does this invoice that we see on the screen from Joint Exhibit 22 compare with all of the other invoices that you've seen?
A. It's typical. It's -- all the other invoices are very similar to this.

(Dkt. No. 315 at 431:10-432:12). Joint Exhibit 22 referenced by Dr. Shoemake is excerpted below:



(JX22 at 3326 (highlighting added by Plaintiff)).

The jury was free to weigh the testimony that Dr. Shoemake provided regarding JX22, including that the invoice listed "ship to" and "bill to" addresses in California and a "from" address in Hong Kong, along with the testimony elicited by Defendants regarding the "FCA HONGKONG" incoterm in reaching their decision on infringement via importation. Resolving such factual disputes is uniquely the province of the jury and is not a suitable ground for JMOL. *See Chamberlain Grp. LLC v. Overhead Door Corp.*, 668 F. Supp. 3d 560, 580 (E.D. Tex. 2023), *appeal dismissed*, No. 2023-1794, 2023 WL 4045371 (Fed. Cir. June 16, 2023) ("Where a jury is presented with two conflicting positions at trial and there is reasonable evidence and argument to

support both positions, the fact that the jury ultimately sided with one party over the other does not support entry of JMOL and does not support granting a new trial.").

### 2. Offers for Sale Through tp-link.com/us

Defendants argue that evidence of offers to sell the accused products through the tp-link.com/us website "is insufficient for any reasonable juror to have found direct infringement by either Defendant." (Dkt. No. 331 at 4). Specifically, Defendants contend that "Defendants' corporate designee, Feiyue Liu, testified that non-party TP-Link USA controls, and is responsible for all content on, the website tp-link.com/us." (*Id.* (citing Dkt. No. 317 at 594:4-18, 596:19-25, 597:13-21). Defendants note that "Mr. Liu also testified that the Defendants do not control the list of retailers authorized to sell the accused products in the United States, nor do they control the price, quantity, or management of any sales of the accused products made through the tp-link.com/us website." (*Id.* (citing Dkt. No. 317 at 589:6-8, 589:20-591:1, 591:9-16, 591:23-592:3, 596:19-25, 597:13-21)). Defendants contend that "all Atlas presented at trial was tangential speculation from its technical expert ostensibly derived from the name 'TP-Link Corporation Limited' being found in terms of service and listed on a copyright notice at the bottom of the website." (*Id.* at 5).

In response, Plaintiff argues that "[s]ubstantial evidence shows Defendants offer for sale the infringing Wi-Fi 6 products via their U.S. website," for example, Dr. Shoemake "explained how the TP-Link website shows Defendants offer to sell the Deco X60 Wi-Fi 6 system for $199.99." (Dkt. No. 339 at 2 (citing Dkt. No. 315 at 428:19–429:7)). As for whether Defendants control the website, Plaintiff argues that "Dr. Shoemake showed that the Terms of Use for the TP-Link website explicitly say it is 'provided by TP-Link Corporation Limited,' a Defendant in this case," and that "the jury saw that Defendant TP-Link Corporation Limited owns the copyright to the TP-Link U.S. website," meaning that "Defendant TP-Link Corporation Limited—not its TP-

Link USA affiliate—claims to be the original author of the TP-Link U.S. website." (*Id.* at 3 (citing Dkt. No. 315 at 429:15–431:9; Dkt. No. 319 at 812:1–11; PX19 at 9; PX10 at 800)).

Finally, as to the testimony of Defendants' witnesses to the contrary, Plaintiff argue that this "self-serving testimony from [Defendants'] own employees" fails to justify JMOL because (1) "[t]he jury was not required to believe any of TP-Link's witnesses, particularly given their interests in the case and substantial credibility problems," and (2) "even if the jury credited Defendants' evidence, where (as here) 'a jury is presented with two conflicting positions at trial and there is reasonable evidence and argument to support both positions, the fact that the jury ultimately sided with one party over the other does not support entry of JMOL.'" (*Id.* at 3-4 (quoting *Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*, 2016 WL 4440255, at *7 (E.D. Tex. Aug. 23, 2016))).

In reply, Defendants argues that "Atlas provided zero evidence showing what happens if a consumer actually presses 'Shop Now,' assuming that this would allow for a direct purchase when, to the contrary, the evidence established that TP-Link USA distributes its products to retail partners." (Dkt. No. 343 at 1 (citing Dkt. No. 317 at 597:1- 598:1)). Defendants repeat their argument that Dr. Shoemake's testimony regarding TP-Link Corporation Limited's control of the website is "based on such scant evidence" and was "directly refuted by the only percipient witnesses to address the issue at trial, who explained that TP-Link USA is solely responsible for the contents of the website." (*Id.* at 2 (citing Dkt. No. 317 at 721:15-723:15)).

In sur-reply, Plaintiff argues that it "presented substantial evidence that Defendants offer to sell the accused products on the TP-Link U.S. website via 'a button that says "shop now" that allows you to purchase the product.'" (Dkt. No. 346 at 1 (quoting Dkt. No. 315 at 428:19–429:12; PX10)). As to control of the website, Plaintiff reiterates that it "walked the jury through the website's Terms of Use several times and showed that the website admits that '[t]he Services

defined here'—defined to include the website—are provided by TP-Link Corporation Limited, which 'means the U.S. website is being provided by TP-Link Corporation Limited, one of the Defendants in this case.'" (*Id.* (quoting Dkt. No. 315 at 429:23–431:9 (Shoemake direct); PX19; Dkt. No. 319 at 809:10–811:23 (Hansen cross))).

The Court agrees with Plaintiff. Defendants raise two issues: (1) whether Defendants control the tp-link.com/us website, and (2) whether the evidence presented regarding that website constituted an "offer to sell." Factual disputes existed for both of these issues, which the jury resolved in Plaintiff's favor. Arguments re-litigating the facts of the case cannot justify overturning the jury's verdict and granting JMOL in Defendants' favor. In short, "[t]he jury was entitled to credit Plaintiff's evidence, and apparently did." *Finesse Wireless LLC v. AT&T Mobility LLC*, 689 F. Supp. 3d 332, 352 (E.D. Tex. 2023) (denying request for JMOL).

As to Defendants' first argument, there is a clear factual dispute as to whether Defendants control the tp-link.com/us website. Defendants argue that their "corporate designee, Feiyue Liu, testified that non-party TP-Link USA controls, and is responsible for all content on, the website tp-link.com/us." (Dkt. No. 331 at 4). However, Plaintiff points to testimony of Dr. Shoemake that "showed that the Terms of Use for the TP-Link website explicitly say it is 'provided by TP-Link Corporation Limited,' a Defendant in this case," and that "the jury saw that Defendant TP-Link Corporation Limited owns the copyright to the TP-Link U.S. website," meaning that "Defendant TP-Link Corporation Limited—not its TP-Link USA affiliate—claims to be the original author of the TP-Link U.S. website." (Dkt. No. 339 at 3 (citing Dkt. No. 315 at 429:3-7; PX10 at 800)). Though Defendants may believe their own witnesses, that does not mean the jury must. *See Finesse Wireless*, 2023 WL 5613209, at *15 (jury may reject testimony from witnesses who have been impeached); *Hearing Components v. Shure, Inc.*, 2009 WL 593836, at *1 (E.D. Tex. Mar. 6, 2009)

(jury may reject testimony of "interested witness"). As the Supreme Court has instructed, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 150 (2000) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."). In so doing, the Court finds no basis to grant Defendants judgment as a matter of law on this issue.

As to the second issue, there is also a clear factual dispute between the parties. Plaintiff points to the testimony of Dr. Shoemake regarding Defendants' "Deco X60 Wi-Fi 6 system" listed on the tp-link.com/us website, concluding that this is sufficient evidence of an "offer to sell" in the United States. An excerpt of the referenced webpage included in Plaintiff's Response is shown below:



(*Id.* (excerpting PX10 at 800 (emphasis added by Plaintiff))). Plaintiff contends that the above webpage "is a commercial offer for sale under the law of contracts because it is sufficiently definite to show 'the manifestation of willingness to enter into a bargain' by Defendants." (*Id.* (quoting *Linear Tech. Corp. v. Micrel, Inc.*, 275 F.3d 1040, 1050 (Fed. Cir. 2001))). Specifically, Plaintiff notes that "[t]he website includes key terms, including the product (Deco X60), the price

($199.99), and quantity (3-pack)" as well as "a 'Shop Now' button through which a customer can accept Defendants' offer to sell the Deco X60 for the offered price." (*Id.* at 3 (citing Dkt. No. 315 at 429:3-7; PX10 at 800)). Defendants only rebuttal to the evidence of the Deco X60 Wi-Fi 6 system on the tp-link.com/us website is that "Atlas provided zero evidence showing what happens if a consumer actually presses 'Shop Now'" and that Defendants' corporate representative testified that no sales to consumers occur through the website. (Dkt. No. 343 at 1). As previously discussed, disputed factual questions, including underlying "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves*, 530 U.S. at 150. As the jury was entitled to credit Plaintiff's evidence over Defendants', the Court sees no basis to disturb the jury's conclusion regarding infringement of claim 1 of the '513 Patent.

### C.  Whether Defendants Waived Their Non-Infringement JMOL Arguments

In response to all of Defendants' non-infringement JMOL arguments except pre-filing induced infringement[7], Plaintiff argues that Defendants failed to raise these arguments under Rule 50(a) with sufficient specificity and they cannot now be raised on a Rule 50(b) motion. (Dkt. No. 339 at 5-6, 9, 11-12). Defendants' argument for JMOL of non-infringement under Rule 50(a) was the following:

> THE COURT: Let's go to the fourth ground raised by the Defendants which, as I understand it, is that Plaintiffs failed to put on a prima facie case of infringement.
> MR. SAUL: Yes, Your Honor.
> No reasonable jury could find that Defendants have directly or indirectly infringed the asserted claims for the additional reason that Plaintiff has failed to meet its burden of proving that all limitations of any asserted claim are met by any accused product. This is for two reasons.
> First, Plaintiff's expert Doctor Shoemake's purported product testing and discussion of the WiFi 6 standard, WiFi chip data sheets, and TP-Link marketing

---

[7] Defendants' waiver of post-suit induced infringement Rule 50(b) arguments is addressed below. *See infra* at 53 n.10.

materials are insufficient for a reasonable jury to conclude that all limitations of
any asserted claim are met by any accused product.

For the vast majority of the claim limitations at issue, Plaintiff and its expert
provided only expert testimony that the limitations cover certain functionality of
the WiFi 6 standard. However, inclusion in the standard does not mean that a
claim is practiced by Defendants' products, and for at least one element of every
asserted claim, Plaintiff's expert provided no evidence to show that such
functionality is in any event implemented in the accused products.

Second, Plaintiff has failed to show that any accused product is representative
of other accused products in this case. Thus, assuming for argument's sake that
Plaintiff showed that any product infringes, that, of course, does not mean that
any other product infringes based on the failure of proof as to representativeness.

In sum, Plaintiff does not -- did not submit sufficient evidence to show that any
of the 69 accused products meet each and every claim limitation of any asserted
claim.

(Dkt. No. 319 at 962:2 – 963:8). Plaintiff contends that "[w]hile Defendants argued at an

exceedingly high level that Dr. Shoemake failed to establish that at least one claim limitation in

each of the Asserted Patents was practiced by Defendants' products, Defendants never identified

any specific limitation or explained why any unidentified limitation was not met." (Dkt. No. 339

at 5-6); *see also* (*id.* at 9, 11-12). The Court finds that Defendants sufficiently preserved their Rule

50(b) non-infringement arguments by raising the issues in their Rule 50(a) motion. Preservation

of the issues does not require the level of specificity in the Rule 50(a) motion that Plaintiff desires.

### D. Whether Defendants Are Entitled to JMOL that They Do Not Infringe the '259 Patent

Defendants argue that Plaintiff's expert relied upon the 802.11ax standard but "ignored the

fact that 802.11ax includes multiple 'sounding methods' that indisputably do not infringe these

claims," and that he "do[es] not show that the optional sounding method Atlas relied on must be

implemented to perform sounding in all (much less any) of Defendants' products." (Dkt. No. 331

at 6-7). Defendants conclude that Plaintiff's "reliance on an optional feature of the 802.11ax

standard is 'not sufficient' to show infringement of these method claims." (*Id.*).

In response to Defendants' "optional" argument, Plaintiff argues that "Defendants' contention that these infringing methods are 'optional,' and Atlas thus failed to prove infringement, fails to address the actual testimony and evidence presented at trial." (Dkt. No. 339 at 6). Plaintiff contends that "Dr. Shoemake provided an element-by-element analysis showing how the method illustrated in Figure 26-8 [(the "HE Sounding" method)] infringes the '259 Patent." (*Id.*). Plaintiff further notes that "Dr. Shoemake also testified that implementing this method is mandatory." (*Id.* (citing Dkt. No. 315 at 447:21–448:8 (Dr. Shoemake discussing the mandatory nature of BFRP trigger frames used in Figure 26-8))). Plaintiff argues that the jury was free to believe Dr. Shoemake's testimony over Defendants' experts' (Dr. Hansen) testimony, especially here where Dr. Hansen testified that "he had not performed an analysis to determine if any TP-Link products infringe any asserted claims." (*Id.* at 7 (citing Dkt. No. 319 at 794:24–795:7)). Finally, Plaintiff contends that Defendants' citation in their JMOL Motion to a page from the 802.11ax that "suggests using the infringing method is optional," is irrelevant as "the jury was never directed to this page and one cherry-picked page of the 802.11ax standard with no context and no supporting testimony (even from Dr. Hansen) cannot overcome extensive evidence to the contrary, especially when the jury had no basis to look to that page." (*Id.*).

In response to Defendants' implementation argument, Plaintiff contends that "the jury saw evidence that TP-Link products are designed to practice the infringing method" and that "TP-Link's products and customers use the claimed methods" through both expert testimony and circumstantial evidence. (Dkt. No. 339 at 7). With respect to expert testimony, Plaintiff contends that "Dr. Shoemake pointed to several types of evidence, including testing, datasheets, and source code, showing the accused Wi-Fi 6 products actually perform the claimed methods." (*Id.* at 8 (citing Dkt. No. 315 at 404:13–405:5 ("my own testing also shows that the method is performed"),

404:19–405:21, 449:2–14, 449:15-450:5, 450:17–454:4), PX9 (product testing results), PX11). With respect to circumstantial evidence, Plaintiff contends that "Dr. Shoemake showed the '259 claims are critical to Wi-Fi 6 improvements, including improvements that Defendants advertise." (*Id.* (citing Dkt. No. 315 at 422:23–423:7, 424:2–16, 425:13–16, 444:18–445:3, 445:10–17)). Plaintiff further notes that "[t]he jury additionally heard evidence from Defendants' own representative that TP-Link products might infringe." (*Id.* at 9 (citing Dkt. No. 317 at 694:19–25)). As such, Plaintiff concludes that substantial evidence supports the verdict. (*Id.*).

In reply, Defendants argue that "Dr. Shoemake's testimony that '***BRFP trigger frames*** … are mandatory' does not establish that ***the specific method of Figure 26-8*** is mandatory," and that "Atlas's own quotations of Dr. Shoemake's source code analysis shows that he did not address each claim limitation." (Dkt. No. 343 at 4 (emphasis in original)).

In sur-reply, Plaintiff contends that "although the Wi-Fi 6 standard describes two HE sounding sequences (shown in Figs. 26-7 and 26-8, respectively), only the Fig. 26-8 sequence uses BFRP trigger frames," and "because BFRP trigger frames are 'mandatory,' the jury reasonably inferred that Defendants' Wi-Fi 6 products must also implement the Fig. 26-8 sequence." (Dkt. No. 346 at 4 (citing JX17 at 1446-47, 1775; Dkt. No. 315 at 447:21–448:8)). Finally, Plaintiff argues that "Shoemake showed how the source code for Defendants' Wi-Fi 6 products practiced each of the steps in Figure 26-8, including BFRP trigger frames." (*Id.* (citing Dkt. No. 315 at 450:25–453:24)).

The Court finds that substantial evidence supported the jury's verdict of infringement. As an initial matter, the Court notes that "the Rule 50(b) motion standard is not whether there was substantial evidence to support a finding contrary to the jury's verdict." *KAIST IP US LLC v. Samsung Elecs. Co.*, 439 F. Supp. 3d 860, 879 (E.D. Tex. 2020). Nor does the Rule 50(b) standard

replace the jury with the Court and ask "whether the Court sitting in place of the jury would have found the contrary evidence adequate to outweigh the evidence supporting the jury's verdict." *Id.* That is, in essence, what Defendants ask the Court to undertake. Such a request attempts to elevate the Court's judgment over that of the jury in contravention to Seventh Amendment principles. The correct standard requires the Court to "determine whether there is substantial evidence to support the jury's verdict as those citizens returned it." *KAIST IP*, 439 F. Supp. 3d at 879. Here, Plaintiff and its expert, Dr. Shoemake, provided substantial evidence to support the jury's finding of infringement. While the Court recognizes that Defendants, and their expert Dr. Hansen, disagree with Dr. Shoemake's testimony, that is irrelevant for the purposes of the present motion. Here, the jury was presented with conflicting evidence and "was free to credit whichever experts and their testimony it found to be credible." *Id.* at 881.

### E. Whether Defendants Are Entitled to JMOL that They Do Not Infringe Claim 1 of the '738 Patent and Claim 18 of the '259 Patent

Defendants argue that "[t]he Court should grant JMOL of non-infringement of Claim 1 of the '738 Patent and claim 18 of the '259 Patent because Atlas failed to show that feedback frames were received at the access point at the same time (or simultaneously) as required by those claims." (Dkt. No. 331 at 11). Specifically, Defendants contend that "Atlas's only argument that this claim requirement is met is Dr. Shoemake's conclusory and unsupported assumption that simultaneous transmission by transmitting devices would somehow result in simultaneous receipt of those transmissions by the access point," which "is insufficient as a matter of law to support a finding of infringement." (*Id.*).

In response, Plaintiff argues that substantial evidence supports the jury verdict of infringement of the '738 and '259 Patents. (Dkt. No. 339 at 9). Specifically, Plaintiff argues that "Dr. Shoemake explained in detail the multi-user transmissions from stations to an access point

that occur using uplink (UL) OFDMA and UL MU-MIMO" and that "during UL OFDMA operations, multiple station devices transmit at the same time to an access point, and those simultaneous transmissions are received by the access point at the same time." (*Id.* at 9-10 (citing Dkt. No. 315 at 413:13–421:17)). Dr. Shoemake further explained that "[t]he access point coordinates the UL OFDMA operation of the multiple stations through the use of a trigger frame, which is 'a packet that goes from the access point to trigger the stations to send their uplink transmissions at the same time, thereby having synchronization so those packets [*sic*] going to the access point arrive at the same time.' (*Id.* at 10 (Dkt. No. 315 at 417:25–418:7)).

Specifically with respect to the '738 Patent, Plaintiff notes that Dr. Shoemake further testified that "the Wi-Fi 6 standard requires that the Wi-Fi 6 access points will simultaneously receive multiple uplink frames from multiple stations in response to a trigger frame," as shown in "Figure 10-14c of the Wi-Fi 6 standard." (*Id.* (citing Dkt. No. 317 at 505:3–506:16; JX17 at 1309)). Plaintiff contends that Dr. Shoemake "explained that the datasheets for the chipsets used in the TP-Link products 'confirm that trigger frames are being used to initiate the simultaneous uplink transmission from those stations,' and that they "show that TP-Link Wi-Fi 6 chipsets 'support[] UL-OFDMA to allocate resource units to multiple users transmitting traffic simultaneously to the AP.'" (*Id.* (citing Dkt. No. 317 at 501:25–502:22; PX11 at 6317)).

With respect to the '259 Patent, Plaintiff contends that "[r]eferring to Figure 26-8 of the 802.11ax standard, Dr. Shoemake testified that each of the High Efficiency stations (i.e., Wi-Fi 6 stations) respond after a SIFs (short inter-frame spacing) period, simultaneously transmitting their compressed beamforming report which 'shows that since those are transmitted simultaneously, that means they'll be received simultaneously at the access point.'" (*Id.* at 10-11 (citing Dkt. No. 315 at 459:2–18; JX17 at 1447 (Fig. 26-8))).

Plaintiff argues that "[o]ther evidence also supports the jury's verdict regarding simultaneous uplink transmission and reception," including that "the Wi-Fi Alliance mandatory tests 4.41.1 and 4.41.2 require an access point to receive uplink multi-user transmissions" and "Dr. Shoemake's own independent testing also confirmed the TP-Link products transmitted data to the TP-Link access point simultaneously." (*Id.* at 10-11 (citing Dkt. No. 315 at 467:19–468:20; PX12 at 7827, 7842 (test results))). Finally, Plaintiff contends that "[s]imultaneous transmission of the multi-user uplink transmissions by the stations [(admitted by Defendants to occur)] provides circumstantial evidence that these transmissions are received simultaneously at the access point." (*Id.* at 11 (citing Dkt. No. 331 at 11)).

In reply, Defendants simply argue that "the only evidence Atlas identifies of simultaneous reception—as opposed to transmission—of frames is Dr. Shoemake's unfounded and conclusory testimony." (Dkt. No. 343 at 4).

In sur-reply, Plaintiff argues that "Dr. Shoemake's testimony about simultaneous reception was not Atlas's 'only evidence,' and it was not 'unfounded and conclusory.'" (Dkt. No. 346 at 4). For example, Plaintiff provides, "Dr. Shoemake showed the jury Figure 10-14c ('738) and Figure 26-8 ('259) of the Wi-Fi 6 standard, which depict multiple frames being simultaneously received:



(*Id.* (citing JX17 at 1309, 1447 (emphasis added by Plaintiffs))).

The Court finds that substantial evidence supports the jury's finding of infringement. Once again, Defendants essentially move for judgment as a matter of law because they disagree with Dr. Shoemake, not because substantial evidence does not exist to support the jury's verdict of infringement. As noted above, enough evidence in the record exists in the form of expert testimony and circumstantial evidence for a reasonable juror to conclude that feedback frames were received simultaneously at the access point. Defendants do not substantively address the expert testimony and circumstantial evidence cited by Plaintiff, opting instead to simply characterize Dr. Shoemake's testimony as "unfounded and conclusory." Such a critique, without more, cannot suffice to overturn a jury's verdict.

### F. Whether Defendants Are Entitled to JMOL that They Do Not Infringe Claims 1 and 6 of the '679 Patent

Defendants argue that "[t]he Court should grant JMOL that claims 1 and 6 of the '679 Patent are not infringed because Atlas failed to set forth evidence that the 'downlink frame . . . including acknowledgement information representing whether the STA is requested to transmit the acknowledgement frame in a single-user (SU) format or in a multiple-user (MU) format' is met." (Dkt. No. 331 at 12). Defendants contend that at trial "Atlas, through Dr. Shoemake, pointed to the Ack Policy Indicator field as constituting the 'acknowledgement information'," and that "Dr. Shoemake claimed that when the Ack policy is 'normal Ack,' it is a single user format, and when Ack policy is 'HE TP Ack' or 'HE [TB] PPDU', then multiuser format is used." (*Id.* at 12-13). However, Defendants argue, Dr. Shoemake's testimony "is contradicted by the Wi-Fi 6 (802.11ax) standard upon which he purports to rely," which, "as confirmed by Dr. Hansen, indicates the HE PB PPDU can be used for ***both*** single-user and multi-user responses." (*Id.* at 13 (citing JX17 at 107-115 (Section 9.3.1.22), Table 9-13, 78; Dkt. No. 319 at 767:7-768:10)).

Defendants further argue that "the Ack Policy Indicator field within the QoS control field in the Wi-Fi 6 standard does not indicate at all whether a single-user format or multi-user format should be used when the STA sends the acknowledgement frame," as such, "the Wi-Fi 6 (802.11ax) standard does not provide sufficient information to show this claim element is met." (*Id.*).

In response, Plaintiff argues that "Dr. Shoemake provided ample evidence that the Ack Policy Indicator field in the accused TP-Link products is the claimed 'acknowledgment information' indicating whether the subsequent acknowledgment will be in single-user format or multi-user format." (Dkt. No. 339 at 12). Specifically, Plaintiff contends that Dr. Shoemake "testified that the 'Ack policy subfield indicates exactly how [] the station should respond with acknowledgments,'" and that he "explained how Table 9-13 of the 802.11ax standard shows 'the rules for how these Ack policy bits are set…[:] if the Ack policy is normal Ack, the bits are set to 00 and you use a single user format. But if the Ack policy is set to HETP Ack, the bits are set to 01, and that means a multiuser format is used, specifically the HE trigger-based PPDU.'" (*Id.* (citing Dkt. No. 317 at 524:13–17, 528:17–529:4; JX18 at 2607 (Table 9-13); JX17 at 1146 (same))). Plaintiff notes that Dr. Shoemake "showed the jury two figures from the standard proving the Ack Policy Indicator is the claimed 'acknowledgment information,'" with "Figure 10-14a from §10.3.2.13.2 show[ing] that 'when the Ack policy is set to HETP Ack, then you will use uplink OFDMA to send the acknowledgment, and that is a multiuser format,'" and "Figure 10-13 and §26.4.4.3 show[ing] that 'when the access point sets the Ack policy indicator to normal Ack, what will happen is a single user PPDU will be sent [] and that's in a single user format.'" (*Id.* (citing Dkt. No. 317 at 532:25–533:16, 534:1–6, 534:17–535:2)). As such, Plaintiff contends that "Defendants' repeated reliance on the testimony of their own expert is misplaced" because "Dr.

Shoemake's testimony provides substantial evidence from which the jury could reasonably find infringement." (*Id.* at 13-14).

In reply, Defendants simply argues that "Atlas does not refute Defendants' key point—that the HE trigger-based PPDU can be used in both single-user and multi-user contexts." (Dkt. No. 343 at 4).

In sur-reply, Plaintiff contends that "Defendants' key point regarding single-user and multi-user 'contexts' is irrelevant," as the "'679 claims recite single-user and multi-user 'formats' and "Dr. Shoemake explained how the Wi-Fi 6 ack policy indicator in Defendants' Wi-Fi 6 products represents whether the subsequent acknowledgment will use single-user or multi-user 'format.'" (Dkt. No. 346 at 4 (citing Dkt. No. 317 at 528:17–529:4, 532:25–533:16, 534:1–6, 534:17–535:2)).

The Court finds that substantial evidence supports the jury's verdict. Notably, here, as in their previous arguments, Defendants argue that their expert should be believed over Dr. Shoemake. *See, e.g.*, (Dkt. No. 331 at 13 ("The Wi-Fi 6 standard, ***as confirmed by Dr. Hansen***, indicates the HE PB PPDU can be used for both single-user and multi-user responses."). The Court reiterates that re-arguing disputed factual positions and urging the Court to usurp the jury's role as fact finder and judge of credibility is not proper in a motion for judgment as a matter of law under Rule 50(b). *See Reeves*, 530 U.S. at 150 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."). That Defendants presented conflicting evidence to Dr. Shoemake at trial placed the question as to who to believe in the hands of the jury. The jury sided with Dr. Shoemake and Plaintiff, and the Court will not overturn that result based on a re-litigation of the issue presented to the jury.

### G. Whether Defendants Are Entitled to JMOL that They Did Not Induce Infringement of the Asserted Patents

Defendants contend that "[a]t trial, Atlas argued that Defendants induced infringement of the asserted patents beginning on June 8, 2021, the date Atlas sent letters to three individuals at the offices of non-party TP-Link USA in the United States," but "those letters failed to provide notice of alleged infringement of any asserted patent." (Dkt. No. 331 at 13-14). Defendants contend that these letters fail to provide sufficient notice as they (1) "do not list any specific patent numbers, but merely reference a 'portfolio'"; (2) "do not identify any specific product that allegedly infringes; instead, the letters vaguely reference a 'range of networking, mobile computing, and internet of things (IOT) applications'"; (3) "the letters provide no analysis of how Defendants' products allegedly infringe any patent"; (4) "the letters provide no information about what features of the 802.11ax standard purportedly are covered by the 'portfolio,' or whether any such features are mandatory in the standard." (*Id.* at 14). Defendants further argue that "Atlas failed to show that either of the Defendants even received the letters Atlas sent to non-party TP-Link USA, or otherwise had knowledge of the asserted patents or their infringement, prior to the filing of the lawsuit." (*Id.* at 15).[8] Finally, Defendants argue that "none of the supposed inducing acts is directed to any feature of the Wi-Fi 6 standard alleged to be covered by any asserted claims" as "[t]he only supposed evidence of inducement set forth at trial by Atlas was benign marketing and support materials for Wi-Fi 6 generally . . . and nothing specific to any specific feature allegedly covered by the asserted claims." (*Id.*). As such, Defendants contend that "Atlas's purported

---

[8] Plaintiff notes that "Defendants failed to present evidence proving the letters were never received" as "Ms. Sun testified that she *personally* did not receive the letters and that TP-Link USA's CEO told her that he *did not recall* receiving the letters, but she never testified that no one affiliated with Defendants ever received the letters," nor could she as "Ms. Sun never asked the recipients of two letters what they did after receiving them." (Dkt. No. 339 at 16 (citing Dkt. No. 317 at 704:20–24 (testifying "I did not receive this letter"), 704:25–705:11 ("[Mr. Liu] said that he did not recall such a letter."), 705:14-16). As such, "Ms. Sun's testimony, then, does not show that TP-Link Corporation and TP-Link Technologies never received the letters," as Defendants now claim. (*Id.*).

evidence of inducement is insufficient to meet Atlas's burden, either before or after the complaint was filed." (*Id.* at 16).

In response, Plaintiff argues that "[a] reasonable jury could have found induced infringement as of June 8, 2021, the date Atlas sent three notice letters to three TP-Link employees," as those letters "notified Defendants about Atlas's Wi-Fi 6 Standard Essential Patents, acquired from Newracom" and "[b]ecause Atlas told Defendants the patents were 802.11ax Standard Essential, Defendants knew its Wi-Fi 6 products necessarily infringed." (Dkt. No. 339 at 14). As such, Plaintiff argues that "[a]t a minimum, a reasonable jury could have found Defendants willfully blind by ignoring the letters." (*Id.*).

As to Defendants' argument that there can be no induced infringement because the letters do not specify patent numbers, Plaintiff argues that "notifying a party of a patent portfolio can provide the requisite knowledge of patents within that portfolio" and that this Court has "specifically rejected the argument that 'the absence of identifying patent numbers' in a pre-suit notice letter was fatal to establishing pre-suit inducement." (*Id.* at 14-15 (*citing Mobile Equity Corp. v. Walmart Inc.*, 2022 WL 4587554, at *2 (E.D. Tex. Sep. 8, 2022))).

As to Defendants' argument that Plaintiff failed to prove that TP-Link Corporation and TP-Link Technologies ever received the notice letters, Plaintiff contends "[t]hat argument requires drawing all reasonable inferences *against* Atlas, which is improper." (*Id.* at 15). Plaintiff notes that (1) "TP-Link USA and TP-Link Corporation share common ownership"; (2) "TP-Link USA is TP-Link Corporation's sole U.S. distributer;" and (3) "the Distribution Agreement (JX21) contains an indemnity provision whereby TP-Link Corporation must indemnify TP-Link USA for allegations of patent infringement" but that obligation is "conditioned on being promptly notified by TP-Link USA of any allegations of infringement." (*Id.* at 15 (citing Dkt. No. 317 at 705:17–19, 709:19–21,

710:4–7; 713:17–714:8; JX21 (Article 6))). As such, Plaintiff concludes that "[i]t is entirely reasonable for the jury to conclude that letters transmitted to TP-Link USA's leadership would be shared with TP-Link Corporation and TP-Link Technologies." (*Id.*).

Finally, as to Defendants' argument that none of the supposed inducing acts is directed to any feature of the Wi-Fi 6 standard alleged to be covered by any asserted claims, Plaintiff argues that "Dr. Shoemake provided several different categories of evidence," including the following:

- Defendants' website advertises and encourages customers to purchase Wi-Fi 6 products. (Dkt. No. 315 at 432:18–433:5; PX10 (website printouts));
- Defendants issue press releases touting the benefits of Wi-Fi 6. (Dkt. No. 315 at 433:6–12; JX60 (press release)).
- Defendants release marketing and instructional videos showing how to use Wi-Fi 6. (Dkt. No. 315 at 433:13–25; JX61 (videos)).
- Defendants encourage customers to "upgrade to Wi-Fi 6." (Dkt. No. 315 at 434:1–10);
- Defendants provide product user guides and manuals explaining how to set up and use the accused products in an infringing manner. (Dkt. No. 315 at 434:11–19, 435:13–18; Dkt. No. 317 at 581:1– 582:2; PX8 (user manual));
- Defendants hire social media influencers to promote the brand. (Dkt. No. 315 at 434:20–435:5; PX20 (website printout of TP-Link Brand Ambassador Program));
- Defendants' product packaging emphasizes the benefits of Wi-Fi 6. (Dkt. No. 315 at 435:6–12; PX8 (product packaging)); and
- Defendants provide customer support on how to use the accused products in an infringing manner. (Dkt. No. 315 at 435:22–436:6; Dkt. No. 317 at 582:3–17; PX18 (printout of customer support page)).

(*Id.* at 16-17). As such, Plaintiff contends that there is more than sufficient evidence to establish inducement. (*Id.* at 17).[9]

The Court agrees with Plaintiff. First, more than enough evidence existed for a reasonable juror to conclude that Defendants received the letters sent by Plaintiff, including at least that (1) Defendants and TP-Link USA are related entities and share a close business relationship, (2) TP-Link USA receives indemnification only if it promptly notifies Defendants of infringement

---

[9] Defendants and Plaintiff reiterate their positions in reply and sur-reply. (Dkt. No. 343 at 4-5); (Dkt. No. 346 at 5).

allegations, giving it strong incentives to do so, and (3) Defendants failed to offer evidence disproving they received the letters. Second, as to the specificity of the letters, this Court has previously found that an identification of a portfolio of patents can be sufficient to plead knowledge of the asserted patents. *See Ziilabs, Inc. v. Samsung Elecs. Co.*, 2015 U.S. Dist. LEXIS 42361, at *9–10 (E.D. Tex. Feb. 26, 2015) (holding that "[plaintiff's] representations regarding continuing communications between it and [defendant] as they relate to [plaintiff's] patent portfolio, the Court concludes [plaintiff's] willfulness claims [are sufficiently plead]"). Furthermore, this Court has specifically rejected the argument that failing to identify specific patent numbers in a notice letter is fatal to establishing pre-suit inducement. *See Mobile Equity Corp.*, 2022 WL 4587554, at *2, *report and recommendation adopted*, No. 2:21-CV-00126-JRG-RSP, 2022 WL 4587499 (E.D. Tex. Sept. 27, 2022) (noting that defendant "does not offer any case law supporting the necessary conclusion that the absence of identifying patent numbers, offers to license, and accusations of infringement in pre-suit materials is fatal to a claim of pre-suit indirect infringement").

The two cases that Defendants cite in support of their position that Plaintiff's reference to the "portfolio" of patents essential to the Wi-Fi 6 standard (802.11ax) dooms Plaintiff's claim for pre-suit induced infringement are both distinguishable. First, in *Bench Walk*, the notice letter did not mention any standard or portfolio, and the patentee in that case conceded its pre-suit notice letter was insufficient. *Bench Walk Lighting LLC v. LG Innotek Co.*, 530 F. Supp. 3d 468, 492 (D. Del. 2021). In *Textile Computer*, the notice letter specifically identified two patents, which led the court to hold that the letter failed to provide notice regarding other patents that were not specifically mentioned. *Textile Comp. Sys. v. Broadway Nat'l Bank*, 620 F. Supp. 3d 557, 565 (W.D. Tex. 2022). Neither case is analogous to the present facts where Plaintiff identified "Newracom's

49

substantial Wi-Fi 6 (802.11ax) SEP portfolio of over 75 granted patent families, consisting of approximately 365+ worldwide patents and applications with over 15 years of life remaining, and cover[ing] key improvements adopted in the IEEE 802.11ax standard." *See, e.g.*, (Dkt. No. 331-9 at 2 (JX019.00002)). This is not a circumstance where Plaintiff identified some patents in a letter and now seeks to support a claim for pre-filing induced infringement for entirely different patents based on said letter. Defendants do not dispute that "Newracom's substantial Wi-Fi 6 (802.11ax) SEP portfolio" includes the asserted patents in this case. As such, and upon a review of the case law cited by the parties, the Court finds that sufficient evidence existed to support the jury's finding that Defendants knew of, or were at least willfully blind to, the asserted patents as of the June 8, 2021 date of the letters.

Furthermore, because the letters identify the portfolio of patents (including the asserted patents) as "Standard Essential Patents" for the "Wi-Fi 6 standard (802.11ax)," a reasonable juror could have found that Defendants knew that their Wi-Fi 6 products infringed the asserted patents, as products practicing the Wi-Fi 6 standard (802.11ax) would necessarily infringe patents *essential* to that standard. (Dkt. No. 331-9 at 2 (JX019.00001)). As such, Defendants' remaining arguments regarding the specificity of the notice letter also fail.

Finally, the Court rejects Defendants' argument that sufficient evidence does not exist to support the jury's finding that Defendants induced end users to directly infringe the asserted patents because that evidence of inducement "was benign marketing and support materials for Wi-Fi 6 generally." (Dkt. No. 331 at 15). The Federal Circuit's decision in *Ericsson, Inc. v. D-Link Systems, Inc.* is instructive on this point. In that case, plaintiff "presented evidence that [defendant] knew about the patents and knew that the patents potentially were essential to the 802.11(n) standard—a standard with which [defendant] intentionally complied." *Ericsson, Inc. v. D-Link*

*Sys., Inc.*, 773 F.3d 1201, 1222 (Fed. Cir. 2014). The Federal Circuit held that "the jury had substantial evidence to find that [defendant] induced infringement of the claims." *Id.* The same result is applicable here. Plaintiff presented evidence that Defendants' products not only comply with the 802.11ax Wi-Fi 6 standard, but that Defendants provided customers with advertising and marketing materials regarding the benefits of "Wi-Fi 6" as well as customer support, product guides, and instructional videos relating to the use of Defendants' Wi-Fi 6 products in an infringing manner. *See* (Dkt. No. 339 at 16-17 (collecting evidence adduced at trial regarding such material)). As the Federal Circuit in *Ericsson* noted, "[q]uestions of intent are quintessential jury questions." *Ericsson, Inc.*, 773 F.3d at 1222; *see also Allen Organ Co. v. Kimball Int'l, Inc.*, 839 F.2d 1556, 1567 (Fed.Cir.1988) ("Intent is a factual determination particularly within the province of the trier of fact."). As such, and like the Federal Circuit in *Ericsson*, this Court "cannot say that the jury did not have substantial evidence to find induced infringement and [the Court] decline[s] to supplant the jury's factual findings with [its] own." *Id.*[10]

---

[10] The Court notes that while Defendants moved for judgment as a matter of law of no induced infringement "either before or after the complaint was filed" in this present JMOL Motion (Dkt. No. 331 at 16), they only moved for judgment as a matter of law of no *pre-suit* induced infringement in their Rule 50(a) motion:

> THE COURT: All right. Let's move to the third ground identified by Defendants, which I believe was ***no pre-suit induced infringement***?
> MR. SAUL: Yes, Your Honor.
> THE COURT: Let me hear from Defendant on that.
> MR. SAUL: Your Honor, no reasonable jury could find based on the evidence presented at trial that Defendants have induced infringement of any asserted claim ***prior to the date this lawsuit was filed***. Specifically, there was no evidence presented at trial that the three pre-suit notice letters Plaintiff sent to TP-Link USA Corporation were received by either of the Defendants such that they might confer pre-suit notice, or that Defendants were willfully blind to the asserted patents. Again, this is Plaintiff's burden. There was no evidence presented that the two Defendants in this case, TP-Link Technologies and TP-Link Corporation, were aware of those letters.

(Dkt. No. 319 at 959:21 – 960:13 (emphasis added)). Defendants did not a make Rule 50(a) motion regarding post-suit induced infringement. As such, even though Defendants' arguments fail on the merits, the Court notes that Defendants also waived any argument specific to ***post-suit*** induced infringement by failing to raise it in a Rule 50(a) motion.

### H.  Whether the Defendants Are Entitled to JMOL of No Damages

Defendants argue that "[n]o reasonable jury could find that the damages amount proffered by Atlas's expert at trial was supported by evidence and consistent with the Court's instructions." (Dkt. No. 331 at 16). Specifically, Defendants explain that "Atlas's purported FRAND damages model is based on four discounts Atlas allegedly applies when licensing its entire Wi-Fi 6 patent portfolio: litigation stage discount, early adopter discount, fully paid-up discount and volume discount," however, "Atlas's damages expert Mr. Weinstein at trial . . . opined that Defendants were not entitled to three of the discounts at the time of hypothetical negotiation in 2019 because Defendants elected to defend themselves at a trial conducted many years later." (*Id.* at 16-17). Defendants conclude that "Atlas's argument contravenes long-standing Federal Circuit law that (1) the hypothetical negotiation occurs before infringement begins (not during the middle of trial as Mr. Weinstein's opinion supposes); and (2) the real-world willingness of the parties to license cannot be considered in the hypothetical negotiation." (*Id.* at 17).

In response, Plaintiff argues that "Defendants' assertion that Mr. Weinstein's opinions are inconsistent with the assumptions of the hypothetical negotiation framework are quintessential challenges to his methodology," and that such methodological challenges "are not appropriate for JMOL." (Dkt. No. 339 at 18 (citing *Finesse Wireless LLC v. AT&T Mobility LLC*, 2023 WL 5612448, at *6 (E.D. Tex. Aug. 30, 2023))).

The Court agrees with Plaintiff. In *Versata*, the Federal Circuit addressed two arguments on appeal "relate[d] to the methodology used by Versata's expert," including that it was "inconsistent with sound economic principles . . . [and] should have been excluded from evidence" and that the expert "did not adhere to the *Panduit* framework because he used multiple markets thereby rendering his analysis legally defective." *Versata*, 717 F.3d at 1264. The Federal Circuit "reject[ed] these two arguments as improperly raised," stating the following:

Under the guise of sufficiency of the evidence, SAP questions the admissibility of Versata's expert testimony and whether his damages model is properly tied to the facts of the case. Such questions should be resolved under the framework of the Federal Rules of Evidence and through a challenge under *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

*Id.* The Federal Circuit noted that appellant's "briefs and statements at oral argument confirm that its arguments should have been resolved under the framework of *Daubert* and the Federal Rules of Evidence," including that appellant argued that "[the expert's] analysis is 'legally defective.'" (*Id.* (citing appellant's brief)). As a result, the Federal Circuit held:

Whether evidence is inadmissible is a question clearly within the scope of the rules of evidence and *Daubert.* However, SAP has not appealed a *Daubert* ruling. Instead, it argues that the jury could have not had sufficient evidence to award lost profits because the expert's testimony was fatally flawed and should not have been admitted. This is the improper context for deciding questions that, by SAP's own admissions, boil down to the admissibility of evidence.

(*Id.*)

Like the appellant in *Versata*, Defendants make a belated and improper *Daubert* challenge to Mr. Weinstein's methodology "[u]nder the guise of sufficiency of the evidence." (*Id.*). As in *Versata*, Defendants' challenge is principally to Mr. Weinstein's methodology, not to the sufficiency of the evidence. *See, e.g.*, (Dkt. No. 331 at 17 (arguing that "Atlas's [damages model] contravenes long-standing Federal Circuit law" and that "Atlas's expert cannot use such evidence to vitiate the central premises of the Georgia-Pacific hypothetical negotiation"), 19 (arguing that "Atlas's damages model assumes without justification that its late-arising discounts would have been part of the hypothetical negotiation"), 20 (arguing that "in contravention of the hypothetical negotiation construct mandated under Georgia-Pacific, Atlas's damages expert Mr. Weinstein did not assume that Defendants were willing licensees in 2019," and referring to "***Mr. Weinstein's erroneous theory***") (emphasis added). Indeed, that Defendants present challenge rests on the

argument that Mr. Weinstein's damages model is legally defective is best summed up by
Defendants' own conclusion:

> In sum, allowing the jury verdict to stand here would upend the basic premises
> of the hypothetical negotiation, as Atlas's and ***Mr. Weinstein's damages model***
> (adopted by the jury) expressly charges Defendants a higher royalty because
> there was no settlement before trial. ***Such a model*** (and jury award) ***cannot be
> reconciled with the requirements under Georgia-Pacific*** that in January 2019
> (1) the Parties were a "willing licensor" and a "willing licensee," and (2) an
> agreement is "successfully negotiated . . . just before infringement began."

(*Id.* at 22).

As in *Versata*, Defendants' arguments are premised on the notion that Mr. Weinstein's

damages model is "legally defective." *Versata*, 717 F.3d at 1264. Such arguments are properly

considered at the *Daubert* stage, not for the first time on a motion for JMOL after the jury has

returned its verdict. *See Versata*, 717 F.3d at 1264 (stating that questions regarding "whether [the

expert's] damages model is properly tied to the facts of the case . . . should be resolved under the

framework of the Federal Rules of Evidence and through a challenge under *Daubert*"); *Finesse

Wireless LLC*, 2023 WL 5612448, at *3 ("[C]hallenges to [] methodology and are not

appropriately addressed at the JMOL stage."). To allow Defendants to raise this argument after the

trial would throw a wrench into the orderly, timely, and ideally final resolution of parties' disputes.

The time to raise an issue with an expert's methodology is *before* that testimony is presented to

the jury, not after the jury has returned an unfavorable verdict. This timeline helps ensure that the

parties', the jury's, and the Court's time and effort are not expended assessing testimony that one

side believes should be excluded as counter to the law. Given that Defendants raise their issues

with Mr. Weinstein's methodology (and his application of the same) for the first time in their Rule

50(b) motion, the Court finds that such arguments are waived.[11]

## I. Whether Mr. Weinstein's 79-Cent Royalty Was Supported by the Evidence or Violated Apportionment Requirements

Defendants argue that "Mr. Weinstein's cursory apportionment testimony is insufficient to support the enormously high royalty rate he presented to the jury." (Dkt. No. 331 at 22). Specifically, Defendants contend that (1) "Mr. Weinstein gave no explanation of how he arrived at his apportioned 79-cent royalty from his starting point of 92 cents per unit"; and (2) "Mr. Weinstein admitted that he failed to apportion for certain unpatented benefits, contrary to Supreme Court and Federal Circuit precedent." (*Id.* at 23).

Plaintiff disputes each of Defendants' apportionment arguments and additionally contends that said arguments were waived by Defendants as "[i]n their lone Rule 50(a) motion on damages, Defendants never argued—as they do now— that Mr. Weinstein failed to sufficiently explain his math or that he failed to apportion for certain unpatented features." (Dkt. No. 339 at 27 (citing Dkt. No. 319 at 966:22-24)). Rather, Plaintiff contends, Defendants "argued there was 'no basis *not* to apportion'—i.e., that Mr. Weinstein allegedly failed to perform any apportionment," which "is a

---

[11] The Court further notes that **Defendants** themselves presented testimony through **their own damages expert** that it was "up to the jury" to determine which discounts should be considered at the hypothetical negotiation:

> Q. And when the jury is evaluating the hypothetical negotiation, are they required to accept all the evidence that might be available during the hypothetical negotiation as relevant to that particular dispute?
> A. My understanding is it's up to them.
>
> Q. Would that include **whether the discounts should even be considered as part of the hypothetical negotiation**?
> A. Yes. That would fall -- **my understanding is that would be up to the jury**.
>
> Q. **If the jury decides they don't want to follow those discounts, they don't have to do so**. Is that correct?
> A. **That's my understanding**.

(Dkt. No. 319 at 939:12-23 (emphasis added)). Defendants' position now that "[n]o reasonable juror could have found that, at the time of the hypothetical negotiation in January 2019, Defendants would not have received Atlas's so-called pre-litigation and early-adopter discounts" (Dkt. No. 331 at 17) is difficult to square with what they themselves told the jury at trial.

different argument from the one they assert in their current Rule 50(b) motion," meaning "Defendants have therefore waived their current arguments." (*Id.* at 27-28).

The Court finds that Defendants' challenge regarding whether Mr. Weinstein properly apportioned the royalty rate was raised in their Rule 50(a) motion, preserving the issue. Having concluded that the issue is properly before the Court, the Court addresses each of Defendants' arguments in turn.

### 1. Whether the 79-Cent Royalty Rate Was Supported by the Evidence

Defendants contend that "Mr. Weinstein testified that he identified a 92-cent starting point of his apportionment analysis" but then "stated that he "subtract[ed] out for benefits in the portfolio that are not part of this case. And that's how we got from the 92 cents down to the 79 cents." (Dkt. No. 331 at 22 (citing Dkt. No. 317 at 635:4-10)). Defendants argue that Mr. Weinstein "did not explain which benefits allegedly were taken out, the valuation of those benefits, or how they impacted the royalty rate," and that such a "conclusory claim" of apportionment "does not constitute substantial evidence from which the jury could have adopted Mr. Weinstein's royalty model and resulting damages number." (*Id.*)

In response, Plaintiff argues that "Mr. Weinstein testified that he started with the $0.92 undiscounted rate from Atlas's portfolio-wide licenses to limit the rate to the value of Atlas's patents," and "[t]hen, because the 'the five patents in this case do not provide a hundred percent of the functionality and the benefits that are contained in the entire patent portfolio,' Mr. Weinstein 'subtracted out for that functionality that's not part of this case' to limit the rate to the value of the asserted patents, yielding a rate of $0.79." (Dkt. No. 339 at 28 (citing Dkt. No. 317 at 633:11–17, 634:3–6. 632:17–633:10, 633:11–17, 634:3–6, 634:7–635:10)). Plaintiff notes that "[t]he benefits and values of the same that Mr. Weinstein used for his apportionment are set out in JX30":

| Benefit of Wi-Fi 6 Relative to Wi-Fi 5 | Quantitative Multiplier |
|---|---|
| **OFDMA** | |
| 1.  Speed: Measured by downlink throughput gains | 1.40 |
| 2.  Speed: Measured by uplink throughput gains | 2.20 - 3.00 |
| 3.  Speed: Measured by improvement in goodput for outdoor coverage from OFDMA | 4.60 |
| 4.  Speed: Theoretical improvement in throughput | 6.00 |
| 5.  Coverage: Measured by increased outdoor linear coverage range from OFDMA | 1.67 |
| 6.  Coverage: Measured by increased outdoor coverage area from ODFMA | 2.79 |
| 7.  Efficiency: Measured by reduced average upload time from scheduling efficiency | 1.80 - 2.70 |
| **Beamforming** | |
| 8.  Coverage: Measured by increased coverage range from beamforming | 2.00 |
| 9.  Coverage: Measured by increased coverage area from beamforming | 4.00 |
| **BSS Coloring** | |
| 10.  Efficiency: Measured by improvement in BSS throughput during color filtering | 1.49 |
| **Midamble** | |
| 11.  Speed: Measured by improvement in goodput for outdoor coverage from use of midamble | 7.00 - 9.00 |

(*Id.* (excerpting JX30 at 5346)). Plaintiff further notes that "Dr. Shoemake [(Plaintiff's technical expert)] [] testified that three of the eleven multipliers, relating to BSS coloring (at line 10) and midambles (at line 11 and line 3), are not enabled by the Asserted Patents—a point he conveyed to Mr. Weinstein for purposes of Mr. Weinstein's analysis," and that it "is the value of those benefits that Mr. Weinstein 'subtract[ed] out' to arrive at his apportioned rate." (*Id.* at 29 (Dkt. No. 315 at 421:4–427:15; Dkt. No. 317 at 633:11–17, 634:14–635:10)). As such, Plaintiff concludes that substantial evidence supports the damages verdict and JMOL is inappropriate. (*Id.*).

In reply, Defendants argue that (1) "there was no testimony from Dr. Shoemake that he analyzed the more than one hundred additional patents in Atlas's portfolio and weighed the relative contribution of the five patents at issue"; and (2) "Mr. Weinstein failed to explain how JX30 (or any other evidence) justified such a tiny apportionment (from 92 to 79 cents), despite Dr. Shoemake's admission that less than 5% of the portfolio patents were being asserted in the litigation." (Dkt. No. 343 at 10 (citing Dkt. No. 317 at 560:3-8)).

In sur-reply, Plaintiff argues that Dr. Shoemake "unequivocally testified he had reviewed other patents, that other patents 'enable [] benefits' that are not covered here, and the Asserted Patents are key drivers of certain benefits compared to other patents in the portfolio." (Dkt. No. 346 at 10 (citing Dkt. No. 315 at 427:9–11, 427:12–15, 423:21–424:4)). Plaintiff contends that Defendants ignore all of the evidence cited and simply "ask the Court to adopt their expert's apportionment methodology—counting patents," but "expert disputes are for the jury." (*Id.*)

The Court agrees with Plaintiff. Defendants essentially take issue with Mr. Weinstein's apportionment analysis because he did not assume that all patents in Atlas's patent portfolio were of equal (or similar) value—a position taken by Defendants' expert at trial and already raised in Defendants' *Daubert* motion against Mr. Weinstein (Dkt. No. 201) and rejected by Court (Dkt. Nos. 267, 291). It is for the jury to decide which expert to believe when competing apportionment methods are applied, and in this instance, the jury believed Mr. Weinstein. That Mr. Weinstein did not follow the same apportionment methodology as Defendants' expert does not provide a basis to disturb the jury's verdict where it is otherwise supported by substantial evidence.

### 2. Whether Mr. Weinstein Failed to Properly Apportion for Unpatented Features

Defendants first contend that "Mr. Weinstein conceded that [] purported Wi-Fi 6 benefits are at least partially attributable to features not covered by any asserted patent claim, including BSS color, TWT, and 1024 QAM," and that "Mr. Weinstein did not assign any deductions for 1024 QAM or TWT, and he did not apportion them at all from his royalty rate." (*Id.* at 24 (citing Dkt. No. 317 at 682:11-21, 683:10–685:22)). Defendants further argue that "Mr. Weinstein did not seek to identify whether any other patents in the portfolio, beyond those asserted, contributed to the features he asserted were valuable," and "[t]herefore, there can be no dispute that Mr. Weinstein's damages model . . . was overstated and inadequately apportioned." (*Id.*)

In response, Plaintiff first argues that Defendants' arguments go to Mr. Weinstein's methodology, which are not appropriate for JMOL. (Dkt. No. 339 at 29-30). Further, Plaintiff contends that "Mr. Weinstein did not make any deductions for the other Wi-Fi 6 features Defendants now highlight (1024 QAM and target wake time) for a simple reason: the Atlas portfolio does not have any patents that relate to these technologies," and "Defendants' damages expert admitted as much." (*Id.* at 30 (citing Dkt. No. 319 at 934:3-20)). As such, Plaintiff notes that "[b]ecause the $0.92 undiscounted rate from Atlas's portfolio-wide licenses does not include the value of these technologies, no deduction needs to be made." (*Id.*). As to Defendants' second argument, Plaintiff notes that "Mr. Weinstein—relying on Dr. Shoemake—testified that the Asserted Patents are the 'key drivers' of such features, compared to the other patents in portfolio, which is why further apportionment was not necessary," and that "Defendants never impeached this testimony or presented any contrary testimony." (*Id.* (citing Dkt. No. 317 at 633:18–634:2 (Weinstein testimony); Dkt. No. 315 at 423:21–424:4 (Shoemake testimony))).

In reply, Defendants argue that Plaintiff's response underscores the issue, namely that "[t]he purported Wi-Fi 6 standard benefits that Mr. Weinstein attributes to Atlas's portfolio and uses to determine his starting rate of 92 cents for the entire portfolio—faster speed, more convenience, and higher efficiency—are also attributable to a host of unpatented features in the 802.11ax standard such as 1024 QAM and target wake time." (Dkt. No. 343 at 10). As such, conclude Defendants, "Mr. Weinstein's failure to apportion out the contribution of those unpatented features renders the jury's adoption of Mr. Weinstein's damages opinion unsustainable as a matter of law." (*Id.*).

In sur-reply, Plaintiff argues that Defendants "continues [*sic*] to misunderstand Mr. Weinstein's methodology," as "Mr. Weinstein's royalty rate starts with the $0.92 undiscounted

rate <u>from Atlas licenses</u>, which limits the rate to the value of Atlas's patents." (Dkt. No. 346 at 10). As such, Plaintiff concludes that "[b]ecause the $0.92 starting point comes from licenses to Atlas's patents and is limited to the value of those patents, there was zero reason to apportion for features that were not valued in the rate in the first place." (*Id.*).

The Court agrees with Plaintiff. As an initial matter, Defendants bring a belated challenge to Mr. Weinstein's methodology, which is an issue suitable to *Daubert* but not JMOL. *See Finesse Wireless LLC*, 2023 WL 5612448, at *3 ("[C]hallenges to [] methodology and are not appropriately addressed at the JMOL stage."). Moreover, as discussed in the preceding section, Defendants previously sought to exclude Mr. Weinstein's opinions on the basis that he failed to apportion the $0.92 rate lower because only a subset of Atlas's patent portfolio is at issue in this case. *See* (Dkt. No. 201 at 4-7 (section titled, "The $0.92 Portfolio Rate Should Be Excluded as Mr. Weinstein Fails To Properly Apportion the Rate To Account for the Fact that Just Seven Patents from the 133+ Patent Portfolio Are Asserted."). The Court has already rejected that argument (Dkt. Nos. Dkt. Nos. 267, 291), and a request for JMOL after the jury's verdict is not an appropriate time to re-urge *Daubert* arguments. *See Optis Wireless Tech.*, No. 2:19-cv-00066-JRG, Dkt. No. 740 ("[I]t is improper to use a JMOL motion . . . as a renewed *Daubert* challenge."); *Rembrandt Wireless Techs.*, 2016 WL 362540, at *3–4; *see also Versata*, 717 F.3d at 1264 (stating that raising *Daubert*-type issues in the context of post-trial rulings "is the improper context for deciding questions that . . . boil down to the admissibility of evidence"). As such, the Court once again rejects Defendants' *Daubert* argument on the same basis.

As to Defendants' argument that "Mr. Weinstein did not assign any deductions for 1024 QAM or TWT, and he did not apportion them at all from his royalty rate," Defendants' own expert (in addition to Mr. Weinstein) testified that those features were not included in the $0.92 royalty

rate in the first place:

> Q. [Mr. Weinstein's] damages analysis starts with Atlas' licenses. Right?
> A. That's fair.
>
> Q. And those licenses are licensees only paying for Atlas' portfolio. Right?
> A. Yes, that's fair. It's very close.
>
> Q. There is -- the other features that we've been hearing about in WiFi 6 that Atlas admits are not part of its portfolio are not being paid for in those licenses. Right?
> A. That's accurate, yes.
>
> Q. So *1024 QAM is not part of the basis of those licenses*, is it?
> A. *Not of the licenses, no*.
>
> Q. And Atlas admits that. Right?
> A. Oh, I think so. I'd defer to them, but that sounds right.
>
> Q. And *TWT, target wake time*, *that's not part of the licenses* and Atlas isn't trying to claim that. Right?
> A. Atlas does not claim to have invented TWT is right, *yes*.

(Dkt. No. 319 at 934:3-20 (emphasis added)). It is undisputed that the $0.92 undiscounted royalty rate comes from licenses to Plaintiff's patents and is limited to the value of those patents, which do not include the 1024 QAM or TWT features. As such, the Court sees no error in Mr. Weinstein not apportioning the $0.92 royalty rate for those features. Indeed, it makes no sense to apportion for features that make up no part of the royalty rate in the first place. Accordingly, the Court finds that substantial evidence supports the jury's damages findings.

## III.     DISCUSSION: JOINT MOTION TO AMEND (DKT. NO. 328)

In the Joint Motion to Amend, the parties make two requests. First, "Atlas moves the Court to amend the judgment to state the amount of pre-judgment interest is $3,851,202." (Dkt. No. 328 at 1). The parties explain that "[a]fter the Court entered judgment [including an award of pre-judgment interest to Plaintiff], Atlas provided TP-Link a calculation of pre-judgment interest

applying the Court's instructions" and "TP-Link has agreed to that calculation of interest and does not oppose the relief requested." (*Id.* at 2). Second, Defendants request that "the judgment should be amended to state that the jury found that Defendants 'infringed one or more' of the Asserted Claims" instead of "infringed <u>all</u> of the Asserted claims" to match the jury's response on the verdict form. (*Id.*). Plaintiff does not oppose the relief requested. (*Id.*).

Having considered the Joint Motion to Amend, and noting its joint nature and for good cause shown, the Court finds that it should be and hereby is **GRANTED**. The Court shall enter an amended final judgment reflecting these agreed amendments.

## IV.    CONCLUSION

Having considered the Motion for New Trial and the JMOL Motion, and for the reasons stated herein, the Court finds that they should be and hereby are **DENIED**. Having considered the Joint Motion to Amend, the Court finds that it should be and hereby is **GRANTED**. The parties are directed to jointly prepare a redacted version of this Memorandum Opinion and Order for public viewing and to file the same on the Court's docket as an attachment to a Notice of Redaction within five (5) business days.

**So ORDERED and SIGNED this 3rd day of September, 2024.**

RODNEY  GILSTRAP
UNITED STATES DISTRICT JUDGE